# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:<br><br>WYNIT DISTRIBUTION, LLC, et. al.[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-[_____] ([___])<br><br>Joint Administration Pending |

## DECLARATION OF PETER A. RICHICHI
## IN SUPPORT OF CHAPTER 11 PETITIONS AND INITIAL MOTIONS

I, Peter A. Richichi, declare as follows:

1. I am the Chief Operating Officer of WYNIT Distribution, LLC, WD Navarre Distribution, LLC, WD Encore Software, LLC, WD Navarre Digital Services, LLC, WD Navarre Holdings, LLC, Wynit Holdings, Inc., and WD Navarre Canada, ULC. (collectively, "WYNIT" or the "Debtors").

2. I submit this declaration (the "Declaration") to assist this court and parties in interest in (a) understanding the Debtors' operations and capital structure; (b) understanding the circumstances related to the commencement of these chapter 11 cases; and (c) in support of: (i) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code filed on the date hereof (the "Petition Date"); and (ii) the relief requested by the Debtors in various initial motions filed with the Court along with the petitions for relief.

3. Based on my positions with the Debtors, and my experience with the companies, I am familiar with the day-to-day operations, business affairs, assets and liabilities, and books and

---

[1] The Debtors in these chapter 11 cases are the following: Wynit Distribution, LLC, WD Navarre Distribution, LLC, WD Encore Software, LLC, WD Navarre Digital Services, LLC, WD Navarre Holdings, LLC, Wynit Holdings, Inc., WD Navarre Canada, ULC.

CORE/9990000.2173/134884395.2

records of the Debtors. Except as otherwise indicated herein, all facts set forth in this Declaration are based on: (i) my personal knowledge of the Debtors' operations and finances; (ii) my years of experience in the Debtors' businesses; (iii) information supplied to me by other members of the Debtors' management or by the Debtors' advisors; (iv) information obtained from my review of relevant documents; and (v) information obtained from other sources relating to the Debtors' operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

4. On the date of this Declaration (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and a motion to procedurally consolidate their respective chapter 11 cases (the "Cases") for administrative purposes only. The Debtors are continuing to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee of creditors has been appointed in the Cases.

A. **HISTORY, OPERATIONS, AND EVENTS LEADING TO THE FILINGS**

5. WYNIT was founded in 1987 and, in the years following, grew into a leading distributor of consumer electronics and accessories, photography and video equipment, specialty printing products, and emerging technology products. WYNIT historically served a wide base of customers ranging from large national retailers, so-called "e-tailers," independent retailers and commercial technology resellers

6. WYNIT functioned as a "middle man" in the retail supply chain. In terms of the services and value offered to customers, among other things, WYNIT: (i) purchased or

consigned products from manufacturers and stored them in large warehouses and distribution facilities until retailers needed such products in their inventory; (ii) managed transportation issues by collaborating with retailers to ensure goods were shipped at the appropriate time to meet demand but avoid the accrual of excess inventory; and (iii) analyzed market demand information and collaborated with retailers to develop related strategies. The companies' Encore division continues to operate as a software developer, publisher, and reseller.

7. On a daily basis, WYNIT delivered millions of dollars of product manufactured by more than 300 well-known brands to thousands of resellers across the United States and parts of Canada. WYNIT executed on these operational objectives through corporate offices located in Greenville, South Carolina, Eden Prairie, Minnesota, Bentonville, AR and Mississauga, Ontario, and warehouses and distribution centers located in Tennessee, Nevada, and Ontario. In fiscal year 2016, on a consolidated basis, WYNIT generated approximately $1.105 billion in gross revenue and approximately $18.109 million in EBITDA.

8. The primary factors giving rise to these chapter 11 filings were a slower-than-expected holiday season in 2016 and the companies' inability to secure anticipated, supplemental financing.

9. The majority of WYNIT's revenue comes from sale of product to national retailers. The retail sector is undergoing significant changes and experiencing financial stress and the market relating to technology-related products is particularly volatile given competitive pressures and the rapid rate at which such products develop and evolve. As a supplier to the retail industry with a significant focus on technology driven products, WYNIT has been directly impacted by these factors. Doing business with national retailers in the US and Canada is a difficult and complex process. Accounts receivable management is very challenging as the AR

team is required to reconcile thousands of transactions with promotional activity, pricing changes, merchandising allowances and a host of other deductions taken from the retailers which are subsequently passed on to the company's suppliers for reimbursement. Due to a number of factors including bringing a new Chief Financial Officer up to speed and relocating our corporate headquarters, including all accounting and finance functions, from Syracuse, NY to Greenville SC cash application fell behind slowing the cash conversion cycle putting pressure on accounts payable.

10.     Each calendar year, in or around August or September, WYNIT completed an analysis to determine which products it would purchase, and in what amounts it would purchase them, in advance of the retail holiday season. WYNIT's largest supplier ("Supplier A"), which was responsible for 34% (or $377 million) of WYNIT's revenues in FY2016, manufactures a popular consumer electronic product. In the fall of 2016, WYNIT completed a market analysis and projections relating to Supplier A's products with Supplier A's assistance and input. Based on that collective forecast for the holiday selling season, WYNIT's inventory of this particular product was $62 million in November 2016.

11.     Supplier A's actual sales for the company's first fiscal quarter (Nov-Jan) were over $60 million behind expectation and an additional $35 million off in fiscal Q2, for a six month total shortfall of over $95 million which had a materially negative impact on WYNIT's finances. Just before Thanksgiving in 2016, Supplier A projected fourth quarter sales revenues to Wall Street in the range of $725 million to $750 million, but its actual fourth quarter sales, as reported in February 2017, were just $576 million a shortfall of over 30%.

12.     Despite this development, WYNIT's management was able to make the company cash flow and service primary secured debt obligations through the first several months of 2017.

4

In or around May 2017, Supplier A informed WYNIT that it would not supply any further product to WYNIT without securing a second lien on all of WYNIT's assets. This raised a large-scale, potential cash flow issue for WYNIT because WYNIT required ongoing receipt of inventory to create the collateral needed to generate working capital availability on its primary asset based loan facility. WYNIT discussed the possibility of granting a second lien to Supplier A with its secured lender and, in addition, began exploring the possibility of obtaining a supplemental, mezzanine credit facility that would allow it to continue operations without violating existing loan covenants.

13.    After discussions with Supplier A to ship product without the second security position stagnated, and after obtaining approvals from its secured lender, WYNIT executed a security agreement on June 12, 2017, that purports to provide Supplier A with a subordinated lien on WYNIT's assets. Supplier A filed a related UCC financing statement on June 16, 2017. WYNIT believed that providing Supplier A with a signed security agreement would lead to the shipment of additional product from Supplier A. Although some product was received after June 16, 2017, due to the length of time it took to come to an agreement with Supplier A and the resulting pressure on WYNIT's borrowing base, cash availability became increasingly tight. WYNIT attempted to negotiate an alternative plan with Supplier A, but was not able to negotiate agreeable terms.

14.    In the face of these challenges, WYNIT returned to discussions with potential mezzanine lenders and such discussions went very well. On August 2, 2017, WYNIT obtained a term sheet from Great Rock Capital for a supplemental credit facility in the amount of $12 million (the "Great Rock Facility") and Great Rock accepted a $75,000 deposit from WYNIT. WYNIT's primary secured lender was prepared to sign off on the terms of the Great Rock

CORE/9990000.2173/134884395.2

Facility and, as of August 21, 2017, WYNIT was confident that (i) it would close on the Great Rock Facility, (ii) the companies would thus be in a position to cash flow through the fall of 2017, and (iii) WYNIT would be current, or close to current, with the vast majority of vendors coming out of the holiday season. Based on past experience, if that scenario took place, we believed strongly that the company would be in a position to continue operating indefinitely.

15. At a meeting with its primary secured lender on August 22, 2017, WYNIT was informed for the first time that it could not enter the credit agreement with Great Rock Capital unless Supplier A moved aside and allowed Great Rock into a second secured position. That afternoon, the WYNIT leadership spoke with Supplier A about the situation. Each option proposed by Supplier A would have nullified entirely any positive impact resulting from the infusion of new capital from Great Rock. Upon further analysis, WYNIT determined that a compromise with Supplier A was either not possible, or that any resolution would take too much time to avoid irreparable harm to the company.

16. After careful consideration of available options, and consultation with counsel, on August 24, 2017, WYNIT determined that, without the Great Rock Facility in place, it could no longer operate. At approximately 1:00 p.m. Eastern Time on that same date, WYNIT stopped issuing purchase orders and stopped accepting supplier deliveries of goods titled to other parties to its warehouses. In addition, to preserve as much value as possible for its creditors, WYNIT undertook the difficult step of terminating more than 200 employees.

17. As a result of the cessation of primary operations in South Carolina and elsewhere, most material domestic, commercial operations are now located in Eden Prairie, Minnesota. Minimal warehouse activity continues at distribution centers located in Memphis, Tennessee, McCarran, Nevada, and Mississauga, Ontario. Operations in Eden Prairie relate to

the Encore division of the companies that focuses specifically on the development, distribution, publishing, and resale of software products.

18.    As explained in more detail below, WYNIT's intent is to maintain operations in Eden Prairie, Minnesota throughout the duration of these cases and to sell its Encore division as a stand-alone, going concern. WYNIT further intends to use the bankruptcy process to liquidate approximately $90.5 million of inventory currently in warehouses and collect approximately $108 million in outstanding accounts receivable in a manner that preserves maximum value for all creditors.

19.    A large percentage of the inventory in WYNIT's possession consists of technology or software-based consumer goods. Because such goods have a "shelf life" driven by the rapid evolution of existing products and the rapid development of new products, to preserve value for WYNIT's creditors, it will be critically important to liquidate WYNIT's inventory as quickly as reasonably possible. WYNIT's inventory will also have more value to retailers if it can be sold, shipped, and incorporated into retailer inventories before the 2017 holiday retail season commences in earnest.

**B.    CORPORATE STRUCTURE**

20.    As mentioned above, the first WYNIT entity was established in 1987. WYNIT Distribution, LLC, the primary operating company in these cases, was formed as a New York limited liability company in 2011. In July 2014, WYNIT Distribution, LLC acquired Navarre – a distribution company based in Eden Prairie, Minnesota, that also served the retail industry WYNIT formed the various "WD Navarre" entities in the wake of that acquisition.

21.    WYNIT's corporate ownership is structured as follows:

      a.    WYNIT Distribution, LLC was formerly the Debtors' primary operating entity and is the ultimate parent company of all Debtors relevant to domestic operations.

      b.    WD Navarre Holdings, LLC is a wholly-owned subsidiary of WYNIT Distribution, LLC. The entity does not have any operations or hold assets other than ownership interests in three downstream entities. Those three entities are:

          i.    WD Navarre Digital Services, LLC, is a wholly-owned subsidiary of WD Navarre Holdings, LLC. WD Navarre Digital Services, LLC houses the small portion of the Debtors' operations relating to direct-to-consumer internet sales. WD Navarre Digital Services, LLC holds limited contractual rights and assets all of which relate to direct-to-consumer internet sales and such operations generate approximately $500,000 monthly in gross revenue.

          ii.    WD Encore Software, LLC, is a wholly-owned subsidiary of WD Navarre Holdings, LLC. WD Encore Software, LLC, houses operations relating to the legacy Navarre software and product distribution entity acquired by WYNIT in 2014. WD Encore Software, LLC, holds title to certain software and contract rights relating to that portion of WYNIT's operations.

          iii.    WD Navarre Distribution, LLC, is a wholly-owned subsidiary of WD Navarre Holdings, LLC. WD Navarre Distribution, LLC, holds limited contractual rights as well as title to a relatively small subset of the WYNIT entities' overall inventory. Such inventory relates specifically to the legacy Navarre software and product distribution entity acquired by WYNIT in 2014.

      c.    WYNIT Holdings, Inc. does not have any operations or hold assets other than its ownership interest in one downstream entity. That entity is:

    i. WD Navarre Canada, ULC is a wholly-owned subsidiary of WYNIT Holdings, Inc. WD Navarre Canada, ULC holds limited contractual rights as well as title to the subset of the WYNIT entities' overall inventory that is located in Canada.

22. An organizational chart is attached as **Exhibit A** to this Declaration.

23. All of the Debtors other than WYNIT Holdings, Inc. are direct borrowers under the Wells Facility described below and all of those Debtors' respective assets are cross-collateralized under the Wells Security Agreement (as defined below). WYNIT Holdings, Inc. is a guarantor of the other Debtors' obligations under the Wells Credit Agreement (as defined below).

## C. PRE-PETITION SECURED DEBT

24. Each of the Debtors other than WYNIT Holdings, Inc. is a borrower under a Credit Agreement, dated November 29, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Wells Credit Agreement"), under which Wells Fargo Capital Finance, as administrative agent for itself and other participating lenders (collectively, the "Lender Group"), has authority to act as secured lender. WYNIT Holdings, Inc. signed a guaranty of the other Debtors' obligations under the Wells Credit Agreement.

25. Each of the Debtors other than WYNIT Holdings, Inc. also executed a security agreement dated November 29, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Wells Security Agreement") in favor of the Lender Group to secure performance of terms and obligations arising under the Wells Credit Agreement and, under the Security Agreement, each signing Debtor granted Wells Fargo Capital Finance, for the benefit of itself and the Prepetition Senior Lenders, a first priority security interest in and continuing lien

9

on substantially all of each such Debtor's assets and property, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.

26. The Wells Credit Agreement provided WYNIT with a revolving, operating line of credit, subject to borrowing base restrictions and compliance with a host of other covenants, in an aggregate maximum principal amount of $250,000,000.00 (the "Wells Facility"). As of the Petition Date, the balance of the Wells Facility was $77,026,711.83.

27. In addition to the foregoing, on February 12, 2014, WYNIT Distribution, LLC, entered into an Inventory Financing Agreement with Wells Fargo Commercial Distribution Finance, LLC ("WFCDF"), that provided financing for the purchase of certain, specified inventory and, in exchange, WFCDF received, among other things, a first-priority, purchase money security interest in specific inventory purchased with the proceeds of its loan. As of August 29, 2017, the outstanding balance on WFCDF's line of credit was $10,356,227. After careful analysis, WYNIT Distribution, LLC, in consultation with its third-party financial advisor, concluded that the value of the inventory subject to WFCDF's purchase money security interest was nearly identical to the amount owed to WFCDF. As a result, WYNIT Distribution, LLC, entered into a Voluntary Surrender Agreement with WFCDF, and surrendered relevant inventory to WFCDF on September 5, 2017.

**D.  REAL PROPERTY**

28. The Debtors do not hold a fee interest in any real property, but they lease real property in seven locations as follows:

    a. WYNIT Distribution, LLC is the lessee of certain real property located in Greenville, South Carolina, that was historically used as corporate office space. The lease

10

has a ten year term, February 2016 through January 2026. The square footage of the leased property is 57,330, the monthly rent obligations are $127,565.26, and the landlord on the property is Greenville 1.1, LLC. The Debtors believes its rent obligations relating to this property to be substantially below market.

b.  WYNIT Distribution, LLC is the lessee of certain real property located in Memphis, Tennessee, that is used as warehouse space and to service distribution operations. The lease term ends on September 30, 2018. The square footage of the leased property is 250,000, the monthly rent obligations are $70,681.00, and the landlord on the property is Exeter 4550 Quality, LLC.

c.  WYNIT Distribution, LLC is the lessee of a second parcel of real property located in Memphis, Tennessee, that is also used as warehouse space and to service distribution operations. The lease term ends on September 30, 2018. The square footage of the leased property is 244,885.00, the monthly rent obligations are $84,550.00, and the landlord on the property is G&I VII Southpoint I & II LLC.

d.  WD Navarre Canada, ULC is the lessee of certain real property located in Mississauga, Ontario, that is used as warehouse space, to service distribution operations, and as corporate office space. The lease term ends on October 31, 2018, but has one, five-year renewal option. The square footage of the leased property is 61,219, the monthly rent obligations are $41,831.00 CAD, and the landlord on the property is Orlando Corporation.

e.  WD Navarre Distribution, LLC is the lessee of certain real property located in Eden Prairie, Minnesota, that is also used as corporate office space. The lease term ends on October 31, 2018. The square footage of the leased property is 13,686, the

monthly rent obligations are $23,393.58, and the landlord on the property is FR National Life, LLC.

f. WD Encore Software, LLC is the lessee of certain real property located in Cedar Rapids, Iowa, that was historically used as office space to support WYNIT's software support operations. The lease term is currently month-to-month. The square footage of the leased property is 3,087, the monthly rent obligations are $4,244.83, and the landlord on the property is Armstrong-Race Realty Company.

g. WYNIT Distribution, LLC is the lessee of certain real property located in Bentonville, Arkansas, that was historically used as office space to support WYNIT's sales operations. The lease term ends on February 28, 2019, and has automatic, three-year renewal options after each term, unless cancelled. The square footage of the leased property is 2,000, the monthly rent obligations are $2,731.82, and the landlord on the property is Benton-Mobly Partners, LLC.

### E. FIRST DAY MOTIONS

29. To enable the Debtors to minimize adverse effects of the commencement of these cases, the Debtors have requested various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions") filed concurrently with this Declaration.

30. I have reviewed the First Day Motions (including all related schedules and exhibits). The facts stated in this Declaration are true and correct to the best of my knowledge, information, and belief, and I believe the form of relief sought in each of the First Day Motions: (i) necessary to enable the Debtors to maintain asset values and conduct an orderly sale process(es); and (ii) essential to the maximization of the value of the Debtors' assets for the benefit of the Debtors' estates and creditors.

31.    It is my further belief that, with respect to those First Day Motions requesting authority to pay certain, limited prepetition claims, the relief requested is essential to the Debtors' efforts to preserve and maximize value in these cases and to avoid immediate and irreparable harm to the Debtors and their estates and creditors.

32.    I believe that any diminution in the limited relief requested in the First Day Motions could have an immediate and irreparable harmful impact on the value of the Debtors' assets to the detriment of all of the Debtors' stakeholders. The Debtors believe that payment of those selected prepetition claims identified in the First Day Motions will forestall such harm and that all creditors of the Debtors will ultimately benefit from the relief requested.

a.    **Sales of Assets**

33.    The Debtors intend to maintain operations in Eden Prairie, Minnesota, sell the Encore division that operates there as a stand-alone, going concern, liquidate approximately $90.5 million of inventory currently in its warehouses, collect as much as possible of approximately $108 million in outstanding accounts receivable, and maximize estate recoveries upon the sale of currently-unsold inventory that remains on the shelves of retailers.

34.    The Debtors intend to file a motion seeking authority to sell estate property outside the ordinary course of business (the "Sale Motion") within a week after the Petition Date. The Sale Motion will propose specific procedures and timelines relating to the liquidation of inventory. As noted previously, it will be essential to move as quickly as reasonably possible to sell the inventory at issue because its market value may fall quickly.

b.    **Post-Petition Financing**

35.    The Debtors are seeking interim approval of a post-petition credit facility on an expedited basis. WYNIT has an urgent and immediate need for the use of capital. WYNIT has

CORE/9990000.2173/134884395.2

not obtained post-petition financing and, unless interim access to the proposed post-petition loan facility is allowed as requested, it is my opinion that the companies will not be able to continue operations or to effectuate an orderly sale process(es) to maximize value for creditors.

36. On a consolidated basis, WYNIT continues to employ approximately 145 people. Without immediate access to a post-petition loan facility, WYNIT would be forced to immediately cease all operations and terminate all remaining employees, causing immediate and irreparable harm to these chapter 11 estates.

37. WYNIT requires immediate access to a post-petition loan facility to continue operations at its Eden Prairie facility. An operating distribution company that retains knowledgeable and experienced employees, and that continues to generate ongoing revenues and preserve existing customer goodwill, is significantly more valuable than a non-operational distribution company. Without access to capital, WYNIT will be unable to meet its post-petition obligations and will be unable to fund working capital needs, thus causing irreparable harm to the value of substantial assets in the Debtors' estates. Thus, to preserve and maximize going concern value, WYNIT urges the Court to approve the Debtors' Motion to Approve Interim Debtor-in-Possession Financing.

    c. **Use of Existing Bank Accounts and Cash Management System**

38. The Debtors have filed a motion (the "Bank Accounts Motion") asking for authority to continue use of their existing bank accounts and their cash management system, and other related relief, on an expedited basis.

39. A description of the Debtors' bank accounts, and their cash management system, is set out in the related motion. I have reviewed those descriptions and they are accurate to the best of my knowledge and belief.

CORE/9990000.2173/134884395.2

40. I have been advised that Chapter 11 debtors are generally required to:

   a. close all existing Bank Accounts and open new debtor-in-possession Bank Accounts;

   b. establish one debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes;

   c. maintain a separate debtor-in-possession account for cash collateral; and

   d. obtain checks for all debtor-in-possession Bank Accounts bearing the designation "Debtor in Possession," the bankruptcy case number, and the type of account.

41. As I understand it, these requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, help to protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

42. To avoid delays in payments to administrative creditors, to ensure as smooth a transition into Chapter 11 as possible with minimal disruption, and to aid in the Debtors' efforts to complete successful reorganization, I believe it is important that the Debtors be permitted to continue to maintain its existing bank accounts, with the same account numbers, following the commencement of this case, subject to a prohibition against honoring checks issued or dated before the Petition Date absent a prior order of the Court allowing such action.

43. It is my belief that, by preserving business continuity and avoiding the disruption and delay to the Debtors' disbursement obligations that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers will be best served. In granting the relief requested in the Bank Accounts Motion, the benefit to the Debtors, their business operations, and all parties in interest will be considerable. The confusion that would result absent the relief requested would undermine the Debtors' efforts to maximize value for all creditors.

15

44. I further believe that the relief sought through the Bank Accounts Motion must be granted immediately to avoid irreparable harm. Without the relief sought, the Debtors could be forced to discontinue ongoing operations and stop other efforts necessary to maximize the value of the estate's assets. Any shutdown or delay in the Debtors' operations would damage relationships with customers and vendors, undermine employee confidence, and, at this critical juncture, further impair the Debtors' going-concern value.

### d.     Payment of Prepetition Wages and Benefits

45. The Debtors are asking the court for authority to (i) pay pre-petition wages to its employees that, absent the Debtors' bankruptcy filing, would be paid to employees in the ordinary course of business, (ii) maintain funding of employee benefit contributions, including its contributions to employee insurance and related programs, in the ordinary course of business; (iii) have its payroll provider and applicable financial institutions receive, process, honor, and pay any and all checks drawn to the extent that those checks or transfers relating to any of the foregoing, and provided that sufficient funds are immediately available and on deposit in the applicable accounts.

46. The Debtors further request that its payroll provider and all other financial institutions be authorized and directed to rely on the representations of the Debtors as to which checks, drafts, or wire transfers are in payment of the pre-petition wages.

47. As of the Petition Date, the Debtors owed employees for unpaid gross wages, commissions, benefits, salaries, payroll taxes (including, but not limited to, employer matching), reimbursements, and 401(k) contributions. Of this amount, the Debtors will owe approximately $181,554.10 for payroll taxes. Most, if not all of these amounts are attributable to pre-petition services provided by the Debtors' employees. The Debtor will only pay pre-petition wages to or

CORE/9990000.2173/134884395.2

on behalf of any employee up to the $12,850.00 limit set forth in § 507(a)(4) of the Bankruptcy Code.

48.  Employee morale and retention is critical to complete the liquidation of inventory assets, collect outstanding accounts receivable, and complete the sale of the Encore division as a going concern. Both will likely falter if the Debtors' remaining employees do not receive timely payment for their work. I understand that the employee payments at issue would qualify for priority status in any event and that, as a result, the only question raised by the wages and benefits motion is really about the timing of payment of employee claims. Many of our employees served the Debtors for years and they had no responsibility for the companies' financial challenges. These people should not be made to suffer further by waiting to receive one of their final (or in many cases, their final) pay checks.

49.  Cause also exists to grant the wages and benefits motion on an expedited basis. If the motion is not granted expeditiously, the Debtors' payroll schedule will be disrupted, the Debtors will be unable to fund timely wages and benefits that are critically important to their employees, and the Debtors' relationship with their remaining employees will be materially and irreparably damaged. If this occurs, the Debtors may be unable to retain important employees who remain vital to the winding down of the businesses or the successful going-concern sale of the Encore division.

e.  **Continuation of Insurance Programs**

50.  The Debtors ask the court for authority to continue their Insurance Programs on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date, including: (i) paying all amounts arising under the Insurance Programs or the financing thereof whether due and payable before or after the Petition Date; (ii) renewing or obtaining new insurance policies as needed in the ordinary course of business;

17

and (iii) authorizing applicable banks and other financial institutions to receive, process, honor, and pay any and all checks or electronic transfers used by the Debtors to pay the Debtors' insurance obligations.

51. The Debtors' motion regarding insurance programs should be heard on an expedited basis because any delay in paying the insurance obligations could cause the Debtors' insurance programs to lapse or terminate, thereby harming the Debtors' creditors and the estate.

### f. Continuation of Utilities

52. In connection with the operation of their businesses and management of their properties, the Debtors obtain utility services from several utilities. A list of utility providers is included as an exhibit to the Debtors' motion asking the court for authority to establish procedures for the continuation of utility services and to provide assurances of ongoing payment to utility providers.

53. During the past 12 months, the Debtors paid an average of approximately $137,651.87 per month on account of Utility Services. As of the Petition Date, the Debtors estimate that approximately $2,500.00 or less on account of prepetition utility services may be outstanding.

54. Uninterrupted utility services are essential to the Debtors' ongoing operations and the orderly liquidation of the Debtors' assets and, therefore, to the success of these proceedings. The Debtors operate multiple locations that contain millions of dollars' worth of inventory and that depend on the reliable delivery of power and other utility services, and because of the nature of the Debtors' operations, it is essential that utility services continue uninterrupted. Should any utility refuse or discontinue service, even for a brief period, the Debtors' operations could be severely disrupted and the value of assets in the estate could be severely and unnecessarily diminished. The impact of this disruption on the Debtors' operations and revenue, and the

CORE/9990000.2173/134884395.2

potential diminution of the safety and security of inventory within the Debtors' control, could be extremely harmful and could jeopardize the Debtors' efforts to maximize creditor recoveries.

55.  I believe that the Debtors' motion relating to utility services must be addressed on an expedited basis to avoid a material risk of immediate and irreparable harm.

### g.  Authority to Act as a Foreign Representative

56.  One of the Debtor entities, WD Navarre Canada ULC, is an unlimited liability company, registered in Nova Scotia, Canada. The Debtors are asking the Court to allow WYNIT Distribution, LLC, to act as the Foreign Representative for WD Navarre Canada ULC.

57.  WD Navarre Canada ULC is the lessee of certain real property located in Mississauga, Ontario, that is used as warehouse space, to service distribution operations, and as corporate office space. WD Navarre Canada ULC holds approximately $21 million in inventory in the warehouse located in Mississauga, Ontario, and that inventory will have to be administered in these cases.

58.  With the assistance of Canadian counsel, WD Navarre Canada ULC will, contemporaneously with the Debtor's chapter 11 filings, seek relief in Canada under the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36 (as amended). The purpose of proceeding will be to request that the Canadian court recognize the WD Navarre Canada ULC's chapter 11 filing, and the filings of the related Debtors in these cases, as "foreign main proceedings" under the applicable provisions of the CCAA to, among other things, protect the Debtors' assets and operations in Canada.

59.  To administer the Canadian Proceeding, WYNIT Distribution, LLC, requires authority to act as the "foreign representative" on behalf of the WD Navarre Canada ULC's estate. For this purpose, the Debtors ask the Court for authority to appoint WYNIT Distribution, LLC, as such Foreign Representative.

60. It is my belief that the motion seeking authority to act as a foreign representative must be addressed on an expedited basis. If expedited relief is not granted, the gap between the Debtors' chapter 11 filings and the Canadian filing could allow assets in Canada to be attached by foreign creditors. Without these foreign assets, the recovery for all creditors in these chapter 11 cases could be diminished materially.

61. Accordingly, for the reasons stated herein and in each of the First Day Motions, the Debtors request that the relief sought in the First Day Motions be granted.

I swear that the foregoing is true and accurate to the best of my knowledge and belief.

Dated: September 8, 2017

_____
Peter A. Richichi

CORE/9990000.2173/134884395.2