**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| In re: | Joint Administration Pending |
| WYNIT DISTRIBUTION, LLC, *et al.*[1]<br>Debtors. | Case No. 17-42726 |
| | Chapter 11 Cases |

**NOTICE OF HEARING AND MOTION FOR INTERIM AND FINAL ORDERS
GRANTING (I) AN EXPEDITED HEARING, (II) AUTHORITY TO (A) OBTAIN
POSTPETITION FACILITY, (B) USE CASH COLLATERAL, AND (C) PROVIDE
CERTAIN PROTECTIONS TO PREPETITION SENIOR LENDERS, AND
(III) RELATED RELIEF**

To:     The parties-in-interest as defined in Local Rule 9013-3(a)(2).

1.      The above-captioned debtors ("**Debtors**" or "**Wynit**") hereby move the Court for the relief set forth below and provide notice of the related hearing.

2.      The Court will hold an interim hearing on the above captioned motion (this "**Motion**") at 2:30 p.m. on September 13, 2017 in Courtroom 8 West, United States Court House, 300 South Forth Street, Minneapolis, MN 55415 (such interim hearing, the "**Interim Hearing**").

3.      The deadline to file a response to this motion is Wednesday September 23 at 8:00 AM.  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING**.

4.      The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334, and Rule 5005 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  This is a

---

[1]  The Debtors in these chapter 11 cases are the following:  Wynit Distribution, LLC (Case No. 17-2726), WD Navarre Distribution, LLC (Case No. 17-42728), WD Encore Software, LLC(Case No. 17-42729), WD Navarre Digital Services, LLC (Case No. 17-32865), WD Navarre Holdings, LLC (Case No. 17-32864), Wynit Holdings, Inc. (Case No. 17-32866), WD Navarre Canada, ULC (Case No. 17-32867).

core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant 28

U.S.C. §§ 1408 and 1409.  The petitions commencing these Chapter 11 cases were filed on

September 6, 2017 (the "**Petition Date**"), and the cases are now pending before this Court.

5.       This Motion arises under Sections 105, 361, 362, 363, 364, and 507 of Title 11 of

the United States Code (the "**Bankruptcy Code**") and Bankruptcy Rule 4001.  This Motion is

filed under Bankruptcy Rule 9013 and Local Rules 9013-2 and 9013-3.

6.       A detailed description of the Debtors and their operations, and the facts and

circumstances supporting this Motion and the Debtors' Chapter 11 cases, are set forth in greater

detail in the *Declaration of Peter A. Richichi in Support of Chapter 11 Petitions and Initial*

*Motions* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated by

reference herein.

7.       The Debtors are authorized to continue to operate their business and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these

chapter 11 cases.

## RELIEF REQUESTED

8.       By this Motion, the Debtors seek immediate access to Postpetition Facility in

order to continue to preserve the value of their assets and to effectuate a sale of substantially all

of their assets.  The Debtors' Prepetition Senior Lenders (as defined below) have agreed to

provide Postpetition Facility that will allow the Debtors to preserve and maximize the value of

their assets through an auction process (the "**Sale Process**").  The proposed Postpetition Facility

(as defined below) provides the Debtors with the necessary liquidity and time to implement the

Sale Process.

9.      The Debtors propose to enter into a senior secured postpetition revolving loan facility of up to $15,000,000 with certain of their prepetition first-lien lenders (the "**Postpetition Facility**") and to use cash collateral to fund their operations through the completion of the Sale Process.  The financing on the terms set forth in the *Senior Secured, Super Priority Debtor in Possession Credit Agreement*, substantially in the form attached hereto as **Exhibit A** (the "**Postpetition Credit Agreement**" and, together with all related credit documents, the "**Postpetition Loan Documents**"), the proposed interim order attached hereto as **Exhibit B** (the "**Interim Order**")[2], the initial budget attached to the Interim Order as Exhibit A (such budget, as modified pursuant to the terms of the Interim Order or any Final Order (as defined in the Interim Order), the "**Approved Budget**"), and the use of cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code) authorized under the Interim Order represents the best available interim solution to the Debtors' near-term liquidity needs.

10.      By this Motion, pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, the Debtors request entry of the Interim Order and a proposed final order to be filed with the Court (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**") in connection with the Final Hearing (as defined below), granting, among other things, the following relief:

> a.      authorizing the Debtors to obtain Postpetition Facility in an aggregate principal amount not to exceed $15,000,000 under the Postpetition Facility;

> b.      authorizing the Debtors to execute and enter into the Postpetition Loan Documents and to perform all such other and further acts as may be necessary or appropriate in connection with the Postpetition Loan Documents;

> c.      authorizing the Debtors to grant security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Interim Order.

Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code), to secure all obligations of the Debtors under and with respect to the Postpetition Facility;

       d.      authorizing the Debtors' limited use of Cash Collateral solely on the terms and conditions set forth in the Interim Order and in the Postpetition Loan Documents;

       e.      granting adequate protection to the Prepetition Senior Lenders (as defined in the Interim Order), whose liens and security interests are being primed by the Postpetition Facility;

       f.      modifying the automatic stay under section 362 of the Bankruptcy Code on the terms set forth herein to the extent necessary to implement the terms of the Postpetition Loan Documents and the DIP Orders;

       g.      waiver of any applicable stay (including a stay pursuant to Bankruptcy Rule 6004) with respect to the effectiveness or enforceability of the Interim Order; and

       h.      scheduling of a final hearing (the "**Final Hearing**") pursuant to Bankruptcy Rule 4001 to be held within 14 days following the entry of the Interim Order to consider entry of the Final Order and to approve notice procedures with respect thereto.

## **RULE 4001 STATEMENT**

11.      In compliance with Local Rule 4001-2(a), attached as **Exhibit C** is the Approved Budget, which also contains the Debtors' cash flow projections; and attached as **Exhibit D** is a verified statement containing the initial borrowing base certificate submitted by Debtors to Postpetition Agent as the Debtors' calculation of its collateral base.

12.      Pursuant to Bankruptcy Rule 4001(b), (c), and (d) and Local Rule 4001-2(a), the following table summarizes the significant terms of the Interim Order and the Postpetition Loan Documents:

4

## SUMMARY OF THE POSTPETITION FACILITY

| | |
|---|---|
| **Borrowers**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Wynit Distribution, LLC, a New York limited liability company ("**US Parent**"), WD Navarre Distribution, LLC, a New York limited liability company ("**Navarre Distribution**"), WD Encore Software, LLC, a New York limited liability company ("**Encore Software**"), WD Navarre Digital Services, LLC, a New York limited liability company ("**Navarre Digital**"); WD Navarre Holdings, LLC, a New York limited liability company ("**Navarre Holdings**"); together with US Parent, Navarre Distribution, Encore Software, and Navarre Digital, individually, a "**US Borrower**", and collectively, "**US Borrowers**"), and WD Navarre Canada, ULC, a Nova Scotia unlimited liability company ("**Canadian Borrower**"; Canadian Borrower and US Borrowers, each individually, a "**Borrower**", and collectively, the "**Borrowers**").  *See* **Interim Order, Introduction; Postpetition Credit Agreement, Preamble**. |
| **Guarantors**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Wynit Holdings, Inc., a New York corporation ("**Canadian Parent**"); **Postpetition Credit Agreement, Recitals**. |
| **Postpetition Lenders**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Wells Fargo, Wells Fargo Capital Finance Corporation Canada, JPMorgan Chase Bank, N.A., JPMorgan Chase Bank, N.A. (Toronto Branch), SunTrust Bank, Bank of the West, City National Bank, a National Banking Association, and Webster Business Credit Corporation.  *See* **Interim Order, Introduction; Postpetition Credit Agreement, Signature Pages**. |
| **Postpetition Agent**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Wells Fargo.  *See* **Interim Order, Introduction; Postpetition Credit Agreement, Preamble.** |
| **Postpetition Facility**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Senior secured, super-priority revolving credit facility up to $15,000,000.  *See* **Interim Order, Introduction; Postpetition Credit Agreement, Recitals, § 2.1**. |
| **Borrowing Limits**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Maximum aggregate principal amount of Revolving Loans available under the Postpetition Credit Agreement of $15,000,000.<br><br>*See* **Interim Order, ¶ 7; Postpetition Credit Agreement, § 2.1**. |
| **Budget**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Borrowers must, at all times, be in Substantial Compliance with the Approved Budget.<br><br>Substantial Compliance means (a) with respect to the aggregate amount of expenditures shown in any Approved Budget for any one week period, an amount not to exceed 105% of the amount shown in the applicable Approved Budget for such period, and (b) with respect to Borrowers' aggregate income for any one week period shown in the applicable Approved Budget, an amount not less than 95% of the amount shown for such period.  *See* **Interim Order, ¶ 8; Postpetition Credit Agreement, § 7 and Definition of "Substantial Compliance"**. |
| **Use of DIP Proceeds**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The Debtors may use the proceeds of the Postpetition Facility and the Cash Collateral solely to:<br>    (i) pay outstanding Postpetition Obligations;<br>    (ii) make payments with respect to the Prepetition Senior Obligations; |

**SUMMARY OF THE POSTPETITION FACILITY**

| | |
|---|---|
| | (iii) pay the fees and transaction expenses associated with the closing of the transactions described in the Postpetition Credit Agreement; <br> (iv) fund the Chapter 11 Cases in accordance with the Approved Budget (subject to permitted variances based on the definition of "Substantial Compliance"); and <br> (v) make expenditures for the ongoing working capital requirements of the Debtors and for other general corporate purposes of the Debtors. <br><br> The Postpetition Agent and Postpetition Lenders have not consented to the use of any cash collateral or the proceeds of the Postpetition Facility to fund any employee retention plan.  Any such use proposed by the Debtors remains subject the Postpetition Agent's and Postpetition Lenders' review and prior consent. <br><br> *See* **Interim Order, ¶ 7; Postpetition Credit Agreement, § 6.11**. |
| **Interest Rates** <br> Fed. R. Bankr. P. 4001(c)(1)(B) | <u>Interest Rate</u>: 6.00 % (the "**Applicable Margin**") <u>plus</u> (A) as to US Revolving Loans, the greater of (i) the Postpetition Agent's publicly announced "prime rate"; and (ii) one-half of one percent per annum above the Federal Funds Rate, or (B) as to Canadian Revolving Loans, a rate per annum equal to the "prime rate" for Canadian Dollar commercial loans made in Canada as reported by Thomson Reuters under Reuters Instrument Code <CAPRIME=> on the "CA Prime Rate (Domestic Interest Rate) – Composite Display" page. <br> <u>Default Interest Rate</u>: 2.00% plus the applicable Interest Rate on such date. <br> *See* **Postpetition Credit Agreement, § 2.6**. |
| **Expenses and Fees** <br> Local Rule 4001-2(a)(3) | <u>Unused Line Fee.</u>  a monthly fee equal to 0.25% per annum of the amount by which the average unpaid balance of outstanding loans and letter of credit obligations for any calendar month is less than the $15,000,000 commitment under the Postpetition Facility. <br><br> <u>LC Facility Fees.</u> (i) a monthly fee equal to 7.00% on a per annum basis based on the average amount available to be drawn under the outstanding letters of credit and all letters of credit that are paid or expire during the period of measurement; and (ii) all customary charges associated with the issuance, amending, negotiating, payment, processing and administration of all letters of credit. <br><br> <u>Field Exam and Other Fees.</u> for field examinations, appraisals, and valuations fees and charges, as and when incurred or chargeable, as follows (i) a fee of $1,000 per day, per examiner, plus out-of-pocket expenses (including travel, meals, and lodging) for each field examination of any Borrower performed by personnel employed by the Postpetition Agent, and (ii) the fees or charges paid or incurred by the Postpetition Agent (but, in any event, no less than a charge of $1,000 per day, per person, plus out-of-pocket expenses (including travel, meals, and lodging)) if it elects to employ the services of one or more third persons to perform field examinations, to establish electronic collateral reporting systems, or to appraise the Collateral, or any portion thereof. <br><br> <u>Closing Fee.</u>  A closing fee equal to $150,000. <br><br> *See* **Interim Order, ¶ 6; Postpetition Credit Agreement, § 2.10**. |

| SUMMARY OF THE POSTPETITION FACILITY | |
|---|---|
| **Maturity Date**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | The earliest to occur of (i) December 7, 2017, (ii) the Commitment Termination Date ( as defined in the DIP Order), and (iii) the date on which the Postpetition Obligations (other than the Bank Product Obligations) become due and payable pursuant to the terms of the DIP Order, the Canadian DIP Orders (as defined in the Postpetition Credit Agreement) and the Postpetition Credit Agreement.  ***See* Interim Order, ¶ 4; Postpetition Credit Agreement, § 3.3**. |
| **Collateral and Priority**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B)(i) | First-priority priming lien on substantially all assets of the Debtors ***See* Interim Order, ¶¶ 9 and 10; Postpetition Credit Agreement, § 1.8**. |
| **Conditions to Closing**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | <u>For the initial credit extension</u>: (i)  delivery of executed Postpetition Loan Documents to the Postpetition Agent; (ii) DIP Order perfects the liens of the Postpetition Agent on the Collateral and there are no other liens on the Collateral except for those permitted by the Postpetition Credit Agreement; (iii) delivery of certified organizational documents of each Borrower to the Postpetition Agent; (iv) delivery of a borrowing base certificate to the Postpetition Agent; (v) all fees under the Postpetition Credit Agreement have been paid; (vi) if letters of credit are to be issued, the conditions required for their issuance are satisfied; (vii) Borrowers shall have effective insurance coverage satisfactory to the Postpetition Agent; (viii) all representations and warranties made by any Borrower shall be true and correct; and (ix)  the Interim Order shall have been entered by the Court and the Interim Oder shall be in full force and effect.<br><u>Upon each extension of credit</u>: (a) all representations and warranties set forth in the Postpetition Credit Agreement or the Postpetition Loan Documents; (b) the delivery of each borrowing base certificate then required by the Postpetition Credit Agreement; (c) if letters of credit are to be issued, the conditions required for their issuance are satisfied; (d) Substantial Compliance with the Approved Budget; (d) the absence of a Default or an Event of Default; (e) the continuing effectiveness of the Interim Order or Final Order, as applicable; and (f) as to any Canadian Revolving Loans (as defined in the Postpetition Credit Agreement).<br>***See* Postpetition Credit Agreement, §§ 3.1, 3.2**. |
| **Covenants**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Usual and customary for financings of this type, including, among other things:<br><u>Affirmative Covenants</u>: visits and inspections; notices; Financial statement and other reporting; taxes; compliance with laws; insurance; use of proceeds; sale transaction milestones; chapter 11 pleadings; committee reports; compliance with approved budget.<br><u>Negative Covenants</u>: Limitations on: fundamental changes; loans; permitted debt; affiliate transactions;  incurrence of liens; payments of certain debt; distributions; upstream payments; asset dispositions; forming of subsidiaries; making certain investments; change of fiscal year; change governing documents; entry into hedging agreements; non-compliance with anti-terrorism laws; conduct new business activities; and create new deposit or securities accounts.<br><br>***See* Postpetition Credit Agreement, §§ 5 and 6.** |
| **Events of Default**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | In addition to customary events of default, (i) the failure to achieve certain milestones in the Chapter 11 Cases, (ii) the occurrence of actions or events that are contrary to the Postpetition Lenders' interests such as (A) the proposal of a sale of substantially all of the Debtors' assets without the Postpetition Agent's consent that does not pay the Prepetition Senior Obligations and Postpetition Obligations in full, (B) the filing of any motion that |

| **SUMMARY OF THE POSTPETITION FACILITY** | |
|---|---|
| | materially affects the Debtors' assets without the Postpetition Agent's consent unless such motion provides for payment in full of the Prepetition Senior Obligations and Postpetition Obligations, (iii) the entry of any order dismissing or converting the Chapter 11 Cases or confirming a plan that does not pay the Prepetition Senior Obligations and Postpetition Obligations in full, and (iv) the failure of the Debtors to be in Substantial Compliance with the Approved Budget. <br> *See* **Interim Order, ¶ 34; Postpetition Credit Agreement, § 8.** |
| **Milestones** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(vi) | Sales Transaction Milestones include: (i) filing of a motion with the court to approve a sale (the "**Approved Sale Motion**") pursuant to section 363 of the Bankruptcy Code acceptable to the Postpetition Agent together with committed asset purchase agreements to purchase substantially all of the inventory assets and equipment and related assets of the Borrowers from purchasers satisfactory to Postpetition Agent (as to inventory, the "**Inventory Stalking Horse Bid**", and as to equipment and related assets, the "**Equipment Stalking Horse Bid**") 7 days after the Petition Date;(ii) obtaining court approval of the Inventory Stalking Horse Bid and Equipment Stalking Horse Bid 20 days after the Petition Date; (iii) the occurrence of the final auction of the assets 42 days after the Petition Date; (iv) the grant of the Approved Sale Motion by the court 45 days after the Petition Date; and (v) the closing and funding of the sale described in the Approved Sale Motion 55 days after the Petition Date as to the Inventory Stalking Horse Bid and 65 days after the Petition Date as to the Equipment Stalking Horse Bid. <br><br> *See* **Interim Order, ¶ 15; Postpetition Credit Agreement, § 5.17**. |
| **Carve-Out** <br> Fed. R. Bankr. P. 4001(c)(1)(B) | The Carve-Out is comprised of: <br> (i) with respect to claims incurred prior to the Carve-Out Trigger Date, the claims of (x) professionals of the Debtors whose retention is approved by this Court during the Chapter 11 Cases pursuant to Sections 327 and 328 of the Bankruptcy Code (the "**Debtors' Professionals**") for unpaid fees and expenses which were incurred on and after the Petition Date and prior to the Carve-Out Trigger Date; and (y) professionals of any statutory committees appointed in the Chapter 11 Cases whose retention is approved by this Court during the Chapter 11 Cases pursuant to Section 1103 of the Bankruptcy Code (the "**Committee's Professionals**" and together with the Debtors' Professionals, the "**Retained Professionals**") for unpaid fees and expenses which were incurred on and after the Petition Date and prior to the Carve-Out Trigger Date; <u>provided</u> that, in each case, such fees and expenses of the Retained Professionals (A) are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code, (B) comply with the professional fee budget approved in writing by the Postpetition Agent and attached hereto as Exhibit B (such budget, the "**Professional Fee Budget**"), (C) are not excluded from the Carve-Out under <u>paragraph 28</u> of the Interim Order, and (D) do not exceed $1,700,000 in the aggregate for all of the Retained Professionals (such fees and expenses, the "**Pre-Carve-Out Trigger Date Expenses**" and the permitted amount thereof, the "**Pre-Carve-Out Trigger Date Amount**"); <br> (ii)  with respect to claims incurred on or after the Carve-Out Trigger Date, the claims of Retained Professionals for unpaid fees and expenses which were incurred on and after the Carve-Out Trigger Date; <u>provided</u> that, in each case, such fees and expenses of the Retained Professionals (A) are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code, (B) are not excluded from the Carve-Out under <u>paragraph 28</u> of the Interim Order, and (C) do not exceed $50,000 in the aggregate for all of the Retained Professionals (such fees and expenses, the "**Post-Carve-Out Trigger Date Expenses**" and the permitted amount thereof, the "**Post-Carve-Out Trigger** |

8

| SUMMARY OF THE POSTPETITION FACILITY | |
|---|---|
| | **Date Amount**" and, together with the Pre-Carve-Out Trigger Date Amount, the "**Carve-Out Amount**"); and<br><br>(iii) unpaid fees payable to the United States Trustee and Clerk of the Bankruptcy Court pursuant to Section 1930 of Title 28 of the United States Code.<br><br>*See* **Interim Order, ¶ 13**. |
| **Use of Cash Collateral**<br>Fed. R. Bankr. P. 4001(b)(1)(B)(ii) | Subject to the terms and conditions set forth in the DIP Orders and in the Postpetition Loan Documents, the Debtors may use the proceeds of the Postpetition Facility and the Cash Collateral solely to: (i) pay outstanding Postpetition Obligations as provided in the Postpetition Loan Documents and the DIP Orders, (ii) make the adequate protection payments required under the DIP Orders, and (iii) fund general corporate and working capital requirements of the Debtors constituting administrative expenses in the Chapter 11 Cases, in each case in accordance with the Approved Budget and the terms of the Postpetition Loan Documents.   *See* **Interim Order, ¶ 7.** |
| **Duration of Use of Cash Collateral**<br>Fed. R. Bankr. P. 4001(b)(1)(B)(iii) | The earliest of (i) December 7, 2017, (ii) the closing of any refinancing of the Prepetition Senior Obligations and Postpetition Obligations, (iii) the confirmation of a plan of reorganization in the Chapter 11 Cases, (iv) the conversion or dismissal of any of the Chapter 11 Cases, (vi) the appointment of a trustee or examiner in any of the Chapter 11 Cases, and (v) at the option of the Postpetition Agent in its sole discretion, the occurrence of any Event of Default under the Interim Order, any Final Order, and/or the Postpetition Credit Agreement (the date of the earliest such occurrence, the "**Commitment Termination Date**"). *See* **Interim Order ¶ 4** |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br>Fed. R. Bankr. P. 4001(b)(1)(B)(iv), (c)(1)(B)(ii) | Adequate Protection Senior Obligations.  As adequate protection for the Prepetition Senior Agent's interest in the Prepetition Senior Collateral, the Prepetition Senior Agent and Prepetition Senior Lenders will be granted the following:<br><br>• Liens and security interests in and on all of the Postpetition Collateral (the "**Adequate Protection Senior Liens**").  The Adequate Protection Senior Liens will (i) be subordinate only to: (A) the Carve-Out, (B) the Postpetition Liens, and (C) the Prior Liens; and (ii) be senior and superior to the Subordinate Liens and Related Rights (as defined in the Interim Order);<br><br>• An allowed super-priority administrative expense claim (the "**Adequate Protection Senior Claim**") against each Debtor and its respective estate.  The Adequate Protection Senior Claim will: (i) be subordinate only to: (A) the Carve-Out, and (B) the Super-Priority Claim; and (ii) be senior and superior to the Subordinate Claims and Related Rights;<br><br>• (i) The proceeds of any Prepetition Senior Collateral and any Postpetition Collateral will be paid to the Prepetition Senior Agent and Prepetition Senior Lenders for application to the Prepetition Senior Obligations until such Prepetition Senior Obligations are paid in full or cash collateralized in accordance with the terms of the Prepetition Senior Credit Agreement, (ii) the Debtors will make all payments of interest as and when due under the Prepetition Senior Credit Agreement, and (iii) the Debtors will, on the Closing Date and on a monthly basis thereafter, pay or reimburse the Prepetition Senior Agent and Prepetition Senior Lenders for any and all of its accrued and past-due fees, costs, expenses and charges payable under the Prepetition Senior Loan Documents, including without limitation, the reasonable attorneys' and other fees and expenses of the Prepetition |

| SUMMARY OF THE POSTPETITION FACILITY | |
|---|---|
| | Senior Agent and Prepetition Senior Lenders as provided in the Prepetition Senior Credit Agreement, whether accrued prepetition or postpetition; <br><br> The Adequate Protection Senior Liens and Adequate Protection Senior Claim will secure the payment of the Prepetition Senior Obligations in an amount equal to any diminution in the value of the Prepetition Senior Agent's interests in the Prepetition Senior Collateral from and after the Petition Date (the amount of such diminution, the "**Adequate Protection Senior Obligations**") including, without limitation, any such diminution resulting from the following: (i) the use by the Debtors of the Prepetition Senior Collateral, including, without limitation, the Cash Collateral, (ii) the imposition of the Postpetition Liens, which will prime the Primed Liens, (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, (iv) the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Senior Collateral or otherwise, or (v) costs and fees incurred in connection with the Prepetition Senior Loan Documents. *See Interim Order, ¶ 17;* |
| **Liens on Avoidance Actions** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(xi) | As security for the full and timely payment of the Postpetition Obligations, the Postpetition Agent will be granted valid, binding, enforceable, unavoidable and fully perfected security interests, liens and mortgages (collectively, the "**Postpetition Liens**") in and upon, among other things, all prepetition and postpetition causes of action (exclusive of actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (the "**Avoidance Actions**"), but, subject to entry of the Final Order, inclusive of the proceeds and recoveries from the Avoidance Actions (the "**Avoidance Action Proceeds**")). *See Interim Order ¶ 9.* |
| **Determination Regarding Prepetition Claim** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(iii) | The Interim Order contains stipulations of fact by the Debtors, including those related to the amount, validity and enforceability of the Debtors' prepetition obligations and the Prepetition Senior Agent's and Prepetition Senior Liens under the Prepetition Senior Loan Documents. *See Interim Order ¶ D.* <br> The Creditors' Committee or any other party with standing shall have until the earlier of (i) 60 days from appointment of any Creditors' Committee, and (ii) 75 days from the Petition Date (the earlier of such dates, the "**Complaint Filing Deadline**") to investigate and challenge the validity of the interests of the Prepetition Senior Lenders and the Prepetition Senior Agent in the Prepetition Senior Collateral. *See Interim Order ¶ 29.* |
| **Effect of Debtors' Stipulations on Third Parties** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(iii),(vii) | The stipulations and admissions contained in the DIP Orders shall be binding on all parties in interest, including, without limitation, the Creditors' Committee, unless, and solely to the extent that, (a) the Creditors' Committee files a complaint and commences an adversary proceeding challenging the amount, extent, validity, or enforceability of the Prepetition Senior Obligations, or the perfection or priority of the Prepetition Senior Liens, or otherwise asserting any claims or causes of action against the Prepetition Senior Agent or the Prepetition Senior Lenders relating to the Prepetition Senior Obligations, by the Complaint Filing Deadline, and (b) the Court rules in favor of the plaintiff in such adversary proceeding. Notwithstanding anything to the contrary in the DIP Orders, if any such adversary proceeding is timely commenced, the stipulations contained in the DIP Orders will nonetheless remain binding on all parties in interest and preclusive except to the extent that such stipulations are expressly challenged in such adversary proceeding. *See Interim Order ¶ 29.* |
| **Waiver or Modification of the** | The automatic stay will be modified as to the Postpetition Agent and Postpetition Lenders to the extent necessary to permit them to perform in accordance with, provide any notice |

| SUMMARY OF THE POSTPETITION FACILITY | |
|---|---|
| **Automatic Stay**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B)(iv) | under, and exercise, enjoy and enforce their respective rights, benefits, privileges and remedies pursuant to the DIP Orders and the other Postpetition Loan Documents.<br><br>The Postpetition Agent and Postpetition Lenders will be authorized and granted leave from the automatic stay to do the following on and after the occurrence and continuation of an Event of Default under the Postpetition Credit Agreement (or otherwise on and after the Commitment Termination Date), in each case without further notice, motion or application to, order of, or hearing before, this Court:<br>• terminate any obligation of Postpetition Agent or Postpetition Lenders to make loans or other extensions of credit under the Postpetition Loan Documents or the DIP Orders;<br>• declare all Postpetition Obligations immediately due and payable in full in cash, and require that all letters of credit and other contingent obligations related thereto, if any, to be cash collateralized or terminated without liability to Postpetition Agent or Postpetition Lenders; and<br>• revoke the Debtors' right, if any, under the DIP Orders and/or the other Postpetition Loan Documents to use Cash Collateral.<br><br>On and after the occurrence and continuation of an Event of Default under the Postpetition Credit Agreement (or otherwise on and after the Commitment Termination Date), and after obtaining Court approval upon notice and hearing, the Postpetition Agent and the Postpetition Lenders will be entitled to foreclose or otherwise enforce their respective liens on any or all of the Postpetition Collateral and/or to exercise any other default-related rights and remedies under the Postpetition Loan Documents, the DIP Orders and applicable law.  *See* **Interim Order ¶ 26.** |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B)(vii) | The Interim Order, and, if and when it becomes effective, the Final Order, shall be sufficient and conclusive evidence of the validity, perfection and priorities of the Postpetition Liens and the Prepetition   To the extent that any applicable non-bankruptcy law would otherwise restrict the grant, scope, enforceability, attachment or perfection of the security interests and liens authorized or created under or in connection with the DIP Orders or the Postpetition Loan Documents, or otherwise would impose filing or registration requirements or fees and charges with respect thereto, such law will be pre-empted to the maximum extent permitted by the United States Constitution, the Bankruptcy Code, applicable federal law, and the judicial power of the United States Bankruptcy Court.  *See* **Interim Order, ¶¶ 21 and 22.** |

| **SUMMARY OF THE POSTPETITION FACILITY** | |
|---|---|
| **Section 506(c) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B)(x) | No costs or expenses of administration or other charge, lien, assessment or claim incurred on or after the Petition Date of any Person or entity will be imposed against the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent, or Prepetition Senior Lenders, their respective claims or the Prepetition Senior Collateral or Postpetition Collateral under section 506(c) of the Bankruptcy Code or otherwise, and the Debtors will waive any and all such rights, remedies and benefits under section 506(c) of the Bankruptcy Code. *See Interim Order ¶ 19.* |
| **Section 552(b) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B) | The Postpetition Agent, the Prepetition Agents, the Postpetition Lenders, and the Prepetition Senior Lenders will not be subject to the equitable doctrine of "marshaling", "election of remedies" or any other similar doctrine, or an "equities of the case" claim under section 552(b) of the Bankruptcy Code, in each case with respect to any of its respective interests in the Postpetition Collateral and Prepetition Senior Collateral. *See Interim Order ¶ 30.* |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | The Debtors irrevocably waive any right to challenge or contest the Prepetition Senior Liens and the validity of the Prepetition Senior Obligations; provided that, subject to paragraph 28 of the Interim Order and the time limitations specified in paragraph 29 of the Interim Order, none of the foregoing acknowledgments or agreements by the Debtors contained in the stipulations shall be binding on any other party and shall not affect the rights of any committee, Person or entity (other than the Debtors with respect to the acknowledgements and agreements set forth in the stipulations) with respect to their rights to assert, pursue or otherwise allege any of the claims and actions described in paragraph 29 of the Interim Order. *See Interim Order ¶ D.* <br><br> Without limiting the terms and conditions of paragraphs 9 through 12 and 18 of the Interim Order, none of the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent or Prepetition Senior Lenders will waive, and each will expressly reserve, any and all claims, causes of action, defenses, rights and remedies it has or may have pursuant to any or all of the Prepetition Senior Loan Documents, the Postpetition Loan Documents, any other inter-creditor or subordination agreement, the Bankruptcy Code and/or under applicable law against or with respect to any Debtor and any other Person or entity. *See Interim Order ¶ 27.* |

## **PREPETITION CREDIT FACILITY**

13.     The Debtors' prepetition secured credit facility consists of first-lien indebtedness under the Prepetition Senior Credit Agreement (as defined below).

### **A. Debtors' Prepetition Senior Secured Indebtedness**

14.     Pursuant to that certain Credit Agreement, dated as of November 29, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Senior Credit Agreement**"), among each Borrower (with Canadian Parent party thereto as a

guarantor), Wells Fargo Bank, National Association (in its individual capacity, "**Wells Fargo**"), as administrative agent for itself and the Prepetition Senior Lenders (as defined below) (in such capacity, the "**Prepetition Senior Agent**"), and the other lenders party thereto (collectively, together with each Bank Product Provider and each Issuing Bank (each as defined in the Prepetition Senior Credit Agreement), the "**Prepetition Senior Lenders**"), the Prepetition Senior Lenders agreed to extend loans to, issue letters of credit for, and provide services and other credit accommodations to, the Borrowers (the "**Prepetition Senior Credit Facility**").  All obligations of the Debtors arising under, or in connection with, the Prepetition Senior Credit Agreement (including, without limitation, the "Obligations" and "Bank Product Obligations", each as defined therein), any other Prepetition Senior Loan Document, and/or any Bank Product Agreement shall collectively be referred to herein as the "**Prepetition Senior Obligations**."

15.     Pursuant to the Guaranty and Security Agreements (as defined in the Prepetition Senior Credit Agreement) and all other Prepetition Senior Loan Document that purport to create a Lien (as defined in the Prepetition Senior Credit Agreement) in favor of Prepetition Senior Agent (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Senior Security Documents**"), each Debtor granted to the Prepetition Senior Agent, for the benefit of itself and the Prepetition Senior Lenders, to secure the Prepetition Senior Obligations, a first priority security interest in and continuing lien (the "**Prepetition Senior Liens**") on substantially all of such Debtor's assets and property, and all proceeds, products, accessions, rents and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  All collateral granted or pledged by the Debtors pursuant to any Prepetition Senior Security Document or any other Prepetition Senior Loan Document, including, without limitation, the "Collateral" as defined in the Prepetition Senior

13

Credit Agreement, and all pre-petition and post-petition proceeds thereof shall collectively be referred to herein as the "**Prepetition Senior Collateral**".

16.      (a) All Prepetition Senior Loan Documents executed and delivered by the Debtors to the Prepetition Senior Agent or any Prepetition Senior Lender are valid and enforceable by the Prepetition Senior Agent and the Prepetition Senior Lenders against each of the Debtors; (b) the Prepetition Senior Liens constitute valid, binding, enforceable and perfected first priority liens and security interests in and on the Prepetition Senior Collateral, subject only to the Prior Liens (as defined below) and are not subject to avoidance, reduction, disallowance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except insofar as such liens are subordinated to the Postpetition Liens and the Carve-Out (each term as hereinafter defined)) in accordance with the provisions of the DIP Orders); (c) the Prepetition Senior Obligations constitute legal, valid and binding obligations of each of the Debtors, (d) no offsets, defenses or counterclaims to the Prepetition Senior Obligations exist, (e) no portion of the Prepetition Senior Obligations, or any amounts previously paid to Prepetition Senior Agent or any Prepetition Senior Lender on account of or with respect to the Prepetition Senior Obligations, are subject to avoidance, reduction, disgorgement, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (f) each Guaranty and Security Agreement (as defined in the Prepetition Senior Credit Agreement) continues in full force and effect notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the Postpetition Agent or Postpetition Lenders to the Debtors pursuant to the terms of this DIP Order or Postpetition Loan Documents.

17.      The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Senior Agent or any Prepetition

Senior Lender with respect to the Prepetition Senior Credit Agreement or any other Prepetition Senior Loan Documents, whether arising at law or at equity, including, without limitation, any re-characterization, subordination, avoidance or other debtor claims arising under or pursuant to sections 105, 510 or 542 through 553, inclusive, of the Bankruptcy Code.

18.    As of the Petition Date, (i) the Debtors were truly and justly indebted to the Prepetition Senior Agent and Prepetition Senior Lenders pursuant to the Prepetition Senior Loan Documents, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $76,724,574.38 in respect of loans made and letters of credit issued by the Prepetition Senior Agent and Prepetition Senior Lenders, plus all accrued and hereafter accruing and unpaid interest thereon and any additional fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Senior Loan Documents) now or hereafter due under the Prepetition Senior Credit Agreement and the other Prepetition Senior Loan Documents, and (ii) the value of the Prepetition Senior Collateral exceeded the amount of Prepetition Senior Obligations.

## DEBTORS' NEED FOR POSTPETITION FACILITY

19.    The Debtors require the financing available under the Postpetition Facility and the use of cash collateral to have sufficient liquidity to administer their estates during the Sale Process.  Moreover, all of the Debtors' cash is subject to the liens of their secured creditors. Consequently, the Debtors require the Postpetition Facility and the use of cash collateral as a critical, value-maximizing element of their sale process.

20.    Access to the Postpetition Facility and the use of cash collateral is essential for the Debtors to assure their employees, customers, and vendors that the Debtors have sufficient capital to pursue a successful asset sale.  Within days of the commencement of these chapter 11

cases, Debtors will not have sufficient liquidity to fund certain material obligations, including payroll items. Thus, without access to interim funding under the Postpetition Facility and the use of cash collateral, the Debtors' ability to preserve the value of their assets would be in serious jeopardy. Interim funding in the amount of $2,500,000 and immediate access to cash collateral will permit the Debtors to preserve the value of the Debtors' assets. Accordingly, the Postpetition Facility and the use of cash collateral as provided in the Interim Order are essential to the Debtors' ability to minimize disruptions and avoid irreparable harm to the value of their assets.

21.      Despite their best efforts under the circumstances, the Debtors were unable to procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1), (b) as an administrative expense under section 364(a),(c) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1), or (d) without granting priming liens pursuant to section 364(d). They were also unable to obtain Postpetition Facility or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. Given the critical need for use of Cash Collateral and Postpetition Facility on an expedited basis, the Debtors determined that they could not obtain Postpetition Facility on terms other than as provided in the Postpetition Facility.

22.      Having determined that financing was available only under sections 364(c) and (d) of the Bankruptcy Code and that the Prepetition Senior Lenders would not agree to be primed by any third party, the Debtors, in their best business judgment, negotiated the Postpetition Facility with the Postpetition Lenders extensively, at arm's length and in good faith.

## PROPOSED POSTPETITION FACILITY

23.     As further described herein, the Prepetition Senior Lenders have agreed to provide Postpetition Facility and have consented to the priming of their liens in exchange for certain customary protections, including the granting of certain liens and superpriority administrative expense status to the Prepetition Senior Lenders as adequate protection.   The Postpetition Obligations (as defined below) will be secured by, among other interests, a priming first priority lien on the collateral of the Prepetition Senior Lenders.

24.     The Postpetition Facility is comprised of a $15,000,000 asset-based revolving credit facility, a letter of credit subfacility, and a swingline loan subfacility (the borrowings under each, the "**Postpetition Obligations**"), and is provided by Wells Fargo, as administrative agent (in such capacity, the "**Postpetition Agent**") for itself and the lenders party to the Postpetition Credit Agreement (collectively with Wells Fargo, the "**Postpetition Lenders**"). The Postpetition Lenders are also Prepetition Senior Lenders, and in such capacity, have been supportive of the Debtors' sale process by, among other things, continuing to fund Wynit prior to the Petition Date and granting certain concessions under the Prepetition Senior Credit Agreement (as defined below), in order to give the Debtors sufficient time to finalize key components of the Sale Process and maximize the value of their collateral.

25.     The Postpetition Credit Agreement addresses the Debtors' liquidity needs by permitting the Debtors to draw up to $2,500,000 upon entry of the Interim Order and, upon entry of the Final Order, draw up to an additional $12,500,000.  The Debtors' obligations under the Postpetition Credit Agreement are secured by a priming, first-priority postpetition security interest in and lien on all prepetition and postpetition real and personal, tangible and intangible property and assets of each of the Debtors, the Prepetition Senior Collateral, and the proceeds,

17

products, offspring, rents and profits of all of the foregoing, including insurance proceeds (collectively, the "**Postpetition Collateral**"; such security interests and liens, the "**Postpetition Liens**").

26.     The Debtors are also seeking authority to use the Prepetition Senior Lenders' cash collateral (as such term is defined by section 363(a) of the Bankruptcy Code, "**Cash Collateral**") pursuant to this Motion in order to fund the cash needs related to their operations, including amounts necessary to administer the Sale Process.  The Debtors' access to sufficient working capital and liquidity and incurrence of the additional secured indebtedness under the Postpetition Facility is vital to the Debtors' ability to pursue their chapter 11 strategy and complete the Sale Process.

27.     If approved, the Debtors will be permitted to use the proceeds of the Postpetition Facility and cash collateral for working capital, general corporate purposes, and the administration of these chapter 11 cases, all in accordance with the Approved Budget.  The Approved Budget is based on the Debtors' 13-week cash-flow forecasts and may be updated from time to time.  Under the Postpetition Credit Agreement, the Debtors are permitted to make disbursements each week that are, in the aggregate and exclusive of professional fees, up to 5% greater than the Debtors' projected total disbursements for that week.  This arrangement provides significant financial flexibility to the Debtors.

28.     The Postpetition Agent will have cash dominion over the Debtors' bank accounts, consistent with the cash dominion status Wynit was subject to under the Prepetition Senior Credit Agreement.  Under the terms of the cash dominion process, the Debtors will submit to the Postpetition Agent daily funding requests to operate their businesses throughout the Sale Process.

29.     The Postpetition Facility is subject to the Debtors' compliance with certain deadlines as reflected in the Postpetition Credit Agreement and the Interim Order (collectively, the "**Milestones**") which were designed to most efficiently maximize the value of the Debtors' assets.  In summary, the Milestones (as set forth in detail above) require that the Debtors have completed sales of (a) substantially all of their inventory within 55 days of the Petition Date, and (b) substantially all of their equipment and related assets within 65 days of the Petition Date.

30.     The Postpetition Facility provides the Prepetition Senior Lenders with adequate protection in the form of (a) replacement liens, (b) an allowed super-priority claim, and (c) adequate protection payments such that all of the proceeds of the Postpetition Collateral will be applied to pay the Prepetition Senior Obligations before any proceeds are applied to the Postpetition Obligations.

31.     The other material terms and conditions of the Postpetition Facility are summarized in the table set forth above in this Motion.  The terms and conditions of the Debtors' use of Cash Collateral and the Postpetition Facility, including the Milestones and the Approved Budget, are commercially reasonable.

32.     The Postpetition Facility preserves the status quo, and provides the Debtors with sufficient liquidity to fund the business and the Sale Process in order to pursue and consummate a successful asset sale.  It contains the best available pricing in the circumstances and was negotiated in good faith and at arms' length.  As discussed above and in the First Day Declaration, the Postpetition Facility is unquestionably the Debtors' most attractive Postpetition Facility option available and should be approved by the Court.

## REQUEST FOR EXPEDITED RELIEF

33.     The Debtors request expedited relief on this Motion. The Debtors have scheduled and served a number of "first day" motions designed to facilitate an orderly transition to Chapter

11. The granting of this Motion on an expedited basis will minimize disruptions to the Debtors' accounting system, enable the Debtors to continue making and generating timely accounting information, and meet obligations of employees without further interruption.  Any shutdown or delay in the Debtors' operations would damage relationships with customers, undermine employee confidence, and, at this critical juncture, further impair the value of the Debtors' assets.

34.     Pursuant to Local Rule 9013-2, this Motion is verified and is accompanied by a memorandum of law, proof of service, and a proposed order.

35.     Pursuant to Local Rule 9013-2, the Debtors give notice that they may, if necessary, call Peter A. Richichi, Chief Operating Officer of WYNIT Distribution, LLC, to testify at the hearing on the Motion regarding the facts set forth herein.

## TERMS SUBJECT TO FINAL CREDIT APPROVAL

36.     Due to the expedited nature of the filing of these Chapter 11 Cases, the terms of the Postpetition Facility remain under the review of the Postpetition Lenders as of the filing of the Motion.  To the extent that any changes to the terms of the Postpetition Facility as set forth in the attached Interim Order or Postpetition Credit Agreement change, the Debtors will provide all necessary parties with redline copies of such documents showing any such changes before the Interim Hearing.

## NO PRIOR REQUEST

37.     No prior request for the relief sought in this Motion has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request the entry of an order:

A.   granting an expedited hearing;

B.   granting the relief requested herein; and

C.   granting such other relief as the Court deems just and equitable.


Dated:  September 6, 2017          *e/ Robert T. Kugler*

Robert T. Kugler (#0194116)
Edwin H. Caldie (#0388930)
Phillip J. Ashfield (#0388990)
Andrew J. Glasnovich (#0398366)
**STINSON LEONARD STREET LLP**
150 South Fifth Street Suite 2300, Minneapolis, MN 55402
Telephone:  612.335.1500
Facsimile:  612.335.1657

**PROPOSED COUNSEL FOR THE DEBTORS**

## **VERIFICATION**

I, Pete Richichi, Chief Operating Officer of WYNIT Distribution, LLC, *et al.*, declare

under penalty of perjury that the facts set forth in the preceding Motion are true and correct

according to the best of my knowledge, information, and belief.

Dated: September 8 , 2017

Signed: _____

Pete Richichi, COO

## Exhibit A

**Postpetition Credit Agreement**



**SENIOR SECURED, SUPER PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT**

**by and among**

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

**as Administrative Agent,**

**WELLS FARGO BANK, NATIONAL ASSOCIATION,
JPMORGAN CHASE BANK, N.A., and SUNTRUST ROBINSON HUMPHREY, INC.,**

**as Joint Lead Arrangers and Joint Book Runners,**

**JPMORGAN CHASE BANK, N.A. and SUNTRUST BANK,**

**as Syndication Agents,**

**THE LENDERS THAT ARE PARTIES HERETO**

**as the Lenders,**

**WYNIT DISTRIBUTION, LLC**

**as Administrative Borrower, and**

**ITS SUBSIDIARIES AND AFFILIATES PARTY HERETO**

**as Borrowers and Loan Parties**

**Dated as of September [__], 2017**

*ATL 22306858v2*

1.    DEFINITIONS AND CONSTRUCTION ........................................................... 2
      1.1    Definitions ........................................................................................... 2
      1.2    Accounting Terms ................................................................................ 2
      1.3    Code; PPSA .......................................................................................... 2
      1.4    Construction.......................................................................................... 3
      1.5    Time References ................................................................................... 4
      1.6    Schedules and Exhibits ........................................................................ 4
      1.7    Exchange Rates; Currency Equivalents; Applicable Currency ............ 4
      1.8    Super Priority Nature of Obligations and Liens ................................. 5
      1.9    Payment of the Obligations ................................................................. 6
      1.10   No Discharge; Survival of Claims ....................................................... 6
      1.11   Waiver of Priming Rights..................................................................... 6
2.    LOANS AND TERMS OF PAYMENT........................................................... 6
      2.1    Revolving Loans ................................................................................... 6
      2.2    [RESERVED] ........................................................................................ 8
      2.3    Borrowing Procedures and Settlements ............................................... 8
      2.4    Payments; Prepayments; Collections ..................................................17
      2.5    Promise to Pay; Promissory Notes......................................................21
      2.6    Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations .......22
      2.7    Crediting Payments .............................................................................23
      2.8    Designated Accounts............................................................................24
      2.9    Maintenance of Loan Account; Statements of Obligations.................24
      2.10   Fees .....................................................................................................25
      2.11   Letters of Credit ..................................................................................25
      2.12   [RESERVED] .......................................................................................33
      2.13   Capital Requirements ..........................................................................33
      2.14   [RESERVED] .......................................................................................35
      2.15   Joint and Several Liability...................................................................35
      2.16   Interest Act (Canada); Criminal Rate of Interest; Nominal Rate of Interest........37
      2.17   Currencies............................................................................................38
3.    CONDITIONS; TERM OF AGREEMENT....................................................39
      3.1    Conditions Precedent to the Initial Extension of Credit....................39

-i-

## TABLE OF CONTENTS
(continued)

**Page**

| | | | |
|---|---|---|---|
| | 3.2 | Conditions Precedent to all Extensions of Credit | 39 |
| | 3.3 | Maturity | 39 |
| | 3.4 | Effect of Maturity | 40 |
| | 3.5 | Early Termination by Borrowers | 40 |
| | 3.6 | [Conditions Subsequent | 40 |
| 4. | | REPRESENTATIONS AND WARRANTIES | 40 |
| | 4.1 | Due Organization and Qualification; Subsidiaries | 41 |
| | 4.2 | Due Authorization; No Conflict | 41 |
| | 4.3 | Governmental Consents | 42 |
| | 4.4 | Binding Obligations; Perfected Liens | 42 |
| | 4.5 | Title to Assets; No Encumbrances | 42 |
| | 4.6 | Litigation | 42 |
| | 4.7 | Compliance with Laws | 43 |
| | 4.8 | No Material Adverse Effect | 43 |
| | 4.9 | Solvency | 43 |
| | 4.10 | Employee Benefits | 43 |
| | 4.11 | Environmental Condition | 44 |
| | 4.12 | Complete Disclosure | 44 |
| | 4.13 | Patriot Act | 44 |
| | 4.14 | Indebtedness | 45 |
| | 4.15 | Payment of Taxes | 45 |
| | 4.16 | Margin Stock | 45 |
| | 4.17 | Governmental Regulation | 45 |
| | 4.18 | OFAC; Anti-Corruption Laws | 45 |
| | 4.19 | Employee and Labor Matters | 46 |
| | 4.20 | Canadian Parent as a Holding Company | 46 |
| | 4.21 | Leases | 46 |
| | 4.22 | Eligible Accounts | 46 |
| | 4.23 | Eligible Inventory | 47 |
| | 4.24 | Location of Inventory | 47 |
| | 4.25 | Inventory Records | 47 |

ATL 22306858v2

**TABLE OF CONTENTS**

(continued)

Page

| | | |
|---|---|---|
| 4.26 | [RESERVED] | 47 |
| 4.27 | Administrative Priority; Lien Priority; DIP Order | 47 |
| 4.28 | Approved Budget | 48 |
| 4.29 | Appointment of Trustee or Examiner; Liquidation | 48 |
| 4.30 | Chapter 11 Cases | 48 |
| 4.31 | Canadian Proceedings | 48 |
| 4.32 | Information Officer | 48 |
| 5. | AFFIRMATIVE COVENANTS | 48 |
| 5.1 | Financial Statements, Reports, Certificates | 48 |
| 5.2 | Reporting | 49 |
| 5.3 | Existence | 49 |
| 5.4 | Maintenance of Properties | 49 |
| 5.5 | Taxes | 49 |
| 5.6 | Insurance | 49 |
| 5.7 | Inspection | 50 |
| 5.8 | Compliance with Laws | 50 |
| 5.9 | Environmental | 50 |
| 5.10 | Disclosure Updates | 51 |
| 5.11 | [RESERVED] | 51 |
| 5.12 | Further Assurances | 51 |
| 5.13 | Lender Meetings | 51 |
| 5.14 | Location of Inventory | 52 |
| 5.15 | Bank Products | 52 |
| 5.16 | Employee Benefits | 52 |
| 5.17 | Sale Transaction Milestones; Advisor | 52 |
| 5.18 | Chapter 11 and Recognition Proceedings Pleadings | 54 |
| 5.19 | Committee Reports | 54 |
| 6. | NEGATIVE COVENANTS | 54 |
| 6.1 | Indebtedness | 54 |
| 6.2 | Liens | 54 |
| 6.3 | Restrictions on Fundamental Changes | 54 |

ATL 22306858v2

**TABLE OF CONTENTS**

(continued)

Page

| | | | |
|---|---|---|---|
| | 6.4 | Disposal of Assets | 55 |
| | 6.5 | Nature of Business | 55 |
| | 6.6 | Prepayments and Amendments | 55 |
| | 6.7 | Restricted Payments | 55 |
| | 6.8 | Accounting Methods | 55 |
| | 6.9 | Investments | 55 |
| | 6.10 | Transactions with Affiliates | 56 |
| | 6.11 | Use of Proceeds | 56 |
| | 6.12 | Limitation on Issuance of Equity Interests | 57 |
| | 6.13 | Parent as Holding Company | 57 |
| | 6.14 | Canadian Pension Plans | 57 |
| 7. | | APPROVED BUDGET | 57 |
| 8. | | EVENTS OF DEFAULT | 57 |
| | 8.1 | Payments | 58 |
| | 8.2 | Covenants | 58 |
| | 8.3 | [RESERVED] | 58 |
| | 8.4 | [RESERVED] | 58 |
| | 8.5 | [RESERVED] | 58 |
| | 8.6 | [RESERVED] | 58 |
| | 8.7 | Representations, etc | 58 |
| | 8.8 | Guaranty | 59 |
| | 8.9 | Security Documents | 59 |
| | 8.10 | Loan Documents | 59 |
| | 8.11 | Change of Control | 59 |
| | 8.12 | Canadian Pension Plans | 59 |
| | 8.13 | Additional Events of Default | 59 |
| 9. | | RIGHTS AND REMEDIES | 62 |
| | 9.1 | Rights and Remedies | 62 |
| | 9.2 | Remedies Cumulative | 63 |
| 10. | | WAIVERS; INDEMNIFICATION; RELEASE | 63 |
| | 10.1 | Demand; Protest; etc | 64 |

-iv-

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 10.2 | The Lender Group's Liability for Collateral | 64 |
| 10.3 | Indemnification | 64 |
| 10.4 | Release | 65 |
| 11. | NOTICES | 65 |
| 12. | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER | 67 |
| 13. | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS | 68 |
| 13.1 | Assignments and Participations | 68 |
| 13.2 | Successors | 72 |
| 14. | AMENDMENTS; WAIVERS | 73 |
| 14.1 | Amendments and Waivers | 73 |
| 14.2 | Replacement of Certain Lenders | 75 |
| 14.3 | No Waivers; Cumulative Remedies | 75 |
| 15. | AGENT; THE LENDER GROUP | 76 |
| 15.1 | Appointment and Authorization of Agent | 76 |
| 15.2 | Delegation of Duties | 77 |
| 15.3 | Liability of Agent | 77 |
| 15.4 | Reliance by Agent | 77 |
| 15.5 | Notice of Default or Event of Default | 78 |
| 15.6 | Credit Decision | 78 |
| 15.7 | Costs and Expenses; Indemnification | 79 |
| 15.8 | Agent in Individual Capacity | 79 |
| 15.9 | Successor Agent | 80 |
| 15.10 | Lender in Individual Capacity | 80 |
| 15.11 | Collateral Matters | 81 |
| 15.12 | Restrictions on Actions by Lenders; Sharing of Payments | 82 |
| 15.13 | Agency for Perfection | 83 |
| 15.14 | Payments by Agent to the Lenders | 83 |
| 15.15 | Concerning the Collateral and Related Loan Documents | 83 |
| 15.16 | Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information | 84 |
| 15.17 | Several Obligations; No Liability | 85 |

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 15.18 | Joint Lead Arrangers, Joint Book Runners, and Syndication Agents | 85 |
| 16. | WITHHOLDING TAXES | 85 |
| 16.1 | Payments | 85 |
| 16.2 | Exemptions | 86 |
| 16.3 | Reductions | 88 |
| 16.4 | Refunds | 88 |
| 17. | GENERAL PROVISIONS | 88 |
| 17.1 | Effectiveness | 89 |
| 17.2 | Section Headings | 89 |
| 17.3 | Interpretation | 89 |
| 17.4 | Severability of Provisions | 89 |
| 17.5 | Bank Product Providers | 89 |
| 17.6 | Debtor-Creditor Relationship | 90 |
| 17.7 | Counterparts; Electronic Execution | 90 |
| 17.8 | Revival and Reinstatement of Obligations; Certain Waivers | 90 |
| 17.9 | Confidentiality | 91 |
| 17.10 | Survival | 92 |
| 17.11 | Patriot Act | 93 |
| 17.12 | Integration | 93 |
| 17.13 | US Parent_as Agent for Borrowers | 93 |
| 17.14 | Acknowledgment and Consent to Bail-In of EEA Financial Institutions | 94 |
| 17.15 | Judgment Currency | 94 |
| 17.16 | Canadian AML Laws | 95 |
| 17.17 | Agent and Lenders as Parties-in-Interest | 95 |
| 17.18 | Waiver of Right to Obtain Alternative Financing | 95 |
| 17.19 | Credit Bids | 95 |
| 17.20 | Conflict of Terms | 96 |

ATL 22306858v2

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A-1 | Form of Assignment and Acceptance |
| Exhibit B-1 | Form of Borrowing Base Certificate |
| Exhibit B-2 | Form of Bank Product Provider Agreement |
| Exhibit C-1 | Form of Compliance Certificate |
| Exhibit I-1 | Form of Interim Order |

| | |
|---|---|
| Schedule A-1 | Agent's Canadian Account |
| Schedule A-2 | Agent's US Account |
| Schedule A-3 | Authorized Persons |
| Schedule C-1 | Commitments |
| Schedule D-1 | Canadian Designated Account |
| Schedule D-2 | US Designated Account |
| Schedule D-3 | Designated Account Debtors |
| Schedule E-1 | Eligible Inventory Locations |
| Schedule P-1 | Permitted Investments |
| Schedule P-2 | Permitted Liens |
| Schedule 3.1 | Conditions Precedent |
| Schedule 3.6 | Conditions Subsequent |
| Schedule 4.1(b) | Capitalization of Parents |
| Schedule 4.1(c) | Capitalization of Parents' Subsidiaries |
| Schedule 4.1(d) | Subscriptions, Options, Warrants, Calls |
| Schedule 4.6(b) | Litigation |
| Schedule 4.10(b) | Canadian Pension Plans |
| Schedule 4.11 | Environmental Matters |
| Schedule 4.14 | Permitted Indebtedness |
| Schedule 4.24 | Location of Inventory |
| Schedule 5.1 | Financial Statements, Reports, Certificates |
| Schedule 5.2 | Collateral Reporting |
| Schedule 6.5 | Nature of Business |

ATL 22306858v2

### SENIOR SECURED, SUPER PRIORITY DEBTOR IN POSSESSION
### CREDIT AGREEMENT

**THIS SENIOR SECURED, SUPER PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT** (this "Agreement"), is entered into as of September [__], 2017, by and among the lenders identified on the signature pages hereof (each of such lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender", as that term is hereinafter further defined), **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, as administrative agent for each member of the Lender Group and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, "Agent"), **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, **JPMORGAN CHASE BANK, N.A.**, and **SUNTRUST ROBINSON HUMPHREY, INC.**, as joint lead arrangers and joint book runners (in such capacity, together with their successors and assigns in such capacity, the "Joint Lead Arrangers" and "Joint Book Runners", respectively), **JPMORGAN CHASE BANK, N.A.** and **SUNTRUST BANK**, as Syndication Agents (in such capacity, together with their successors and assigns in such capacity, the "Syndication Agents"), **WYNIT DISTRIBUTION, LLC**, a New York limited liability company ("US Parent"), **WD NAVARRE DISTRIBUTION, LLC**, a New York limited liability company ("Navarre Distribution"), **WD ENCORE SOFTWARE, LLC**, a New York limited liability company ("Encore Software"), **WD NAVARRE DIGITAL SERVICES, LLC**, a New York limited liability company ("Navarre Digital"); **WD NAVARRE HOLDINGS, LLC**, a New York limited liability company ("Navarre Holdings"); together with US Parent, Navarre Distribution, Encore Software, and Navarre Digital, individually, a "US Borrower", and collectively, "US Borrowers"), **WYNIT HOLDINGS, INC.**, a New York corporation ("Canadian Parent"), and **WD NAVARRE CANADA, ULC**, a Nova Scotia unlimited liability company ("Canadian Borrower"; Canadian Borrower and US Borrowers, each individually, a "Borrower", and collectively, the "Borrowers").

### R E C I T A L S:

WHEREAS, on September [__], 2017 (the "Petition Date"), the Loan Parties commenced Chapter 11 Case Nos. [_____ through _____,] as jointly administered at Chapter 11 Case No. [_____] (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases"), by filing separate voluntary petitions for reorganization under Chapter 11, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"). The Loan Parties continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, within one Business Day after the Petition Date, US Parent, in its capacity as foreign representative on behalf of the Loan Parties, will commence a recognition proceeding under Part IV of the *Companies' Creditors Arrangement Act* (Canada) (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") to recognize the Chapter 11 Cases as "foreign main proceedings" (the "Recognition Proceedings");

WHEREAS, prior to the Petition Date, Wells Fargo Bank, National Association, as agent, and certain lenders provided financing to the Borrowers pursuant to that certain Credit

Agreement, dated as of November 29, 2016, among the Borrowers, Canadian Parent, Wells Fargo Bank, National Association, as agent, and the lenders party thereto (as amended, modified or supplemented through the Petition Date, the "Prepetition Senior Credit Agreement"), and Canadian Parent guarantied the payment and performance of all of the Borrowers' obligations under the Prepetition Credit Agreement;

WHEREAS, the Borrowers have requested that Agent and the Lenders provide a senior secured, super priority revolving credit facility to the Borrowers of up to $15,000,000 in the aggregate to fund the working capital requirements of the Borrowers during the pendency of the Chapter 11 Cases and the Recognition Proceedings and to fund other corporate needs and expenses;

WHEREAS, Agent and the Lenders are willing to make certain Postpetition (as defined below) loans and other extensions of credit to the Borrowers of up to such amount upon the terms and conditions set forth herein;

WHEREAS, the Loan Parties have agreed to secure all of the Obligations (as defined below) under the Loan Documents (as defined below) by granting to Agent, for the benefit of Agent, the Lenders and the Bank Product Providers (as defined below), a security interest in and lien upon all or substantially all of their existing and after-acquired personal and real property; and

WHEREAS, each Borrower has agreed to be jointly and severally liable for all loans and other obligations under this Agreement and to guarantee the obligations of each of the other Borrowers under this Agreement and each of the other Loan Documents.

NOW, THEREFORE, for good and valuable consideration, the parties hereto, intending to be bound hereby, agree as follows:

1.      **DEFINITIONS AND CONSTRUCTION.**

1.1      **Definitions**.    Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule 1.1.

1.2      **Accounting Terms**.    All accounting terms not specifically defined herein shall be construed in accordance with GAAP.  When used herein, the term "financial statements" shall include the notes and schedules thereto.

1.3      **Code; PPSA**.    Any terms used in this Agreement that are defined in (a) the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern, and (b) to the extent applicable, the PPSA (but not the Code) shall be construed and defined as set forth in the PPSA when used in relation to Collateral located in Canada or otherwise subject to the PPSA, unless otherwise defined herein. Notwithstanding the foregoing, and where the context so requires, (i) any term defined in this Agreement by reference to the "Code", the "UCC" or the "Uniform Commercial Code" shall also have any extended, alternative or analogous meaning given to such term in applicable

- 2 -

Canadian personal property security and other laws (including, without limitation, the PPSA, the *Bills of Exchange Act* (Canada) and the *Depository Bills and Notes Act* (Canada)), to the extent that the context requires and in all cases for the extension, preservation or betterment of the security and rights of the Collateral, (ii) all references in this Agreement to "Article 8" shall be deemed to refer also to applicable Canadian securities transfer laws (including, without limitation, the *Securities Transfer Act* of each applicable province of Canada (the "STA")), (iii) all references in this Agreement to a financing statement, continuation statement, amendment or termination statement shall be deemed to refer also to the analogous documents used under applicable Canadian personal property security laws, (iv) all references to the United States of America, or to any subdivision, department, agency or instrumentality thereof shall be deemed to refer, where the context requires with respect to Canadian Loan Parties, in lieu thereof to Canada, or to any subdivision, department, agency or instrumentality thereof, and (v) all references to federal or state securities law of the United States shall be deemed to refer, where the context requires with respect to Canadian Loan Parties, in lieu thereof to analogous federal (where applicable) and provincial securities laws in Canada.

   **1.4** **Construction**. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to "law" means all international, foreign, federal, state, provincial and local statutes, treaties, rules, guidelines, regulations, by-laws, ordinances, decrees, codes and administrative or judicial or arbitral or administrative or ministerial or departmental or regulatory precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties. All references to "province" or like terms shall include "territory" and like terms. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (a) the payment or repayment in full in immediately available funds in the Applicable Currency of (i) the principal amount of, and interest accrued and unpaid with respect to, all outstanding Loans, together with the payment of any premium applicable to the repayment of the Loans, (ii) all Lender Group Expenses that have accrued and are unpaid regardless of whether demand has been made therefor, (iii) all fees or charges that have accrued hereunder or under any other Loan Document (including the Letter of Credit Fee

and the Unused Line Fee) and are unpaid, (b) in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Letter of Credit Collateralization, (c) in the case of obligations with respect to Bank Products, providing Bank Product Collateralization, (d) the receipt by Agent of cash collateral in the Applicable Currency in order to secure any other contingent Obligations for which a claim or demand for payment has been made on or prior to such time or in respect of matters or circumstances known to Agent or a Lender at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorneys fees and legal expenses), such cash collateral to be in such amount as Agent reasonably determines is appropriate to secure such contingent Obligations, (e) the payment or repayment in full in immediately available funds in the Applicable Currency of all other outstanding Obligations other than (i) unasserted contingent indemnification Obligations, and (ii) any Bank Product Obligations that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding without being required to be repaid or cash collateralized, and (f) the termination of all of the Commitments of the Lenders; provided, that, in any such case, the deadline set forth in the DIP Order or the Canadian DIP Orders for any Person to file a complaint or adversary proceeding challenging the amount, extent, validity, or enforceability of the Prepetition Senior Obligations, or the perfection or priority of the Prepetition Senior Liens, or otherwise asserting any claims or causes of action on behalf of the Borrowers' estates against the Prepetition Senior Agent or the Prepetition Senior Secured Parties relating to the Prepetition Senior Obligations, has expired and any such complaint or adversary proceeding has been resolved.  Any reference herein to any Person shall be construed to include such Person's successors and assigns.  Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

1.5    **Time References**.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, all references to time of day refer to Eastern standard time or Eastern daylight saving time, as in effect in Atlanta, Georgia on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; provided that, with respect to a computation of fees or interest payable to Agent or any Lender, such period shall in any event consist of at least one full day.

1.6    **Schedules and Exhibits**.  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

1.7    **Exchange Rates; Currency Equivalents; Applicable Currency**For purposes of this Agreement and the other Loan Documents, the Dollar Equivalent of any Revolving Loans, Letters of Credit, other Obligations and other references to amounts denominated in a currency other than Dollars shall be determined in accordance with the terms of this Agreement.  Such Dollar Equivalent shall become effective as of such Revaluation Date for such Revolving Loans, Letters of Credit and other Obligations and shall be the Dollar Equivalent employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur for such Revolving Loans, Letters of Credit and other Obligations. Except as otherwise expressly provided herein, the applicable amount of any currency for purposes of the Loan Documents (including for purposes of financial statements and all calculations in connection with the covenants, including the financial covenants) shall be the Dollar Equivalent thereof.

- 4 -

(b)      Wherever in this Agreement and the other Loan Documents in connection with a borrowing, conversion, continuation or prepayment of a Revolving Loan or the issuance, amendment or extension of a Letter of Credit, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such Revolving Loan or Letter of Credit is denominated in Canadian Dollars, such amount shall be the relevant Canadian Dollar Equivalent of such Dollar amount (rounded to the nearest Canadian Dollar, with 0.5 of a unit being rounded upward).

1.8    **Super Priority Nature of Obligations and Liens** The priority of Agent's and the Lenders' claims against, and Liens on and in the Collateral of, the Loan Parties shall be as set forth in the DIP Order and the DIP Recognition Order.

(b)      All Obligations shall constitute administrative expenses of the Loan Parties in the Chapter 11 Cases, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code and shall constitute interim financing with a super-priority charge under Section 11.2 of the CCAA.   Subject to the Carve-Out, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code, the CCAA or otherwise, and shall at all times be senior to the rights of the Loan Parties, the Loan Parties' estates, and any successor trustee or estate representative in the Chapter 11 Cases, the Recognition Proceedings or any subsequent proceeding or case under the Bankruptcy Code or the CCAA.   The Liens granted to Agent and the Lenders on and in the Collateral of the Loan Parties, and the priorities accorded to the Obligations shall have the priority and senior secured status afforded by Sections 364(c) and 364(d)(l) of the Bankruptcy Code (all as more fully set forth in the DIP Order) and section 11.2 of the CCAA (all as more fully set forth in the DIP Recognition Order) senior to all claims and interests other than the Carve-Out and Permitted Senior Liens.

(c)      Agent's Liens on and in the Collateral of the Loan Parties and Agent's and the Lenders' respective administrative claims under Sections 364(c)(l) and 364(d) of the Bankruptcy Code  and section 11.2 of the CCAA afforded the Obligations shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code subject and subordinate only to the Carve-Out and Permitted Senior Liens.  Except as set forth herein or in the DIP Order or DIP Recognition Order, no other claim having a priority superior or pari passu to that granted to Agent and the Lenders by the DIP Order shall be granted or approved while any Obligations under this Agreement remain outstanding.  Except for the Carve-Out, no costs or expenses of administration shall be imposed against Agent, the Lenders or any of their Collateral or against any of the Prepetition Senior Agent and Prepetition Senior Secured Parties under the Prepetition Senior Credit Agreement or their Collateral (as defined in the Prepetition Senior Credit Agreement) under Sections 105, 506(c) or 552 of the Bankruptcy Code, any provision of the CCAA or otherwise, and each of the Loan Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, any provision of the CCAA or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Agent or the Lenders or against the Prepetition Senior Agent or the Prepetition Senior Secured Parties under the Prepetition Senior Credit Agreement.

1.9     **Payment of the Obligations**.  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Agent and the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court or the Canadian Court.**No Discharge; Survival of Claims**.  The Loan Parties agree that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and the Loan Parties pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) or any recognition thereof in the Recognition Proceedings and (ii) the superpriority administrative claim granted to Agent and Lenders pursuant to the DIP Order  and described in Section 1.8, and pursuant to the DIP Recognition Order, and the Liens granted to Agent pursuant to the Interim Order and Final Order and described in Section 1.8, and by the DIP Recognition Orders, shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.**Waiver of Priming Rights**. Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations and Prepetition Senior Obligations shall be outstanding, without limiting any terms or conditions of the DIP Order or the DIP Recognition Order, the Loan Parties hereby irrevocably waive any right, (a) to grant or impose, or request that (i) the Bankruptcy Court grant or impose, under section 364 of the Bankruptcy Code or otherwise or (ii) the Canadian Court grant or impose, under section 11.2 of the CCAA or otherwise, liens on or security interests in any of the collateral securing the Obligations or Prepetition Senior Obligations, which are pari passu with, equal to or superior to the liens and security interests held by Agent or Prepetition Senior Agent, (b) to grant or impose, or request that (i) the Bankruptcy Court grant or impose  under section 364 of the Bankruptcy Code or otherwise or (ii) the Canadian Court grant or impose under section 11.2 of the CCAA or otherwise, claims or expenses against any Loan Party, which are pari passu with, equal to or superior to the Obligations or adequate protection claims of the Prepetition Senior Agent or Prepetition Senior Secured Parties, and (c) to use, or to request that the Bankruptcy Court or the Canadian Court authorize the use of, Cash Collateral (as defined in the DIP Order) or proceeds of Loans, except for such consensual uses expressly provided under the DIP Order and the DIP Recognition Order.**LOANS AND TERMS OF PAYMENT.**

2.1     **Revolving Loans**.

(a)     Subject to the terms and conditions of this Agreement, the DIP Order and the Canadian DIP Orders, and during the term of this Agreement, each Revolving Lender with a US Revolver Commitment agrees (severally, not jointly or jointly and severally) to make revolving loans in Dollars ("US Revolving Loans") to US Borrowers in an amount at any one time outstanding not to exceed *the lesser of:*

(i)     such Lender's US Revolver Commitment, or

(ii)     such Lender's Pro Rata Share of an amount equal to *the least of:*

(A)     the amount equal to (1) the Maximum Revolver Amount less (2) the sum of (x) the Letter of Credit Usage at such time plus (y) the principal amount of US Swing Loans outstanding at such time, plus (z) the Canadian Revolver Usage at such time,

(B)    the amount equal to (1) the Borrowing Base as of such date (based upon the most recent Borrowing Base Certificate) *less* (2) the sum of (x) the Letter of Credit Usage at such time, *plus* (y) the principal amount of US Swing Loans outstanding at such time, *plus* (z) the Canadian Revolver Usage at such time,

provided, that, in no event shall the sum of the US Revolver Usage and the Dollar Equivalent of the Canadian Revolver Usage exceed the budgeted amount for any applicable period of Revolver Usage as set forth in the Approved Budget (after giving effect to the permitted variances as to expenditures and income provided in the definition of "Substantial Compliance").

(b)    Subject to the terms and conditions of this Agreement and the DIP Order, and during the term of this Agreement, each Revolving Lender with a Canadian Revolver Commitment agrees (severally, not jointly or jointly and severally) to make revolving loans in Dollars or Canadian Dollars ("Canadian Revolving Loans") to Canadian Borrower in an amount at any one time outstanding not to exceed the Dollar Equivalent equal to *the lesser of:*

(i)    such Lender's Canadian Revolver Commitment, or

(ii)    such Lender's Pro Rata Share of an amount equal to *the lesser of:*

(A)    the amount equal to (1) the Canadian Maximum Revolver Amount *less* (2) the principal amount of Canadian Swing Loans outstanding at such time,

(B)    the amount equal to (1) the Borrowing Base as of such date (based upon the most recent Borrowing Base Certificate) *less* (2) the sum of (y) the principal amount of Canadian Swing Loans outstanding at such time, *plus* (z) the US Revolver Usage at such time,

(C)    the amount equal to (1) the Maximum Revolver Amount less (2) the sum of (x) the Letter of Credit Usage at such time plus (y) the principal amount of Canadian Swing Loans outstanding at such time, plus (z) the US Revolver Usage at such time,

provided, that, in no event shall the sum of the US Revolver Usage and the Dollar Equivalent of the Canadian Revolver Usage exceed the budgeted amount for any applicable period of Revolver Usage as set forth in the Approved Budget (after giving effect to the permitted variances as to expenditures and income provided in the definition of "Substantial Compliance").

(c)    Amounts borrowed pursuant to this Section 2.1 may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement.  The outstanding principal amount of the Revolving Loans, together with interest accrued and unpaid thereon, shall constitute Obligations and shall be due and payable on the Maturity Date or, if earlier, on the date on which they are declared or become due and payable pursuant to the terms of the DIP Order, the Canadian DIP Orders and this Agreement.

(d)    Anything to the contrary in this Section 2.1 notwithstanding, Agent shall have the right (but not the obligation), in the exercise of its Permitted Discretion, to establish and increase or decrease Receivable Reserves, Inventory Reserves, Bank Product Reserves, Canadian Priority Payables Reserves, and other Reserves against the Borrowing Base, the Canadian

- 7 -

Maximum Revolver Amount or the Maximum Revolver Amount.   The amount of any Receivable Reserve, Inventory Reserve, Bank Product Reserve, Canadian Priority Payables Reserves, or other Reserve established by Agent shall have a reasonable relationship to the event, condition, other circumstance, or fact that is the basis for such reserve and shall not be duplicative of any other reserve established and currently maintained.

(e)   Anything to the contrary in this <u>Section 2.1</u> notwithstanding, at no time shall the sum of the US Revolver Usage and the Dollar Equivalent of the Canadian Revolver Usage exceed (i) the Maximum Revolver Amount, or (ii) the budgeted amount for any applicable period of Revolver Usage as set forth in the Approved Budget (after giving effect to the permitted variances as to expenditures and income provided in the definition of "Substantial Compliance").

2.2   **[RESERVED]**.

2.3   **Borrowing Procedures and Settlements**.

(a)   **Procedure for Borrowing Revolving Loans**.   Each Borrowing shall be made by a written request by an Authorized Person delivered to Agent and received by Agent (i) no later than 1:00 p.m. on the Business Day that is the requested Funding Date, in the case of a request for a Swing Loan, (ii) 2 Business Days prior to the requested Funding Date, in the case of a request for a Canadian Revolving Loan, and (iii) no later than 1:00 p.m. on the Business Day that is 1 Business Day prior to the requested Funding Date, in the case of all other requests, specifying (A) the amount of such Borrowing and whether such Borrowing is for the account of US Borrowers or Canadian Borrower (and if for the Canadian Borrower, whether in Dollars or Canadian Dollars), (B) the requested Funding Date (which shall be a Business Day), and (C) whether such Borrowing is a Swing Loan.   At Agent's election, in lieu of delivering the above-described written request, any Authorized Person may give Agent telephonic notice of such request by the required time.   In such circumstances, Borrowers agree that any such telephonic notice will be confirmed in writing within 24 hours of the giving of such telephonic notice, but the failure to provide such written confirmation shall not affect the validity of the request. Borrowings for the account of US Borrowers shall be denominated in Dollars and Borrowings for the account of Canadian Borrower shall be denominated in Dollars or Canadian Dollars (as selected by Administrative Borrower).

(b)   **Making of Swing Loans**.   In the case of a request for a US Swing Loan by US Borrowers or a request for a Canadian Swing Loan by Canadian Borrower and so long as either (i) the aggregate Dollar Equivalent amount of Swing Loans made since the last Settlement Date, minus all payments or other amounts applied to Swing Loans since the last Settlement Date, plus the amount of the requested Swing Loan does not exceed 10% of the Maximum Revolver Amount, or (ii) the applicable Swing Lender, in its sole discretion, agrees to make such Swing Loan notwithstanding the foregoing limitation, the US Swing Lender (in the case of a US Swing Loan) or the Canadian Swing Lender (in the case of a Canadian Swing Loan), as applicable, shall make a Revolving Loan (any such Revolving Loan for the account of US Borrowers made by US Swing Lender pursuant to this <u>Section 2.3(b)</u> being referred to as a "<u>US Swing Loan</u>" and all such Revolving Loans for the account of US Borrowers by US Swing Lender being referred to as "<u>US Swing Loans</u>" and any such Revolving Loan for the account of

- 8 -

Canadian Borrower made by Canadian Swing Lender pursuant to this <u>Section 2.3(b)</u> being referred to as a "<u>Canadian Swing Loan</u>" and all such Revolving Loans for the account of Canadian Borrower by Canadian Swing Lender being referred to as "<u>Canadian Swing Loans</u>") available to the applicable Borrower on the Funding Date applicable thereto by transferring immediately available funds in the Applicable Currency in the amount of such requested Borrowing to the US Designated Account (in the case of a US Swing Loan) or the Canadian Designated Account (in the case of Canadian Swing Loan). Each Swing Loan shall be deemed to be a Revolving Loan hereunder and shall be subject to all the terms and conditions (including <u>Section 3</u>) applicable to other Revolving Loans, except that all payments (including interest) on any Swing Loan shall be payable to the applicable Swing Lender solely for its own account. Subject to the provisions of <u>Section 2.3(d)(ii)</u>, no Swing Lender shall make or be obligated to make any Swing Loan if such Swing Lender has actual knowledge that (i) one or more of the applicable conditions precedent set forth in <u>Section 3</u> will not be satisfied (unless such condition has been waived in accordance with the terms of this Agreement) on the requested Funding Date for the applicable Borrowing, (ii) the requested Borrowing would exceed US Availability (if a US Borrowing) or Canadian Availability (if a Canadian Borrowing) on such Funding Date, or (iii) the requested Borrowing would cause the Borrowers to exceed any applicable budgeted amount for the period during which such Revolving Loan would be made as set forth in the Approved Budget (after giving effect to the permitted variances as to expenditures and income provided in the definition of "Substantial Compliance"). No Swing Lender shall otherwise be required to determine whether the applicable conditions precedent set forth in <u>Section 3</u> have been satisfied on the Funding Date applicable thereto prior to making any Swing Loan. The US Swing Loans shall constitute US Revolving Loans and US Obligations, and bear interest at the rate applicable from time to time to US Revolving Loans that are Base Rate Loans, and the Canadian Swing Loans shall constitute Canadian Revolving Loans and Canadian Obligations, and bear interest at the rate applicable from time to time to Canadian Revolving Loans that are Base Rate Loans.

(c)     **Making of Revolving Loans**.

(i)     In the event that the applicable Swing Lender is not obligated to make a Swing Loan, then after receipt of a request for a Borrowing pursuant to <u>Section 2.3(a)</u>, Agent shall notify the applicable Lenders by telecopy, telephone, email, or other electronic form of transmission, of the requested Borrowing (and whether such borrowing is for the account of US Borrowers or Canadian Borrower); such notification to be sent on the Business Day that is 1 Business Day prior to the requested Funding Date (in the case of US Revolving Loans) or 2 Business Days prior to the requested Funding Date (in the case of Canadian Revolving Loans). If Agent has notified the applicable Lenders of a requested Borrowing in accordance with the preceding sentence, then each Lender with the applicable Revolver Commitment shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds in the Applicable Currency, to Agent's US Account or Agent's Canadian Account, as applicable, not later than 1:00 p.m. on the Business Day that is the requested Funding Date. After Agent's receipt of the proceeds of such Revolving Loans from the applicable Lenders, Agent shall make the proceeds thereof available to the applicable Borrower on the applicable Funding Date by transferring immediately available funds in the Applicable Currency equal to such proceeds received by Agent to the US Designated Account or Canadian Designated Account, as applicable; <u>provided</u>, that, subject to the provisions of <u>Section 2.3(d)(ii)</u>,

- 9 -

no Lender shall have an obligation to make any Revolving Loan, if (1) one or more of the applicable conditions precedent set forth in <u>Section 3</u> will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, (2) the requested Borrowing would exceed the US Availability (in the case of a US Borrowing) or Canadian Availability (in the case of a Canadian Borrowing) on such Funding Date, or (3) the requested Borrowing would cause the Borrowers to exceed any applicable budgeted amount for the period during which such Revolving Loan would be made as set forth in the Approved Budget (after giving effect to the permitted variances as to expenditures and income provided in the definition of "Substantial Compliance").

(ii)     Unless Agent receives notice from a Lender prior to 12:30 p.m. on the Business Day that is the requested Funding Date relative to a requested Borrowing as to which Agent has notified the Lenders of a requested Borrowing that such Lender will not make available as and when required hereunder to Agent for the account of US Borrowers or Canadian Borrower, as applicable, the amount of that Lender's Pro Rata Share of the Borrowing, Agent may assume that each Lender has made or will make such amount available to Agent in immediately available funds in the Applicable Currency on the Funding Date and Agent may (but shall not be so required), in reliance upon such assumption, make available to US Borrowers or Canadian Borrower, as applicable, a corresponding amount.  If, on the requested Funding Date, any Lender shall not have remitted the full amount that it is required to make available to Agent in immediately available funds in the Applicable Currency and if Agent has made available to US Borrowers or Canadian Borrower, as applicable, such amount on the requested Funding Date, then such Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds in the Applicable Currency, to Agent's Applicable Account, no later than 1:00 p.m. on the Business Day that is the first Business Day after the requested Funding Date (in which case, the interest accrued on such Lender's portion of such Borrowing for the Funding Date shall be for Agent's separate account).  If any Lender shall not remit the full amount that it is required to make available to Agent in immediately available funds in the Applicable Currency as and when required hereby and if Agent has made available to US Borrowers or Canadian Borrower, as applicable, such amount, then that Lender shall be obligated to immediately remit such amount to Agent, together with interest at the applicable Defaulting Lender Rate for each day until the date on which such amount is so remitted.  A notice submitted by Agent to any Lender with respect to amounts owing under this <u>Section 2.3(c)(ii)</u> shall be conclusive, absent manifest error.  If the amount that a Lender is required to remit is made available to Agent, then such payment to Agent shall constitute such Lender's US Revolving Loans (in the case of Revolving Loans for the account of US Borrowers) or Canadian Revolving Loans (in the case of Revolving Loans for the account of Canadian Borrower) for all purposes of this Agreement.  If such amount is not made available to Agent on the Business Day following the Funding Date, Agent will notify Administrative Borrower of such failure to fund and, upon demand by Agent, US Borrowers (in the case of US Revolving Loans) and Canadian Borrower (in the case of Canadian Revolving Loans) shall pay such amount in the Applicable Currency to Agent, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the applicable Revolving Loans composing such Borrowing.

(d)     **Protective Advances and Optional Overadvances**.

- 10 -

(i)       Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to Section 2.3(d)(iv), at any time (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) that any of the other applicable conditions precedent set forth in Section 3 are not satisfied, Agent hereby is authorized by Borrowers and the Lenders, from time to time, in Agent's sole discretion, to make US Revolving Loans to, or for the benefit of, US Borrowers, and/or Canadian Revolving Loans to, or for the benefit of, Canadian Borrower, in each case, on behalf of the applicable Revolving Lenders, that Agent, in its Permitted Discretion, deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, or (2) to enhance the likelihood of repayment of the Obligations (other than the Bank Product Obligations), in each case so long as such Revolving Loans have not been outstanding for more than 60 consecutive days, unless otherwise agreed to by the Required Lenders (the US Revolving Loans described in this Section 2.3(d)(i) shall be referred to as "US Protective Advances" and the Canadian Revolving Loans described in this Section 2.3(d)(i) shall be referred to as "Canadian Protective Advances").  Notwithstanding the foregoing, the aggregate Dollar Equivalent principal amount of all Protective Advances outstanding at any one time shall not exceed 10% of the Adjusted Borrowing Base.

(ii)       Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to Section 2.3(d)(iv), the Lenders hereby authorize Agent or the applicable Swing Lender, as applicable, and either Agent or the applicable Swing Lender, as applicable, may, but is not obligated to, knowingly and intentionally, continue to make US Revolving Loans (including US Swing Loans) to US Borrowers and Canadian Revolving Loans (including Canadian Swing Loans) to Canadian Borrower notwithstanding that an Overadvance exists or would be created thereby, so long as (A) with respect to any such Revolving Loans, after giving effect to any such Revolving Loans, (x) the outstanding Revolver Usage does not exceed the Borrowing Base (based upon the most recent Borrowing Base Certificate) by more than 10% of the Adjusted Borrowing Base, (y) the sum of the outstanding US Revolver Usage (except for and excluding amounts charged to the US Loan Account for interest, fees, or Lender Group Expenses) and the Dollar Equivalent of the Canadian Revolver Usage (except for and excluding amounts charged to the Canadian Loan Account for interest, fees and Lender Group Expenses) does not exceed the Maximum Revolver Amount, and (z) such Revolving Loans have not been outstanding for more than 60 consecutive days, unless otherwise agreed to by the Required Lenders, and (B) with respect to any such Canadian Revolving Loans, after giving effect to such Canadian Revolving Loans, the sum of the outstanding Dollar Equivalent of the Canadian Revolver Usage (except for and excluding amounts charged to the Canadian Loan Account for interest, fees, or Lender Group Expenses) does not exceed the Canadian Maximum Revolver Amount.  In the event Agent obtains actual knowledge that the applicable US Revolver Usage or Canadian Revolver Usage (or Revolver Usage) exceeds the amounts permitted by the immediately foregoing provisions, regardless of the amount of, or reason for, such excess, Agent shall notify the Lenders as soon as practicable (and prior to making any (or any additional) intentional Overadvances (except for and excluding amounts charged to the applicable Loan Account for interest, fees, or Lender Group Expenses) unless Agent determines that prior notice would result in imminent harm to the Collateral or its value, in which case Agent may make such Overadvances and provide notice as promptly as practicable thereafter), and the Lenders with applicable Revolver Commitments thereupon shall, together with Agent, jointly determine the terms of arrangements that shall be implemented with the applicable Borrowers intended to reduce, within a reasonable time, the outstanding principal amount of the applicable Revolving

- 11 -

Loans to such Borrowers to an amount permitted by the preceding sentence. In such circumstances, if any Lender with a Revolver Commitment objects to the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders. The foregoing provisions are meant for the benefit of the Lenders and Agent and are not meant for the benefit of Borrowers, which shall continue to be bound by the provisions of Section 2.4(e). Each Lender with a Revolver Commitment shall be obligated to settle with Agent as provided in Section 2.3(e) (or Section 2.3(g), as applicable) for the amount of such Lender's Pro Rata Share of any unintentional Overadvances by Agent reported to such Lender, any intentional Overadvances made as permitted under this Section 2.3(d)(ii), and any Overadvances resulting from the charging to the applicable Loan Account of interest, fees, or Lender Group Expenses.

(iii)   Each US Protective Advance and each US Overadvance (each, "US Extraordinary Advance") shall be deemed to be a US Revolving Loan hereunder and each Canadian Protective Advance and Canadian Overadvance (each, a "Canadian Extraordinary Advance") shall be deemed a Canadian Revolving Loan hereunder. Prior to Settlement with respect to Extraordinary Advances, all payments on the Extraordinary Advances, including interest thereon, shall be payable to Agent solely for its own account. The US Extraordinary Advances shall be repayable on demand, constitute US Obligations hereunder, and bear interest at the rate applicable from time to time to US Revolving Loans that are Base Rate Loans, and the Canadian Extraordinary Advances shall be repayable on demand, constitute Canadian Obligations hereunder, and bear interest at the rate applicable from time to time to Canadian Revolving Loans that are Base Rate Loans. The provisions of this Section 2.3(d) are for the exclusive benefit of Agent, Swing Lenders, and the Lenders and are not intended to benefit Borrowers (or any other Loan Party) in any way.

(iv)   Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, (A) no Extraordinary Advance may be made by Agent if such Extraordinary Advance would cause (1) the aggregate Dollar Equivalent principal amount of Extraordinary Advances outstanding to exceed an amount equal to 10% of the Adjusted Borrowing Base, or (2) the aggregate Revolver Usage (except for and excluding amounts charged to the Loan Accounts for interest, fees, or Lender Group Expenses) to exceed the Maximum Revolver Amount, and (B) Agent's authorization to make Protective Advances and/or Overadvances may be revoked at any time by the Required Lenders.

(e)   **Settlement**. It is agreed that each Lender's funded portion of (i) the US Revolving Loans is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding US Revolving Loans and (ii) Canadian Revolving Loans is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Canadian Revolving Loans. Such agreement notwithstanding, Agent, Swing Lenders, and the other Lenders agree (which agreement shall not be for the benefit of Borrowers) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Revolving Loans (including the Swing Loans and the Extraordinary Advances) shall take place on a periodic basis in accordance with the following provisions:

(i)   Agent shall request settlement ("Settlement") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Agent in its sole discretion (1) on

ATL 22306858v2

behalf of US Swing Lender, with respect to the outstanding US Swing Loans, (2) on behalf of Canadian Swing Lender, with respect to the outstanding Canadian Swing Loans, (3) for itself, with respect to the outstanding Extraordinary Advances, and (4) with respect to Loan Parties' payments or other amounts received, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 5:00 p.m. on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "Settlement Date").   Such notice of a Settlement Date shall include a summary statement of the amount of outstanding US Revolving Loans (including US Swing Loans and US Extraordinary Advances) and Canadian Revolving Loans (including Canadian Swing Loans and Canadian Extraordinary Advances) for the period since the prior Settlement Date.   Subject to the terms and conditions contained herein (including Section 2.3(g)):  (y) if the amount of the applicable Revolving Loans (including applicable Swing Loans and applicable Extraordinary Advances) made by a Lender that is not a Defaulting Lender exceeds such Lender's Pro Rata Share of the Revolving Loans (including Swing Loans, and Extraordinary Advances) as of a Settlement Date, then Agent shall, by no later than 3:00 p.m. on the Settlement Date, transfer in immediately available funds in the Applicable Currency to a Deposit Account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the US Revolving Loans (including US Swing Loans and US Extraordinary Advances) and the Canadian Revolving Loans (including Canadian Swing Loans and Canadian Extraordinary Advances), as applicable, and (z) if the amount of the applicable Revolving Loans (including the applicable Swing Loans and applicable Extraordinary Advances) made by a Lender is less than such Lender's Pro Rata Share of the applicable Revolving Loans (including applicable Swing Loans and applicable Extraordinary Advances) as of a Settlement Date, such Lender shall no later than 3:00 p.m. on the Settlement Date transfer in immediately available funds in the Applicable Currency to Agent's Applicable Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the US Revolving Loans (including US Swing Loans and US Extraordinary Advances) and Canadian Revolving Loans (including Canadian Swing Loans and Canadian Extraordinary Advances). Such amounts made available to Agent under clause (z) of the immediately preceding sentence shall be applied against the amounts of the applicable Swing Loans or Extraordinary Advances. If any such amount is not made available to Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii)     In determining whether a Lender's balance of the applicable Revolving Loans (including Swing Loans and Extraordinary Advances) is less than, equal to, or greater than such Lender's Pro Rata Share of the applicable Revolving Loans as of a Settlement Date, Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments applicable to such Obligations actually received in good funds by Agent with respect to principal, interest, fees payable by Borrowers and allocable to the Lenders hereunder, and proceeds of Collateral.

(iii)     Between Settlement Dates, Agent, to the extent Extraordinary Advances for the account of Agent or Swing Loans for the account of a Swing Lender are outstanding, may pay over to Agent or such Swing Lender, as applicable, any payments or other

- 13 -

amounts received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to the Extraordinary Advances or Swing Loans. Between Settlement Dates, Agent, to the extent no Extraordinary Advances or Swing Loans are outstanding, may pay over to the applicable Swing Lender any payments or other amounts received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to the applicable Swing Lender's Pro Rata Share of the applicable Revolving Loans. If, as of any Settlement Date, payments or other amounts of Loan Parties received since the then immediately preceding Settlement Date have been applied to a Swing Lender's Pro Rata Share of the applicable Revolving Loans other than to its Swing Loans, as provided for in the previous sentence, such Swing Lender shall pay to Agent for the accounts of the Lenders, and Agent shall pay to the Lenders (other than a Defaulting Lender if Agent has implemented the provisions of Section 2.3(g)), to be applied to the outstanding applicable Revolving Loans of such Lenders, an amount such that each such Lender shall, upon receipt of such amount, have, as of such Settlement Date, its Pro Rata Share of the applicable Revolving Loans. During the period between Settlement Dates, a Swing Lender with respect to its Swing Loans, Agent with respect to Extraordinary Advances, and each Lender with respect to the Revolving Loans other than Swing Loans and Extraordinary Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by such Swing Lender, Agent, or the Lenders, as applicable.

(iv)    Anything in this Section 2.3(e) to the contrary notwithstanding, in the event that a Lender is a Defaulting Lender, Agent shall be entitled to refrain from remitting settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in Section 2.3(g).

(f)    **Notation**.  Agent, as a non-fiduciary agent for Borrowers, shall maintain a register showing in the Applicable Currency the principal amount of the Revolving Loans owing to each Lender, including Swing Loans owing to the applicable Swing Lender, and Extraordinary Advances owing to Agent, and the interests therein of each Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(g)    **Defaulting Lenders**.

(i)    Notwithstanding the provisions of Section 2.4(b)(iii), Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrowers to Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments (A) first, to Swing Lenders to the extent of any Swing Loans that were made by Swing Lenders and that were required to be, but were not, paid by the Defaulting Lender, (B) second, to Issuing Bank, to the extent of the portion of a Letter of Credit Disbursement that was required to be, but was not, paid by the Defaulting Lender, (C) third, to each Non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Revolving Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (D) to a suspense account maintained by Agent, the proceeds of which shall be retained by Agent and may be made available to be re-advanced to or for the benefit of Borrowers (upon the request of

- 14 -

Borrowers and subject to the conditions set forth in <u>Section 3.2</u>) as if such Defaulting Lender had made its portion of Revolving Loans (or other funding obligations) hereunder, and (E) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender in accordance with tier (L) of <u>Section 2.4(b)(iii)</u>.  Subject to the foregoing, Agent may hold and, in its discretion, re-lend to the applicable Borrower(s) for the account of such Defaulting Lender the amount of all such payments received and retained by Agent for the account of such Defaulting Lender.  Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Pro Rata Share in connection therewith) and for the purpose of calculating the fee payable under <u>Section 2.10(b)</u>, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; <u>provided</u>, that the foregoing shall not apply to any of the matters governed by <u>Section 14.1(a)(i)</u> through <u>(iii)</u>.  The provisions of this <u>Section 2.3(g)</u> shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, Agent, Issuing Bank, and Borrowers shall have waived, in writing, the application of this <u>Section 2.3(g)</u> to such Defaulting Lender, or (z) the date on which such Defaulting Lender makes payment of all amounts that it was obligated to fund hereunder, pays to Agent all amounts owing by Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by Agent pursuant to <u>Section 2.3(g)(ii)</u> shall be released to the applicable Borrower(s)).  The operation of this <u>Section 2.3(g)</u> shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to Agent, Issuing Bank, or to the Lenders other than such Defaulting Lender.  Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrowers, at their option, upon written notice to Agent, to arrange for a substitute Lender to assume the Commitments of such Defaulting Lender and any Affiliate of such Defaulting Lender, such substitute Lender to be reasonably acceptable to Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than Bank Product Obligations, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Pro Rata Share of its participation in the Letters of Credit); <u>provided</u>, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Groups' or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.  In the event of a direct conflict between the priority provisions of this <u>Section 2.3(g)</u> and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 2.3(g)</u> shall control and govern.

ATL 22306858v2

(ii)     If any applicable Swing Loan or Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender then:

(A)     such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure shall be reallocated among the applicable Non-Defaulting Lenders in accordance with their respective Pro Rata Shares but only to the extent (x) the sum of all Non-Defaulting Lenders' US Revolver Usage plus such Defaulting Lender's US Swing Loan Exposure and Letter of Credit Exposure does not exceed the amount by which the total of all Non-Defaulting Lenders' US Revolver Commitments exceed the Dollar Equivalent of the Canadian Revolver Usage, (y) the sum of the Dollar Equivalent of all Non-Defaulting Lenders' Canadian Revolver Usage plus such Defaulting Lender's Canadian Swing Line Exposure and Canadian Letter of Credit Exposure does not exceed the total of all Non-Defaulting Lenders' Canadian Revolver Commitments, and (z) the conditions set forth in Section 3.2 are satisfied at such time;

(B)     if the reallocation described in clause (A) above cannot, or can only partially, be effected, applicable Borrower(s) shall within one Business Day following notice by the Agent (x) first, prepay such Defaulting Lender's applicable Swing Loan Exposure (after giving effect to any partial reallocation pursuant to clause (A) above) and (y) second, cash collateralize such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (A) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Agent, for so long as such Letter of Credit Exposure is outstanding; provided, that Borrowers shall not be obligated to cash collateralize any Defaulting Lender's Letter of Credit Exposure if such Defaulting Lender is also the Issuing Bank;

(C)     if Borrowers cash collateralize any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.3(g)(ii), Borrowers shall not be required to pay any Letter of Credit Fees to Agent for the account of such Defaulting Lender pursuant to Section 2.6(b) with respect to such cash collateralized portion of such Defaulting Lender's Letter of Credit Exposure during the period such Letter of Credit Exposure is cash collateralized;

(D)     to the extent the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.3(g)(ii), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to Section 2.6(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Letter of Credit Exposure;

(E)     to the extent any Defaulting Lender's Letter of Credit Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.3(g)(ii), then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under Section 2.6(b) with respect to such portion of such Letter of Credit Exposure shall instead be payable to the Issuing Bank until such portion of such Defaulting Lender's Letter of Credit Exposure is cash collateralized or reallocated;

(F)     so long as any Lender is a Defaulting Lender, the Swing Lender shall not be required to make any Swing Loan and the Issuing Bank shall not be required

- 16 -

to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Pro Rata Share of such Swing Loans or Letter of Credit cannot be reallocated pursuant to this Section 2.3(g)(ii) or (y) the Swing Lender or Issuing Bank, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the Swing Lender or Issuing Bank, as applicable, and Borrowers to eliminate the Swing Lender's or Issuing Bank's risk with respect to the Defaulting Lender's participation in Swing Loans or Letters of Credit; and

(G)     Agent may release any cash collateral provided by Borrowers pursuant to this Section 2.3(g)(ii) to the Issuing Bank and the Issuing Bank may apply any such cash collateral to the payment of such Defaulting Lender's Pro Rata Share of any Letter of Credit Disbursement that is not reimbursed by Borrowers pursuant to Section 2.11(d).

(iii)     If any Lender with a US Revolver Commitment is a Defaulting Lender, then any Affiliate of such Lender with a Canadian Revolver Commitment shall be deemed to be a Defaulting Lender, and if any Lender with a Canadian Revolver Commitment is a Defaulting Lender, then any Affiliate of such Lender with a US Revolver Commitment shall be deemed to be a Defaulting Lender.

(h)     **Independent Obligations**.  All Revolving Loans (other than Swing Loans and Extraordinary Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares.  It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Revolving Loan (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

2.4     <u>**Payments; Prepayments; Collections**</u>.

(a)     **Payments by Borrowers**.

(i)     Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Applicable Account for the account of the Lender Group and shall be made in immediately available funds in the Applicable Currency, no later than 4:30 p.m. on the date specified herein.  Any payment received by Agent later than 4:30 p.m. shall be deemed to have been received (unless Agent, in its sole discretion, elects to credit it on the date received) on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)     Unless Agent receives notice from Borrowers prior to the date on which any payment is due to the Lenders that Borrowers will not make such payment in full as and when required, Agent may assume that Borrowers have made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent Borrowers do not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the

- 17 -

Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

      (b)     **Apportionment and Application**.

         (i)     Subject to the terms of the DIP Order and the Canadian DIP Orders, all payments (including all prepayments) received by Agent or Prepetition Senior Agent shall be applied to the Prepetition Senior Obligations and Obligations as follows: first to all Prepetition Senior Obligations until payment in full (as defined in the Prepetition Senior Credit Agreement) thereof (including, without limitation the Letter of Credit Collateralization (as defined in the Prepetition Senior Credit Agreement) of the Prepetition Senior Letters of Credit through the deposit of collections and/or the making of Revolving Loans into the Prepetition Senior Agent's Applicable Account), and second, to the Obligations until payment in full thereof.  So long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by Agent for application to the Obligations shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses received by Agent for application to the Obligations (other than fees or expenses that are for Agent's separate account or for the separate account of Issuing Bank) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee or expense relates.

        (ii)     Subject to the terms of the DIP Order and the Canadian DIP Orders and Section 2.4(b)(v), Section 2.4(d), and Section 2.4(e), all payments to be made hereunder by Borrowers shall be remitted to Agent and all such payments, and all proceeds of Collateral received by Agent, shall be applied, so long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, to reduce the balance of the Revolving Loans outstanding and, thereafter, to Borrowers (to be wired to the applicable Designated Account) or such other Person entitled thereto under applicable law.

        (iii)     At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all payments remitted to Agent and all proceeds of Collateral received by Agent shall be applied as follows (in each case, subject to the terms of the DIP Order and the Canadian DIP Orders and Section 2.4(b)(i)):

        (A)     first, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the Loan Documents, until paid in full,

        (B)     second, to pay any fees or premiums (other than with respect to Bank Products) then due to Agent under the Loan Documents until paid in full,

        (C)     third, to pay interest due in respect of all Protective Advances until paid in full,

        (D)     fourth, to pay the principal of all Protective Advances until paid in full,

- 18 -

(E)    <u>fifth</u>, ratably, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents, until paid in full,

(F)    <u>sixth</u>, ratably, to pay any fees or premiums then due to any of the Lenders under the Loan Documents until paid in full,

(G)    <u>seventh</u>, to pay interest accrued in respect of the Swing Loans until paid in full,

(H)    <u>eighth</u>, to pay the principal of all Swing Loans until paid in full,

(I)    <u>ninth</u>, ratably, to pay interest accrued in respect of the Revolving Loans (other than Protective Advances and Swing Loans) until paid in full,

(J)    <u>tenth</u>, ratably

i.     ratably, to pay the principal of all Revolving Loans (other than Protective Advances and Swing Loans) until paid in full,

ii.     to Agent, to be held by Agent, for the benefit of Issuing Bank (and for the ratable benefit of each of the Lenders that have an obligation to pay to Agent, for the account of Issuing Bank, a share of each Letter of Credit Disbursement), as cash collateral in an amount up to 105% of the Letter of Credit Usage (to the extent permitted by applicable law, such cash collateral shall be applied to the reimbursement of any Letter of Credit Disbursement as and when such disbursement occurs and, if a Letter of Credit expires undrawn, the cash collateral held by Agent in respect of such Letter of Credit shall, to the extent permitted by applicable law, be reapplied pursuant to this <u>Section 2.4(b)(iii)</u>, beginning with tier (A) hereof),

iii.     ratably, up to the amount (after taking into account any amounts previously paid pursuant to this clause iii. during the continuation of the applicable Application Event) of the most recently established Bank Product Reserve, which amount was established prior to the occurrence of, and not in contemplation of, the subject Application Event, to (y) the Bank Product Providers based upon amounts then certified by the applicable Bank Product Provider to Agent (in form and substance satisfactory to Agent) to be due and payable to such Bank Product Providers on account of Bank Product Obligations, and (z) with any balance to be paid to Agent, to be held by Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this <u>Section 2.4(b)(iii)</u>, beginning with tier (A) hereof,

- 19 -

(K)      eleventh, to pay any other Obligations other than Obligations owed to Defaulting Lenders (including being paid, ratably, to the Bank Product Providers on account of all amounts then due and payable in respect of Bank Product Obligations, with any balance to be paid to Agent, to be held by Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this Section 2.4(b)(iii), beginning with tier (A) hereof),

(L)      twelfth, ratably to pay any Obligations owed to Defaulting Lenders; and

(M)      thirteenth, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(iv)      Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 2.3(e).

(v)      In each instance, so long as no Application Event has occurred and is continuing, Section 2.4(b)(ii) shall not apply to any payment made by Borrowers to Agent and specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document.

(vi)      For purposes of Section 2.4(b)(iii), "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any Insolvency Proceeding, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(vii)      In the event of a direct conflict between the priority provisions of this Section 2.4 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, if the conflict relates to the provisions of Section 2.3(g) and this Section 2.4, then the provisions of Section 2.3(g) shall control and govern, and if otherwise, then the terms and provisions of this Section 2.4 shall control and govern.

(c)      **[RESERVED]**.

(d)  **Optional Prepayments**.  Borrowers may prepay the principal of any Revolving Loan at any time in whole or in part, without premium or penalty.

(e)  **Mandatory Prepayments**.  If, at any time, (A) the Revolver Usage on such date exceeds the Borrowing Base reflected in the most recent Borrowing Base Certificate, or (B) any of the limits sets forth in Section 2.1(e) shall be exceeded, then Borrowers shall, subject to the terms of the DIP Order and the Canadian DIP Orders, promptly, but in any event within 1 Business Day, prepay the Obligations in accordance with Section 2.4(f) in an aggregate amount equal to the amount of such excess.

(f)  **Application of Payments**.  Subject to the terms of the DIP Order and the Canadian DIP Orders and Section 2.4(b)(i), each prepayment pursuant to Section 2.4(e) shall, (A) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to the outstanding principal amount of the applicable Revolving Loans until paid in full, and *second*, to cash collateralize the Letters of Credit in an amount equal to 100% of the then outstanding Letter of Credit Usage, and (B) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(iii).

(g)  **Collections**. Without limitation of the foregoing provisions, subject to the terms of the DIP Order and the Canadian DIP Orders, Borrowers shall cause all Collections (as defined in the Guaranty and Security Agreements) to be deposited  into one or more Controlled Accounts (as defined in the Guaranty and Security Agreements) in accordance with Section 7(k) of the Guaranty and Security Agreements.

2.5  **Promise to Pay; Promissory Notes**.

(a)  Subject to the terms of the DIP Order and the Canadian DIP Orders, Borrowers agree to pay the Lender Group Expenses on the earlier of (i) the first day of the month following the date on which the applicable Lender Group Expenses were first incurred or (ii) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the applicable Loan Account pursuant to the provisions of Section 2.6(d) shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (ii)).  Subject to the terms of the DIP Order and the Canadian DIP Orders, Borrowers promise to pay all of the Obligations (including principal, interest, premiums, if any, fees, costs, and expenses (including Lender Group Expenses)) in full on the Maturity Date or, if earlier, on the date on which the Obligations (other than the Bank Product Obligations) become due and payable pursuant to the terms of the DIP Order, the Canadian DIP Orders and this Agreement.  Borrowers agree that their obligations contained in the first sentence of this Section 2.5(a) shall survive payment or satisfaction in full of all other Obligations.

(b)  Any Lender may request that any portion of its Commitments or the Loans made by it be evidenced by one or more promissory notes.  In such event, Borrowers shall execute and deliver to such Lender the requested promissory notes payable to the order of such Lender in a form furnished by Agent and reasonably satisfactory to Borrowers.  Thereafter, the portion of the Commitments and Loans evidenced by such promissory notes and interest thereon

- 21 -

shall at all times be represented by one or more promissory notes in such form payable to the order of the payee named therein.

2.6 **Interest Rates and Letter of Credit Fee:    Rates, Payments, and Calculations**.

(a)    **Interest Rates**.  Except as provided in Section 2.6(c):

(i)    all US Revolving Loans and all other US Obligations (except for undrawn Letters of Credit) that have been charged to the US Loan Account pursuant to the terms hereof, shall bear interest at a per annum rate equal to the US Base Rate plus the Applicable Margin; and

(ii)    all Canadian Revolving Loans and all other Canadian Obligations that have been charged to the Canadian Loan Account pursuant to the terms hereof, shall bear interest as follows: (A) if the relevant Canadian Obligation is denominated in Canadian Dollars, at a per annum rate equal to the Canadian Base Rate plus the Applicable Margin, and (B) if the relevant Canadian Obligation is denominated in Dollars, at a per annum rate equal to the US Base Rate plus the Applicable Margin.

(b)    **Letter of Credit Fee**.  Borrowers shall pay Agent (for the ratable benefit of the Revolving Lenders), a Letter of Credit fee (the "Letter of Credit Fee") (which fee shall be in addition to the fronting fees and commissions, other fees, charges and expenses set forth in Section 2.11(k)) that shall accrue at a *per annum* rate equal to the 7.0% times the undrawn amount of all outstanding Letters of Credit.

(c)    **Default Rate**.  Upon the occurrence and during the continuation of an Event of Default and at the election of Agent or the Required Lenders,

(i)    all Obligations (except for undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest at a *per annum* rate equal to 2 percentage points above the per annum rate otherwise applicable thereunder, and

(ii)    the Letter of Credit Fee shall be increased to 2 percentage points above the *per annum* rate otherwise applicable hereunder.

(d)    **Payment**.  Except to the extent provided to the contrary in Section 2.10 or Section 2.11(k), (i) all interest, all Letter of Credit Fees and all other fees payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the first day of each month and (ii) all costs and expenses payable hereunder or under any of the other Loan Documents, and all Lender Group Expenses shall be due and payable on the earlier of (x) the first day of the month following the date on which the applicable costs, expenses, or Lender Group Expenses were first incurred or (y) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the applicable Loan Account pursuant to the provisions of the following sentence shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (y)).  Each Borrower hereby authorizes Agent, from time to time without prior notice to Borrowers, to charge to the Loan Account of such Borrower (A) on the first day of each month,

- 22 -

all interest accrued during the prior month on the Revolving Loans for the account of such Borrower hereunder, (B) on the first day of each month, all Letter of Credit Fees accrued or chargeable hereunder during the prior month for the account of such Borrower, (C) as and when incurred or accrued, all fees and costs provided for in Section 2.10(a) owing by such Borrower, (D) on the first day of each month, the Unused Line Fee accrued during the prior month pursuant to Section 2.10(b), (E) as and when due and payable, all other fees payable by such Borrower hereunder or under any of the other Loan Documents, (F) as and when incurred or accrued, the fronting fees and all commissions, other fees, charges and expenses provided for in Section 2.11(k) owing by such Borrower, (G) as and when incurred or accrued, all other Lender Group Expenses, and (H) as and when due and payable all other payment obligations payable under any Loan Document or any Bank Product Agreement (including any amounts due and payable to the Bank Product Providers in respect of Bank Products) owing by such Borrower.  All amounts (including interest, fees, costs, expenses, Lender Group Expenses, or other amounts payable hereunder or under any other Loan Document or under any Bank Product Agreement) charged to the applicable Loan Account shall thereupon constitute Revolving Loans hereunder for the account of the applicable Borrower, shall constitute Obligations hereunder of such Borrower, and shall initially accrue interest at the rate then applicable to Revolving Loans that are Base Rate Loans.

(e)     **Computation**.     All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue; provided that Loans denominated in Canadian Dollars shall be calculated on the basis of a 365 day year (or a 366 day year, in the case of a leap year) and for the actual number of days elapsed.  In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(f)     **Intent to Limit Charges to Maximum Lawful Rate**.  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied, except as otherwise expressly provided in Section 2.16(b), to reduce the principal balance of the applicable Obligations to the extent of such excess.

2.7     **Crediting Payments**.  The receipt of any payment item by Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds in the Applicable Currency made to Agent's Applicable Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly.  Anything to the

- 23 -

contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into Agent's Applicable Account on a Business Day on or before 4:30 p.m. If any payment item is received into Agent's Applicable Account on a non-Business Day or after 4:30 p.m. on a Business Day (unless Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.8 **Designated Accounts**. Agent is authorized to make the Revolving Loans and each Issuing Bank is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.6(d). US Borrowers agree to establish and maintain the US Designated Account with the US Designated Account Bank and Canadian Borrower agrees to establish and maintain the Canadian Designated Account with the Canadian Designated Bank, in each case, for the purpose of receiving the proceeds of the applicable Revolving Loans requested by such Borrower and made by Agent or the applicable Lenders hereunder. Unless otherwise agreed by Agent and Borrowers, any Revolving Loan or Swing Loan requested by Borrowers and made by Agent or the Lenders hereunder shall be made to the applicable Designated Account.

2.9 **Maintenance of Loan Account; Statements of Obligations**. Agent shall maintain an account on its books in the name of US Borrowers (the "US Loan Account") on which US Borrowers will be charged with all US Revolving Loans (including US Extraordinary Advances and US Swing Loans) made by Agent, US Swing Lender, or the Lenders to US Borrowers or for US Borrowers' account, the Letters of Credit issued or arranged by Issuing Bank for Borrowers' account, and with all other payment US Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses of US Borrowers with respect thereto. Agent shall maintain an account on its books in the name of Canadian Borrower (the "Canadian Loan Account") on which Canadian Borrower will be charged with all Canadian Revolving Loans (including Canadian Extraordinary Advances and Canadian Swing Loans) made by Agent, Canadian Swing Lender, or the Lenders to Canadian Borrower or for Canadian Borrower's account, and with all other payment Canadian Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses of Canadian Borrower with respect thereto In accordance with Section 2.7, the applicable Loan Account will be credited with all payments received by Agent from the applicable Borrower or for the applicable Borrower's account. Agent shall make available to Borrowers monthly statements regarding the Loan Accounts, including the principal amount of Revolving Loans, interest accrued hereunder, fees accrued or charged hereunder or under the other Loan Documents, and a summary itemization of all charges and expenses constituting Lender Group Expenses accrued hereunder or under the other Loan Documents, and each such statement, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lender Group unless, within 30 days after Agent first makes such a statement available to Borrowers, Borrowers shall deliver to Agent written objection thereto describing the error or errors contained in such statement.

2.10 **Fees**.

(a) **Closing Fee**. Borrowers shall pay to Agent, for the account of the Lenders (including Wells Fargo in its capacity as a Lender), a closing fee of $150,000, which fee shall be due and payable in full on the Closing Date and shall be allocated among the Lenders in accordance with their respective Pro Rata Shares.

(b) **Unused Line Fee**. US Borrowers shall pay to Agent, for the ratable account of the Revolving Lenders with a US Revolver Commitment, an unused line fee (the "Unused Line Fee") in an amount equal to the Applicable Unused Line Fee Percentage per annum times the result of (i) the aggregate amount of the US Revolver Commitments, less (ii) the average amount of the sum of the US Revolver Usage and the Dollar Equivalent of the Canadian Revolver Usage during the immediately preceding month (or portion thereof), which Unused Line Fee shall be due and payable in arrears on the first day of each month from and after the Closing Date up to the first day of the month prior to the date on which the Obligations are paid in full and on the date on which the Obligations are paid in full.

(c) **Field Examination and Other Fees**. Borrowers shall pay to Agent, field examination, appraisal, and valuation fees and charges, as and when incurred or chargeable, as follows (i) a fee of $1,000 per day, per examiner, plus out-of-pocket expenses (including travel, meals, and lodging) for each field examination of any Parent or its Subsidiaries performed by personnel employed by Agent, and (ii) the fees or charges paid or incurred by Agent (but, in any event, no less than a charge of $1,000 per day, per Person, plus out-of-pocket expenses (including travel, meals, and lodging)) if it elects to employ the services of one or more third Persons to perform field examinations of Parents or their Subsidiaries, to establish electronic collateral reporting systems, or to appraise the Collateral, or any portion thereof.

2.11 **Letters of Credit**.

(a) Subject to the terms and conditions of this Agreement, upon the request of US Borrowers made in accordance herewith, and prior to the Maturity Date, Issuing Bank agrees to issue a requested Letter of Credit for the account of US Borrowers, provided that each Letter of Credit shall expire (or be subject to termination or non-renewal by notice from Issuing Bank to the applicable beneficiary) no later than one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, including any automatic renewal provision, one year after such renewal or extension). By submitting a request to Issuing Bank for the issuance of a Letter of Credit, US Borrowers shall be deemed to have requested that Issuing Bank issue the requested Letter of Credit. Each request for the issuance of a Letter of Credit, or the amendment, renewal, or extension of any outstanding Letter of Credit, shall be irrevocable and shall be made in writing by an Authorized Person and delivered to Issuing Bank via telefacsimile or other electronic method of transmission reasonably acceptable to Issuing Bank and reasonably in advance of the requested date of issuance, amendment, renewal, or extension. Each such request shall be in form and substance reasonably satisfactory to Issuing Bank and (i) shall specify (A) the amount of such Letter of Credit, (B) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment, renewal, or

- 25 -

extension, identification of the Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as Agent or Issuing Bank may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that Issuing Bank generally requests for Letters of Credit in similar circumstances.  Bank's records of the content of any such request will be conclusive.  Anything contained herein to the contrary notwithstanding, Issuing Bank may, but shall not be obligated to, issue a Letter of Credit that supports the obligations of Borrowers or one of their Subsidiaries in respect of (x) a lease of real property, or (y) an employment contract.

      (b)    Issuing Bank shall have no obligation to issue a Letter of Credit if any of the following would result after giving effect to the requested issuance:

      (i)    the Letter of Credit Usage would exceed the Letter of Credit Sublimit,

      (ii)    the Letter of Credit Usage would exceed the Maximum Revolver Amount *less* the outstanding amount of Revolving Loans (including Swing Loans),

      (iii)    the Letter of Credit Usage would exceed the Borrowing Base at such time *less* the outstanding principal balance of the Revolving Loans (inclusive of Swing Loans) at such time, or

      (iv)    the Letter of Credit Usage exceed any applicable budgeted amount for the period during which such Letter of Credit would be issued as set forth in the Approved Budget (after giving effect to the permitted variances as to expenditures and income provided in the definition of "Substantial Compliance").

      (c)    In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, the Issuing Bank shall not be required to issue or arrange for such Letter of Credit to the extent (i) the Defaulting Lender's Letter of Credit Exposure with respect to such Letter of Credit may not be reallocated pursuant to Section 2.3(g)(ii), or (ii) the Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to it and Borrowers to eliminate the Issuing Bank's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include Borrowers cash collateralizing such Defaulting Lender's Letter of Credit Exposure in accordance with Section 2.3(g)(ii). Additionally, Issuing Bank shall have no obligation to issue a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain Issuing Bank from issuing such Letter of Credit, or any law applicable to Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over Issuing Bank shall prohibit or request that Issuing Bank refrain from the issuance of letters of credit generally or such Letter of Credit in particular, (B) the issuance of such Letter of Credit would violate one or more policies of Issuing Bank applicable to letters of credit generally, or (C) if amounts demanded to be paid under any Letter of Credit will or may not be in United States Dollars.

(d)      Any Issuing Bank (other than Wells Fargo or any of its Affiliates) shall notify Agent in writing no later than the Business Day immediately following the Business Day on which such Issuing Bank issued any Letter of Credit; provided that (i) until Agent advises any such Issuing Bank that the provisions of Section 3.2 are not satisfied, or (ii) unless the aggregate amount of the Letters of Credit issued in any such week exceeds such amount as shall be agreed by Agent and such Issuing Bank, such Issuing Bank shall be required to so notify Agent in writing only once each week of the Letters of Credit issued by such Issuing Bank during the immediately preceding week as well as the daily amounts outstanding for the prior week, such notice to be furnished on such day of the week as Agent and such Issuing Bank may agree. Each Letter of Credit shall be in form and substance reasonably acceptable to Issuing Bank, including the requirement that the amounts payable thereunder must be payable in Dollars. If Issuing Bank makes a payment under a Letter of Credit, Borrowers shall pay to Agent an amount equal to the applicable Letter of Credit Disbursement on the Business Day such Letter of Credit Disbursement is made and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a US Revolving Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Section 3) and, initially, shall bear interest at the rate then applicable to US Revolving Loans that are Base Rate Loans. If a Letter of Credit Disbursement is deemed to be a US Revolving Loan hereunder, Borrowers' obligation to pay the amount of such Letter of Credit Disbursement to Issuing Bank shall be automatically converted into an obligation to pay the resulting US Revolving Loan. Promptly following receipt by Agent of any payment from Borrowers pursuant to this paragraph, Agent shall distribute such payment to Issuing Bank or, to the extent that Revolving Lenders have made payments pursuant to Section 2.11(e) to reimburse Issuing Bank, then to such Revolving Lenders and Issuing Bank as their interests may appear.

(e)      Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.11(d), each Revolving Lender with a US Revolver Commitment agrees to fund its Pro Rata Share of any US Revolving Loan deemed made pursuant to Section 2.11(d) on the same terms and conditions as if Borrowers had requested the amount thereof as a US Revolving Loan and Agent shall promptly pay to Issuing Bank the amounts so received by it from such Revolving Lenders. By the issuance of a Letter of Credit (or an amendment, renewal, or extension of a Letter of Credit) and without any further action on the part of Issuing Bank or the Revolving Lenders, Issuing Bank shall be deemed to have granted to each Revolving Lender with a US Revolver Commitment, and each Revolving Lender with a US Revolver Commitment shall be deemed to have purchased, a participation in each Letter of Credit issued by Issuing Bank, in an amount equal to its Pro Rata Share of such Letter of Credit, and each such Revolving Lender agrees to pay to Agent, for the account of Issuing Bank, such Revolving Lender's Pro Rata Share of any Letter of Credit Disbursement made by Issuing Bank under the applicable Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender with a US Revolver Commitment hereby absolutely and unconditionally agrees to pay to Agent, for the account of Issuing Bank, such Revolving Lender's Pro Rata Share of each Letter of Credit Disbursement made by Issuing Bank and not reimbursed by Borrowers on the date due as provided in Section 2.11(d), or of any reimbursement payment that is required to be refunded (or that Agent or Issuing Bank elects, based upon the advice of counsel, to refund) to Borrowers for any reason. Each Revolving Lender acknowledges and agrees that its obligation to deliver to Agent, for the account of Issuing Bank, an amount equal to its respective Pro Rata Share of each Letter of Credit Disbursement pursuant to this Section 2.11(e) shall be absolute and

- 27 -

unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in <u>Section 3</u>.  If any such Revolving Lender fails to make available to Agent the amount of such Revolving Lender's Pro Rata Share of a Letter of Credit Disbursement as provided in this Section, such Revolving Lender shall be deemed to be a Defaulting Lender and Agent (for the account of Issuing Bank) shall be entitled to recover such amount on demand from such Revolving Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)     Each Borrower agrees to indemnify, defend and hold harmless each member of the Lender Group (including Issuing Bank and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including Issuing Bank, a "<u>Letter of Credit Related Person</u>") (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any such Letter of Credit Related Person (other than Taxes, which shall be governed by <u>Section 16</u>) (the "<u>Letter of Credit Indemnified Costs</u>"), and which arise out of or in connection with, or as a result of:

(i)     any Letter of Credit or any pre-advice of its issuance;

(ii)     any transfer, sale, delivery, surrender or endorsement of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any Letter of Credit;

(iii)     any action or proceeding arising out of, or in connection with, any Letter of Credit (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Letter of Credit, or for the wrongful dishonor of, or honoring a presentation under, any Letter of Credit;

(iv)     any independent undertakings issued by the beneficiary of any Letter of Credit;

(v)     any unauthorized instruction or request made to Issuing Bank in connection with any Letter of Credit or requested Letter of Credit or error in computer or electronic transmission;

(vi)     an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated;

(vii)     any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds or holder of an instrument or document;

(viii)     the fraud, forgery or illegal action of parties other than the Letter of Credit Related Person;

- 28 -

(ix)   Issuing Bank's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation; or

(x)   the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person;

in each case, including that resulting from the Letter of Credit Related Person's own negligence; provided, however, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification under clauses (i) through (x) above to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity.  Borrowers hereby agree to pay the Letter of Credit Related Person claiming indemnity on demand from time to time all amounts owing under this Section 2.11(f).  If and to the extent that the obligations of Borrowers under this Section 2.11(f) are unenforceable for any reason, Borrowers agree to make the maximum contribution to the Letter of Credit Indemnified Costs permissible under applicable law.  This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)   The liability of Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by Borrowers that are caused directly by Issuing Bank's gross negligence or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit or (iii) retaining Drawing Documents presented under a Letter of Credit.  Issuing Bank shall be deemed to have acted with due diligence and reasonable care if Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement. Borrowers' aggregate remedies against Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by Borrowers to Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under Section 2.11(d), plus interest at the rate then applicable to US Revolving Loans that are Base Rate Loans hereunder.  Borrowers shall take action to avoid and mitigate the amount of any damages claimed against Issuing Bank or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit.  Any claim by Borrowers under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by Borrowers as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had Borrowers taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing Issuing Bank to effect a cure.

(h)   Borrowers are responsible for preparing or approving the final text of the Letter of Credit as issued by Issuing Bank, irrespective of any assistance Issuing Bank may provide such as drafting or recommending text or by Issuing Bank's use or refusal to use text

- 29 -

submitted by Borrowers.  Borrowers are solely responsible for the suitability of the Letter of Credit for Borrowers' purposes.  With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, Issuing Bank, in its sole and absolute discretion, may give notice of nonrenewal of such Letter of Credit and, if Borrowers do not at any time want such Letter of Credit to be renewed, Borrowers will so notify Agent and Issuing Bank at least 15 calendar days before Issuing Bank is required to notify the beneficiary of such Letter of Credit or any advising bank of such nonrenewal pursuant to the terms of such Letter of Credit.

(i)     Borrowers' reimbursement and payment obligations under this Section 2.11 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i)     any lack of validity, enforceability or legal effect of any Letter of Credit or this Agreement or any term or provision therein or herein;

(ii)    payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of the applicable Letter of Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such Letter of Credit;

(iii)   Issuing Bank or any of its branches or Affiliates being the beneficiary of any Letter of Credit;

(iv)    Issuing Bank or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Letter of Credit;

(v)     the existence of any claim, set-off, defense or other right that any Parent or any of its Subsidiaries may have at any time against any beneficiary, any assignee of proceeds, Issuing Bank or any other Person;

(vi)    any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing that might, but for this Section 2.11(i), constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, any Borrower's or any of its Subsidiaries' reimbursement and other payment obligations and liabilities, arising under, or in connection with, any Letter of Credit, whether against Issuing Bank, the beneficiary or any other Person; or

(vii)   the fact that any Default or Event of Default shall have occurred and be continuing;

provided, however, that subject to Section 2.11(g) above, the foregoing shall not release Issuing Bank from such liability to Borrowers as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against Issuing Bank following reimbursement or

- 30 -

payment of the obligations and liabilities, including reimbursement and other payment obligations, of Borrowers to Issuing Bank arising under, or in connection with, this <u>Section 2.11</u> or any Letter of Credit.

(j)   Without limiting any other provision of this Agreement, Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to Borrowers for, and Issuing Bank's rights and remedies against Borrowers and the obligation of Borrowers to reimburse Issuing Bank for each drawing under each Letter of Credit shall not be impaired by:

(i)   honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)   honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)   acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)   the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)   acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)   any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to Borrowers;

(vii)   any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and any Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)   assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

- 31 -

(ix)     payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)     acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)     honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by Issuing Bank if subsequently Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)     dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)     honor of a presentation that is subsequently determined by Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)     Borrowers shall pay immediately upon demand to Agent for the account of Issuing Bank as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Loan Account pursuant to the provisions of Section 2.6(d) shall be deemed to constitute a demand for payment thereof for the purposes of this Section 2.11(k)):  (i) a fronting fee which shall be imposed by Issuing Bank upon the issuance of each Letter of Credit of 0.125% per annum of the face amount thereof, *plus* (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all expenses incurred by, Issuing Bank, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, renewals or cancellations).

(l)     If by reason of (x) any Change in Law, or (y) compliance by Issuing Bank or any other member of the Lender Group with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board of Governors as from time to time in effect (and any successor thereto):

(i)     any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued or caused to be issued hereunder or hereby, or

(ii)     there shall be imposed on Issuing Bank or any other member of the Lender Group any other condition regarding any Letter of Credit,

and the result of the foregoing is to increase, directly or indirectly, the cost to Issuing Bank or any other member of the Lender Group of issuing, making, participating in, or maintaining any

- 32 -

Letter of Credit or to reduce the amount receivable in respect thereof, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Borrowers, and Borrowers shall pay within 30 days after demand therefor, such amounts as Agent may specify to be necessary to compensate Issuing Bank or any other member of the Lender Group for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder; provided, that (A) Borrowers shall not be required to provide any compensation pursuant to this Section 2.11(l) for any such amounts incurred more than 180 days prior to the date on which the demand for payment of such amounts is first made to Borrowers, and (B) if an event or circumstance giving rise to such amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  The determination by Agent of any amount due pursuant to this Section 2.11(l), as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(m)     Unless otherwise expressly agreed by Issuing Bank and Borrowers when a Letter of Credit is issued, (i) the rules of the ISP and the UCP shall apply to each standby Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Letter of Credit.

(n)     In the event of a direct conflict between the provisions of this Section 2.11 and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.11 shall control and govern.

2.12   **[RESERVED]**.

2.13   **Capital Requirements**.

(a)     If, after the date hereof, Issuing Bank or any Lender determines that (i) any Change in Law regarding capital, liquidity or reserve requirements for banks or bank holding companies, or (ii) compliance by Issuing Bank or such Lender, or their respective parent bank holding companies, with any guideline, request or directive of any Governmental Authority regarding capital adequacy or liquidity (whether or not having the force of law), has the effect of reducing the return on Issuing Bank's, such Lender's, or such holding companies' capital as a consequence of Issuing Bank's or such Lender's commitments hereunder to a level below that which Issuing Bank, such Lender, or such holding companies could have achieved but for such Change in Law or compliance (taking into consideration Issuing Bank's, such Lender's, or such holding companies' then existing policies with respect to capital adequacy and liquidity, and assuming the full utilization of such entity's capital) by any amount deemed by Issuing Bank or such Lender to be material, then Issuing Bank or such Lender may notify Borrowers and Agent thereof.  Following receipt of such notice, Borrowers agree to pay Issuing Bank or such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within 30 days after presentation by Issuing Bank or such Lender of a statement in the amount and setting forth in reasonable detail Issuing Bank's or such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement

- 33 -

shall be deemed true and correct absent manifest error). In determining such amount, Issuing Bank or such Lender may use any reasonable averaging and attribution methods. Failure or delay on the part of Issuing Bank or any Lender to demand compensation pursuant to this Section shall not constitute a waiver of Issuing Bank's or such Lender's right to demand such compensation; provided that Borrowers shall not be required to compensate Issuing Bank or a Lender pursuant to this Section for any reductions in return incurred more than 180 days prior to the date that Issuing Bank or such Lender notifies Borrowers of such Change in Law giving rise to such reductions and of such Lender's intention to claim compensation therefor; provided further that if such claim arises by reason of the Change in Law that is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)      If Issuing Bank or any Lender requests additional or increased costs referred to in Section 2.11(l) or amounts under Section 2.13(a) (such Issuing Bank or Lender, an "Affected Lender"), then such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to Section 2.11(l) or Section 2.13(a), as applicable, and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it. Borrowers agree to pay all reasonable out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment. If, after such reasonable efforts, such Affected Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate Borrowers' obligation to pay any future amounts to such Affected Lender pursuant to Section 2.11(l) or Section 2.13(a), as applicable, then Borrowers (without prejudice to any amounts then due to such Affected Lender under Section 2.11(l) or Section 2.13(a), as applicable) may, unless prior to the effective date of any such assignment the Affected Lender withdraws its request for such additional amounts under Section 2.11(l) or Section 2.13(a), as applicable, may designate a different Issuing Bank or substitute a Lender, in each case, reasonably acceptable to Agent to purchase the Obligations owed to such Affected Lender and such Affected Lender's commitments hereunder (a "Replacement Lender"), and if such Replacement Lender agrees to such purchase, such Affected Lender shall assign to the Replacement Lender its Obligations and commitments, and upon such purchase by the Replacement Lender, which such Replacement Lender shall be deemed to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement and such Affected Lender shall cease to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement.

(c)      Notwithstanding anything herein to the contrary, the protection of Sections 2.11(l) and 2.13 shall be available to Issuing Bank and each Lender (as applicable) regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, judicial ruling, judgment, guideline, treaty or other change or condition which shall have occurred or been imposed, so long as it shall be customary for issuing banks or lenders affected thereby to comply therewith. Notwithstanding any other provision herein, neither Issuing Bank nor any Lender shall demand compensation pursuant to this Section 2.13 if it shall not at the time be the general policy or practice of Issuing Bank or such Lender (as the case may

be) to demand such compensation in similar circumstances under comparable provisions of other credit agreements, if any.

2.14   **[RESERVED]**.

2.15   <u>**Joint and Several Liability**</u>.

(a)     Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lender Group under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)     Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this <u>Section 2.15</u>), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)     If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation until such time as all of the Obligations are paid in full.

(d)     The Obligations of each Borrower under the provisions of this <u>Section 2.15</u> constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of the provisions of this Agreement (other than this <u>Section 2.15(d)</u>) or any other circumstances whatsoever.

(e)     Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Revolving Loans or Letters of Credit issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement).   Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time

- 35 -

or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.15 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.15, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.15 shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower under this Section 2.15 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower or any Agent or Lender.

(f)     Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.  Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents.  Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)     The provisions of this Section 2.15 are made for the benefit of Agent, each member of the Lender Group, each Bank Product Provider, and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of Agent, any member of the Lender Group, any Bank Product Provider, or any of their successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 2.15 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section 2.15 will forthwith be reinstated in effect, as though such payment had not been made.

(h)     Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to any Agent or any member of the Lender Group hereunder or under any of the Bank Product Agreements are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the

- 36 -

Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(i)      Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash.  If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Agent, and such Borrower shall deliver any such amounts to Agent for application to the Obligations in accordance with Section 2.4(b).

(j)      Without limiting the foregoing, and notwithstanding that there are separate US Revolver Commitments and Canadian Revolver Commitments hereunder, (i) Canadian Borrower shall be jointly and severally liable with each US Borrower for all Obligations, including all US Obligations and Canadian Obligations, and (ii)  each US Borrower shall be jointly and severally liable with Canadian Borrower for all Obligations, including all US Obligations and Canadian Obligations.

(k)      Without limitation of anything set forth in any Guaranty and Security Agreement, each Guarantor agrees that it shall be jointly and severally liable for the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.15), as if each Guarantor were a Borrower hereunder, it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Loan Party without preferences or distinction among them; provided that, anything to the contrary contained in the foregoing notwithstanding, the Obligations for which any Guarantor is liable shall exclude any Excluded Swap Obligation (as defined in the US Guaranty and Security Agreement).

2.16    **Interest Act (Canada); Criminal Rate of Interest; Nominal Rate of Interest**.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, solely to the extent that: (i) a court of competent jurisdiction finally determines that the calculation or determination of interest payable by Canadian Borrower in respect of the Obligations pursuant to this Agreement and the other Loan Documents shall be governed by the laws of any province of Canada and the federal laws of Canada; or (ii) the Interest Act (Canada) otherwise applies:

(a)      whenever interest payable by Canadian Borrower is calculated on the basis of a period which is less than the actual number of days in a calendar year, each rate of interest determined pursuant to such calculation is, for the purposes of the Interest Act (Canada), equivalent to such rate multiplied by the actual number of days in the calendar year in which such rate is to be ascertained and divided by the number of days used as the basis of such calculation;

- 37 -

(b)      in no event shall the aggregate "interest" (as defined in Section 347 of the Criminal Code, R.S.C. 1985, c. C 46, as the same shall be amended, replaced or re-enacted from time to time (the "Criminal Code Section")) payable (whether by way of payment, collection or demand) by Canadian Borrower to Agent or any Lender under this Agreement or any other Loan Document exceed the effective annual rate of interest on the "credit advanced" (as defined in that section) under this Agreement or such other Loan Document lawfully permitted under that section and, if any payment, collection or demand pursuant to this Agreement or any other Loan Document in respect of "interest" (as defined in that section) is determined to be contrary to the provisions of that section and the amount of such payment or collection shall be refunded by Agent and Lenders to Canadian Borrower with such "interest" deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by the Criminal Code Section to result in a receipt by Agent or such Lender of interest at a rate not in contravention of the Criminal Code Section, such adjustment to be effected, to the extent necessary, as follows: firstly, by reducing the amounts or rates of interest required to be paid to Agent or that Lender; and then, by reducing any fees, charges, expenses and other amounts required to be paid to the affected Agent or Lender which would constitute "interest".  Notwithstanding the foregoing, and after giving effect to all such adjustments, if Agent or any Lender shall have received an amount in excess of the maximum permitted by the Criminal Code Section, then Canadian Borrower shall be entitled, by notice in writing to Agent or affected Lender, to obtain reimbursement from Agent or that Lender in an amount equal to such excess.  For the purposes of this Agreement and each other Loan Document to which Canadian Borrower is a party, the effective annual rate of interest payable by Canadian Borrower shall be determined in accordance with generally accepted actuarial practices and principles over the term of the loans on the basis of annual compounding for the lawfully permitted rate of interest and, in the event of dispute, a certificate of a Fellow of the Institute of Actuaries appointed by Agent for the account of Canadian Borrower will be conclusive for the purpose of such determination in the absence of evidence to the contrary;

(c)      all calculations of interest payable by Canadian Borrower under this Agreement or any other Loan Document are to be made on the basis of the nominal interest rate described herein and therein and not on the basis of effective yearly rates or on any other basis which gives effect to the principle of deemed reinvestment of interest.  The parties acknowledge that there is a material difference between the stated nominal interest rates and the effective yearly rates of interest and that they are capable of making the calculations required to determine such effective yearly rates of interest; and

(d)      if there is a conflict, inconsistency, ambiguity or difference between any provision of this Section 2.16 and any other Section of this Agreement or any other Loan Document with respect to Canadian Borrower then the provisions of this Section 2.16 shall prevail and be paramount.

2.17   **Currencies**.  The US Revolving Loans, and other US Obligations (unless such other US Obligations expressly provide otherwise) shall be made and repaid in Dollars. The Canadian Revolving Loans and other Canadian Obligations (unless such other Canadian Obligations expressly provide otherwise) shall be made in Dollars or Canadian Dollars, as selected by Administrative Borrower as provided herein.  All such Canadian Obligations denominated in Dollars shall be repaid in Dollars and all such Canadian Obligations

- 38 -

denominated in Canadian Dollars shall be repaid in Canadian Dollars. Payments made in a currency other than the Applicable Currency may be accepted by the Agent in its discretion, and, if so accepted, the parties agree that the Agent may convert the amount received to the Applicable Currency at the applicable Spot Rate in accordance with its normal banking practices.

3. **CONDITIONS; TERM OF AGREEMENT.**

    3.1   **Conditions Precedent to the Initial Extension of Credit**. The obligation of each Lender to make the initial extensions of credit provided for hereunder is subject to the fulfillment, to the satisfaction of Agent and each Lender, of each of the conditions precedent set forth on <u>Schedule 3.1</u> (the making of such initial extensions of credit by a Lender being conclusively deemed to be its satisfaction or waiver of the conditions precedent ).

    3.2   **Conditions Precedent to all Extensions of Credit**. The obligation of the Lender Group (or any member thereof) to make any Revolving Loans hereunder (or to extend any other credit hereunder) at any time shall be subject to the following conditions precedent:

    (a)   the representations and warranties of Parents and their Subsidiaries contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date);

    (b)   no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof;

    (c)   Borrowers shall be in Substantial Compliance with the Approved Budget immediately before and immediately after (on a pro forma basis) giving effect to any request for a Revolving Loan or issuance of any Letter of Credit; and

    (d)   The DIP Order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than, as to the Interim Order, by the Final Order) absent the prior written consent of Agent and the Lenders.

Without limitation of the foregoing, neither the Lender Group (nor any member thereof) shall have any obligation to make any Canadian Revolving Loans hereunder at any time unless and until each Canadian DIP Order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than, as to the Canadian Interim DIP Recognition Order, by the Final Recognition Order) absent the prior written consent of Agent and the Lenders.

    3.3   **Maturity**. This Agreement shall continue in full force and effect for a term ending on the Maturity Date.

3.4    **Effect of Maturity**.  On the Maturity Date, all commitments of the Lender Group to provide additional credit hereunder shall automatically be terminated and all of the Obligations immediately shall become due and payable without notice or demand and Borrowers shall be required to repay all of the Obligations in full.  No termination of the obligations of the Lender Group (other than payment in full of the Obligations and termination of the Commitments, and payment in full of all Prepetition Senior Obligations in accordance with the terms of the Prepetition Senior Credit Agreement) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and Agent's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitments have been terminated (and all Prepetition Senior Obligations have been paid in full in accordance with the terms of the Prepetition Senior Credit Agreement).  When all of the Obligations have been paid in full and the Lender Group's obligations to provide additional credit under the Loan Documents have been terminated irrevocably, Agent will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Agent's Liens and all notices of security interests and liens previously filed by Agent.

3.5    **Early Termination by Borrowers**.  Borrowers have the option, at any time upon 10 Business Days prior written notice to Agent, to terminate this Agreement and terminate the Commitments hereunder by repaying to Agent all of the Prepetition Senior Obligations and Obligations in full.  The foregoing notwithstanding, (a) Borrowers may rescind termination notices relative to proposed payments in full of the Prepetition Senior Obligations and Obligations with the proceeds of third party Indebtedness if the closing for such issuance or incurrence does not happen on or before the date of the proposed termination (in which case, a new notice shall be required to be sent in connection with any subsequent termination), and (b) Borrowers may extend the date of termination at any time with the consent of Agent (which consent shall not be unreasonably withheld or delayed).

3.6    **[Conditions Subsequent**.  The obligation of the Lender Group (or any member thereof) to continue to make Revolving Loans (or otherwise extend credit hereunder) is subject to the fulfillment, on or before the date applicable thereto, of the conditions subsequent set forth on Schedule 3.6 (the failure by Borrowers to so perform or cause to be performed such conditions subsequent as and when required by the terms thereof (unless such date is extended, in writing, by Agent, which Agent may do without obtaining the consent of the other members of the Lender Group), shall constitute an Event of Default).]

4.    **REPRESENTATIONS AND WARRANTIES.**

In order to induce the Lender Group to enter into this Agreement, each Parent and each Borrower makes the following representations and warranties to the Lender Group which shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date, and shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the

- 40 -

text thereof), as of the date of the making of each Revolving Loan (or other extension of credit) made thereafter, as though made on and as of the date of such Revolving Loan (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1    **Due Organization and Qualification; Subsidiaries**.

(a)    Each Loan Party (i) is duly organized and existing and in good standing under the laws of the jurisdiction of its organization, (ii) is qualified to do business in any jurisdiction where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect, and (iii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)    Set forth on Schedule 4.1(b) (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement) is a complete and accurate description of the authorized Equity Interests of each Parent, by class, and, as of the Closing Date, a description of the number of shares of each such class that are issued and outstanding.  Except as set forth on Schedule 4.1(b), no Parent is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its Equity Interests or any security convertible into or exchangeable for any of its Equity Interests.

(c)    Set forth on Schedule 4.1(c) (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement), is a complete and accurate list of the Loan Parties' direct and indirect Subsidiaries, showing:  (i) the number of shares of each class of common and preferred Equity Interests authorized for each of such Subsidiaries, and (ii) the number and the percentage of the outstanding shares of each such class owned directly or indirectly by a Parent.  All of the outstanding Equity Interests of each such Subsidiary has been validly issued and is fully paid and non-assessable.

(d)    Except as set forth on Schedule 4.1(d), there are no subscriptions, options, warrants, or calls relating to any shares of any Parent's or any of its Subsidiaries' Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument.

4.2    **Due Authorization; No Conflict**.

(a)    As to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Loan Party.

(b)    As to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party do not and will not (i) violate any

- 41 -

material provision of federal, state, provincial, foreign or local law or regulation applicable to any Loan Party or its Subsidiaries, the Governing Documents of any Loan Party or its Subsidiaries, or any order, judgment, or decree of any court or other Governmental Authority binding on any Loan Party or its Subsidiaries, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material agreement of any Loan Party or its Subsidiaries where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of any Loan Party, other than Permitted Liens, or (iv) require any approval of any holder of Equity Interests of a Loan Party or any approval or consent of any Person under any material agreement of any Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of material agreements, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

4.3     **Governmental Consents**.  The execution, delivery, and performance by each Loan Party of the Loan Documents to which such Loan Party is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than (a) registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect, (b) filings and recordings with respect to the Collateral to be made, or otherwise delivered to Agent for filing or recordation, as of the Closing Date, and (c) the entry of the DIP Order.

4.4     **Binding Obligations; Perfected Liens**.  Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms.

4.5     **Title to Assets; No Encumbrances**.  Each of the Loan Parties and its Subsidiaries has (a) good, sufficient and legal title to (in the case of fee interests in Real Property), (b) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (c) good and marketable title to (in the case of all other personal property), all of their respective assets reflected in their most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby.  All of such assets are free and clear of Liens except for Permitted Liens.

4.6     **Litigation**.

(a)     There are no actions, suits, or proceedings pending or, to the knowledge of any Borrower, after due inquiry, threatened in writing against a Loan Party or any of its Subsidiaries that (i) either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect, or (ii) relate to the Loan Documents or the Prepetition Senior Loan Documents or any of the transactions contemplated hereby or thereby.

- 42 -

(b)      Schedule 4.6(b) sets forth a complete and accurate description, with respect to each of the actions, suits, or proceedings with asserted liabilities in excess of, or that could reasonably be expected to result in liabilities in excess of, $150,000 that, as of the Closing Date, is pending or, to the knowledge of any Borrower, after due inquiry, threatened against a Loan Party or any of its Subsidiaries, of (i) the parties to such actions, suits, or proceedings, (ii) the nature of the dispute that is the subject of such actions, suits, or proceedings, (iii) the procedural status, as of the Closing Date, with respect to such actions, suits, or proceedings, and (iv) whether any liability of the Loan Parties' and their Subsidiaries in connection with such actions, suits, or proceedings is covered by insurance.

4.7      **Compliance with Laws**.  No Loan Party nor any of its Subsidiaries (a) is in violation of any applicable laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, provincial, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

4.8      **No Material Adverse Effect**.  All historical financial statements relating to the Loan Parties and their Subsidiaries that have been delivered by Borrowers to Agent have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, the Loan Parties' and their Subsidiaries' consolidated financial condition as of the date thereof and results of operations for the period then ended.  Since the Petition Date, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Effect with respect to the Loan Parties and their Subsidiaries.

4.9      **Solvency**.  No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Loan Party.

4.10      **Employee Benefits**.

(a)      (i) Each Employee Plan complies with, and has been operated in compliance with, all applicable laws (including ERISA and the IRC) and the terms of such Employee Plan in all material respects, and (ii) except as could not reasonably be expected to result in a payment liability to any Loan Party in excess of $500,000, no Loan Party has incurred any fine, penalty, excise tax, or damage with respect to the operation of any Employee Plan (provided that the foregoing shall not prohibit contributions to an Employee Plan made in the ordinary course).  As of the Closing Date, no Loan Party, none of their Subsidiaries, nor any of their ERISA Affiliates maintains or contributes to any Benefit Plan.

(b)      Except as set forth on Schedule 4.10(b), as of the Closing Date, no Loan Party, nor any of their Subsidiaries, maintains or contributes to any Canadian Pension Plan. No Loan Party, nor any of its Subsidiaries, maintains, sponsors or contributes to any Canadian

- 43 -

Defined Benefit Pension Plan nor has any liabilities or obligations in respect of a Canadian Defined Benefit Pension Plan that has been terminated or wound up.  Each Canadian Pension Plan is in material compliance with, all applicable federal and provincial laws, including the Income Tax Act (Canada) and pension benefits standards legislation, and the terms of each such Canadian Pension Plan, and the Loan Parties have made all payments with respect thereto when due, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.  As of the Closing Date, no Canadian Pension Termination Event has occurred.

4.11    **Environmental Condition**.  Except as set forth on Schedule 4.11, (a) to each Borrower's knowledge, no Loan Party's nor any of its Subsidiaries' properties or assets has ever been used by a Loan Party, its Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) to each Borrower's knowledge, after due inquiry, no Loan Party's nor any of its Subsidiaries' properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) no Loan Party nor any of its Subsidiaries has received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by a Loan Party or its Subsidiaries, and (d) no Loan Party nor any of its Subsidiaries nor any of their respective facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or Environmental Liability that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

4.12    **Complete Disclosure**.  All factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) furnished by or on behalf of a Loan Party or its Subsidiaries in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents, and all other such factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) hereafter furnished by or on behalf of a Loan Party or its Subsidiaries in writing to Agent or any Lender will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

4.13    **Patriot Act**.  To the extent applicable, each Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act") and all applicable Canadian AML Laws.  No part of the proceeds of the Loans made hereunder, nor any Letter of Credit issued hereunder, will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of

- 44 -

a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.14    **Indebtedness**.  Set forth on Schedule 4.14 is a true and complete list of all Indebtedness of each Loan Party and each of its Subsidiaries outstanding immediately prior to the Closing Date that is to remain outstanding immediately after giving effect to the closing hereunder on the Closing Date and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of the Closing Date.

4.15    **Payment of Taxes**.  Except as otherwise permitted under Section 5.5, all US and Canadian federal, provincial and state (as applicable) income tax returns and all other material tax returns and reports of each Loan Party and its Subsidiaries required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon a Loan Party and its Subsidiaries and upon their respective assets, income, businesses and franchises that are due and payable have been paid when due and payable.  Each Loan Party and each of its Subsidiaries have made adequate provision in accordance with GAAP for all taxes not yet due and payable. No Borrower knows of any proposed tax assessment against a Loan Party or any of its Subsidiaries that is not being actively contested by such Loan Party or such Subsidiary diligently, in good faith, and by appropriate proceedings; provided such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

4.16    **Margin Stock**.   No Loan Party nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the loans made to Borrowers will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.

4.17    **Governmental Regulation**.   No Loan Party nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. No Loan Party nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.18    **OFAC; Anti-Corruption Laws**.  No Loan Party nor any of its Subsidiaries (a) is a Sanctioned Person or a Sanctioned Entity, (b) has its assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and directors and, to the knowledge of such Loan Party, its employees and agents, are in compliance with Anti-

- 45 -

Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person.  None of (i) any Loan Party, any Subsidiary or any of their respective directors, officers or employees, or (ii) to the knowledge of any such Loan Party or Subsidiary, any agent of such Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No proceeds of any Loan made hereunder, nor any Letter of Credit issued hereunder, will violate any applicable Anti-Corruption Laws or Sanctions.

4.19   **Employee and Labor Matters**.    There is (i) no unfair labor practice complaint pending or, to the knowledge of any Borrower, threatened against any Parent or its Subsidiaries before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Parent or its Subsidiaries which arises out of or under any collective bargaining agreement and that could reasonably be expected to result in a material liability, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened in writing against any Parent or its Subsidiaries that could reasonably be expected to result in a material liability, or (iii) to the knowledge of any Borrower, after due inquiry, no union representation question existing with respect to the employees of any Parent or its Subsidiaries and no union organizing activity taking place with respect to any of the employees of any Parent or its Subsidiaries.  None of any Parent or its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state or provincial law, which remains unpaid or unsatisfied.  The hours worked and payments made to employees of each Parent and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  All material payments due from any Parent or its Subsidiaries on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Parents and their Subsidiaries, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.20   **Canadian Parent as a Holding Company**.  Canadian Parent is a holding company and does not have any material liabilities (other than liabilities arising under the Loan Documents), own any material assets (other than the Equity Interests of Canadian Borrower) or engage in any operations or business (other than the ownership of Canadian Borrower).

4.21   **Leases**.  Each Loan Party and its Subsidiaries enjoy peaceful and undisturbed possession under all leases material to their business and to which they are parties or under which they are operating, and, subject to Permitted Protests, all of such material leases are valid and subsisting and no material default by the applicable Loan Party or its Subsidiaries exists under any of them (other than solely as a result of the filing of the Chapter 11 Cases and the Recognition Proceedings).

4.22   **Eligible Accounts**.  As to each Account that is identified by Borrowers as an Eligible Account (whether as an Eligible Insured Account or an Eligible Non-Insured Account) in a Borrowing Base Certificate submitted to Agent, such Account is (a) a bona fide existing payment obligation of the applicable Account Debtor created by the sale and delivery of

- 46 -

Inventory or the rendition of services to such Account Debtor in the ordinary course of the Borrowers' business, (b) owed to a Borrower without any known defenses, disputes, offsets, counterclaims, or rights of return or cancellation (other than rights of return granted by Borrowers in the ordinary course of business consistent with Borrowers' practices as in effect as of the Closing Date or as otherwise modified with Agent's consent), and (c) not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Agent-discretionary criteria) set forth in the definitions of Eligible Accounts, Eligible Insured Accounts or Eligible Non-Insured Accounts.

4.23   **Eligible Inventory**.   As to each item of Inventory that is identified by Borrowers as Eligible Inventory (whether as Eligible Excess Inventory or other Eligible Inventory) in a Borrowing Base Certificate submitted to Agent, such Inventory is (a) of good and merchantable quality, free from known defects, and (b) not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Agent-discretionary criteria) set forth in the definitions of Eligible Excess Inventory or Eligible Inventory.

4.24   **Location of Inventory**.   Except as set forth on <u>Schedule 4.24</u>, the Inventory of Borrowers and their Subsidiaries is not stored with a bailee, warehouseman, or similar party and is located only at, or in-transit to or between, the locations identified on <u>Schedule 4.24</u> (as such Schedule may be updated pursuant to <u>Section 5.14</u>).

4.25   **Inventory Records**.   Each Loan Party keeps correct and accurate records itemizing and describing the type, quality, and quantity of its and its Subsidiaries' Inventory and the book value thereof.

4.26   **[RESERVED]**.

4.27   **Administrative Priority; Lien Priority; DIP Order**.

(a)   The Obligations constitute an allowed administrative expense in the Chapter 11 Cases and constitute interim financing under the CCAA, having priority in payment over all other administrative expenses and claims against the Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.

(b)   Pursuant to Section 364(c)(2) of the Bankruptcy Code and the DIP Order and Section 11.2 of the CCAA and the DIP Recognition Order, all Obligations are secured by a perfected Lien on the Collateral, subject to no other Lien (except as provided in the DIP Order) in any of the Collateral which is not encumbered by a Prior Lien (as defined in the DIP Order).

(c)   Pursuant to Section 364(d)(1) of the Bankruptcy Code and the DIP Order and Section 11.2 of the CCAA and the DIP Recognition Order, all of the Obligations are secured by (1) a perfected Lien on the Collateral which came into existence or was acquired by any Loan Party on or after the Petition Date, subject to no other Lien except as provided in the DIP Order, and (2) a perfected Lien on the Collateral which came into existence or was acquired by any Loan Party prior to the Petition Date, subject to no other Lien except as provided in the DIP Order.

- 47 -

(d)     On the Closing Date, the Interim Order is, and from and after the entry of the Final Order, the Final Order will be, in full force and effect, and neither the Interim Order nor the Final Order has been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to Agent and Lenders and are not stayed in any respect.

4.28    **Approved Budget**.  Borrowers have furnished the Approved Budget to Agent and the Lenders.  The Approved Budget is reasonable and was prepared on a reasonable basis and in good faith by Borrowers and is based on reasonable assumptions based on the best information available to Borrowers, and Borrowers are not aware of any facts or information that would lead any of them to believe that the Approved Budget is incorrect or misleading in any material respect.

4.29    **Appointment of Trustee or Examiner; Liquidation**.  No order has been entered or is pending in any Chapter 11 Case (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Sections 1104(d) and 1106(b) of the Bankruptcy Code or (c) to convert any Chapter 11 Case to a Chapter 7 case or to dismiss any Chapter 11 Case.

4.30    **Chapter 11 Cases**.  The Chapter 11 Cases were commenced by the filing of voluntary petitions on the Petition Date.  No Chapter 11 Case has been dismissed.  The motion for approval of this Agreement was proper and sufficient pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules of the Bankruptcy Court.

4.31    **Canadian Proceedings**.  The Recognition Proceedings were commenced within one Business Day after the Petition Date in accordance with all applicable law and proper notice thereof and the proper notice of (i) the application for the Canadian Initial Stay Order, the Canadian Supplemental Order and the Canadian Interim DIP Recognition Order and (ii) the hearing for the Canadian Interim DIP Recognition Order.  The Canadian Court will grant a hearing for the Canadian Final DIP Recognition Order subject only to the requirement that the Loan Parties give, on a timely basis, all notices required in accordance with applicable law to be given in respect of such hearing. No order has been entered or is pending under the CCAA or any other Insolvency Law applicable in Canada other than the Canadian Initial Stay Order, the Canadian Supplemental Order and the Canadian Interim DIP Recognition Order.

4.32    **Information Officer**.  The Information Officer for the Recognition Proceedings to be selected by the Loan Parties and approved by the Canadian Court shall be satisfactory to the Agent and the Lenders.

5.      **AFFIRMATIVE COVENANTS.**

Each Parent and each Borrower covenants and agrees that, until termination of all of the Commitments, payment in full of the Obligations, and payment in full of all Prepetition Senior Obligations in accordance with the terms of the Prepetition Senior Credit Agreement:

5.1     **Financial Statements, Reports, Certificates**.  Borrowers (a) will deliver to Agent (and, if reasonably requested by any Lender, with copies to such Lender), each of the

- 48 -

financial statements, reports, and other items set forth on <u>Schedule 5.1</u> no later than the times specified therein, (b) agree that no Subsidiary of a Loan Party will have a fiscal year different from that of Administrative Borrower, (c) agree to maintain a system of accounting that enables the Loan Parties to produce financial statements in accordance with GAAP, and (d) agree that they will, and will cause each other Loan Party to, (i) keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to their and their Subsidiaries' sales, and (ii) maintain their billing systems and practices substantially as in effect as of the Closing Date and shall only make material modifications thereto with notice to, and with the consent of, Agent.

5.2    **Reporting**.  Borrowers (a) will deliver to Agent (and, if reasonably requested by any Lender, with copies to such Lender) each of the reports set forth on <u>Schedule 5.2</u> at the times specified therein, and (b) agree to use commercially reasonable efforts in cooperation with Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on such Schedule.

5.3    **Existence**.  Except as otherwise permitted under <u>Section 6.3</u> or <u>Section 6.4</u>, each Parent and each Borrower will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect such Person's valid existence and good standing in its jurisdiction of organization and, except as could not reasonably be expected to result in a Material Adverse Effect, good standing with respect to all other jurisdictions in which it is qualified to do business and any rights, franchises, permits, licenses, accreditations, authorizations, or other approvals material to their businesses.

5.4    **Maintenance of Properties**.  Each Parent and each Borrower will, and will cause each of its Subsidiaries to, maintain and preserve all of its assets that are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear, tear, casualty, and condemnation and Permitted Dispositions excepted (and except where the failure to so maintain and preserve assets could not reasonably be expected to result in a Material Adverse Effect).

5.5    **Taxes**.  Each Parent and Borrower will, and will cause each of its Subsidiaries to, pay and discharge all Taxes in accordance with the requirements of the Bankruptcy Code and other applicable Insolvency Laws to the extent permitted under the DIP Order and the DIP Recognition Order.

5.6    **Insurance**.  Each Parent and Borrower will, and will cause each of its Subsidiaries to, at Borrowers' expense, (a) maintain insurance respecting each of each Loan Parties' assets wherever located, covering liabilities, losses or damages as are customarily are insured against by other Persons engaged in same or similar businesses and similarly situated and located.  All such policies of insurance shall be with financially sound and reputable insurance companies acceptable to Agent (it being agreed that, as of the Closing Date, Continental Casualty Company is acceptable to Agent) and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and, in any event, in amount, adequacy, and scope reasonably satisfactory to Agent (it being agreed that the amount, adequacy, and scope of the policies of insurance of the Loan Parties in effect as of the Closing Date are acceptable to Agent).  All property insurance policies

- 49 -

covering the Collateral are to be made payable to Agent for the benefit of Agent and the Lenders, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies.  All certificates of property and general liability insurance are to be delivered to Agent, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Agent and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to Agent of the exercise of any right of cancellation.  If any Loan Party or its Subsidiaries fails to maintain such insurance, Agent may arrange for such insurance, but at Borrowers' expense and without any responsibility on Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Borrowers shall give Agent prompt notice of any loss exceeding $500,000 covered by Parents or their Subsidiaries' casualty or business interruption insurance.  Upon the occurrence and during the continuance of an Event of Default, Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

5.7   **Inspection**.

(a)   Each Parent and Borrower will, and will cause each of its Subsidiaries to, permit Agent, any Lender, and each of their respective duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees (provided an authorized representative of a Borrower shall be allowed to be present) at such reasonable times and intervals as Agent or any Lender, as applicable, may designate and, so long as no Default or Event of Default has occurred and is continuing, with reasonable prior notice to Borrowers and during regular business hours.

(b)   Each Parent and Borrower will, and will cause each of its Subsidiaries to, permit Agent and each of its duly authorized representatives or agents to conduct appraisals and valuations at such reasonable times and intervals as Agent may designate.

5.8   **Compliance with Laws**.  Each Parent and Borrower will, and will cause each of its Subsidiaries to, comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

5.9   **Environmental**.  Each Parent and Borrower will, and will cause each of its Subsidiaries to,

(a)      Keep any property either owned or operated by any Parent or its Subsidiaries free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens,

(b)      Comply, in all material respects, with Environmental Laws and provide to Agent documentation of such compliance which Agent reasonably requests,

(c)      Promptly notify Agent of any release of which any Borrower has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Parent or its Subsidiaries and take any Remedial Actions required to abate said release or otherwise to come into compliance, in all material respects, with applicable Environmental Law, and

(d)      Promptly, but in any event within 10 Business Days of its receipt thereof, provide Agent with written notice of any of the following:  (i) notice that an Environmental Lien has been filed against any of the real or personal property of any Parent or its Subsidiaries, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Parent or its Subsidiaries, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

5.10    **Disclosure Updates**.  Each Parent and Borrower will, promptly and in no event later than 5 Business Days after obtaining knowledge thereof, notify Agent if any written information, exhibit, or report furnished to Agent or the Lenders contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made.  The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

5.11    **[RESERVED]**.

5.12    **Further Assurances**.  Without limitation of any of the terms of the DIP Order or the DIP Recognition Order, each Parent and Borrower will, and will cause each of the other Loan Parties to, at any time upon the reasonable request of Agent, execute or deliver to Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, opinions of counsel, and all other documents that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to create, perfect, and continue perfected or to better perfect Agent's Liens in all of the assets of each Parent and its Subsidiaries (whether now owned or hereafter arising or acquired, tangible or intangible, but excluding owned Real Property), and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents.

5.13    **Lender Meetings**.  US Parent will, within 5 Business Days after the request of Agent or of the Required Lenders, hold a meeting (at a mutually agreeable location and time or, at the option of Agent, by conference call) with all Lenders who choose to attend such meeting at which meeting shall be reviewed such matters as Agent or the Required Lenders may

- 51 -

reasonably request with respect to the Collateral and the financial results and condition of the Loan Parties.

5.14    **Location of Inventory**.   Each Borrower will, and will cause each of its Subsidiaries to, keep its Inventory only at the locations identified on <u>Schedule 4.24</u> and their chief executive offices only at the locations identified on <u>Schedule 4.24</u>; <u>provided</u>, that Borrowers may amend <u>Schedule 4.24</u> so long as such amendment occurs by written notice to Agent not less than 5 Business Days prior to the date on which such Inventory is moved to such new location or such chief executive office is relocated and so long as such new location is within the continental United States.

5.15    **Bank Products**.   The US Loan Parties shall maintain their primary depository and treasury management relationships with Wells Fargo or one or more of its Affiliates.   The Canadian Loan Parties shall maintain their primary depository and treasury management relationships with one or more Canadian banks reasonably acceptable to Agent.

5.16    **Employee Benefits**.   Each Parent and each Borrower will maintain and operate, and cause each of its Subsidiaries to maintain and operate, each Employee Plan and each Canadian Benefit Plan in accordance with all applicable laws except where the failure to maintain or operate such an Employee Plan  or Canadian Benefit Plan in accordance with applicable law could not reasonably be expected to have a Material Adverse Effect.   Each Parent and each Borrower will notify Agent within 5 Business Days of (i) the formation of, or undertaking the duty to make a contribution to, any Benefit Plan (other than contributions to an Employee Plan made in the ordinary course of business), or (ii) the receipt of any written notice from any Governmental Authority that any Loan Party may have a liability (in excess of $500,000) to make a contribution to any Benefit Plan or Canadian Benefit Plan or a liability for excise taxes, fines, penalties, or damages for breach of fiduciary duty with respect to any Employee Plan or Canadian Benefit Plan (other than contributions to an Employee Plan or Canadian Benefit Plan made in the ordinary course of business).

5.17    **Sale Transaction Milestones; Advisor**.

(a)    Within the time periods set forth below, unless otherwise extended in the discretion of Agent, and subject to the DIP Order and the DIP Recognition Order (including any modifications to the following schedule set forth therein), the Loan Parties shall achieve each of the following milestones with respect to an Equipment Sale Transaction and an Inventory Sale Transaction:

(i)    On or before 7 days after the Petition Date, the Loan Parties shall file an Approved Sale Motion with the Bankruptcy Court together with (A) a committed asset purchase agreement, in form and substance acceptable to Agent, to purchase substantially all of the Inventory of the Loan Parties from a purchaser satisfactory to Agent (such purchaser, the "<u>Inventory Stalking Horse Bidder</u>"; such committed asset purchase agreement, the "<u>Inventory Stalking Horse Bid</u>") for an amount acceptable to Agent (the "<u>Minimum Inventory Purchase Price</u>"), in cash at closing, signed by the Inventory Stalking Horse Bidder and the Loan Parties, with no material conditions to close (including any financing contingency), except for an order of the Bankruptcy Court

- 52 -

approving the sale and an order of the Canadian Court recognizing such order of the Bankruptcy Court, and (B) a committed asset purchase agreement, in form and substance acceptable to Agent, to purchase substantially all of the Equipment and related assets of the Loan Parties not subject to a Prior Lien (as defined in the DIP Order) from a purchaser satisfactory to Agent (such purchaser, the "Equipment Stalking Horse Bidder"; such committed asset purchase agreement, the "Equipment Stalking Horse Bid") for an amount acceptable to Agent (the "Minimum Equipment Purchase Price"), in cash at closing, signed by the Inventory Stalking Horse Bidder and the Loan Parties, with no material conditions to close (including any financing contingency), except for an order of the Bankruptcy Court approving the sale and an order of the Canadian Court recognizing such order of the Bankruptcy Court;

(ii)     The Loan Parties shall have obtained the Bankruptcy Court's approval of (A) Inventory Stalking Horse Bid which must provide for payment of the Minimum Inventory Purchase Price, and (B) the Equipment Stalking Horse Bid, which Equipment Stalking Horse Bid must provide for payment of the Minimum Equipment Purchase Price, no later than 25 days after the Petition Date and shall have obtained recognition by the Canadian Court of such approval order in the Recognition Proceedings no later than 3 days after issuance thereof by the Bankruptcy Court;

(iii)     The final auction of the assets covered by the Inventory Stalking Horse Bid and the Equipment Stalking Horse Bid shall be held no later than 42 days after the Petition Date;

(iv)     The Bankruptcy Court shall grant the Sale Motion no later than 45 days after the Petition Date and the Canadian Court shall enter an order recognizing such Sale Motion granted by the Bankruptcy Court no later than 3 days after the granting thereof by the Bankruptcy Court; and

(v)     The closing and funding of (A) the sale described in the Inventory Stalking Horse Bid (including the receipt by Agent and Prepetition Senior Agent of the Minimum Inventory Purchase Price) must occur no later than 55 days after the Petition Date, and (B) the sale described in the Equipment Stalking Horse Bid (including the receipt by Agent and Prepetition Senior Agent of the Minimum Equipment Purchase Price) must occur no later than 65 days after the Petition Date.

(b)     Borrowers shall (i) promptly, and in any event no later than two Business Days after receipt or delivery thereof, as applicable, deliver to Agent copies of any and all initial indications of interest from prospective buyers, management presentations to prospective buyers, and bids from prospective buyers, and (ii) promptly, and in any event no later than two Business Days after obtaining knowledge thereof, provide Agent with notice of the withdrawal of any bid from a prospective buyer and any other event that could reasonably be expected to have a materially adverse effect on any potential Sale Transaction or the timing thereof.

(c)     Borrowers (i) shall cause the Advisor to be retained at all times until an Equipment Sale Transaction and an Inventory Sale Transaction have occurred, (ii) shall not reduce the scope of the Advisors' primary duties without the prior written consent of Agent, (iii)

- 53 -

acknowledge and agree that Agent shall have access to the Advisor and (iv) shall provide Agent with copies of materials related to any Sale Transaction that is provided to any Borrower's Board of Directors

(d)    Nothing contained in this Section 5.17 shall constitute Agent's or the Lenders' consent to the sale, transfer or other disposition of any of the Collateral or any of the Loan Parties' other assets.

5.18    **Chapter 11 and Recognition Proceedings Pleadings** .  Promptly (and in any event within two days) after filing thereof, the Loan Parties will deliver, or cause to be delivered, to Agent copies of any pleadings, motions, applications, financial information and other papers and documents filed by any Loan Party in any Chapter 11 Case or in the Recognition Proceedings, which papers and documents would not otherwise be served on Agent and Agent's counsel pursuant to the Bankruptcy Court's and the Canadian Court's appropriate procedures.

5.19    **Committee Reports**.  Promptly (and in any event within two days) after sending thereof, the Loan Parties will deliver, or cause to be delivered, to Agent copies of all written reports given by any Loan Party to any Committee.

## 6.    NEGATIVE COVENANTS.

Each Parent and each Borrower covenants and agrees that, until termination of all of the Commitments, payment in full of the Obligations, and payment in full of all Prepetition Senior Obligations in accordance with the terms of the Prepetition Senior Credit Agreement:

6.1    **Indebtedness**.  Each Parent and each Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2    **Liens**.  Each Parent and each Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3    **Restrictions on Fundamental Changes**.  Each Parent and each Borrower will not, and will not permit any of its Subsidiaries to,

(a)    Enter into any merger, amalgamation, consolidation, reorganization, or recapitalization, or reclassify its Equity Interests, except as approved by Agent and the Required Lenders in writing,

(b)    liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), or

(c)    form or acquire any Subsidiary.

- 54 -

6.4     **Disposal of Assets**.   Other than Permitted Dispositions or transactions expressly permitted by Sections 6.3 or 6.9, each Parent and each Borrower will not, and will not permit any of its Subsidiaries to, convey, sell, lease, license, assign, transfer, return (including any return of Inventory to vendors or suppliers), or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any of its or their assets.

6.5     **Nature of Business**.   Each Parent and each Borrower will not, and will not permit any of its Subsidiaries to, make any change in the nature of its or their business as described in Schedule 6.5 or acquire any properties or assets that are not reasonably related to the conduct of such business activities.

6.6     **Prepayments and Amendments**.   Each Parent and Borrower will not, and will not permit any of its Subsidiaries to,

    (a)     Except as permitted in the DIP Order,

        (i)     optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Parent or its Subsidiaries, other than (A) the Obligations in accordance with this Agreement, (B) the Prepetition Senior Obligations, and (C) Permitted Intercompany Advances, or

        (ii)     make any payment on account of Indebtedness that has been contractually subordinated in right of payment to the Obligations or the Prepetition Senior Obligations if such payment is not permitted at such time under the subordination terms and conditions, or

        (b)     Directly or indirectly, amend, modify, or change any of the terms or provisions of

        (i)     any agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness other than (A) the Obligations in accordance with this Agreement, (B) Permitted Intercompany Advances, and (C) Indebtedness permitted under clauses (e) and (h) of the definition of "Permitted Indebtedness, or

        (ii)     the Governing Documents of any Loan Party or any of its Subsidiaries if the effect thereof, either individually or in the aggregate, could reasonably be expected to be adverse to the interests of the Lenders or the Prepetition Senior Lenders.

6.7     **Restricted Payments**.   Each Parent and Borrower will not, and will not permit any of its Subsidiaries, to make any Restricted Payment.

6.8     **Accounting Methods**.   Each Parent and each Borrower will not, and will not permit any of its Subsidiaries to, modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.9     **Investments**.   Each Parent and each Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, make or acquire any Investment or incur any

- 55 -

liabilities (including contingent obligations) for or in connection with any Investment except for Permitted Investments.

6.10    **Transactions with Affiliates**.  Each Parent and each Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction with any Affiliate of such Parent, Borrower or Subsidiary except for:

(a)    transactions (other than the payment of management, consulting, monitoring, or advisory fees) between a Parent, Borrower or Subsidiary, on the one hand, and any Affiliate of a Parent, Borrower or Subsidiary on the other hand, so long as such transactions (i) are fully disclosed to Agent prior to the consummation thereof, and (ii) are no less favorable, taken as a whole, to such Parent, Borrower or Subsidiary, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate,

(b)    so long as it has been approved by such Parent's, Borrower's or Subsidiary's board of directors (or comparable governing body) in accordance with applicable law, any indemnity provided for the benefit of directors (or comparable managers) of such Parent, Borrower or Subsidiary,

(c)    so long as it has been approved by Parent's, Borrower's or Subsidiary's board of directors (or comparable governing body) in accordance with applicable law, the payment of reasonable compensation, severance, or employee benefit arrangements to employees, officers, and outside directors of Parent, Borrower or Subsidiary in the ordinary course of business and consistent with industry practice,

(d)    transactions permitted by Section 6.3 or Section 6.7, and

(e)    any Permitted Intercompany Advance.

6.11    **Use of Proceeds**.  Each Borrower will not, and will not permit any of its Subsidiaries or any Parent to, use the proceeds of any loan made hereunder for any purpose other than (a) to make adequate protection payments with respect to the Prepetition Senior Obligations in accordance with the DIP Order, (b) on the Closing Date, to pay the fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby, in each case, as set forth in the Funds Flow Agreement, and (c) thereafter, consistent with the terms and conditions of the DIP Order and this Agreement, for their lawful and permitted purposes; provided, that: (i) no part of the proceeds of the Loans made to Borrowers hereunder or Letters of Credit issued hereunder will be used (A) to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors, (B) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (C) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Entity, to the extent that such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States, Canada, the United Kingdom or the European Union, or (D) in any manner that would result in the violation of any Sanctions

- 56 -

applicable to any party hereto; and (ii) except as provided in the DIP Order, no part of the proceeds of the Loans made to Borrowers hereunder or Letters of Credit issued hereunder may be utilized by Borrowers to finance in any way any professional fees, disbursements, costs or expenses incurred in connection with asserting, investigating, or preparing for any claims or causes of action against the Prepetition Senior Agent or any of the Prepetition Senior Secured Parties under the Prepetition Senior Credit Agreement or the other Prepetition Senior Loan Documents or any of their counsel or advisors (including advisors to their counsel) and/or investigating, challenging or raising any defenses to the Prepetition Senior Obligations or any Liens under or in connection with the Prepetition Senior Credit Agreement or any Prepetition Senior Loan Document.

6.12    **Limitation on Issuance of Equity Interests**.  Except for the issuance or sale of Qualified Equity Interests by a Parent, each Parent and each Borrower will not, and will not permit any of its Subsidiaries to, issue or sell or enter into any agreement or arrangement for the issuance or sale of any of its Equity Interests.

6.13    **Parent as Holding Company**.  Each Parent and each Borrower will not permit Canadian Parent to incur any liabilities (other than liabilities arising under the Loan Documents and the Prepetition Senior Loan Documents), own or acquire any assets (other than the Equity Interests of Canadian Borrowers) or engage itself in any operations or business, except in connection with its ownership of Canadian Borrowers and its rights and obligations under the Loan Documents and the Prepetition Senior Loan Documents.

6.14    **Canadian Pension Plans**.  Each Parent and each Borrower will not, and will not permit any of its Subsidiaries to:

(a)    establish, maintain, sponsor, administer, contribute to, participate in or assume or incur any liability in respect of any Canadian Defined Benefit Pension Plan or amalgamate with any Person if such Person sponsors, administers, contributes to, participates in or has liability in respect of, any Canadian Defined Benefit Pension Plan;

(b)    terminate any Canadian Pension Plan in a manner, or take any other action with respect to any Canadian Pension Plan, which could reasonably be expected to result in a Material Adverse Effect; or

(c)    fail to make full payment when due of all amounts which, under the provisions of any Canadian Pension Plan, any agreement relating thereto or applicable law if such failure could reasonably be expected to result in a Material Adverse Effect.

## 7.    APPROVED BUDGET.

Each Parent and each Borrower covenants and agrees that they shall be in Substantial Compliance with the Approved Budget at all times until termination of all of the Commitments, payment in full of the Obligations, and payment in full of all Prepetition Senior Obligations in accordance with the terms of the Prepetition Senior Credit Agreement.

## 8.    EVENTS OF DEFAULT.

- 57 -

Any one or more of the following events shall constitute an event of default (each, an "<u>Event of Default</u>") under this Agreement:

8.1    **Payments**.  If Parents or Borrowers fail to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), and such failure continues for a period of 3 Business Days, (b) all or any portion of the principal of the Loans, or (c) any amount payable to an Issuing Bank in reimbursement of any drawing under a Letter of Credit;

8.2    **Covenants**.  If any Loan Party or any of its Subsidiaries:

(a)    fails to perform or observe any covenant or other agreement contained in any of (i) Sections 3.6, 5.1, <u>5.2</u>, <u>5.3</u> (solely if any Loan Party is not in good standing in its jurisdiction of organization), <u>5.6</u>, <u>5.7</u> (solely if any Loan Party refuses to allow Agent or its representatives or agents to visit any Loan Party's properties, inspect its assets or books or records, examine and make copies of its books and records, or discuss Loan Parties' affairs, finances, and accounts with officers and employees of any Loan Party), <u>5.15</u>, <u>5.17</u>, <u>5.18</u> or <u>5.19</u> of this Agreement, (ii) <u>Section 6</u> of this Agreement, (iii) <u>Section 7</u> of this Agreement, or (iv) Section 7 of either Guaranty and Security Agreement; or

(b)    fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this <u>Section 8</u> (in which event such other provision of this <u>Section 8</u> shall govern), and such failure continues for a period of 10 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Loan Party or (ii) the date on which written notice thereof is given to Borrowers by Agent;

8.3    **[RESERVED]**.

8.4    **[RESERVED]**.

8.5    **[RESERVED]**.

8.6    **[RESERVED]**.

8.7    **Representations, etc**.  If any warranty, representation, certificate, statement, or Record made herein or in any other Loan Document or delivered in writing to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

- 58 -

8.8    **Guaranty**.  If the obligation of any Guarantor under the guaranty contained in the any Guaranty and Security Agreement is limited or terminated by operation of law or by such Guarantor (other than in accordance with the terms of this Agreement);

8.9    **Security Documents**.  If any Guaranty and Security Agreement or any other Loan Document that purports to create a Lien in favor of Agent, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent of Permitted Liens which are non-consensual Permitted Liens, permitted purchase money Liens or the interests of lessors under Capital Leases, first priority Lien on the Collateral covered thereby, except as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement;

8.10    **Loan Documents**.  The validity or enforceability of any Loan Document shall at any time for any reason (other than solely as the result of an action or failure to act on the part of Agent) be declared to be null and void, or a proceeding shall be commenced by a Loan Party or its Subsidiaries, or by any Governmental Authority having jurisdiction over a Loan Party or its Subsidiaries, seeking to establish the invalidity or unenforceability thereof, or a Loan Party or its Subsidiaries shall deny that such Loan Party or its Subsidiaries has any liability or obligation purported to be created under any Loan Document;

8.11    **Change of Control**.  A Change of Control shall occur;

8.12    **Canadian Pension Plans**.    The occurrence of a Canadian Pension Termination Event which could reasonably be expected to have a Material Adverse Effect or result in the imposition of a trust, deemed trust or Lien on the assets of any Canadian Loan Party for liabilities arising under Canadian Pension Plans in an aggregate amount in excess of $200,000; or

8.13    **Additional Events of Default**.    The occurrence of any of the following in any Chapter 11 Case:

(a)    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any Loan Party in any Chapter 11 Case or in the Recognition Proceedings or otherwise before the Canadian Court: (i) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code or Section 11.2 of the CCAA not otherwise permitted pursuant to this Agreement; (ii) to grant any Lien other than Permitted Liens upon or affecting any Collateral; (iii) except as provided in the DIP Order to use cash collateral of Agent under Section 363(c) of the Bankruptcy Code without the prior written consent of Agent and the Lenders; or (iv) any other action or actions adverse to either (A) Agent and the Lenders or their rights and remedies hereunder or their interest in the Collateral or (B) Prepetition Senior Agent and the Prepetition Senior Secured Parties or their rights and remedies under the Prepetition Senior Loan Documents or their interest in their respective collateral;

(b)    the filing of any plan of reorganization, plan of compromise or arrangement, or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a Loan Party, or the entry of an order in any of the Chapter 11 Cases or in the Recognition Proceedings or any other proceeding before the Canadian Court

- 59 -

confirming such plan or approving such disclosure statement, (i) to which Agent, Lenders, Prepetition Senior Agent, and Prepetition Senior Lenders do not consent in writing or otherwise agree to the treatment of their respective claims and (ii) that fails to provide for the payment in full in cash of all Obligations, the termination of all related lending commitments, and the payment in full of all Prepetition Senior Obligations in accordance with the terms of the Prepetition Senior Credit Agreement on the effective date of such plan;

(c)     the entry of an order in any of the Chapter 11 Cases or by the Canadian Court confirming a plan or plans of reorganization, compromise or arrangement that does not contain a provision for termination of the Commitments, payment in full in cash of all of the Obligations under this Agreement, and the payment in full of all Prepetition Senior Obligations in accordance with the terms of the Prepetition Senior Credit Agreement on or before the effective date of such plan or plans;

(d)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the DIP Order or any Canadian DIP Order without the written consent of the Agent (or any Loan Party applies for, consents to, or acquiesces in, any such relief) and the Lenders or the filing by any Loan Party of a motion for reconsideration with respect to the DIP Order or any Canadian DIP Order;

(e)     (i) the Final Order, in form and substance acceptable to Agent, Lenders, Prepetition Senior Agent, and Prepetition Senior Lenders, is not entered immediately following the expiration of the Interim Order or (ii) the Canadian Interim DIP Recognition Order is not entered within five (5) Business Days after the entry of the Interim Order;

(f)     (i) the Final Order, in form and substance acceptable to Agent, Lenders, Prepetition Senior Agent, and Prepetition Senior Lenders, is not entered on or before the date that is twenty-one (21) days after the entry of the Interim Order or (ii) the Canadian Final DIP Recognition Order is not entered within three (3) Business Days after the entry of the Final Order;

(g)     the payment of, or application for authority to pay, any Prepetition or Postpetition claim without Agent's and Lenders' prior written consent unless otherwise expressly permitted under this Agreement;

(h)     the Bankruptcy Court, the Canadian Court or any other court of competent jurisdiction enters an order or judgment allowing, imposing, surcharging or assessing any claim, cost or expense against Agent, any Lender, Prepetition Senior Agent, or any of the Prepetition Senior Secured Parties or against any of their respective collateral (or any Loan Party applies for, consents to, or acquiesces in, any such relief), whether pursuant to section 506(c) of the Bankruptcy Code, any other Insolvency Law or otherwise;

(i)     the appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Loan Party (or in each case any Loan Party applies for, consents to, or acquiesces in, any such relief)

- 60 -

or the appointment of any monitor, trustee, receiver, interim receiver, receiver and manager or other similar Person in any Canadian proceeding under any Insolvency Law;

(j)     the sale, without Agent's, the Lenders', Prepetition Senior Agent's, and Prepetition Senior Lenders' consent, of all or substantially all of any Loan Party's assets either through a sale under Section 363 of the Bankruptcy Code, whether through one transaction or a series of transactions, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations, the termination of related lending commitments, and the payment in full of all Prepetition Senior Obligations in accordance with the terms of the Prepetition Senior Credit Agreement;

(k)     (i) the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code (or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief) or (ii) the dismissal of the Recognition Proceedings, the commencement of any other proceedings under the *Bankruptcy and Insolvency Act* (Canada) or any other Insolvency Laws in Canada other than the Recognition Proceedings (or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief);

(l)     the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code or any stay granted pursuant to the Canadian DIP Orders (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case is with respect to any portion of the Collateral having a value, individually or in the aggregate, in excess of $250,000 or which would otherwise have a Material Adverse Effect;

(m)     the commencement of a suit or action against Agent, any Lender, Prepetition Senior Agent, or any of the Prepetition Senior Secured Parties, by or on behalf of a Loan Party;

(n)     the entry of any order in any suit or action against Agent, any Lender, Prepetition Senior Agent, or any of the Prepetition Senior Secured Parties, that asserts or seeks by or on behalf of a Loan Party, the Environmental Protection Agency, any state environmental protection or health and safety agency, any Committee or any other party in interest in any of the Chapter 11 Cases or the Recognition Proceedings or otherwise before the Canadian Court, (x) awarding any claim, stay, injunctive relief or other damages against Agent, any Lender, Prepetition Senior Agent, or any of the Prepetition Senior Secured Parties; or (y) granting or awarding any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of Agent or any Lender under the Loan Documents or DIP Order or DIP Recognition Order, or Prepetition Senior Agent or any of the Prepetition Senior Secured Parties under the Prepetition Senior Loan Documents or DIP Order or DIP Recognition Order, to any other claim;

(o)     the entry of an order in any Chapter 11 Case or by the Canadian Court avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents or on account of the

- 61 -

Prepetition Senior Obligations owing under the Prepetition Senior Credit Agreement or Prepetition Senior Loan Documents (or in each case any Loan Party applies for, consents to, or acquiesces in, any such relief);

(p)     the breach of and/or failure of any Loan Party to perform any of its obligations under the DIP Order or any Canadian DIP Order;

(q)     the Bankruptcy Court, the Canadian Court, or any other court of competent jurisdiction enters an order or judgment, or any Loan Party applies for, consents to, or acquiesces in, the entry of such order or judgment, in any Chapter 11 Case or by the Canadian Court, modifying, limiting, subordinating or avoiding (i) the priority of any Obligations or Prepetition Senior Obligations or (ii) the perfection, priority or validity of any Lien securing such Obligations or Prepetition Senior Obligations; or

(r)     the entry of an order in any of the Chapter 11 Cases or by the Canadian Court granting any other super priority administrative claim, charge or Lien (other than the Carve-Out) equal or superior to that granted to Agent, on behalf of itself and Lenders, or Prepetition Senior Agent, on behalf of itself and Prepetition Senior Secured Parties, hereunder or under the DIP Order (or in each case any Loan Party applies for, consents to, or acquiesces in, any such relief) and the DIP Recognition Order.

9.     **RIGHTS AND REMEDIES.**

9.1     __Rights and Remedies__.

(a)     If any Event of Default has occurred and is continuing, Agent may (and at the written request of the Required Lenders shall), notwithstanding the provisions of Section 362 of the Bankruptcy Code or any other applicable law, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the Revolver Commitments with respect to additional Revolving Loans and/or the issuance of additional Letters of Credit, whereupon any additional Revolving Loans and additional Letters of Credit shall be made or incurred in Agent's sole discretion (or in the sole discretion of the Required Lenders, if such suspension occurred at their direction) so long as such Default or Event of Default is continuing. If any Default or Event of Default has occurred and is continuing, Agent may (and at the written request of the Required Lenders shall), notwithstanding the provisions of Section 362 of the Bankruptcy Code or any other applicable law, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court or the Canadian Court, except as otherwise expressly provided herein, increase the rate of interest applicable to the Revolving Loans and the Letter of Credit fees to the default rate of interest applicable under Section 2.6(c).

(b)     Subject to the terms of the DIP Order and the Canadian DIP Orders, and without limiting the Loan Parties' rights thereunder, if any Event of Default has occurred and is continuing, Agent may (and at the written request of the Required Lenders shall), notwithstanding the provisions of Section 362 of the Bankruptcy Code or any other applicable law, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court or the Canadian Court: (i) terminate the Revolver Commitments with respect to further Revolving Loans or the issuance of further Letters of Credit; (ii) reduce the Revolving

Commitment from time to time, (iii) declare all or any portion of the Obligations, including all or any portion of any Loan to be forthwith due and payable, and direct Borrowers to provide (and Borrowers agree that upon receipt of such notice Borrowers will provide) Letter of Credit Collateralization to Agent to be held as security for Borrowers' reimbursement obligations for drawings that may subsequently occur under issued and outstanding Letters of Credit, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrowers, (iv) direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to Agent and Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral to Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code), (v) enter onto the premises of any Loan Party in connection with an orderly liquidation of the Collateral, or (vi) exercise any rights and remedies provided to Prepetition Senior Agent under the Prepetition Senior Loan Documents or at law or equity, including all remedies provided under the UCC and the PPSA. Pursuant to the terms of the DIP Order and the Canadian DIP Orders, as applicable, the automatic stay of Section 362 of the Bankruptcy Code and any stay granted under the Canadian DIP Orders, as applicable, shall be modified and vacated to permit Agent and the Lenders to exercise their remedies under this Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court, provided, however, notwithstanding anything to the contrary contained herein, Agent shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of any Loan Party in the Collateral only upon (A) the prior written notice required under the DIP Order to such Loan Party and counsel approved by the Bankruptcy Court for any Committee and hearing by the Bankruptcy Court, and (B) the Bankruptcy Court's approval of such liquidation of, or foreclosure on, any interest of any Loan Party in the Collateral, in each case, to the extent and as set forth in the DIP Order. Upon the occurrence of an Event of Default and the exercise by Agent or the Lenders of their rights and remedies under this Agreement, the other Loan Documents, and the DIP Order, the Loan Parties shall assist Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are acceptable to the Agent and Required Lenders.

(c)      Subject to the terms of the DIP Order and the Canadian DIP Orders, upon the occurrence and during the continuation of an Event of Default, Agent may, and, at the instruction of the Required Lenders, shall (in each case under clauses (a) or (b) by written notice to Borrowers), in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by applicable law, exercise all other rights and remedies available to Agent or the Lenders under the Loan Documents, under applicable law, or in equity.

9.2      **Remedies Cumulative**. The rights and remedies of the Lender Group under the DIP Order, the Canadian DIP Orders, this Agreement, the other Loan Documents, and all other agreements shall be cumulative. The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver. No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

10.      **WAIVERS; INDEMNIFICATION; RELEASE.**

- 63 -

10.1    **Demand; Protest; etc**. Except as set forth in the DIP Order, each Parent and each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which any Parent or Borrower may in any way be liable.

10.2    **The Lender Group's Liability for Collateral**. Each Parent and each Borrower hereby agrees that: (a) so long as Agent complies with its obligations, if any, under the Code and the PPSA, the Lender Group shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Parents and Borrowers.

10.3    **Indemnification**. Each Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery (provided that Borrowers shall not be liable for costs and expenses (including attorneys fees) of any Lender (other than Wells Fargo) incurred in advising, structuring, drafting, reviewing, administering or syndicating the Loan Documents), enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Parents' and their Subsidiaries' compliance with the terms of the Loan Documents (provided, that the indemnification in this clause (a) shall not extend to (i) disputes solely between or among the Lenders that do not involve any acts or omissions of any Loan Party, or (ii) disputes solely between or among the Lenders and their respective Affiliates that do not involve any acts or omissions of any Loan Party; it being understood and agreed that the indemnification in this clause (a) shall extend to Agent (but not the Lenders) relative to disputes between or among Agent on the one hand, and one or more Lenders, or one or more of their Affiliates, on the other hand, or (iii) any Taxes or any costs attributable to Taxes, which shall be governed by Section 16), (b) with respect to any actual or prospective investigation, litigation, or proceeding related to this Agreement, any other Loan Document, the making of any Loans or issuance of any Letters of Credit hereunder, or the use of the proceeds of the Loans or the Letters of Credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by any Parent or any of its Subsidiaries or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any such assets or properties of any Parent or any of its Subsidiaries (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, no Borrower shall

- 64 -

have any obligation to any Indemnified Person under this <u>Section 10.3</u> with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents.  This provision shall survive the termination of this Agreement and the payment in full of the Obligations.  If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrowers were required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrowers with respect thereto.  WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.

10.4    **Release**.  Each Loan Party hereby acknowledges effective upon entry of the DIP Order, that no Borrower nor any other Loan Party has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of any Borrower's or other Loan Party's liability to repay Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Agent, any Lender, Prepetition Senior Agent, or any of the Prepetition Senior Secured Parties.  The Loan Parties, each in their own right and with respect to the Loan Parties, on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge Agent and the Lenders and all of Agent's and the Lenders' past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.**NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid,

- 65 -

return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile.  In the case of notices or demands to any Parent, any Borrower or Agent, as the case may be, they shall be sent to the respective address set forth below:

<table>
<tr><td>If to any Parent or<br>any Borrower:</td><td>c/o <strong>WYNIT DISTRIBUTION, LLC</strong><br>700 W. 76th Street, Suite 116, Eden<br>Prairie, MN 55344-0000<br>Attn:  Bill Cave, CFO<br>Fax No. 763-533-2156</td></tr>
<tr><td>with copies to:</td><td>c/o <strong>WYNIT DISTRIBUTION, LLC</strong><br>700 W. 76th Street, Suite 116, Eden<br>Prairie, MN 55344-0000<br>Attn:  Tom Chase, General Counsel<br>Fax No. 763-533-2156</td></tr>
<tr><td></td><td>and</td></tr>
<tr><td></td><td><strong>STINSON LEONARD STREET LLP</strong><br>150 South Fifth Street, Suite 2300<br>Minneapolis, MN 55402<br>Attn.: Edwin H. Caldie, Esq.<br>Fax No.: 612-335-1657</td></tr>
<tr><td>If to Agent:</td><td><strong>WELLS FARGO BANK, NATIONAL ASSOCIATION</strong><br>1100 Abernathy Road, Suite 1600<br>Atlanta, GA 30328<br>Attn: Portfolio Manager - WYNIT<br>Fax No.:  855-431-2598</td></tr>
<tr><td>with copies to:</td><td><strong>GREENBERG TRAURIG, LLP</strong><br>3333 Piedmont Road NE, Suite 2500<br>Atlanta, GA 30305<br>Attn:  David Kurzweil, Esq.<br>Fax No.:  678-553-2681</td></tr>
</table>

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party.  All notices or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by

- 66 -

the "return receipt requested" function, as available, return email or other written acknowledgment).

12.    **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a)    THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT; <u>PROVIDED</u>, THAT, SUBJECT TO THE TERMS OF THE DIP ORDER AND THE CANADIAN DIP ORDERS, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  EACH PARENT, EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM</u> <u>NON</u> <u>CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 12(b)</u>.

(c)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARENT, EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVES ITS RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "<u>CLAIM</u>").  EACH PARENT, EACH BORROWER AND EACH MEMBER OF THE LENDER GROUP REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

ATL 22306858v2

(d)      **EACH PARENT AND EACH BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE, SUBJECT TO THE TERMS OF THE DIP ORDER AND THE CANADIAN DIP ORDERS, TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.**

(e)      **NO CLAIM MAY BE MADE BY ANY LOAN PARTY AGAINST THE AGENT, THE SWING LENDER, ANY OTHER LENDER, ISSUING BANK, OR ANY AFFILIATE, DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES OR LOSSES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION THEREWITH, AND EACH LOAN PARTY HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.**

13.    **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.**

13.1    **Assignments and Participations**.

(a)      (i)      Subject to the conditions set forth in clause (a)(ii) below, any Lender may assign and delegate all or any portion of its rights and duties under the Loan Documents (including the Obligations owed to it and its Commitments) to one or more assignees so long as such prospective assignee is an Eligible Transferee (each, an "Assignee"), with the prior written consent (such consent not be unreasonably withheld or delayed) of:

(A)      Borrowers; provided, that no consent of Borrowers shall be required (1) if an Event of Default has occurred and is continuing, or (2) in connection with an assignment to a Person that is a Lender or an Affiliate (other than natural persons) of a Lender; provided further, that Borrowers shall be deemed to have consented to a proposed assignment unless they object thereto by written notice to Agent within 10 Business Days after having received notice thereof; and

(B)      Agent, each Swing Lender, and Issuing Bank; provided, that no consent of Agent, any Swing Lender or Issuing Bank shall be required in connection with an assignment to a Person that is a Lender or an Affiliate (other than natural persons) of a Lender.

(ii)      Assignments shall be subject to the following additional conditions:

(A)      no assignment may be made to a natural person,

(B)      no assignment may be made to a Loan Party or an Affiliate of a Loan Party,

(C)      no assignment may be made by any Lender (I) of all or a portion of its US Revolver Commitment unless such Lender (or its Affiliate that holds the related Canadian Revolver Commitment) contemporaneously assigns the corresponding percentage of the Canadian Revolver Commitment held by such Lender (or its Affiliate) to the same assignee (or its Affiliate), and (II) of all or a portion of its Canadian Revolver Commitment unless such Lender (or its Affiliate that holds the related US Revolver Commitment) contemporaneously assigns the corresponding percentage of the US Revolver Commitment held by such Lender (or its Affiliate) to the same assignee (or its Affiliate),

(D)      the amount of the US Revolver Commitment and the other rights and obligations of the assigning Lender (and, if applicable, its Affiliate) hereunder and under the other Loan Documents subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to Agent) shall be in a minimum amount (unless waived by Agent) of $5,000,000 (except such minimum amount shall not apply to (I) an assignment or delegation by any Lender to any other Lender, an Affiliate of any Lender, or a Related Fund of such Lender or (II) a group of new Lenders, each of which is an Affiliate of each other or a Related Fund of such new Lender to the extent that the aggregate amount to be assigned to all such new Lenders is at least $5,000,000),

(E)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement,

(F)      the parties to each assignment shall execute and deliver to Agent an Assignment and Acceptance; provided, that Borrowers and Agent may continue to deal solely and directly with the assigning Lender in connection with the interest so assigned to an Assignee until written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Borrowers and Agent by such Lender and the Assignee,

(G)      unless waived by Agent, the assigning Lender or Assignee has paid to Agent, for Agent's separate account, a processing fee in the amount of $3,500, and

(H)      the assignee, if it is not a Lender, shall deliver to Agent an Administrative Questionnaire in a form approved by Agent (the "Administrative Questionnaire").

- 69 -

(b)      From and after the date that Agent receives the executed Assignment and Acceptance and, if applicable, payment of the required processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, shall be a "Lender" and shall have the rights and obligations of a Lender under the Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 10.3) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto); provided, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 15 and Section 17.9(a).

(c)      By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower or the performance or observance by any Borrower of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto, (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (v) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent, by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)      Immediately upon Agent's receipt of the required processing fee, if applicable, and delivery of notice to the assigning Lender pursuant to Section 13.1(b), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom.  The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender *pro tanto*.

(e)      Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (a "Participant") participating interests in all or any portion of its Obligations, its Commitment, and the other rights and interests of that Lender (the

- 70 -

"Originating Lender") hereunder and under the other Loan Documents; provided, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrowers, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender (other than a waiver of default interest), or (E) decreases the amount or postpones the due dates of scheduled principal repayments or prepayments or premiums payable to such Participant through such Lender, (v) no participation shall be sold to a natural person, (vi) no participation shall be sold to a Loan Party or an Affiliate of a Loan Party, and (vii) all amounts payable by Borrowers hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement. The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Agent, Borrowers, the Collateral, or otherwise in respect of the Obligations. No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

(f)     In connection with any such assignment or participation or proposed assignment or participation or any grant of a security interest in, or pledge of, its rights under and interest in this Agreement, a Lender may, subject to the provisions of Section 17.9, disclose all documents and information which it now or hereafter may have relating to any Parent and its Subsidiaries and their respective businesses.

(g)     Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR §203.24, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

- 71 -

ATL 22306858v2

(h)      Agent (as a non-fiduciary agent on behalf of Borrowers) shall maintain, or cause to be maintained, a register (the "Register") on which it enters the name and address of each Lender as the registered owner of the Loans (and the principal amount thereof and stated interest thereon) held by such Lender (each, a "Registered Loan").   Other than in connection with an assignment by a Lender of all or any portion of its portion of the Loans to an Affiliate of such Lender or a Related Fund of such Lender (i) a Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide) and (ii) any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s).   Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any evidencing the same), Borrowers shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.   In the case of any assignment by a Lender of all or any portion of its Loans to an Affiliate of such Lender or a Related Fund of such Lender, and which assignment is not recorded in the Register, the assigning Lender, on behalf of Borrowers, shall maintain a register comparable to the Register.

(i)      In the event that a Lender sells participations in the Registered Loan, such Lender, as a non-fiduciary agent on behalf of Borrowers, shall maintain (or cause to be maintained) a register on which it enters the name of all participants in the Registered Loans held by it (and the principal amount (and stated interest thereon) of the portion of such Registered Loans that is subject to such participations) (the "Participant Register").   A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).   Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.

(j)      Agent shall make a copy of the Register (and each Lender shall make a copy of its Participant Register in the extent it has one) available for review by Borrowers from time to time as Borrowers may reasonably request.

13.2    **Successors**.   This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that no Parent or Borrower may assign this Agreement or any rights or duties hereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void *ab initio*.   No consent to assignment by the Lenders shall release any Parent or Borrower from its Obligations.   A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to Section 13.1 and, except as expressly required pursuant to Section 13.1, no consent or approval by any Parent or Borrower is required in connection with any such assignment.

- 72 -

14.    **AMENDMENTS; WAIVERS.**

14.1    **Amendments and Waivers**.

(a)    No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document (other than Bank Product Agreements), and no consent with respect to any departure by any Parent or Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and the Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; provided, that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders directly affected thereby and all of the Loan Parties that are party thereto, do any of the following:

(i)    increase the amount of or extend the expiration date of any Commitment of any Lender or amend, modify, or eliminate the last sentence of Section 2.4(c),

(ii)    postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document,

(iii)    reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document (except in connection with the waiver of applicability of Section 2.6(c), which waiver shall be effective with the written consent of the Required Lenders),

(iv)    amend, modify, or eliminate this Section or any provision of this Agreement providing for consent or other action by all Lenders,

(v)    amend, modify, or eliminate Section 3.1 or 3.2,

(vi)    amend, modify, or eliminate Section 15.11 or Section 15.12(b),

(vii)    other than as permitted by Section 15.11, release Agent's Lien in and to any of the Collateral,

(viii)    amend, modify, or eliminate the definitions of "Required Lenders" or "Pro Rata Share",

(ix)    contractually subordinate any of Agent's Liens,

(x)    other than in connection with a merger, amalgamation, liquidation, dissolution or sale of such Person expressly permitted by the terms hereof or the other Loan Documents, release any Borrower or any Guarantor from any obligation for the payment of money or consent to the assignment or transfer by any Borrower or any Guarantor of any of its rights or duties under this Agreement or the other Loan Documents,

- 73 -

(xi)    amend, modify, or eliminate any of the provisions of Section 2.4(b)(i), (ii) or (iii), or

(xii)    amend, modify, or eliminate any of the provisions of Section 13.1 with respect to assignments to, or participations with, Persons who are Affiliates of a Loan Party;

(b)    No amendment, waiver, modification, or consent shall amend, modify, waive, or eliminate,

(i)    [RESERVED],

(ii)    any provision of Section 15 pertaining to Agent, or any other rights or duties of Agent under this Agreement or the other Loan Documents, without the written consent of Agent, Borrowers, and the Required Lenders;

(c)    No amendment, waiver, modification, elimination, or consent shall without written consent of Agent, Borrowers and each of the Lenders, amend, modify, or eliminate the definition of Borrowing Base or any of the defined terms (including the definitions of Eligible Accounts, Eligible Insured Accounts, Eligible Excess Inventory, Eligible Inventory and Eligible Non-Insured Accounts) that are used in such definition to the extent that any such change results in more credit being made available to Borrowers based upon the Borrowing Base, but not otherwise, or the definition of Canadian Maximum Revolver Amount or Maximum Revolver Amount;

(d)    No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Issuing Bank, or any other rights or duties of Issuing Bank under this Agreement or the other Loan Documents, without the written consent of Issuing Bank, Agent, Borrowers, and the Required Lenders;

(e)    No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to a Swing Lender, or any other rights or duties of a Swing Lender under this Agreement or the other Loan Documents, without the written consent of such Swing Lender, Agent, Borrowers, and the Required Lenders; and

(f)    Anything in this Section 14.1 to the contrary notwithstanding, (i) any amendment, modification, elimination, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of any Parent or any Borrower, shall not require consent by or the agreement of any Loan Party, (ii) any amendment, waiver, modification, elimination, or consent of or with respect to any provision of this Agreement or any other Loan Document may be entered into without the consent of, or over the objection of, any Defaulting Lender other than any of the matters governed by Section 14.1(a)(i) through (iii) that affect such Lender, and (iii) the Administrative Borrower, Agent and Issuing Bank may increase the amount of the Letter of Credit Sublimit in accordance with the proviso set forth in the definition of Letter of Credit Sublimit without the consent of any Lender or any other Loan Party.

- 74 -

14.2   **Replacement of Certain Lenders**.

(a)      If (i) any action to be taken by the Lender Group or Agent hereunder requires the consent, authorization, or agreement of all Lenders or all Lenders affected thereby and if such action has received the consent, authorization, or agreement of the Required Lenders but not of all Lenders or all Lenders affected thereby, or (ii) any Lender makes a claim for compensation under Section 16, then Borrowers or Agent, upon at least 5 Business Days prior irrevocable notice, may permanently replace any Lender that failed to give its consent, authorization, or agreement (a "Non-Consenting Lender") or any Lender that made a claim for compensation (a "Tax Lender") with one or more Replacement Lenders, and the Non-Consenting Lender or Tax Lender, as applicable, shall have no right to refuse to be replaced hereunder.  Such notice to replace the Non-Consenting Lender or Tax Lender, as applicable, shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b)      Prior to the effective date of such replacement, the Non-Consenting Lender or Tax Lender, as applicable, and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Non-Consenting Lender or Tax Lender, as applicable, being repaid in full its share of the outstanding Obligations (without any premium or penalty of any kind whatsoever, but including (i) all interest, fees and other amounts that may be due in payable in respect thereof, and (ii) an assumption of its Pro Rata Share of participations in the Letters of Credit).  If the Non-Consenting Lender or Tax Lender, as applicable, shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, Agent may, but shall not be required to, execute and deliver such Assignment and Acceptance in the name or and on behalf of the Non-Consenting Lender or Tax Lender, as applicable, and irrespective of whether Agent executes and delivers such Assignment and Acceptance, the Non-Consenting Lender or Tax Lender, as applicable, shall be deemed to have executed and delivered such Assignment and Acceptance.   The replacement of any Non-Consenting Lender or Tax Lender, as applicable, shall be made in accordance with the terms of Section 13.1.  Until such time as one or more Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Non-Consenting Lender or Tax Lender, as applicable, hereunder and under the other Loan Documents, the Non-Consenting Lender or Tax Lender, as applicable, shall remain obligated to make the Non-Consenting Lender's or Tax Lender's, as applicable, Pro Rata Share of Revolving Loans and to purchase a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of participations in such Letters of Credit.

14.3   **No Waivers; Cumulative Remedies**.  No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof.  No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Parents and Borrowers of any provision of this Agreement.  Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

15.    **AGENT; THE LENDER GROUP.**

15.1    **Appointment and Authorization of Agent**.  Each Lender hereby designates and appoints Wells Fargo as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to designate, appoint, and authorize) Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Agent agrees to act as agent for and on behalf of the Lenders (and the Bank Product Providers) on the conditions contained in this Section 15.  Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender (or Bank Product Provider), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties.  Each Lender hereby further authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent to act as the secured party under each of the Loan Documents that create a Lien on any item of Collateral.  Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect:  (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, payments and proceeds of Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) make Revolving Loans, for itself or on behalf of Lenders, as provided in the Loan Documents, (d) exclusively receive, apply, and distribute payments and proceeds of the Collateral as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to any Parent or its Subsidiaries, the Obligations, the Collateral, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

15.2   **Delegation of Duties**.   Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Without limitation of the foregoing, Agent may at any time designate and appoint WF Canada or another Person selected by Agent as Agent's subagent (the "Canadian Subagent") with respect to all or any part of the Collateral of the Canadian Loan Parties, and WF Canada hereby agrees to accept such appointment; provided that Canadian Subagent shall not be authorized to take any action with respect to any such Collateral unless and except to the extent expressly authorized in writing by Agent. Should any instrument in writing from any Loan Party be required by the Canadian Subagent to more fully or certainly vest in and confirm to the Canadian Subagent such rights, powers, privileges and duties, such Loan Party shall execute, acknowledge and deliver any and all such instruments promptly upon request by Agent. If the Canadian Subagent, or successor thereto, shall resign or be removed, all rights, powers, privileges and duties of the Canadian Subagent, to the extent permitted by law, shall automatically vest in and be exercised by Agent until the appointment of a new Canadian Subagent. Each member of the Lender Group and each Loan Party acknowledges and agrees that any agent (including Canadian Subagent) appointed by Agent shall be entitled to the rights and benefits of Agent under this Section 15. Agent shall not be responsible for the negligence or misconduct of any agent (including the Canadian Subagent) or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

15.3   **Liability of Agent**.   None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders (or Bank Product Providers) for any recital, statement, representation or warranty made by any Parent or any of its Subsidiaries or Affiliates, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Parent or its Subsidiaries or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lenders (or Bank Product Providers) to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of any Parent or its Subsidiaries.

15.4   **Reliance by Agent**.   Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrowers or counsel to any Lender), independent accountants and other experts selected by Agent. Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable. If Agent

- 77 -

so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders (and, if it so elects, the Bank Product Providers) against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders (and Bank Product Providers).

15.5    **Notice of Default or Event of Default**.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or Borrowers referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default."  Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge.  If any Lender obtains actual knowledge of any Event of Default, such Lender shall use commercially reasonable efforts to promptly notify the other Lenders and Agent of such Event of Default.  Each Lender shall be solely responsible for giving any notices to its Participants, if any.   Subject to <u>Section 15.4</u>, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with <u>Section 9</u>; <u>provided</u>, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

15.6    **Credit Decision**.  Each Lender (and Bank Product Provider) acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of any Parent and its Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender (or Bank Product Provider).  Each Lender represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such due diligence, documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of each Borrower or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrowers.  Each Lender also represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of each Borrower or any other Person party to a Loan Document.  Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender (or Bank Product Provider) with any

- 78 -

credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Borrower or any other Person party to a Loan Document that may come into the possession of any of the Agent-Related Persons. Each Lender acknowledges (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender (or Bank Product Provider) with any credit or other information with respect to any Borrower, its Affiliates or any of their respective business, legal, financial or other affairs, and irrespective of whether such information came into Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement (or such Bank Product Provider entered into a Bank Product Agreement).

15.7   **Costs and Expenses; Indemnification**.   Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Parents or Borrowers are obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise. Agent is authorized and directed to deduct and retain sufficient amounts from payments or proceeds of the Collateral received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders (or Bank Product Providers). In the event Agent is not reimbursed for such costs and expenses by Parents, Borrowers or their Subsidiaries, each Lender hereby agrees that it is and shall be obligated to pay to Agent such Lender's ratable thereof. Whether or not the transactions contemplated hereby are consummated, each of the Lenders, on a ratable basis, shall indemnify and defend the Agent-Related Persons (to the extent not reimbursed by or on behalf of Parents or Borrowers and without limiting the obligation of Parents and Borrowers to do so) from and against any and all Indemnified Liabilities; provided, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make a Revolving Loan or other extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's ratable share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement or any other Loan Document to the extent that Agent is not reimbursed for such expenses by or on behalf of Parents or Borrowers. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

15.8   **Agent in Individual Capacity**.   Wells Fargo and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire Equity Interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Parent and its Subsidiaries and Affiliates and any other Person party to any Loan Document as though Wells Fargo were not Agent hereunder,

- 79 -

and, in each case, without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, Wells Fargo or its Affiliates may receive information regarding a Parent or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Parent or such other Person and that prohibit the disclosure of such information to the Lenders (or Bank Product Providers), and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them.  The terms "Lender" and "Lenders" include Wells Fargo in its individual capacity.

15.9   **Successor Agent**.  Agent may resign as Agent upon 30 days (10 days if an Event of Default has occurred and is continuing) prior written notice to the Lenders (unless such notice is waived by the Required Lenders) and Borrowers (unless such notice is waived by Borrowers) and without any notice to the Bank Product Providers.  If Agent resigns under this Agreement, the Required Lenders shall be entitled, with (so long as no Event of Default has occurred and is continuing) the consent of Borrowers (such consent not to be unreasonably withheld, delayed, or conditioned), appoint a successor Agent for the Lenders (and the Bank Product Providers).  If, at the time that Agent's resignation is effective, it is acting as an Issuing Bank or a Swing Lender, such resignation shall also operate to effectuate its resignation as such Issuing Bank or such Swing Lender, as applicable, and it shall automatically be relieved of any further obligation to issue Letters of Credit, or to make Swing Loans.  If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders and Borrowers, a successor Agent.  If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders with (so long as no Event of Default has occurred and is continuing) the consent of Borrowers (such consent not to be unreasonably withheld, delayed, or conditioned).  In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated.  After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.  If no successor Agent has accepted appointment as Agent by the date which is 30 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

15.10   **Lender in Individual Capacity**.  Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Parent and its Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group (or the

- 80 -

Bank Product Providers).   The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding a Parent or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Parent or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

15.11   **Collateral Matters**.

(a)      The Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by Borrowers of all of the Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Borrowers certify to Agent that the sale or disposition is permitted under <u>Section 6.4</u> (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which no Parent or its Subsidiaries owned any interest at the time Agent's Lien was granted nor at any time thereafter, (iv) constituting property leased or licensed to a Parent or its Subsidiaries under a lease or license that has expired or is terminated in a transaction permitted under this Agreement, or (v) in connection with a credit bid or purchase authorized under this <u>Section 15.11</u>.  The Loan Parties and the Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent, based upon the instruction of the Required Lenders, to (a) consent to the sale of, credit bid, or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code and similar laws in any other jurisdiction in which a Loan Party is subject, (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Code or PPSA, including pursuant to Sections 9-610 or 9-620 of the Code or any similar provision of the PPSA, or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any other sale or foreclosure conducted or consented to by Agent in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy.   In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders and the Bank Product Providers shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the Collateral that is the subject of such credit bid or purchase) and the Lenders and the Bank Product Providers whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations

- 81 -

credit bid in relation to the aggregate amount of Obligations so credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the Equity Interests of the any entities that are used to consummate such credit bid or purchase), and (ii) Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith Agent may reduce the Obligations owed to the Lenders and the Bank Product Providers (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration.  Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders (without requiring the authorization of the Bank Product Providers), or (z) otherwise, the Required Lenders (without requiring the authorization of the Bank Product Providers).  Upon request by Agent or Borrowers at any time, the Lenders will (and if so requested, the Bank Product Providers will) confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this <u>Section 15.11</u>; <u>provided</u>, that (1) anything to the contrary contained in any of the Loan Documents notwithstanding, Agent shall not be required to execute any document or take any action necessary to evidence such release on terms that, in Agent's opinion, could expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly released) upon (or obligations of Borrowers in respect of) any and all interests retained by any Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b)     Agent shall have no obligation whatsoever to any of the Lenders (or the Bank Product Providers) (i) to verify or assure that the Collateral exists or is owned by any Parent or its Subsidiaries or is cared for, protected, or insured or has been encumbered, (ii) to verify or assure that Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, (iii) to verify or assure that any particular items of Collateral meet the eligibility criteria applicable in respect thereof, (iv) to impose, maintain, increase, reduce, implement, or eliminate any particular reserve hereunder or to determine whether the amount of any reserve is appropriate or not, or (v) to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender (or Bank Product Provider) as to any of the foregoing, except as otherwise expressly provided herein.

### 15.12   <u>Restrictions on Actions by Lenders; Sharing of Payments</u>.

(a)     Each of the Lenders agrees that it shall not, without the express written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Agent, set off against the Obligations, any amounts owing by such Lender to any

Parent or its Subsidiaries or any deposit accounts of any Parent or its Subsidiaries now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Borrower or any Guarantor or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)     If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's Pro Rata Share of all such distributions by Agent, such Lender promptly shall (A) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

15.13   **Agency for Perfection**.   Agent hereby appoints each other Lender (and each Bank Product Provider) as its agent (and each Lender hereby accepts (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to accept) such appointment) for the purpose of perfecting Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code can be perfected by possession or control. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

15.14   **Payments by Agent to the Lenders**.   All payments to be made by Agent to the Lenders (or Bank Product Providers) shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent. Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

15.15   **Concerning the Collateral and Related Loan Documents**.   Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan Documents. Each member of the Lender Group agrees (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to agree) that (a) any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders

- 83 -

(and such Bank Product Provider), and (b) any waiver made by Agent (in accordance with Section 14.1(a)) on behalf of itself and the Lender Group of any rights or remedies under any Floorplan Inventory Intercreditor Agreement shall be binding upon all of the Lenders (and such Bank Product Provider).

15.16 **Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information**. By becoming a party to this Agreement, each Lender:

(a) is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field examination report respecting Parents or their Subsidiaries (each, a "Report") prepared by or at the request of Agent, and Agent shall so furnish each Lender with such Reports,

(b) expressly agrees and acknowledges that Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(c) expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any field examination will inspect only specific information regarding Parents and their Subsidiaries and will rely significantly upon Parents' and their Subsidiaries' books and records, as well as on representations of Parents' and their Subsidiaries' personnel,

(d) agrees to keep all Reports and other material, non-public information regarding Parents and their Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 17.9, and

(e) without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers, and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

(f) In addition to the foregoing,  (x) any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by any Parent or its Subsidiaries to Agent that has not been contemporaneously provided by such Parent or such Subsidiary to such Lender, and, upon receipt of such request, Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from any Parent or its Subsidiaries, any Lender may, from time to time, reasonably

- 84 -

request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Borrowers the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from such Parent or such Subsidiary, Agent promptly shall provide a copy of same to such Lender, and (z) any time that Agent renders to Borrowers a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

15.17    **Several Obligations; No Liability**.  Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments.  Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender.  Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender.  Except as provided in <u>Section 15.7</u>, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group.  No Lender shall be responsible to any Borrower or any other Person for any failure by any other Lender (or Bank Product Provider) to fulfill its obligations to make credit available hereunder, nor to advance for such Lender (or Bank Product Provider) or on its behalf, nor to take any other action on behalf of such Lender (or Bank Product Provider) hereunder or in connection with the financing contemplated herein.

15.18    **Joint Lead Arrangers, Joint Book Runners, and Syndication Agents**.  Each of the Joint Lead Arrangers, Joint Book Runners, and Syndication Agents, in such capacities, shall not have any right, power, obligation, liability, responsibility, or duty under this Agreement other than those applicable to it in its capacity as a Lender, as Agent, as Swing Lender, or as Issuing Bank.  Without limiting the foregoing, each of the Joint Lead Arrangers, Joint Book Runners, and Syndication Agents,, in such capacities, shall not have or be deemed to have any fiduciary relationship with any Lender or any Loan Party.  Each Lender, Agent, Swing Lender, Issuing Bank, and each Loan Party acknowledges that it has not relied, and will not rely, on the Joint Lead Arrangers, Joint Book Runners, and Syndication Agents in deciding to enter into this Agreement or in taking or not taking action hereunder.  Each of the Joint Lead Arrangers, Joint Book Runners, and Syndication Agents, in such capacities, shall be entitled to resign at any time by giving notice to Agent and Borrowers.

16.    **WITHHOLDING TAXES.**

16.1    **Payments**.  All payments made by the Loan Parties hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense.  In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future Indemnified Taxes, and in the event any deduction or withholding of Indemnified Taxes is required, the Loan Parties shall comply with the next sentence of this <u>Section 16.1</u>.  If any Indemnified Taxes are so levied or imposed, the Loan Parties agree to pay

- 85 -

the full amount of such Indemnified Taxes and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this Section 16.1 after withholding or deduction for or on account of any Indemnified Taxes, will not be less than the amount provided for herein. The Loan Parties will furnish to Agent as promptly as possible after the date the payment of any Indemnified Tax is due pursuant to applicable law, certified copies of tax receipts evidencing such payment by the Loan Parties. The Loan Parties agree to pay any present or future stamp, value added or documentary taxes or any other excise or property taxes, charges, or similar levies that arise from any payment made hereunder or from the execution, delivery, performance, recordation, or filing of, or otherwise with respect to this Agreement or any other Loan Document.

16.2    **Exemptions**.

(a)    If a Lender or Participant is entitled to claim an exemption or reduction from United States withholding tax, such Lender or Participant agrees with and in favor of Agent, to deliver to Agent (or, in the case of a Participant, to the Lender granting the participation only) one of the following before receiving its first payment under this Agreement:

(i)    if such Lender or Participant is entitled to claim an exemption from United States withholding tax pursuant to the portfolio interest exception, (A) a statement of the Lender or Participant, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of any Parent (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to Borrowers within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN, W-8BEN-E or W-8IMY (with proper attachments);

(ii)    if such Lender or Participant is entitled to claim an exemption from, or a reduction of, withholding tax under a United States tax treaty, a properly completed and executed copy of IRS Form W-8BEN or W-8BEN-E;

(iii)    if such Lender or Participant is entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender, a properly completed and executed copy of IRS Form W-8ECI;

(iv)    if such Lender or Participant is entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because such Lender or Participant serves as an intermediary, a properly completed and executed copy of IRS Form W-8IMY (with proper attachments); or

(v)    a properly completed and executed copy of any other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax.

(b)    Each Lender or Participant shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and to promptly notify

Agent (or, in the case of a Participant, to the Lender granting the participation only) of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(c)      If a Lender or Participant claims an exemption from withholding tax in a jurisdiction other than the United States, such Lender or such Participant agrees with and in favor of Agent, to deliver to Agent (or, in the case of a Participant, to the Lender granting the participation only) any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement, but only if such Lender or such Participant is legally able to deliver such forms, provided, that nothing in this Section 16.2(c) shall require a Lender or Participant to disclose any information that it deems to be confidential (including without limitation, its tax returns).  Each Lender and each Participant shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and to promptly notify Agent (or, in the case of a Participant, to the Lender granting the participation only) of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)      If a Lender or Participant claims exemption from, or reduction of, withholding tax and such Lender or Participant sells, assigns, grants a participation in, or otherwise transfers all or part of the Obligations of Borrowers to such Lender or Participant, such Lender or Participant agrees to notify Agent (or, in the case of a sale of a participation interest, to the Lender granting the participation only) of the percentage amount in which it is no longer the beneficial owner of Obligations of Borrowers to such Lender or Participant.  To the extent of such percentage amount, Agent will treat such Lender's or such Participant's documentation provided pursuant to Section 16.2(a) or 16.2(c) as no longer valid.  With respect to such percentage amount, such Participant or Assignee may provide new documentation, pursuant to Section 16.2(a) or 16.2(c), if applicable.   The Loan Parties agree that each Participant shall be entitled to the benefits of this Section 16 with respect to its participation in any portion of the Commitments and the Obligations so long as such Participant complies with the obligations set forth in this Section 16 with respect thereto.

(e)      If a payment made to a Lender under any Loan Document would be subject to U.S. federal income withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the IRC, as applicable), such Lender shall deliver to Agent (or, in the case of a Participant, to the Lender granting the participation only) at the time or times prescribed by law and at such time or times reasonably requested by Agent (or, in the case of a Participant, the Lender granting the participation only) such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the IRC) and such additional documentation reasonably requested by Agent (or, in the case of a Participant, the Lender granting the participation) as may be necessary for Agent or Borrowers to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

- 87 -

16.3    **Reductions**.

(a)     If a Lender or a Participant is subject to an applicable withholding tax, Agent (or, in the case of a Participant, the Lender granting the participation) may withhold from any payment to such Lender or such Participant an amount equivalent to the applicable withholding tax.  If the forms or other documentation required by Section 16.2(a) or 16.2(c) are not delivered to Agent (or, in the case of a Participant, to the Lender granting the participation), then Agent (or, in the case of a Participant, to the Lender granting the participation) may withhold from any payment to such Lender or such Participant not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(b)     If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Agent (or, in the case of a Participant, to the Lender granting the participation) did not properly withhold tax from amounts paid to or for the account of any Lender or any Participant due to a failure on the part of the Lender or any Participant (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify Agent (or such Participant failed to notify the Lender granting the participation) of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold Agent harmless (or, in the case of a Participant, such Participant shall indemnify and hold the Lender granting the participation harmless) for all amounts paid, directly or indirectly, by Agent (or, in the case of a Participant, to the Lender granting the participation), as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent (or, in the case of a Participant, to the Lender granting the participation only) under this Section 16, together with all costs and expenses (including attorneys fees and expenses).  The obligation of the Lenders and the Participants under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

16.4    **Refunds**.  If Agent or a Lender determines, in its sole discretion, that it has received a refund of any Indemnified Taxes to which Borrowers have paid additional amounts pursuant to this Section 16, so long as no Default or Event of Default has occurred and is continuing, it shall pay over such refund to Administrative Borrower (but only to the extent of payments made, or additional amounts paid, by the Loan Parties under this Section 16 with respect to Indemnified Taxes giving rise to such a refund), net of all out-of-pocket expenses of Agent or such Lender and without interest (other than any interest paid by the applicable Governmental Authority with respect to such a refund); provided, that the Loan Parties, upon the request of Agent or such Lender, agrees to repay the amount paid over to Administrative Borrower (plus any penalties, interest or other charges, imposed by the applicable Governmental Authority, other than such penalties, interest or other charges imposed as a result of the willful misconduct or gross negligence of Agent hereunder) to Agent or such Lender in the event Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything in this Agreement to the contrary, this Section 16 shall not be construed to require Agent or any Lender to make available its tax returns (or any other information which it deems confidential) to any Loan Party or any other Person.

## 17.   **GENERAL PROVISIONS.**

17.1 **Effectiveness**. This Agreement shall be binding and deemed effective when executed by each Parent, each Borrower, Agent, and each Lender whose signature is provided for on the signature pages hereof.

17.2 **Section Headings**. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

17.3 **Interpretation**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or any Parent or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

17.4 **Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

17.5 **Bank Product Providers**. Each Bank Product Provider in its capacity as such shall be deemed a third party beneficiary hereof and of the provisions of the other Loan Documents for purposes of any reference in a Loan Document to the parties for whom Agent is acting. Agent hereby agrees to act as agent for such Bank Product Providers and, by virtue of entering into a Bank Product Agreement, the applicable Bank Product Provider shall be automatically deemed to have appointed Agent as its agent and to have accepted the benefits of the Loan Documents. It is understood and agreed that the rights and benefits of each Bank Product Provider under the Loan Documents consist exclusively of such Bank Product Provider's being a beneficiary of the Liens and security interests (and, if applicable, guarantees) granted to Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein. In addition, each Bank Product Provider, by virtue of entering into a Bank Product Agreement, shall be automatically deemed to have agreed that Agent shall have the right, but shall have no obligation, to establish, maintain, relax, or release reserves in respect of the Bank Product Obligations and that if reserves are established there is no obligation on the part of Agent to determine or insure whether the amount of any such reserve is appropriate or not. In connection with any such distribution of payments or proceeds of Collateral, Agent shall be entitled to assume no amounts are due or owing to any Bank Product Provider unless such Bank Product Provider has provided a written certification (setting forth a reasonably detailed calculation) to Agent as to the amounts that are due and owing to it and such written certification is received by Agent a reasonable period of time prior to the making of such distribution. Agent shall have no obligation to calculate the amount due and payable with respect to any Bank Products, but may rely upon the written certification of the amount due and payable from the applicable Bank Product Provider. In the absence of an updated certification, Agent shall be entitled to assume that the amount due and payable to the applicable Bank Product Provider is the amount last certified to Agent by such Bank Product Provider as being due and payable (less any distributions made to such Bank Product Provider on account thereof). Borrowers may obtain Bank Products from any Bank Product Provider, although Borrowers are not required to do so. Each Borrower acknowledges and agrees that no Bank Product Provider has committed to provide any Bank Products and that the providing of Bank Products by any Bank Product

- 89 -

Provider is in the sole and absolute discretion of such Bank Product Provider. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Product shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or Guarantors.

17.6 **Debtor-Creditor Relationship**. The relationship between the Lenders and Agent, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor. No member of the Lender Group has (or shall be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the members of the Lender Group, on the one hand, and the Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

17.7 **Counterparts; Electronic Execution**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

17.8 **Revival and Reinstatement of Obligations; Certain Waivers**. If any member of the Lender Group or any Bank Product Provider repays, refunds, restores, or returns in whole or in part, any payment or property (including any proceeds of Collateral) previously paid or transferred to such member of the Lender Group or such Bank Product Provider in full or partial satisfaction of any Obligation or on account of any other obligation of any Loan Party under any Loan Document or any Bank Product Agreement, because the payment, transfer, or the incurrence of the obligation so satisfied is asserted or declared to be void, voidable, or otherwise recoverable under any law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent transfers, preferences, or other voidable or recoverable obligations or transfers (each, a "Voidable Transfer"), or because such member of the Lender Group or Bank Product Provider elects to do so on the reasonable advice of its counsel in connection with a claim that the payment, transfer, or incurrence is or may be a Voidable Transfer, then, as to any such Voidable Transfer, or the amount thereof that such member of the Lender Group or Bank Product Provider elects to repay, restore, or return (including pursuant to a settlement of any claim in respect thereof), and as to all reasonable costs, expenses, and attorneys fees of such member of the Lender Group or Bank Product Provider related thereto, (i) the liability of the Loan Parties with respect to the amount or property paid, refunded, restored, or returned will automatically and immediately be revived, reinstated, and

- 90 -

restored and will exist and (ii) Agent's Liens securing such liability shall be effective, revived, and remain in full force and effect, in each case, as fully as if such Voidable Transfer had never been made. If, prior to any of the foregoing, (A) Agent's Liens shall have been released or terminated or (B) any provision of this Agreement shall have been terminated or cancelled, Agent's Liens, or such provision of this Agreement, shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligation of any Loan Party in respect of such liability or any Collateral securing such liability.

17.9   **Confidentiality**.

(a)   Agent and Lenders each individually (and not jointly or jointly and severally) agree that material, non-public information regarding Parents and their Subsidiaries, their operations, assets, and existing and contemplated business plans ("Confidential Information") shall be treated by Agent and the Lenders in a confidential manner, and shall not be disclosed by Agent and the Lenders to Persons who are not parties to this Agreement, except: (i) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group and to employees, directors and officers of any member of the Lender Group (the Persons in this clause (i), "Lender Group Representatives") on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and on a confidential basis, (ii) to Subsidiaries and Affiliates of any member of the Lender Group (including the Bank Product Providers), provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 17.9, (iii) as may be required by regulatory authorities so long as such authorities are informed of the confidential nature of such information, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided that (x) prior to any disclosure under this clause (iv), the disclosing party agrees to provide Borrowers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrowers pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (y) any disclosure under this clause (iv) shall be limited to the portion of the Confidential Information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance in writing by Borrowers, (vi) as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, provided, that, (x) prior to any disclosure under this clause (vi) the disclosing party agrees to provide Borrowers with prior written notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior written notice to Borrowers pursuant to the terms of the subpoena or other legal process and (y) any disclosure under this clause (vi) shall be limited to the portion of the Confidential Information as may be required by such Governmental Authority pursuant to such subpoena or other legal process, (vii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or the Lenders or the Lender Group Representatives), (viii) in connection with any assignment, participation or pledge of any Lender's interest under this Agreement, provided that prior to receipt of Confidential Information any such assignee, participant, or pledgee shall have agreed in writing to receive such Confidential Information either subject to the terms of this Section 17.9 or pursuant to confidentiality requirements substantially similar to those contained in this Section 17.9 (and such Person may disclose such Confidential Information to Persons employed

or engaged by them as described in clause (i) above), (ix) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents; provided, that, prior to any disclosure to any Person (other than any Loan Party, Agent, any Lender, any of their respective Affiliates, or their respective counsel) under this clause (ix) with respect to litigation involving any Person (other than any Borrower, Agent, any Lender, any of their respective Affiliates, or their respective counsel), the disclosing party agrees to provide Borrowers with prior written notice thereof, and (x) in connection with, and to the extent reasonably necessary for, the exercise of any secured creditor remedy under this Agreement or under any other Loan Document.

(b)     Anything in this Agreement to the contrary notwithstanding, Agent may disclose information concerning the terms and conditions of this Agreement and the other Loan Documents to loan syndication and pricing reporting services or in its marketing or promotional materials, with such information to consist of deal terms and other information customarily found in such publications or marketing or promotional materials and may otherwise use the name, logos, and other insignia of any Borrower or the other Loan Parties and the Commitments provided hereunder in any "tombstone" or other advertisements, on its website or in other marketing materials of the Agent.

(c)     The Loan Parties hereby acknowledge that Agent or its Affiliates may make available to the Lenders materials or information provided by or on behalf of Borrowers hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks, SyndTrak or another similar electronic system (the "Platform") and certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender"). The Loan Parties shall be deemed to have authorized Agent and its Affiliates and the Lenders to treat Borrower Materials marked "PUBLIC" or otherwise at any time filed with the SEC as not containing any material non-public information with respect to the Loan Parties or their securities for purposes of United States federal and state securities laws.   All Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor" (or another similar term).  Agent and its Affiliates and the Lenders shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" or that are not at any time filed with the SEC as being suitable only for posting on a portion of the Platform not marked as "Public Investor" (or such other similar term).

17.10  **Survival**.  All representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent, any Issuing Bank, or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee or any other amount payable under this Agreement is outstanding or unpaid or

any Letter of Credit is outstanding and so long as the Commitments have not expired or been terminated.

17.11  **Patriot Act**.  Each Lender that is subject to the requirements of the Patriot Act hereby notifies Borrowers that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow such Lender to identify each Borrower in accordance with the Patriot Act.  In addition, if Agent is required by law or regulation or internal policies to do so, it shall have the right to periodically conduct (a) Patriot Act searches, OFAC/PEP searches, and customary individual background checks for the Loan Parties and (b) OFAC/PEP searches and customary individual background checks for the Loan Parties' senior management and key principals, and each Borrower agrees to cooperate in respect of the conduct of such searches and further agrees that the reasonable costs and charges for such searches shall constitute Lender Group Expenses hereunder and be for the account of Borrowers.

17.12  **Integration**.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.  The foregoing to the contrary notwithstanding, all Bank Product Agreements, if any, are independent agreements governed by the written provisions of such Bank Product Agreements, which will remain in full force and effect, unaffected by any repayment, prepayments, acceleration, reduction, increase, or change in the terms of any credit extended hereunder, except as otherwise expressly provided in such Bank Product Agreement.

17.13  **US Parent as Agent for Borrowers**.  Each Borrower hereby irrevocably appoints US Parent as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (a) to provide Agent with all notices with respect to Revolving Loans and Letters of Credit obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and the other Loan Documents (and any notice or instruction provided by Administrative Borrower shall be deemed to be given by Borrowers hereunder and shall bind each Borrower), (b) to receive notices and instructions from members of the Lender Group (and any notice or instruction provided by any member of the Lender Group to the Administrative Borrower in accordance with the terms hereof shall be deemed to have been given to each Borrower), and (c) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Revolving Loans and Letters of Credit and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loan Account and Collateral in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Lender Group shall not incur liability to any Borrower as a result hereof.  Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.  To induce the

- 93 -

Lender Group to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify each member of the Lender Group and hold each member of the Lender Group harmless against any and all liability, expense, loss or claim of damage or injury, made against the Lender Group by any Borrower or by any third party whosoever, arising from or incurred by reason of (i) the handling of the Loan Account and Collateral of Borrowers as herein provided, or (ii) the Lender Group's relying on any instructions of the Administrative Borrower, except that Borrowers will have no liability to the relevant Agent-Related Person or Lender-Related Person under this <u>Section 17.13</u> with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Agent-Related Person or Lender-Related Person, as the case may be.

17.14   **Acknowledgment and Consent to Bail-In of EEA Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable: (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

17.15   **Judgment Currency**. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of each Borrower in respect of any such sum due from it to Agent or any Lender hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "<u>Judgment Currency</u>") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "<u>Agreement Currency</u>"), be discharged only to the extent that on the Business Day following receipt by Agent or such Lender, as the case may be, of any sum adjudged to be so due in the Judgment Currency, Agent or such Lender, as the case may be, may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to Agent or any Lender from any Borrower in the Agreement Currency, such Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Agent or such Lender,

- 94 -

as the case may be, against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to Agent or any Lender in such currency, Agent or such Lender, as the case may be, agrees to return the amount of any excess to such Borrower (or to any other Person who may be entitled thereto under applicable law).

17.16   **Canadian AML Laws.**  If Agent has ascertained the identity of any Canadian Loan Party or any authorized signatories of any Canadian Loan Party for the purposes of Canadian AML Laws, then Agent:

(a)     shall be deemed to have done so as an agent for each Lender and this Agreement shall constitute a "written agreement" in such regard between each Lender and Agent within the meaning of the applicable Canadian AML Laws; and

(b)     shall provide to each Lender, copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each Lender agrees that Agent has no obligation to ascertain the identity of the Canadian Loan Parties or any authorized signatories of the Canadian Loan Parties on behalf of any Lender, or to confirm the completeness or accuracy of any information it obtains from any Canadian Loan Party or any such authorized signatory in doing so.

17.17   **Agent and Lenders as Parties-in-Interest.**   Each Loan Party hereby stipulates and agrees that Agent and each Lender is and shall remain a party in interest in the Chapter 11 Cases and the Recognition Proceedings and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith.  Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of Agent's or any Lender's rights or remedies under applicable law or documentation.  Without limitation of the foregoing, Agent and each Lender shall have the right to make any motion or raise any objection it deems to be in its interest (specifically including but not limited to objections to use of proceeds of the Revolving Loans, to payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease), provided that neither Agent nor any Lender will exercise such right if the action or inaction by the Loan Parties (or any of them) which is the subject of such motion or objection is expressly permitted by any covenant or provision of this Agreement.

17.18   **Waiver of Right to Obtain Alternative Financing.**  In consideration of the Revolving Loans to be made to Borrowers by Agent and the Lenders, each Loan Party hereby waives any right it may have to obtain an order by the Bankruptcy Court or the Canadian Court, as applicable, authorizing such Loan Party to obtain financing pursuant to Section 364 of the Bankruptcy Code or Section 11.2 of the CCAA, as applicable, from any Person other than Agent and Lenders, unless such financing would result in payment in full of all of the Obligations and the payment in full of all Prepetition Senior Obligations in accordance with the terms of the Prepetition Senior Credit Agreement.

17.19   **Credit Bids**.  Agent and each Lender shall maintain its right to credit bid their respective claims under the this Agreement, the DIP Order or the DIP Recognition Order

- 95 -

pursuant to Section 363(k) of the Bankruptcy Code or other applicable law, and each Loan Party agrees that it shall not object to Agent's or any Lender's right to credit bid.

17.20 **Conflict of Terms**.  If any provision in this Agreement or any other Loan Document conflicts with any provision in the DIP Order or any Canadian DIP Order, the provision in the DIP Order or such Canadian DIP Order, as applicable, shall govern and control.

[Signature pages to follow.]

- 96 -

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**US BORROWERS:**

**WYNIT DISTRIBUTION, LLC**

By:_____
Name:  William L. Cave
Title:  Chief Financial Officer

**WD NAVARRE DISTRIBUTION, LLC**

By:_____
Name:  William L. Cave
Title:  Chief Financial Officer

**WD ENCORE SOFTWARE, LLC**

By:_____
Name:  William L. Cave
Title:  Chief Financial Officer

**WD NAVARRE DIGITAL SERVICES, LLC**

By:_____
Name:  William L. Cave
Title:  Chief Financial Officer

**WD NAVARRE HOLDINGS, LLC**

By:_____
Name:  William L. Cave
Title:  Chief Financial Officer

**GUARANTORS:**                            **WYNIT HOLDINGS, INC.**


By:_____
Name:  William L. Cave
Title:  Chief Financial Officer

[WYNIT—DIP CREDIT AGREEMENT]

**CANADIAN BORROWER:**          **WD NAVARRE CANADA, ULC**

By:_____
Name:  William L. Cave
Title:  Chief Financial Officer

**WELLS FARGO BANK, NATIONAL ASSOCIATION,** as Agent, as Joint Lead Arranger, as Joint Book Runner, and as a Lender

By: _____

Name: _____

Director: _____

**WELLS FARGO CAPITAL FINANCE
CORPORATION CANADA,** as a Lender

By: _____
Name: _____
     Its Authorized Signatory

[LENDER SIGNATURE PAGES TO BE ATTACHED]

[WYNIT—DIP CREDIT AGREEMENT]

## Schedule A-1

### Agent's Canadian Account

An account at a bank designated by Agent from time to time as the account into which Canadian Borrower shall make all payments to Agent for the benefit of the Lender Group and into which the Lender Group shall make all payments to Agent under this Agreement and the other Loan Documents with respect to Canadian Obligations; unless and until Agent notifies Administrative Borrower and the Lender Group to the contrary, Agent's Canadian Account shall be the applicable deposit account described below.

**CAD Wire Instructions:**

| | |
|---|---|
| *Bank:* | **TD Canada Trust** |
| *Bank Address:* | **55 King Street West, Toronto, Ontario, Canada M5K 1A2** |
| *Transit Number* | **10202** |
| *Bank Number:* | **004** |
| *Canadian Clearing Code:* | **000410202** |
| *SWIFT Number:* | **TDOMCATTTOR** |
| *Beneficiary:* | **Wells Fargo Capital Finance Corporation Canada** |
| *Beneficiary Account Number:* | **5388221** |
| *Beneficiary Address:* | **40 King Street West Suite 2500, Toronto, ON M5H 3Y2 Canada** |
| *Ordering Customer:* | **Client Name** |

**USD Wire Instructions:**

| | |
|---|---|
| *Bank:* | **TD Canada Trust** |
| *Bank Address:* | **55 King Street West, Toronto, Ontario, Canada M5K 1A2** |
| *Transit Number* | **10202** |
| *Bank Number:* | **004** |
| *Canadian Clearing Code:* | **000410202** |
| *SWIFT Number:* | **TDOMCATTTOR** |
| *Beneficiary:* | **Wells Fargo Capital Finance Corporation Canada** |
| *Beneficiary Account Number:* | **7387637** |
| *Beneficiary Address:* | **40 King Street West Suite 2500, Toronto, ON M5H 3Y2 Canada** |
| *Ordering Customer:* | **Client Name** |

**Intermediary Bank for USD Payment (Only for paying from Non-Canadian Bank):**

| | |
|---|---|
| *U.S. Correspondent Bank:* | **Bank of America, N.A.** |
| *ABA Number:* | **026009593** |
| *Bank Address:* | **New York, NY** |

**Schedule A-2**

**Agent's US Account**

An account at a bank designated by Agent from time to time as the account into which US Borrowers shall make all payments to Agent for the benefit of the Lender Group and into which the Lender Group shall make all payments to Agent under this Agreement and the other Loan Documents with respect to US Obligations; unless and until Agent notifies Administrative Borrower and the Lender Group to the contrary, Agent's US Account shall be that certain deposit account bearing account number 4124923723, reference WYNIT, and maintained by Agent with Wells Fargo Bank, N.A., 420 Montgomery Street, San Francisco, CA, ABA #121-000-248.

## Schedule C-1

## Commitments

| Lender | US Revolver Commitment | Canadian Revolver Commitment |
|---|---|---|
| Wells Fargo Bank, National Association | $4,500,000 | $0 |
| Wells Fargo Capital Finance Corporation Canada | $0 | $75,000 |
| JPMorgan Chase Bank, N.A. | $3,300,000 | $0 |
| JPMorgan Chase Bank, N.A., Toronto Branch | $0 | $55,000 |
| SunTrust Bank | $2,700,000 | $45,000 |
| Bank of the West | $1,350,000 | $22,500 |
| City National Bank, a National Banking Association | $1,350,000 | $22,500 |
| Webster Business Credit Corporation | $1,800,000 | $30,000 |
| All Lenders | $15,000,000[1] | $250,000 |

---

[1]     Aggregate outstanding principal amount of US Revolver Usage under the US Revolver Commitment shall not exceed (x) the Maximum Revolver Amount ($15,000,000), less (y) the Dollar Equivalent amount of Canadian Revolver Usage at any time.

## Schedule 1.1

As used in the Agreement, the following terms shall have the following definitions:

"Account" means an account (as that term is defined in the Code or the PPSA, as applicable).

"Account Debtor" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"Adjusted Borrowing Base" means the Borrowing Base, as calculated without reduction for the outstanding amount of Net Prepetition Senior Obligations.

"Administrative Borrower" has the meaning specified therefor in Section 17.13 of the Agreement.

"Administrative Questionnaire" has the meaning specified therefor in Section 13.1(a) of the Agreement.

"Advisor" means Conway MacKenzie, or any other financial advisor reasonably acceptable to Agent.

"Affected Lender" has the meaning specified therefor in Section 2.13(b) of the Agreement.

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Equity Interests, by contract, or otherwise; provided, that, for purposes of the definition of Eligible Accounts and Section 6.10 of the Agreement:  (a) any Person which owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"Agent" has the meaning specified therefor in the preamble to the Agreement.

"Agent-Related Persons" means Agent, together with its Affiliates, officers, directors, employees, attorneys, and agents.

"Agent's Applicable Account" means Agent's US Account and/or Agent's Canadian Account, as the context requires.

Schedule 1.1 – 1

"<u>Agent's Canadian Account</u>" means the Deposit Account identified on <u>Schedule A-1</u> as Agent's Canadian Account (or such other Deposit Account that has been designated as such, in writing, by Agent to Administrative Borrower and the Lenders).

"<u>Agent's Liens</u>" means the Liens granted by each Parent and its Subsidiaries to Agent under the Loan Documents and securing the Obligations.

"<u>Agent's US Account</u>" means the Deposit Account identified on <u>Schedule A-2</u> as Agent's US Account (or such other Deposit Account that has been designated as such, in writing, by Agent to Administrative Borrower and the Lenders).

"<u>Agreement</u>" means the Credit Agreement to which this <u>Schedule 1.1</u> is attached.

"<u>Anti-Corruption Laws</u>" means the United States Foreign Corrupt Practices Act of 1977, as amended, all Canadian AML Laws, and all other applicable laws concerning or relating to bribery, money laundering or corruption.

"<u>Applicable Currency</u>" means Dollars; <u>provided</u>, that, with respect to Canadian Revolving Loans and other Obligations denominated in Canadian Dollars, Applicable Currency means Canadian Dollars.

"<u>Applicable Margin</u>" means 6.0%

"<u>Applicable Unused Line Fee Percentage</u>" means 0.25 percentage points.

"<u>Application Event</u>" means the occurrence of (a) a failure by Borrowers to repay all of the Obligations in full on the Maturity Date, or (b) an Event of Default and the election by Agent or the Required Lenders to require that payments and proceeds of Collateral be applied pursuant to <u>Section 2.4(b)(iii)</u> of the Agreement.

"<u>Approved Budget</u>" has the meaning specified in the Interim Order.

"<u>Approved Sale Motion</u>" means a Sale Motion seeking Bankruptcy Court approval of an Equipment Sale Transaction and an Inventory Sale Transaction in form and substance acceptable to Agent.

"<u>Assignee</u>" has the meaning specified therefor in <u>Section 13.1(a)</u> of the Agreement.

"<u>Assignment and Acceptance</u>" means an Assignment and Acceptance Agreement substantially in the form of <u>Exhibit A-1</u> to the Agreement.

"<u>Authorized Person</u>" means any one of the individuals identified on <u>Schedule A-3</u> to the Agreement, as such schedule is updated from time to time by written notice from Borrowers to Agent.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Product" means any one or more of the following financial products or accommodations extended to any Parent or its Subsidiaries by a Bank Product Provider: (a) credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards")), (b) credit card processing services, (c) debit cards, (d) stored value cards, or (e) Cash Management Services.

"Bank Product Agreements" means those agreements entered into from time to time by a Parent or its Subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"Bank Product Collateralization" means providing cash collateral (pursuant to documentation reasonably satisfactory to Agent) to be held by Agent for the benefit of the Bank Product Providers in an amount determined by Agent as sufficient to satisfy the reasonably estimated credit exposure with respect to the then existing Bank Product Obligations.

"Bank Product Obligations" means (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by each Parent and its Subsidiaries to any Bank Product Provider pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, (b) [RESERVED], and (c) all amounts that Agent or any Lender is obligated to pay to a Bank Product Provider as a result of Agent or such Lender purchasing participations from, or executing guarantees or indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to a Parent or its Subsidiaries; provided, in order for any item described in clauses (a), (b), or (c) above, as applicable, to constitute "Bank Product Obligations", if the applicable Bank Product Provider is any Person other than Wells Fargo or its Affiliates, then (i) in the case of Bank Products provided prior to the Closing Date, Agent shall have received a Bank Product Provider Agreement within 10 days after the Closing Date, and (ii) in the case of Bank Products provided on or after the Closing Date, Agent shall have received a Bank Product Provider Agreement within 10 days after the date of the provision of the applicable Bank Product to a Parent or its Subsidiaries. Notwithstanding the generality of the foregoing, and for the sake of clarity, all obligations, liabilities, reimbursement obligations, fees, or expenses owing by US Parent to JPMorgan Chase Bank, N.A. and Paymentech, LLC under that certain Select Merchant Payment Instrument Processing Agreement, fully executed on July 3, 2017, constitute Bank Product Obligations hereunder and the requirement to provide a Bank Product Provider Agreement to Agent does not apply with respect thereto; provided, however, JPMorgan Chase Bank, N.A. acknowledges and agrees to be bound by all of the provisions of Sections 3 and 4 of

Schedule 1.1 – 3

the form of Bank Product Provider Agreement attached hereto as <u>Exhibit B-2</u> to the Agreement as if such provisions were incorporated herein.

"<u>Bank Product Provider</u>" means any Lender or any of its Affiliates; <u>provided</u>, that no such Person (other than Wells Fargo or its Affiliates) shall constitute a Bank Product Provider with respect to a Bank Product unless and until Agent receives a Bank Product Provider Agreement from such Person and with respect to the applicable Bank Product within 10 days after the provision of such Bank Product to a Parent or its Subsidiaries (or, in the case of Bank Products provided prior to the Closing Date, within 10 days after the Closing Date); <u>provided further</u>, that if, at any time, a Lender ceases to be a Lender under the Agreement, then, from and after the date on which it ceases to be a Lender thereunder, neither it nor any of its Affiliates shall constitute Bank Product Providers and the obligations with respect to Bank Products provided by such former Lender or any of its Affiliates shall no longer constitute Bank Product Obligations.  Notwithstanding the generality of the foregoing, and for the sake of clarity, JPMorgan Chase Bank, N.A. and its Affiliates are Bank Product Providers hereunder with respect to services provided under that certain Select Merchant Payment Instrument Processing Agreement, fully executed on July 3, 2017, between US Parent, JPMorgan Chase Bank, N.A. and Paymentech, LLC and the requirement to provide a Bank Product Provider Agreement to the Agent does not apply with respect thereto.

"<u>Bank Product Provider Agreement</u>" means an agreement in substantially the form attached hereto as <u>Exhibit B-2</u> to the Agreement, in form and substance satisfactory to Agent, duly executed by the applicable Bank Product Provider, Borrowers, and Agent.

"<u>Bank Product Reserves</u>" means, as of any date of determination, those reserves that Agent deems necessary or appropriate to establish (based upon the Bank Product Providers' determination of the liabilities and obligations of each Parent and its Subsidiaries in respect of Bank Product Obligations) in respect of Bank Products then provided or outstanding.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals of the Agreement.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Minnesota.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"<u>Bankruptcy Sale</u>" means any sale, disposition, or other transfer of assets pursuant to Section 363 of the Bankruptcy Code.

"<u>Base Rate</u>" means the US Base Rate; <u>provided</u>, that with respect to Canadian Obligations denominated in Canadian Dollars, Base Rate means the Canadian Base Rate.

"<u>Base Rate Loan</u>" means each portion of the Revolving Loans that bears interest at a rate determined by reference to the applicable Base Rate.

Schedule 1.1 – 4

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which any Parent or any of its Subsidiaries or ERISA Affiliates has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Board of Directors" means, as to any Person, the board of directors (or comparable managers) of such Person, or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower" and "Borrowers" have the respective meanings specified therefor in the preamble to the Agreement.

"Borrower Materials" has the meaning specified therefor in Section 17.9(c) of the Agreement.

"Borrowing" means a US Borrowing and/or a Canadian Borrowing, as the context requires.

"Borrowing Base" means, as of any date of determination, the result of:

(a)      85% multiplied by the amount of Eligible Non-Insured Accounts of Borrowers, plus

(b)      90% multiplied by the amount of Eligible Insured Accounts of Borrowers; provided, that, in no event shall the amount of Eligible Insured Accounts that are included in the calculation of this clause (b) at any time exceed the coverage limits that are then in effect under the applicable credit insurance policies covering such Eligible Insured Accounts, plus

(c)      the sum of:

(i)      the least of (1) 70% of the value (calculated at the lower of cost or market on a basis consistent with Borrowers' historical accounting practices) of Eligible Excess Inventory of Borrowers, (2) the product of 85% multiplied by the Net Recovery Percentage identified in the most recent inventory appraisal ordered and obtained by Agent multiplied by the value (calculated at the lower of cost or market on a basis consistent with Borrowers' historical accounting practices) of Eligible Excess Inventory of Borrowers (such determination may be made as to different categories of Inventory based upon the Net Recovery Percentage applicable to such categories) at such time, and (3) $6,000,000, plus

(ii)      the lesser of (1) 70% of the value (calculated at the lower of cost or market on a basis consistent with Borrowers' historical accounting practices) of other Eligible Inventory of Borrowers, and (2) the product of 85% multiplied by the Net Recovery Percentage identified in the most recent inventory appraisal ordered and

Schedule 1.1 – 5

obtained by Agent multiplied by the value (calculated at the lower of cost or market on a basis consistent with Borrowers' historical accounting practices) of other Eligible Inventory of Borrowers (such determination may be made as to different categories of Inventory based upon the Net Recovery Percentage applicable to such categories) at such time, <u>minus</u>

(d)     the outstanding amount of Net Prepetition Senior Obligations, <u>minus</u>

(e)     without duplication of other Reserves or eligibility criteria, the aggregate amount of the Receivables Reserves, Bank Product Reserves, Canadian Priority Payables Reserves, Inventory Reserves, and other Reserves, if any, established by Agent under <u>Section 2.1(d)</u> of the Agreement with respect to the Borrowing Base, the Canadian Maximum Revolver Amount or the Maximum Revolver Amount.

Notwithstanding the foregoing, unless otherwise agreed to by Agent and the Required Lenders, no Accounts or Inventory of the Canadian Borrower shall be included in the Borrowing Base after the 5th Business Day following the Closing Date unless the Initial Stay Order, the Canadian Supplemental Order and the Canadian Interim DIP Recognition Order shall have been entered by the Canadian Court, and such orders shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than in respect of the Canadian Interim DIP Recognition Order by the Canadian Final DIP Recognition Order) absent the prior written consent of the Agent and the Required Lenders.

"<u>Borrowing Base Certificate</u>" means a certificate in the form of <u>Exhibit B-1</u>.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of New York or Georgia, except that, if a determination of a Business Day shall relate to a Canadian Revolving Loan, the term "Business Day" also shall exclude any day on which banks are authorized or required to close in Toronto, Ontario.

"<u>Canadian AML Laws</u>" means any Canadian federal or provincial laws or regulations relating to money laundering or terrorism including  Part II.1 of the Criminal Code, R.S.C. 1985, c. C-46, The Proceeds of Crime (Money Laundering) and Terrorist Financing Act, S.C. 2000, c. 17 and the United Nations Act, R.S.C. 1985, c.U-2, together with all rules, regulations and interpretations thereunder or related thereto including the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism and the United Nations Al-Qaida and Taliban Regulations promulgated under the United Nations Act.

"<u>Canadian Availability</u>" means, as of any date of determination, the Dollar Equivalent amount that Canadian Borrower is entitled to borrow as Canadian Revolving Loans under <u>Section 2.1(b)</u> of the Agreement (after giving effect to the then outstanding Canadian Revolver Usage and US Revolver Usage).

"<u>Canadian Base Rate</u>" means, for any day, a rate per annum equal to the "prime rate" for Canadian Dollar commercial loans made in Canada as reported by Thomson Reuters

under Reuters Instrument Code <CAPRIME=> on the "CA Prime Rate (Domestic Interest Rate) – Composite Display" page (or any successor page or such other commercially available service or source (including the Canadian Dollar "prime rate" announced by a Schedule I bank under the Bank Act (Canada)) as Agent may designate from time to time), and if any such rate is below zero, then such rate shall be deemed to be zero. Each determination of the Canadian Base Rate shall be made by Agent and shall be conclusive in the absence of manifest error.

"<u>Canadian Benefit Plan</u>" means any plan, fund, program, or policy, whether oral or written, formal or informal, funded or unfunded, insured or uninsured, providing material employee benefits, including medical, hospital care, dental, sickness, accident, disability, life insurance, retirement or savings benefits, under which a Canadian Loan Party or any other Subsidiary of any Borrower organized under the laws of Canada or any province thereof has any liability with respect to any employee or former employee based in Canada. For the avoidance of doubt, "Canadian Benefit Plan" excludes any Canadian Pension Plan.

"<u>Canadian Borrower</u>" has the meaning specified therefor in the preamble to the Agreement.

"<u>Canadian Borrowing</u>" means a borrowing consisting of Canadian Revolving Loans made on the same day by the Lenders (or Agent on behalf thereof), or by Canadian Swing Lender in the case of a Canadian Swing Loan, or by Agent in the case of a Canadian Extraordinary Advance.

"<u>Canadian Court</u>" has the meaning set forth in the Recitals of the Agreement.

"<u>Canadian Defined Benefit Pension Plan</u>" means any Canadian Pension Plan which contains a "defined benefit provision" as defined in subsection 147.1(1) of the Income Tax Act (Canada).

"<u>Canadian Designated Account</u>" means the Canadian Deposit Account of Canadian Borrower identified on <u>Schedule D-1</u> to the Agreement (or such other Deposit Account of Canadian Borrower located at Canadian Designated Account Bank that has been designated as such, in writing, by Canadian Borrower to Agent).

"<u>Canadian Designated Account Bank</u>" has the meaning specified therefor in <u>Schedule D-1</u> to the Agreement (or such other bank that is located within Canada that has been designated as such, in writing, by Canadian Borrower to Agent).

"<u>Canadian DIP Orders</u>" means the Canadian Initial Stay Order, the Canadian Supplemental Order, the applicable DIP Recognition Order at such time and any other order of the Canadian Court entered from time to time with the consent of the Agent and the Lenders.

"<u>Canadian Dollar Equivalent</u>" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in Canadian Dollars as reasonably determined by Agent at such time on the basis of the Spot Rate (determined in respect of the

most recent Revaluation Date or such other date as reasonably determined by Agent) for the purchase of Canadian Dollars with Dollars.

"Canadian Dollars" or "Cdn$" means the lawful currency of Canada, as in effect from time to time.

"Canadian Extraordinary Advances" has the meaning specified therefor in Section 2.3(d)(iii) of the Agreement.

"Canadian Final DIP Recognition Order" means an order of the Canadian Court in the Recognition Proceedings, which order shall be satisfactory in form and substance to Agent, the Lenders, Prepetition Senior Agent, and the Prepetition Senior Lenders, which order shall recognize and enforce the Final Order in Canada.

"Canadian Guarantee and Security Agreement" means the Canadian Guarantee and Security Agreement dated as of even date with the Agreement, by and among each Loan Party and Agent.

"Canadian Initial Stay Order" means an order of the Canadian Court, in form and substance satisfactory to Agent, the Lenders, Prepetition Senior Agent, and the Prepetition Senior Lenders, which order shall grant an interim stay in Canada and recognize the Chapter 11 Cases as foreign main proceedings under Part IV of the CCAA. For the avoidance of doubt, the Canadian Initial Stay Order may be part of the Canadian Supplemental Order.

"Canadian Interim DIP Recognition Order" means an order of the Canadian Court, in form and substance satisfactory to Agent, the Lenders, Prepetition Senior Agent, and the Prepetition Senior Lenders which order shall, among other things, provide a charge for the super priority charge over the Canadian Collateral in respect of the Agent's and the Lenders' claims. For the avoidance of doubt, the Canadian Interim DIP Recognition Order may be part of the Canadian Supplemental Order.

"Canadian Loan Account" has the meaning specified therefor in Section 2.9 of the Agreement.

"Canadian Loan Party" means Canadian Borrower and any other Loan Party that is organized under the laws of Canada or any province thereof.

"Canadian Maximum Revolver Amount" means $250,000.

"Canadian Obligations" means (a) all loans (including Canadian Revolving Loans (inclusive of Canadian Extraordinary Advances and Canadian Swing Loans)), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), premiums, liabilities (including all amounts charged to the Canadian Loan Account pursuant to the Agreement), obligations (including indemnification obligations) of any Canadian Loan Party, fees of any Canadian Loan Party, Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding,

regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding) of any Canadian Loan Party, guaranties of any Canadian Loan Party, and all covenants and duties of any other kind and description owing by any Canadian Loan Party arising out of, under, pursuant to, in connection with, or evidenced by the Agreement or any of the other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that any Canadian Loan Party is required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, and (b) all Bank Product Obligations owing by Canadian Loan Parties.  Without limiting the generality of the foregoing, the Canadian Obligations under the Loan Documents include the obligation to pay (i) the principal of the Canadian Revolving Loans, (ii) interest accrued on the Canadian Revolving Loans, (iii) Lender Group Expenses of any Canadian Loan Party, (iv) fees payable by any Canadian Loan Party under the Agreement or any of the other Loan Documents, and (v) indemnities and other amounts payable by any Canadian Loan Party under any Loan Document.  Any reference in the Agreement or in the Loan Documents to the Canadian Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"Canadian Overadvance" means, as of any date of determination, that the Canadian Revolver Usage is greater than any of the limitations set forth in Section 2.1.

"Canadian Parent" has the meaning specified therefor in the preamble to the Agreement.

"Canadian Pension Plan" means each employee pension benefit plan or pension plan that is required to be registered under the Pension Benefits Act (Ontario) or other Canadian federal or provincial law which is maintained or contributed to, or to which there is or may be an obligation to contribute by a Loan Party or a Subsidiary thereof, for its employees or former employees, but does not include the Canada Pension Plan as maintained by the Government of Canada.

"Canadian Pension Termination Event" means (a) the voluntary full or partial wind up of a Canadian Pension Plan by any Loan Party or Subsidiary thereof or initiation of any corporate or other action or filing (including the filing of an amendment to such Canadian Pension Plan) to do so; (b) the institution of proceedings by any Governmental Authority to terminate in whole or in part a Canadian Pension Plan; (c) the appointment by any Governmental Authority of a replacement administrator or trustee to administer or wind-up any Canadian Pension Plan; or (d) any other event or condition that any Loan Party is aware of and that constitutes grounds for the termination of or winding up of any Canadian Pension Plan in whole or in part.

"Canadian Priority Payables Reserves" means reserves (determined from time to time by Agent in its Permitted Discretion) for (but without duplication of any other reserve): (a) the amount past due and owing by any Canadian Loan Party, or the accrued amount for which such Canadian Loan Party has an obligation to remit, to a Governmental Authority or other

Person pursuant to any applicable law, rule or regulation, in respect of (i) goods and services taxes, harmonized sales taxes, other sales taxes, employee income taxes, realty taxes, municipal taxes and other taxes payable or to be remitted or withheld; (ii) workers' compensation or employment insurance; (iii) federal Canada Pension Plan or other statutory pension plan contributions; (iv) vacation or holiday pay; and (v) other like charges and demands, in each case, to the extent that any Governmental Authority or other Person may claim a Lien, trust, deemed trust, right or other claim ranking or capable of ranking in priority to or *pari passu* with one or more of the Agent's Liens; and (b) the aggregate amount of any other liabilities of any Canadian Loan Party (i) in respect of which a trust or deemed trust has been or may be imposed on any Collateral to provide for payment, or (ii) in respect of unpaid or unremitted pension plan contributions, including normal cost contributions, special payments and, without duplication, amounts representing any unfunded liability, solvency deficiency or wind-up deficiency whether or not due with respect to a Canadian Pension Plan, (iii) claims for amounts representing costs in connection with the preservation, protection, collection or realization of Collateral or (iv) which are secured by a Lien, right or claim on any Collateral (other than Permitted Liens that do not have priority over Agent's Liens); in each case, pursuant to any applicable law, rule or regulation and which such Lien, trust, deemed trust, right or claim ranks or, in the Permitted Discretion of Agent, is capable of ranking in priority to or *pari passu* with one or more of the Agent's Liens (such as claims by employees for unpaid wages and other amounts payable under the Wage Earner Protection Program Act (Canada).

"Canadian Protective Advances" has the meaning specified therefor in Section 2.3(d)(i) of the Agreement.

"Canadian Revolver Commitment" means, with respect to each Revolving Lender, its Canadian Revolver Commitment, and, with respect to all Revolving Lenders, their Canadian Revolver Commitments, in each case as set forth beside such Revolving Lender's name under the applicable heading on Schedule C-1 to the Agreement or in the Assignment and Acceptance pursuant to which such Revolving Lender became a Revolving Lender under the Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"Canadian Revolver Usage" means, as of any date of determination, the amount of outstanding Canadian Revolving Loans (inclusive of Canadian Swing Loans and Canadian Extraordinary Advances).

"Canadian Revolving Loan Exposure" means, with respect to any Revolving Lender, as of any date of determination (a) prior to the termination of the Canadian Revolver Commitments, the amount of such Lender's Canadian Revolver Commitment, and (b) after the termination of the Canadian Revolver Commitments, the aggregate outstanding principal amount of the Canadian Revolving Loans of such Lender.

"Canadian Revolving Loans" has the meaning specified therefor in Section 2.1(b) of the Agreement.

"Canadian Security Documents" means the Canadian Guarantee and Security Agreement and any other Loan Document that grants or purports to grant a Lien on any of the assets or interests, and the proceeds thereof, of any Canadian Loan Party (or any other Loan Party with respect to assets located in Canada).

"Canadian Subagent" has the meaning specified therefor in Section 15.2 of the Agreement.

"Canadian Supplemental Order" means an order of the Canadian Court, in form and substance satisfactory to Agent, the Lenders, Prepetition Senior Agent, and the Prepetition Senior Lenders, which order shall grant customary additional relief in the Recognition Proceedings.

"Canadian Swing Lender" means WF Canada or any other Lender that, at the request of Canadian Borrower and with the consent of Agent agrees, in such Lender's sole discretion, to become the Canadian Swing Lender under Section 2.3(b) of the Agreement.

"Canadian Swing Loan" has the meaning specified therefor in Section 2.3(b) of the Agreement.

"Canadian Swing Loan Exposure" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Canadian Swing Loans on such date.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" has the meaning provided in the DIP Order.

"Carve-Out Amount" has the meaning provided in the DIP Order.

"Cash Equivalents" means (a) Domestic Cash Equivalents, and (b) Foreign Cash Equivalents.

"Cash Management Services" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement,  merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing house transfer (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system) and other cash management arrangements.

"CCAA" has the meaning set forth in the Recitals of the Agreement.

"Change of Control" means that:

(a)     Permitted Holders fail to own and control, directly or indirectly, 100% of the Equity Interests of each Parent entitled (without regard to the occurrence of any contingency) to vote for the election of members of the Board of Directors of such Parent,

(b)  a majority of the members of the Board of Directors of any Parent do not constitute Continuing Directors,

(c)  US Parent fails to own and control, directly or indirectly, 100% of the Equity Interests of each other US Loan Party, or

(d)  Canadian Parent fails to own and control, directly or indirectly, 100% of the Equity Interests of each other Canadian Loan Party.

"Change in Law" means the occurrence after the date of the Agreement of: (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, or (c) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided that notwithstanding anything in the Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States, Canadian or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" has the meaning set forth in the Recitals of the Agreement.

"Closing Date" means the date of the making of the initial Revolving Loan (or other extension of credit) under the Agreement.

"Code" means the New York Uniform Commercial Code, as in effect from time to time.

"Collateral" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by any Loan Party in or upon which a Lien is granted by such Person in favor of Agent or the Lenders under any of the Loan Documents.

"Collateral Access Agreement" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, customs broker, carrier, freight forwarder, or other Person in possession of, having a Lien upon, or having rights or interests in any Loan Party's books and records, Equipment, or Inventory, in each case, in form and substance reasonably satisfactory to Agent.

"Commitment" means, with respect to each Lender, its Revolver Commitment, and, with respect to all Lenders, their Revolver Commitments.

"Committees" means, collectively, any official committee of unsecured creditors and any other committee formed, appointed, or approved in any Chapter 11 Case and each of such Committees shall be referred to herein as a "Committee".

Schedule 1.1 – 12

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C-1 to the Agreement delivered by the chief financial officer of Administrative Borrower to Agent.

"Confidential Information" has the meaning specified therefor in Section 17.9(a) of the Agreement.

"Continuing Director" means, as to any Parent, (a) any member of the Board of Directors who was a director (or comparable manager) of such Parent on the Closing Date, and (b) any individual who becomes a member of the Board of Directors after the Closing Date if such individual was approved, appointed or nominated for election to the Board of Directors by either the Permitted Holders or a majority of the Continuing Directors, but excluding any such individual originally proposed for election in opposition to the Board of Directors in office at the Closing Date in an actual or threatened election contest relating to the election of the directors (or comparable managers) of such Parent and whose initial assumption of office resulted from such contest or the settlement thereof.

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by a Loan Party, Agent, and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account), including, without limitation, existing control agreements executed in connection with the Prepetition Credit Agreement.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to fund any amounts required to be funded by it under the Agreement within 2 Business Days of the date that it is required to do so under the Agreement (including the failure to make available to Agent amounts required pursuant to a Settlement or to make a required payment in connection with a Letter of Credit Disbursement), unless, solely in respect of making Revolving Loans, such Lender notifies the Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Revolving Loan under the Agreement cannot be satisfied, (b) notified Borrowers, Agent, or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations under the Agreement (unless such writing indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding under the Agreement cannot be satisfied), (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under the Agreement or under other agreements generally (as reasonably determined by Agent) under which it has committed to extend credit, (d) failed, within 2 Business Days after written request by Agent, to confirm that it will comply with the terms of the Agreement relating to its obligations to fund any amounts required to be funded by it under the

Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (d) upon Agent's receipt of such certification in form and substance satisfactory to it, (e) otherwise failed to pay over to Agent or any other Lender any other amount required to be paid by it under the Agreement within 2 Business Days of the date that it is required to do so under the Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent or (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, provided, that a Lender shall not be a Defaulting Lender under this clause (f) solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Defaulting Lender Rate" means (a) with respect to US Obligations, (i) for the first 3 days from and after the date the relevant payment is due, the US Base Rate, and (ii) thereafter, the interest rate then applicable to US Revolving Loans that are Base Rate Loans (inclusive of the Applicable Margin applicable thereto), and (b) with respect to Canadian Obligations, (i) for the first 3 days from and after the date the relevant payment is due, the Canadian Base Rate (if such Canadian Obligations are denominated in Canadian Dollars) or the US Base Rate (if such Canadian Obligations are denominated in Dollars), and (ii) thereafter, the interest rate then applicable to Canadian Revolving Loans that are Base Rate Loans (inclusive of the Applicable Margin applicable thereto).

"Deposit Account" means any deposit account (as that term is defined in the Code).

"Designated Account" means the Canadian Designated Account or the US Designated Account, as applicable.

"Designated Account Debtors" means the Account Debtors listed on Schedule D-3 to the Agreement and any other Account Debtors that Borrowers propose for designation as Designated Account Debtors and Agent approves in writing for such designation (in its Permitted Discretion).

"DIP Order" means the Interim Order or the Final Order, whichever is in effect as of the relevant date in question.

"DIP Recognition Order" means the Canadian Interim DIP Recognition Order and the Canadian Final DIP Recognition Order, whichever is in effect as of the relevant date in question.

ATL 22306858v2

"Disqualified Equity Interest" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable, the termination of the Commitments, and the payment in full of all Prepetition Senior Obligations in accordance with the terms of the Prepetition Senior Credit Agreement), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 180 days after the Maturity Date.

"Dollar Equivalent" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in another currency, the equivalent amount thereof in Dollars as reasonably determined by Agent, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date or such other date reasonably determined by Agent) for the purchase of Dollars with such currency.

"Dollars" or "$" means United States dollars.

"Domestic Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 360 days from the date of creation thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $500,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $500,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of 1 year or less from the date of acquisition

Schedule 1.1 – 15

backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Drawing Document" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Accounts" means those Accounts created by a Borrower in the ordinary course of its business, that arise out of such Borrower's sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any field examination performed by (or on behalf of) Agent from time to time after the Closing Date.  In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits, unapplied cash, taxes, discounts, credits, allowances, and rebates.  Eligible Accounts shall not include the following:

(a)     Accounts owing by any Account Debtor that the Account Debtor has failed to pay within 120 days of original invoice date or within 60 days of the original due date; provided, that, Accounts owing by Designated Account Debtors shall not be excluded from eligibility based on this clause (a) so long as (i) such Accounts do not remain unpaid for more than 120 days after the original invoice date or 90 days after the original due date, and (ii) the aggregate amount of availability that is included in the calculation of the Borrowing Base based on this proviso shall not exceed $1,000,000 at any time,

(b)     Accounts owed by an Account Debtor (or its Affiliates) where 50% or more of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (a) above,

(c)     Accounts with respect to which the Account Debtor is an Affiliate of any Borrower or an employee or agent of any Borrower or any Affiliate of any Borrower,

Schedule 1.1 – 16

(d)      Accounts arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional,

(e)      Accounts that are not payable in Dollars or, with respect to Accounts of Canadian Borrower, Dollars or Canadian Dollars,

(f)      Accounts with respect to which the Account Debtor either (i) does not maintain its chief executive office in the United States or Canada, or (ii) is not organized under the laws of the United States or any state thereof or the laws of Canada or any province thereof, or (iii) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless the Account is supported by an irrevocable letter of credit reasonably satisfactory to Agent (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Agent and is directly drawable by Agent,

(g)      Accounts with respect to which the Account Debtor is (i) the United States or any department, agency, or instrumentality of the United States (exclusive, however, of Accounts with respect to which Borrowers have complied, to the extent required by Agent, with the Assignment of Claims Act, 31 USC §3727 to the reasonable satisfaction of Agent), (ii) any state of the United States, or (iii) a Governmental Authority of Canada or any province thereof (exclusive, however, of Accounts with respect to which a Canadian Loan Party has complied, to the extent required by Agent, with any applicable assignment of claims statute, including the Financial Administration Act (Canada) to the reasonable satisfaction of Agent); provided, that, the aggregate amount of Accounts that are eligible under clauses (i) and (iii) above at any time shall not exceed the Dollar Equivalent of $5,000,000,

(h)      Accounts with respect to which the Account Debtor is a creditor of a Borrower, has or has asserted a right of recoupment or setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent of such claim, right of recoupment or setoff, or dispute,

(i)      [RESERVED]

(j)      Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which any Borrower has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(k)      Accounts, the collection of which, Agent, in its Permitted Discretion, believes to be doubtful, including by reason of the Account Debtor's financial condition,

(l)      Accounts that are not subject to a valid and perfected first priority Agent's Lien,

(m)    Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor,

(n)    Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity, or

(o)    Accounts that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by the applicable Borrower of the subject contract for goods or services.

"Eligible Excess Inventory" shall mean Excess Inventory that qualifies as Eligible Inventory.

"Eligible Insured Accounts" means Eligible Accounts with respect to which (a) the Account Debtor maintain its chief executive office in the United States or Canada, (b) is organized under the laws of the United States or any state thereof or the laws of Canada or any province thereof, and (c) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, reasonably satisfactory to Agent and with respect to which Agent has been designated as lender loss payee or bank beneficiary on terms acceptable to Agent.

"Eligible Inventory" means Inventory of a Borrower, that complies with each of the representations and warranties respecting Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any field examination or appraisal performed by Agent from time to time after the Closing Date.  In determining the amount to be so included, Inventory shall be valued at the lower of cost or market on a basis consistent with Borrowers' historical accounting practices.  An item of Inventory shall not be included in Eligible Inventory if:

(a)    a Borrower does not have good, valid, and marketable title thereto,

(b)    a Borrower does not have actual and exclusive possession thereof (either directly or through a bailee or agent of a Borrower),

(c)    it is not located at one of the locations in the continental United States or Canada set forth on Schedule E-1 to the Agreement (or in-transit from one such location to another such location),

(d)    it is in-transit to or from a location of a Borrower (other than in-transit from one location set forth on Schedule E-1 to the Agreement to another location set forth on Schedule E-1 to the Agreement),

(e)    it is located on real property leased by a Borrower or in a contract warehouse, in each case, unless it is subject to a Collateral Access Agreement executed by the

lessor or warehouseman, as the case may be, and unless it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises,

(f)      it is the subject of a bill of lading or other document of title,

(g)      it is not subject to a valid and perfected first priority Agent's Lien,

(h)      it consists of goods returned or rejected by a Borrower's customers (other than goods returned in the ordinary course of business consistent with Borrowers' practices as in effect as of the Closing Date (or as otherwise modified with Agent's consent) so long as such goods are not defective or damaged, are not subject to any Lien of any such customer's creditors, are not being held for return by Borrowers to their suppliers, and are otherwise acceptable to Agent in its Permitted Discretion),

(i)      it consists of goods that constitute Excess Inventory (other than Eligible Excess Inventory) or are obsolete, restrictive or custom items, work-in-process, raw materials, or goods that constitute spare parts, packaging and shipping materials, supplies used or consumed in Borrowers' business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment,

(j)      it is subject to third party trademark, licensing or other proprietary rights, unless Agent is satisfied that such Inventory can be freely sold by Agent on and after the occurrence of an Event of Default despite such third party rights, or

(k)      it constitutes Floorplan Inventory.

"Eligible Non-Insured Accounts" means Eligible Accounts other than Eligible Insured Accounts.

"Eligible Transferee" means (a) any Lender (other than a Defaulting Lender), any Affiliate of any Lender and any Related Fund of any Lender; (b) (i) a commercial bank organized under the laws of the United States (or any state thereof) or Canada, and having total assets in excess of $1,000,000,000; (ii) a savings and loan association or savings bank organized under the laws of the United States or any state thereof, and having total assets in excess of $1,000,000,000; (iii) a commercial bank organized under the laws of any other country or a political subdivision thereof; provided that (A) (x) such bank is acting through a branch or agency located in the United States or Canada or (y) such bank is organized under the laws of a country that is a member of the Organization for Economic Cooperation and Development or a political subdivision of such country, and (B) such bank has total assets in excess of $1,000,000,000; (c) any other entity (other than a natural person) that is an "accredited investor" (as defined in Regulation D under the Securities Act) that extends credit or buys loans as one of its businesses including insurance companies, investment or mutual funds and lease financing companies, and having total assets in excess of $1,000,000,000; and (d) during the continuation of an Event of Default, any other Person approved by Agent.

"Employee Plan" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA to which any Loan Party has an obligation to make a contribution, including as the result of being an ERISA Affiliate, other than a Canadian Benefit Plan and Canadian Pension Plan.

"Encore Software" has the meaning specified therefor in the preamble to the Agreement.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials (a) from any assets, properties, or businesses of any Parent, any Subsidiary of any Parent, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by any Parent, any Subsidiary of any Parent, or any of their predecessors in interest.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on any Parent or its Subsidiaries, relating to the environment, the effect of the environment on public or employee health and safety, or the regulation of Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equipment" means equipment (as that term is defined in the Code or the PPSA, as applicable).

"Equipment Sale Transaction" means a sale of all or substantially all of the Equipment and related assets of the Loan Parties.

"Equipment Stalking Horse Bid" has the meaning specified therefor in Section 5.17(a) of the Agreement.

"Equipment Stalking Horse Bidder" has the meaning specified therefor in Section 5.17(a) of the Agreement.

"Equity Interests" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of any Parent or its Subsidiaries under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of any Parent or its Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which any Parent or any of its Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with any Parent or any of its Subsidiaries and whose employees are aggregated with the employees of such Parent or its Subsidiaries under IRC Section 414(o).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified therefor in Section 8 of the Agreement.

"Excess Inventory" shall mean (a) Inventory that has been held by the Borrowers for more than 12 months, or (b) Inventory of a type or category to the extent in excess of the amount of such type or category of Inventory sold by the Borrowers during the most recently ended trailing twelve month period.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Excluded Taxes" means (i) any tax imposed on the net income or net profits of any Lender or any Participant (including any branch profits taxes), in each case imposed by the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender or such Participant is organized or the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender's or such Participant's principal office is located in each case as a result of a present or former connection between such Lender or such Participant and the jurisdiction or taxing authority imposing the tax (other than any such connection arising solely from such Lender or such Participant having executed, delivered or performed its

obligations or received payment under, or enforced its rights or remedies under the Agreement or any other Loan Document); (ii) United States federal or Canadian federal withholding taxes that would not have been imposed but for the Agent's, Lender's or a Participant's failure to comply with the requirements of <u>Section 16.2</u> of the Agreement, (iii) any United States or Canadian federal withholding taxes that would be imposed on amounts payable to a Foreign Lender based upon the applicable withholding rate in effect at the time such Foreign Lender becomes a party to the Agreement (or designates a new lending office), <u>except</u> that Taxes shall include (A) any amount that such Foreign Lender (or its assignor, if any) was previously entitled to receive pursuant to <u>Section 16.1</u> of the Agreement, if any, with respect to such withholding tax at the time such Foreign Lender becomes a party to the Agreement (or designates a new lending office), and (B) additional United States and Canadian federal withholding taxes that may be imposed after the time such Foreign Lender becomes a party to the Agreement (or designates a new lending office), as a result of a change in law, rule, regulation, order or other decision with respect to any of the foregoing by any Governmental Authority, and (iv) any United States federal withholding taxes imposed under FATCA.

"<u>Extraordinary Advances</u>" means the US Extraordinary Advances and/or the Canadian Extraordinary Advances, as the context requires.

"<u>FATCA</u>" means Sections 1471 through 1474 of the IRC, as of the date of the Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"<u>Federal Funds Rate</u>" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by it.

"<u>Final Order</u>" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Agent, the Lenders, Prepetition Senior Agent, and the Prepetition Senior Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Agent, the Lenders, Prepetition Senior Agent, and the Prepetition Senior Lenders waive such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Agent, the Lenders, Prepetition Senior Agent, and the Prepetition Senior Lenders, which, among other matters but not by way of limitation, authorizes the Borrowers to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of the Agent's and the Lenders' claims.

"<u>FitBit</u>" means FitBit, Inc., a Delaware corporation.

Schedule 1.1 – 22

"FitBit Collateral" means all of the Loan Parties' Prepetition Accounts, Chattel Paper and Inventory (other than Floorplan Inventory), and all proceeds of the foregoing.

"FitBit Lien Subordination Agreement" means the Lien Subordination Agreement, dated as of June 12, 2017, among FitBit, Prepetition Senior Agent and the Loan Parties.

"Floorplan Financing Facility" means a floorplan financing facility with the Floorplan Inventory Lender providing for Borrowers' financing of purchases of Floorplan Inventory.

"Floorplan Inventory" means Inventory of a Borrower that was purchased from Epson or Hewlett-Packard and that is subject to a Floorplan Financing Facility.

"Floorplan Inventory Intercreditor Agreements" means, collectively, (a) the Intercreditor Agreement (Floorplan Lender as First Priority Representative), dated as of November 29, 2016, among the Floorplan Inventory Lender, Prepetition Senior Agent and one or more of the Loan Parties, and (b) the Intercreditor Agreement (ABL Agent as First Priority Representative), dated as of November 29, 2016, among the Floorplan Inventory Lender, Prepetition Senior Agent and one or more of the Loan Parties.

"Floorplan Inventory Lender" means Wells Fargo Commercial Distribution Finance, LLC.

"Flow of Funds Agreement" means a flow of funds agreement, dated as of even date herewith, in form and substance reasonably satisfactory to Agent, executed and delivered by each Loan Party and Agent.

"Foreign Cash Equivalents" means, in the case of any Canadian Loan Party or any Subsidiary of either Parent organized under the laws of Canada or any province thereof), investments denominated in Canadian Dollars or in Dollars, in each case which are of substantially the same type as the items specified in the definition of Domestic Cash Equivalents.

"Foreign Lender" means any Lender or Participant that (i) in the case of a US Loan Party, is not a United States person within the meaning of IRC section 7701(a)(30), and (ii) in the case of a Canadian Loan Party, is not resident in Canada (within the meaning of the Income Tax Act (Canada) for the purposes of Part XIII of the Income Tax Act (Canada).

"Funding Date" means the date on which a Borrowing occurs.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, operating agreement, or other organizational documents of such Person.

"Governmental Authority" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantor" means (a) each Subsidiary of each Parent (other than any Subsidiary that is a Borrower), (b) Canadian Parent, and (c) each other Person that becomes a guarantor after the Closing Date.

"Guaranty and Security Agreements" means, collectively, the US Guaranty and Security Agreement and the Canadian Guarantee and Security Agreement.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices and, for the avoidance of doubt, other than royalty payments payable in the ordinary course of business in respect of non-exclusive licenses), (f) [RESERVED], (g) any Disqualified Equity Interests of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above.  For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if

applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation.

"Indemnified Liabilities" has the meaning specified therefor in Section 10.3 of the Agreement.

"Indemnified Person" has the meaning specified therefor in Section 10.3 of the Agreement.

"Indemnified Taxes" means, any Taxes other than Excluded Taxes.

"Information Officer" means KSV Advisory, in its capacity as court-appointed information officer of the Loan Parties in connection with the Recognition Proceedings.

"Insolvency Laws" means (i) the Bankruptcy Code, (ii) the *Bankruptcy and Insolvency Act* (Canada), (iii) the CCAA, (iv) the *Winding-Up and Restructuring Act* (Canada), (v) the *Canada Business Corporations Act* (Canada) or provincial corporate laws where such statute is used by a Person to propose an arrangement or compromise of some or all of the debts of a Person or a stay of proceedings to enforce some or all claims of creditors against a Person, and/or (vi) any similar legislation in a relevant jurisdiction, in each case as applicable and as in effect from time to time.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any Insolvency Law or under any other provincial, state or federal bankruptcy or insolvency law, each as now and hereafter in effect, any successors to such statutes, and any similar laws in any jurisdiction including, without limitation, any laws relating to assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief and any law permitting a debtor to obtain a stay or a compromise of the claims of its creditors.

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications, and amendments thereto, in form and substance satisfactory to Agent, the Lenders, Prepetition Senior Agent, and the Prepetition Senior Lenders which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrowers to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit I-1.

"Inventory" means inventory (as that term is defined in the Code or the PPSA, as applicable).

"Inventory Sale Transaction" means a sale of all or substantially all of the Inventory of the Loan Parties.

"Inventory Reserves" means, as of any date of determination, (a) Landlord Reserves, (b) those reserves that Agent deems necessary or appropriate, in its Permitted

Discretion and subject to Section 2.1(d), to establish and maintain (including reserves for slow moving Inventory and Inventory shrinkage) with respect to Eligible Inventory, the Canadian Maximum Revolver Amount or the Maximum Revolver Amount.

"Inventory Stalking Horse Bid" has the meaning specified therefor in Section 5.17(a) of the Agreement.

"Inventory Stalking Horse Bidder" has the meaning specified therefor in Section 5.17(a) of the Agreement.

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* accounts receivable arising in the ordinary course of business), or acquisitions of Indebtedness, Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustment for increases or decreases in value, or write-ups, write-downs, or write-offs with respect to such Investment.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Issuer Document" means, with respect to any Letter of Credit, a letter of credit application, a letter of credit agreement, or any other document, agreement or instrument entered into (or to be entered into) by a Borrower in favor of Issuing Bank and relating to such Letter of Credit.

"Issuing Bank" means Wells Fargo or any other Lender that, at the request of Borrowers and with the consent of Agent, agrees, in such Lender's sole discretion, to become an Issuing Bank for the purpose of issuing Letters of Credit pursuant to Section 2.11 of the Agreement, and Issuing Bank shall be a Lender.

"Joint Book Runners" has the meaning set forth in the preamble to the Agreement.

"Joint Lead Arrangers" has the meaning set forth in the preamble to the Agreement.

"Landlord Reserve" means, as to each location at which a Borrower has Inventory or books and records located and as to which a Collateral Access Agreement has not been

Schedule 1.1 – 26

received by Agent, a reserve in an amount equal to the greater of (a) the number of months rent for which the landlord will have, under applicable law, a Lien in the Inventory of such Borrower to secure the payment of rent or other amounts under the lease relative to such location, or (b) 3 months rent under the lease relative to such location; provided, that, notwithstanding Agent's receipt of a Collateral Access Agreement with respect to any such location, Agent may establish a reserve with respect to such location if Agent determines that it is necessary or appropriate to do so in its Permitted Discretion.

"Lender" has the meaning set forth in the preamble to the Agreement, shall include Issuing Bank and each Swing Lender, and shall also include any other Person made a party to the Agreement pursuant to the provisions of Section 13.1 of the Agreement and "Lenders" means each of the Lenders or any one or more of them.

"Lender Group" means each of the Lenders (including Issuing Bank and each Swing Lender) and Agent, or any one or more of them.

"Lender Group Expenses" means all (a) costs or expenses (including taxes and insurance premiums) required to be paid by any Parent or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by the Lender Group, (b) documented out-of-pocket fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with each Parent and its Subsidiaries under any of the Chapter 11 Cases or the Loan Documents, including, photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Parent or its Subsidiaries, (d) Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of any Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, (e) customary charges imposed or incurred by Agent resulting from the dishonor of checks payable by or to any Loan Party, (f) reasonable documented out-of-pocket costs and expenses paid or incurred by the Lender Group to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (g) field examination, appraisal, and valuation fees and expenses of Agent related to any field examinations, appraisals, or valuation to the extent of the fees and charges provided in Section 2.10 of the Agreement, (h) Agent's reasonable costs and expenses (including reasonable documented attorneys fees and expenses) relative to third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents or otherwise in connection with the transactions contemplated by the Loan Documents, Agent's Liens in and to the Collateral, or the Lender Group's relationship with any Parent or any of its Subsidiaries, (i) Agent's reasonable documented costs and expenses (including due diligence expenses and reasonable documented attorneys, accountants, consultants, and other advisors fees and expenses) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), syndicating (including reasonable costs and expenses relative to the rating of the Revolving Loans, CUSIP,

DXSyndicate™, SyndTrak or other communication costs incurred in connection with a syndication of the loan facilities), or amending, waiving, or modifying the Loan Documents, or otherwise in connection with the Lender Group's transactions with each Parent and its Subsidiaries under any of the Chapter 11 Cases, and (j) Agent's and each Lender's reasonable documented costs and expenses (including reasonable documented attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning any Parent or any of its Subsidiaries or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or in taking any enforcement action or any Remedial Action with respect to the Collateral.  Lender Group Expenses will not include costs, expenses, fees or charges paid or incurred by any of the Lenders (other than the Agent) in connection with disputes solely between or among the Lenders and their respective Affiliates that do not involve any acts or omissions of any Loan Party; it being understood and agreed that Lender Group Expenses will include costs, expenses, fees or charges paid or incurred by the Agent (but not the Lenders) relative to disputes between or among Agent on the one hand, and one or more Lenders, or one or more of their Affiliates, on the other hand.

"Lender Group Representatives" has the meaning specified therefor in Section 17.9 of the Agreement.

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"Letter of Credit" means a letter of credit (as that term is defined in the Code) issued by Issuing Bank.

"Letter of Credit Collateralization" means either (a) providing cash collateral (pursuant to documentation reasonably satisfactory to Agent, including provisions that specify that the Letter of Credit Fees and all commissions, fees, charges and expenses provided for in Section 2.11(k) of the Agreement (including any fronting fees) will continue to accrue while the Letters of Credit are outstanding) to be held by Agent for the benefit of the Revolving Lenders in an amount equal to 105% of the then existing Letter of Credit Usage, (b) delivering to Agent documentation executed by all beneficiaries under the Letters of Credit, in form and substance reasonably satisfactory to Agent and Issuing Bank, terminating all of such beneficiaries' rights under the Letters of Credit, or (c) providing Agent with a standby letter of credit, in form and substance reasonably satisfactory to Agent, from a commercial bank acceptable to Agent (in its sole discretion) in an amount equal to 105% of the then existing Letter of Credit Usage (it being understood that the Letter of Credit Fee and all fronting fees set forth in the Agreement will continue to accrue while the Letters of Credit are outstanding and that any such fees that accrue must be an amount that can be drawn under any such standby letter of credit).

"Letter of Credit Disbursement" means a payment made by Issuing Bank pursuant to a Letter of Credit.

Schedule 1.1 – 28

"Letter of Credit Exposure" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Letter of Credit Usage on such date.

"Letter of Credit Fee" has the meaning specified therefor in Section 2.6(b) of the Agreement.

"Letter of Credit Indemnified Costs" has the meaning specified therefor in Section 2.11(f) of the Agreement.

"Letter of Credit Related Person" has the meaning specified therefor in Section 2.11(f) of the Agreement.

"Letter of Credit Sublimit" means $0.

"Letter of Credit Usage" means, as of any date of determination, the aggregate undrawn amount of all outstanding Letters of Credit.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan" shall mean any Revolving Loan, Swing Loan, or Extraordinary Advance made (or to be made) hereunder.

"Loan Account" means the US Loan Account and/or the Canadian Loan Account, as the context requires.

"Loan Documents" means the Agreement, any Borrowing Base Certificate, the Canadian Security Documents, the Control Agreements, the DIP Order, the FitBit Lien Subordination Agreement, the Floorplan Inventory Intercreditor Agreements, any Issuer Documents, the Letters of Credit, the US Guaranty and Security Agreement, any note or notes executed by Borrowers in connection with the Agreement and payable to any member of the Lender Group, and any other instrument or agreement entered into, now or in the future, by any Parent or any of their Subsidiaries and any member of the Lender Group in connection with the Agreement.

"Loan Party" means any Borrower or any Guarantor.

"Local Bankruptcy Rules" means the local bankruptcy rules of the Bankruptcy Court as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"Margin Stock" as defined in Regulation U of the Board of Governors as in effect from time to time.

"Material Adverse Effect" means (a) a material adverse effect in the business, operations, results of operations, assets, liabilities or financial condition of the Parents and their Subsidiaries, taken as a whole, (b) a material impairment of the Parents and their Subsidiaries ability to perform their obligations under the Loan Documents to which they are parties or of the Lender Group's ability to enforce the Obligations or realize upon the Collateral (other than as a result of as a result of an action taken or not taken that is solely in the control of Agent), or (c) a material impairment of the enforceability or priority of Agent's Liens with respect to all or a material portion of the Collateral.

"Maturity Date" means the earlier of (a) December [7], 2017, (b) the Commitment Termination Date ( as defined in the DIP Order), and (c) the date on which the Obligations (other than the Bank Product Obligations) become due and payable pursuant to the terms of the DIP Order, the Canadian DIP Orders and this Agreement.

"Maximum Revolver Amount" means $15,000,000.

"Minimum Equipment Purchase Price" has the meaning specified therefor in Section 5.17(a) of the Agreement.

"Minimum Inventory Purchase Price" has the meaning specified therefor in Section 5.17(a) of the Agreement.

"Moody's" has the meaning specified therefor in the definition of Domestic Cash Equivalents.

"Navarre Digital" has the meaning specified therefor in the preamble to the Agreement.

"Navarre Distribution" has the meaning specified therefor in the preamble to the Agreement.

"Navarre Holdings" has the meaning specified therefor in the preamble to the Agreement.

"Net Prepetition Senior Obligations" means, on any date, the aggregate outstanding amount of Prepetition Senior Obligations, other than Prepetition Letters of Credit that have been collateralized in accordance with the definition of Letter of Credit Collateralization (as defined in the Prepetition Senior Credit Agreement).

"Net Recovery Percentage" means, as of any date of determination, the percentage of the book value of Borrowers' Inventory that is estimated to be recoverable in an orderly liquidation of such Inventory net of all associated costs and expenses of such liquidation, such percentage to be determined as to each category of Inventory and to be as specified in the most recent appraisal received by Agent from an appraisal company selected by Agent.

"Non-Consenting Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

Schedule 1.1 – 30

ATL 22306858v2

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Obligations" means the US Obligations and/or the Canadian Obligations, as the context requires.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Originating Lender" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Overadvance" means a US Overadvance and/or a Canadian Overadvance, as the context requires.

"Parents" means the Canadian Parent and the US Parent, collectively and "Parent" means the Canadian Parent or US Parent, as the context requires.

"Participant" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Participant Register" has the meaning set forth in Section 13.1(i) of the Agreement.

"Patriot Act" has the meaning specified therefor in Section 4.13 of the Agreement.

"Permitted Discretion" means a determination made in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Dispositions" means:

(a)    sales, abandonment, or other dispositions of Equipment that is substantially worn, damaged, or obsolete, in each case subject to the approval of the Bankruptcy Court and Agent,

(b)    sales of Inventory, subject to the approval of the Bankruptcy Court and Agent,

(c)    any sale or other disposition of (i) Inventory pursuant to an Approved Inventory Sale Motion, or (ii) Equipment and related assets pursuant to an Approved Equipment Sale Motion,

(d)    the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of the Agreement or the other Loan Documents, but only to the extent such use or transfer would be permissible under the Bankruptcy Code without the Bankruptcy Court's approval,

Schedule 1.1 – 31

(e)      the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business, in each case subject to the approval of the Bankruptcy Court and Agent,

(f)      the granting of Permitted Liens,

(g)      the sale or discount, in each case without recourse, of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof, in each case subject to the approval of the Bankruptcy Court and Agent,

(h)      any involuntary loss, damage or destruction of property,

(i)      any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property,

(j)      the making of Permitted Investments, and

(k)      so long as no Event of Default has occurred and is continuing or would immediately result therefrom, but in each case subject to Agent's approval, transfers of assets from any Loan Party to a US Loan Party.

"Permitted Holders" means Geoffrey Lewis and Peter Richichi or a special purpose entity wholly owned by Geoffrey Lewis or Peter Richichi (or direct family members) or any trust created by either of them primarily for estate planning purposes for which Geoffrey Lewis or Peter Richichi serves as trustee or manager and retains voting control over 100% of the Equity Interests of the applicable Parent held by the trust or special purpose entity.

"Permitted Indebtedness" means all of the following (but, in the case of any of the following that arise on or after the Petition Date, only to the extent set forth in the Approved Budget and consented to by Agent):

(a)      Indebtedness evidenced by the Agreement or the other Loan Documents,

(b)      Indebtedness set forth on Schedule 4.14 to the Agreement,

(c)      endorsement of instruments or other payment items for deposit,

(d)      Indebtedness consisting of (i) unsecured guarantees incurred in the ordinary course of business with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, completion guarantee and similar obligations; (ii) unsecured guarantees arising with respect to customary indemnification obligations to purchasers in connection with Permitted Dispositions; and (iii) unsecured guarantees with respect to Indebtedness of any Parent or one of its Subsidiaries, to the extent that the Person that is obligated under such guaranty could have incurred such underlying Indebtedness,

(e)      Indebtedness incurred in the ordinary course of business under performance, surety, statutory, or appeal bonds to the extent set forth in the Approved Budget,

(f)     Indebtedness owed to any Person providing property, casualty, liability, or other insurance to any Parent or any of its Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year, in each case subject to the approval of the Bankruptcy Court and Agent,

(g)     [RESERVED],

(h)     Indebtedness incurred in the ordinary course of business in respect of credit cards, credit card processing services, debit cards, stored value cards, commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards"), or Cash Management Services,

(i)     Indebtedness under Floorplan Financing Facilities in an aggregate outstanding principal amount not to exceed the balance thereof as of the Closing Date,

(j)     Indebtedness under the Prepetition Senior Loan Documents,

(k)     Indebtedness composing Permitted Investments,

(l)     unsecured Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business, and

(m)     accrual of interest, accretion or amortization of original issue discount, or the payment of interest in kind, in each case, on Indebtedness that otherwise constitutes Permitted Indebtedness.

"Permitted Intercompany Advances" means transfers, loans and other Investments made by a Loan Party to or in a US Loan Party.

"Permitted Investments" means:

(a)     Investments in cash and Cash Equivalents,

(b)     Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business,

(c)     advances made in connection with purchases of goods or services to the extent set forth in the Approved Budget,

(d)     Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries, in each case subject to the approval of Agent,

(e)     Investments owned by any Loan Party or any of its Subsidiaries on the Closing Date and set forth on <u>Schedule P-1</u> to the Agreement,

(f)     guarantees permitted under the definition of Permitted Indebtedness,

(g)     Permitted Intercompany Advances,

(h)     deposits of cash made in the ordinary course of business to secure performance of operating leases to the extent set forth in the Approved Budget, and

(i)     Investments resulting from entering into Bank Product Agreements.

"<u>Permitted Liens</u>" means

(a)     Liens granted to, or for the benefit of, Agent to secure the Obligations,

(b)     Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) do not have priority over Agent's Liens and the underlying taxes, assessments, or charges or levies are the subject of Permitted Protests,

(c)     [RESERVED],

(d)     Liens set forth on <u>Schedule P-2</u> to the Agreement; <u>provided</u>, that to qualify as a Permitted Lien, any such Lien described on <u>Schedule P-2</u> to the Agreement shall only secure the Indebtedness that it secures on the Closing Date,

(e)     the interests of lessors under operating leases and non-exclusive licensors under license agreements,

(f)     Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests,

(g)     Liens on amounts deposited to secure any Parent's and its Subsidiaries obligations in connection with worker's compensation or other unemployment insurance to the extent set forth in the Approved Budget,

(h)     Liens on amounts deposited to secure any Parent's and its Subsidiaries obligations in connection with the making or entering into of bids, tenders, or leases to the extent set forth in the Approved Budget,

(i)     Liens on amounts deposited to secure any Parent's and its Subsidiaries reimbursement obligations with respect to surety or appeal bonds obtained in the ordinary course of business to the extent set forth in the Approved Budget,

(j)      with respect to any Real Property, easements, rights of way, and zoning restrictions that do not materially interfere with or impair the use or operation thereof,

(k)      non-exclusive licenses of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business, in each case subject to the approval of the Bankruptcy Court and Agent,

(l)      rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such Deposit Accounts in the ordinary course of business,

(m)      Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness,

(n)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods,

(o)      Liens in Floorplan Inventory in favor of the Floorplan Inventory Lender as security for Indebtedness under Floorplan Financing Facilities that constitutes Permitted Indebtedness, provided that such Liens shall at all times be subject to the Floorplan Inventory Intercreditor Agreements,

(p)      Liens granted pursuant to the DIP Order,

(q)      Liens granted to pursuant to the Prepetition Senior Loan Documents,

(r)      Liens in FitBit Collateral in favor of FitBit as security for Prepetition trade payables owing by the Loan Parties to FitBit, provided that such Liens shall at all times be subject to the FitBit Lien Subordination Agreement, and

(s)      Prior Liens (as defined in the DIP Order).

"Permitted Protest" means the right of any Parent or any of its Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien or a requirement to pay issued by a Canadian Governmental Authority), or rental payment, provided that (a) a reserve with respect to such obligation is established on such Parent's or its Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Parent or its Subsidiary, as applicable, in good faith, and (c) Agent is satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Agent's Liens.

"Permitted Senior Lien" means any Prior Lien (as defined in the DIP Order), and valid, enforceable, and non-avoidable Lien that was perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), which is not subject to avoidance, reduction, disallowance, impairment or

subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which is senior in priority to the Liens of the Prepetition Senior Agent and Prepetition Senior Secured Parties under applicable law and after giving effect to any subordination or inter-creditor agreements; <u>provided</u> that this definition shall exclude the Liens: (a) of both the Prepetition Senior Agent and the Prepetition Senior Secured Parties arising under the Prepetition Senior Loan Documents, (b) of FitBit in the FitBit Collateral, which Liens shall be subordinate to the Liens securing the Obligations, and (c) of the Floorplan Inventory Lender in Collateral other than Floorplan Inventory arising under the Floorplan Security Documents, which Liens shall be subordinate to the Liens securing the Obligations.

"<u>Person</u>" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"<u>Petition Date</u>" has the meaning set forth in the Recitals of the Agreement.

"<u>Platform</u>" has the meaning specified therefor in <u>Section 17.9(c)</u> of the Agreement.

"<u>Postpetition</u>" means the time period beginning immediately upon the filing of the Chapter 11 Cases.

"<u>PPSA</u>" means the Personal Property Security Act (Ontario) and the regulations thereunder, as from time to time in effect; <u>provided</u>, <u>however</u>, if attachment, perfection or priority of Agent's Lien on any Collateral are governed by the personal property security laws of any jurisdiction in Canada other than the laws of the Province of Ontario, "PPSA" means those personal property security laws in such other jurisdiction in Canada for the purposes of the provisions hereof relating to such attachment, perfection or priority and for the definitions related to such provisions.

"<u>Prepetition</u>" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"<u>Prepetition Senior Agent</u>" means Wells Fargo in its capacity as administrative agent under the Prepetition Senior Credit Agreement.

"<u>Prepetition Senior Agent's Applicable Account</u>" means a Cash Collateral Account (as defined in the Prepetition Senior Credit Agreement).

"<u>Prepetition Senior Lenders</u>" means the lenders party to the Prepetition Senior Credit Agreement.

"<u>Prepetition Senior Letters of Credit</u>" means all Letters of Credit issued under and as defined in the Prepetition Senior Credit Agreement.

Schedule 1.1 – 36

"<u>Prepetition Senior Credit Agreement</u>" has the meaning set forth in the Recitals of the Agreement.

"<u>Prepetition Senior Loan Documents</u>" means the Prepetition Senior Credit Agreement, along with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as defined therein.

"<u>Prepetition Senior Obligations</u>" means all obligations arising under the Prepetition Senior Credit Agreement (including, without limitation, the "Obligations" as defined therein) or any other Prepetition Senior Loan Document.

"<u>Prepetition Senior Secured Parties</u>" means Prepetition Senior Agent, the Prepetition Senior Lenders and any of their Affiliates holding any of the Prepetition Senior Obligations.

"<u>Pro Rata Share</u>" means, as of any date of determination:

(a)     with respect to a Lender's obligation to make all or a portion of the US Revolving Loans, with respect to such Lender's right to receive payments of interest, fees, and principal with respect to the US Revolving Loans, and with respect to all other computations and other matters related to the US Revolver Commitments or the US Revolving Loans, the percentage obtained by dividing (i) the US Revolving Loan Exposure of such Lender by (ii) the aggregate US Revolving Loan Exposure of all Lenders,

(b)     with respect to a Lender's obligation to make all or a portion of the Canadian Revolving Loans, with respect to such Lender's right to receive payments of interest, fees, and principal with respect to the Canadian Revolving Loans, and with respect to all other computations and other matters related to the Canadian Revolver Commitments or the Canadian Revolving Loans, the Dollar Equivalent of the percentage obtained by dividing (i) the Canadian Revolving Loan Exposure of such Lender by (ii) the aggregate Canadian Revolving Loan Exposure of all Lenders,

(c)     with respect to a Lender's obligation to participate in the Letters of Credit, with respect to such Lender's obligation to reimburse Issuing Bank, and with respect to such Lender's right to receive payments of the applicable Letter of Credit Fees, and with respect to all other computations and other matters related to the Letters of Credit, the percentage obtained by dividing (i) the US Revolving Loan Exposure of such Lender by (ii) the aggregate US Revolving Loan Exposure of all Lenders; <u>provided</u>, that if all of the US Revolving Loans have been repaid in full and all US Revolver Commitments have been terminated, but Letters of Credit remain outstanding, Pro Rata Share under this clause shall be determined as if the US Revolver Commitments had not been terminated and based upon the US Revolver Commitments as they existed immediately prior to their termination, and

(d)     with respect to all other matters and for all other matters as to a particular Lender (including the indemnification obligations arising under <u>Section 15.7</u> of the Agreement), the Dollar Equivalent of the percentage obtained by dividing (i) the sum of Revolving Loan

Exposure of such Lender by (ii) the aggregate Revolving Loan Exposure of all Lenders, in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to Section 13.1; provided, that if all of the Loans have been repaid in full, all Letters of Credit have been made the subject of Letter of Credit Collateralization, and all Commitments have been terminated, Pro Rata Share under this clause shall be determined as if the Revolving Loan Exposures had not been repaid, collateralized, or terminated and shall be based upon the Revolving Loan Exposures as they existed immediately prior to their repayment, collateralization, or termination.

"Protective Advances" means the US Protective Advances and/or the Canadian Protective Advances, as the context requires.

"Public Lender" has the meaning specified therefor in Section 17.9(c) of the Agreement.

"Qualified Equity Interest" means and refers to any Equity Interests issued by a Parent (and not by one or more of its Subsidiaries) that is not a Disqualified Equity Interest.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by any Parent or one of its Subsidiaries and the improvements thereto.

"Receivable Reserves" means, as of any date of determination, those reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(d), to establish and maintain (including reserves for rebates, discounts, warranty claims, and returns) with respect to the Eligible Accounts (whether as Eligible Insured Accounts or Eligible Non-Insured Accounts), the Canadian Maximum Revolver Amount or the Maximum Revolver Amount.

"Recognition Proceedings" has the meaning set forth in the Recitals of the Agreement.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Register" has the meaning set forth in Section 13.1(h) of the Agreement.

"Registered Loan" has the meaning set forth in Section 13.1(h) of the Agreement.

"Related Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous

Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Replacement Lender" has the meaning specified therefor in Section 2.13(b) of the Agreement.

"Report" has the meaning specified therefor in Section 15.16 of the Agreement.

"Required Lenders" means, at any time, Lenders having or holding more than 50% of the sum of the aggregate Dollar Equivalent of Revolving Loan Exposure of all Lenders; provided, that (i) the Revolving Loan Exposure of any Defaulting Lender shall be disregarded in the determination of the Required Lenders, and (ii) at any time there are 2 or more Lenders, "Required Lenders" must include at least 2 Lenders (who are not Affiliates of one another).

"Reserves" means, as of any date of determination, those reserves (other than Receivable Reserves, Bank Product Reserves, Inventory Reserves and Canadian Priority Payable Reserves) that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(d), to establish and maintain (including reserves with respect to (a) sums that any Parent or its Subsidiaries are required to pay under any Section of the Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, (b) amounts owing by any Parent or its Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than a Permitted Lien), which Lien or trust, in the Permitted Discretion of Agent likely would have a priority superior to the Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral, and (c) any fees, costs, and/or expenses in connection with the Chapter 11 Cases, including, without limitation, the Carve-Out) with respect to the Borrowing Base, the Canadian Maximum Revolver Amount or the Maximum Revolver Amount.

"Restricted Payment" means to (a) declare or pay any dividend or make any other payment or distribution, directly or indirectly, on account of Equity Interests issued by any Parent (including any payment in connection with any merger or consolidation involving any Parent) or to the direct or indirect holders of Equity Interests issued by such Parent in their capacity as such (other than dividends or distributions payable in Qualified Equity Interests issued by such Parent, or (b) purchase, redeem, make any sinking fund or similar payment, or otherwise acquire or retire for value (including in connection with any merger or consolidation involving any Parent) any Equity Interests issued by such Parent, (c) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of any Parent now or hereafter outstanding, and (d) make, or cause or suffer to permit any Parent or any of its Subsidiaries to make, any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to any Indebtedness

that has been subordinated to the payment of the Obligations and/or the Prepetition Senior Obligations.

"Revaluation Date" means (a) with respect to any Revolving Loan denominated in Canadian Dollars, each of the following:  (i) each date of a Borrowing of such Revolving Loan, and (ii) such additional dates as Agent shall determine or the Required Lenders shall require, and (b) with respect to any other Obligations denominated in Canadian Dollars, each date as Agent shall determine unless otherwise prescribed in this Agreement or any other Loan Documents.

"Revolver Commitment" means the US Revolver Commitments and/or the Canadian Revolver Commitments, as the context requires.

"Revolver Usage" means the US Revolver Usage and/or the Canadian Revolver Usage, as the context requires.

"Revolving Lender" means a Lender that has a Revolving Loan Commitment or that has an outstanding Revolving Loan.

"Revolving Loan Exposure" means the US Revolving Loan Exposure and/or the Canadian Revolving Loan Exposure, as the context requires.

"Revolving Loan" means a US Revolving Loan and/or a Canadian Revolving Loan, as the context requires.

"Sale Motion" means any motion, or other pleading, seeking Bankruptcy Court approval of a Bankruptcy Sale.

"Sale Transaction" means an Equipment Sale Transaction or an Inventory Sale Transaction.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person resident in or determined to be resident in a country, in each case, that is the subject or target of any Sanctions.

"Sanctioned Person" means (a) any Person listed in any Sanctions-related list of designated Persons maintained by  OFAC, the U.S. Department of State, or by the United Nations Security Council, the United Kingdom, the European Union or any European Union member state, (b) any similarly designated Person including "designated persons", "politically exposed foreign persons" or "terrorist groups" under applicable Canadian laws, regulations or orders governing transactions in controlled goods or technologies or dealings with countries, entities, organizations or individuals subject to economic sanctions and similar measures, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a), (b) or (c).

"Sanctions" economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, (b) a Canadian Governmental Authority under the Special Economics Measures Act (Canada) or other applicable Canadian laws, regulations or orders, or (c) the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom, or other relevant sanctions authority.

"S&P" has the meaning specified therefor in the definition of Domestic Cash Equivalents.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Securities Account" means a securities account (as that term is defined in the Code).

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Settlement" has the meaning specified therefor in Section 2.3(e)(i) of the Agreement.

"Settlement Date" has the meaning specified therefor in Section 2.3(e)(i) of the Agreement.

"Solvent" means, with respect to any Person as of any date of determination, that (a) at fair valuations, the sum of such Person's debts (including contingent liabilities) is less than all of such Person's assets, (b) such Person is not engaged or about to engage in a business or transaction for which the remaining assets of such Person are unreasonably small in relation to the business or transaction or for which the property remaining with such Person is an unreasonably small capital, and (c) such Person has not incurred and does not intend to incur, or reasonably believe that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise), and (d) such Person is "solvent" or not "insolvent", as applicable within the meaning given those terms and similar terms under applicable Insolvency Laws or other laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Spot Rate" means, for a currency, the rate determined by Agent to be the rate quoted by Wells Fargo acting in such capacity as the spot rate for the purchase by Wells Fargo of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. (New York time) on the date two Business Days prior to the date as of

which the foreign exchange computation is made; *provided*, that Agent may obtain such spot rate from another financial institution designated by Agent if Wells Fargo acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

"Standard Letter of Credit Practice" means, for Issuing Bank, any domestic or foreign law or letter of credit practices applicable in the city in which Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the Equity Interests having ordinary voting power to elect a majority of the Board of Directors of such corporation, partnership, limited liability company, or other entity.

"Substantial Compliance" means (a) with respect to the aggregate amount of expenditures shown in any Approved Budget for any one week period, an amount not to exceed 105% of the amount shown in the applicable Approved Budget for such period, and (b) with respect to Borrowers' aggregate income for any one week period shown in the applicable Approved Budget, an amount not less than 95% of the amount shown for such period.

"Swing Lender" means the US Swing Lender and/or the Canadian Swing Lender, as the context requires.

"Swing Loan" means the US Swing Loan and/or the Canadian Swing Loan, as the context requires.

"Swing Loan Exposure" means the US Swing Loan Exposure and/or the Canadian Swing Loan Exposure, as the context requires.

"Taxes" means any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein, and all interest, penalties or similar liabilities with respect thereto.

"Tax Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"United States" means the United States of America.

Schedule 1.1 – 42

"Unused Line Fee" has the meaning specified therefor in Section 2.10(b) of the Agreement.

"US Availability" means, as of any date of determination, the amount that US Borrowers are entitled to borrow as US Revolving Loans under Section 2.1(a) of the Agreement (after giving effect to the then outstanding US Revolver Usage and Canadian Revolver Usage).

"US Base Rate" means the greatest of (a) the Federal Funds Rate plus ½%, and (b) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate.

"US Borrower" and "US Borrowers" have the meaning specified therefor in the preamble to the Agreement.

"US Borrowing" means a borrowing consisting of US Revolving Loans made on the same day by the Lenders (or Agent on behalf thereof), or by US Swing Lender in the case of a US Swing Loan, or by Agent in the case of an US Extraordinary Advance.

"US Designated Account" means the US Deposit Account identified on Schedule D-2 to the Agreement (or such other Deposit Account located at US Designated Account Bank that has been designated as such, in writing, by Administrative Borrower to Agent).

"US Designated Account Bank" has the meaning specified therefor in Schedule D-2 to the Agreement (or such other bank that is located within the United States that has been designated as such, in writing, by Administrative Borrower to Agent).

"US Extraordinary Advances" has the meaning specified therefor in Section 2.3(d)(iii) of the Agreement.

"US Guaranty and Security Agreement" means a guaranty and security agreement, dated as of even date with the Agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by each of Loan Party to Agent.

"US Loan Account" has the meaning specified therefor in Section 2.9 of the Agreement.

"US Loan Party" means each US Borrower and any other Loan Party that is organized under the laws of the United States or any state thereof.

"US Obligations" means (a) all loans (including the US Revolving Loans (inclusive of US Extraordinary Advances and US Swing Loans)), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding,

regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), premiums, liabilities (including all amounts charged to the US Loan Account pursuant to the Agreement), obligations (including indemnification obligations) of any US Loan Party, fees of any US Loan Party, Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding) of any US Loan Party, guaranties of any US Loan Party, and all covenants and duties of any other kind and description owing by any US Loan Party arising out of, under, pursuant to, in connection with, or evidenced by the Agreement or any of the other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that any US Loan Party is required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, (b) all debts, liabilities, or obligations (including reimbursement and indemnification obligations, irrespective of whether contingent) owing by any US Borrower or any other US Loan Party to Issuing Bank now or hereafter arising from or in respect of a Letters of Credit, and (c) all Bank Product Obligations owing by US Loan Parties.  Without limiting the generality of the foregoing, the US Obligations under the Loan Documents include the obligation to pay (i) the principal of the US Revolving Loans, (ii) interest accrued on the US Revolving Loans, (iii) the amount necessary to reimburse Issuing Bank for amounts paid or payable pursuant to Letters of Credit, (iv) Letter of Credit commissions, charges, expenses, and fees, in each case in respect of Letters of Credit, (v) Lender Group Expenses of any US Loan Party, (vi) fees payable by any US Loan Party under the Agreement or any of the other Loan Documents, (vii) indemnities and other amounts payable by any US Loan Party under any Loan Document, and (viii) any guaranties by any US Loan Party of all or any part of the Canadian Obligations.  Any reference in the Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"US Overadvance" means, as of any date of determination, that the US Revolver Usage is greater than any of the limitations set forth in Section 2.1 or Section 2.11.

"US Parent" has the meaning specified therefor in the preamble to the Agreement.

"US Parent Operating Agreement" means the operating agreement of US Parent.

"US Protective Advances" has the meaning specified therefor in Section 2.3(d)(i) of the Agreement.

"US Revolver Commitment" means, with respect to each Revolving Lender, its US Revolver Commitment, and, with respect to all Revolving Lenders, their US Revolver Commitments, in each case as set forth beside such Revolving Lender's name under the applicable heading on Schedule C-1 to the Agreement or in the Assignment and Acceptance pursuant to which such Revolving Lender became a Revolving Lender under the Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"US Revolver Usage" means, as of any date of determination, the sum of (a) the amount of outstanding US Revolving Loans (inclusive of US Swing Loans and US Extraordinary Advances), plus (b) the amount of the Letter of Credit Usage.

"US Revolving Loan Exposure" means, with respect to any Revolving Lender, as of any date of determination (a) prior to the termination of the US Revolver Commitments, the amount of such Lender's US Revolver Commitment, and (b) after the termination of the US Revolver Commitments, the aggregate outstanding principal amount of the US Revolving Loans of such Lender.

"US Revolving Loans" has the meaning specified therefor in Section 2.1(a) of the Agreement.

"US Swing Lender" means Wells Fargo or any other Lender that, at the request of US Administrative Borrower and with the consent of Agent agrees, in such Lender's sole discretion, to become the US Swing Lender under Section 2.3(b) of the Agreement.

"US Swing Loan" has the meaning specified therefor in Section 2.3(b) of the Agreement.

"US Swing Loan Exposure" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the US Swing Loans on such date.

"Voidable Transfer" has the meaning specified therefor in Section 17.8 of the Agreement.

"Wells Fargo" means Wells Fargo Bank, National Association, a national banking association.

"WF Canada" means Wells Fargo Capital Finance Corporation Canada.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

## Schedule 3.1

The obligation of each Lender to make its initial extension of credit provided for in the Agreement is subject to the fulfillment, to the satisfaction of each Lender (the making of such initial extension of credit by any Lender being conclusively deemed to be its satisfaction or waiver of the following), of each of the following conditions precedent:

(a)  Agent shall have received the Agreement, duly executed and delivered by each of the parties thereto;

(b)  The DIP Order shall contain all findings of fact and conclusions of law necessary to perfect the Liens of Agent in the Collateral in form satisfactory to Agent and the Lenders that such Liens constitute valid and perfected Liens, and that there are no other Liens upon any Collateral except for Permitted Liens;

(d)  Agent shall have received each of the following documents, in form and substance satisfactory to Agent, duly executed and delivered, and each such document shall be in full force and effect:

(i)  a completed Borrowing Base Certificate;

(ii)  the Flow of Funds Agreement, and

(iii)  the US Guaranty and Security Agreement and the Canadian Guaranty and Security Agreement;

(e)  Agent shall have received copies of each Loan Party's Governing Documents, as amended, modified, or supplemented to the Closing Date, which Governing Documents shall be (i) certified by the Secretary of such Loan Party, and (ii) with respect to Governing Documents that are charter documents, certified as of a recent date (not more than 30 days prior to the Closing Date) by the appropriate governmental official;

(f)  Agent shall have received a certificate of insurance, together with the endorsements thereto, as are required by Section 5.6 of the Agreement, the form and substance of which shall be satisfactory to Agent;

(g)  Agent shall have received the Approved Budget, in form and substance (including as to scope and underlying assumptions) satisfactory to Agent;

(h)  Borrowers shall have paid all Lender Group Expenses incurred in connection with the transactions evidenced by the Agreement and the other Loan Documents;

(i)  the Interim Order shall have been entered by the Bankruptcy Court, and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than by the Final Order) absent the prior written consent of the Agent and the Lenders; and

(j)     all other documents and legal matters in connection with the transactions contemplated by the Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Agent.

Schedule 3.1 – 2

## Schedule 5.1

Deliver to Agent (and, if reasonably requested by any Lender, with copies to such Lender) each of the financial statements, reports, or other items set forth below at the following times in form satisfactory to Agent:

| | |
|---|---|
| as soon as available, but in any event within 30 days after the end of each fiscal month of Parents, | (a)   an unaudited consolidated and consolidating balance sheet, income statement, statement of cash flow, and statement of shareholder's equity covering Parents' and their Subsidiaries' operations during such period and compared to the prior period and plan, and <br><br> (b)   a Compliance Certificate along with the underlying calculations. |
| on or before Friday of each calendar week, | (c)   a 13 week cash flow forecast in a form consistent with the 13 week cash flow forecast most recently delivered to Agent under the Prepetition Senior Credit Agreement or otherwise in a form reasonably acceptable to Agent and the Lenders. |
| on Tuesday of each calendar week | (d)   a report in form and detail satisfactory to Agent and the Lenders showing (i) sales, actual cash collections and disbursements, in each case on a weekly, rolling four-week, and cumulative basis through the immediately preceding Friday, (ii) the Canadian Revolver Usage, US Revolver Usage and Revolver Usage as of the immediately preceding Friday, and (iii) a comparison to the same periods in the Approved Budget, and <br><br> (e)   a report in form and detail reasonably satisfactory to Agent which fully and accurately describes all of the Loan Parties' administrative costs incurred in connection with the Chapter 11 Cases, which description shall include, at a minimum: (i) the date each such administrative expense was incurred, (ii) the amount of each such administrative expense, and (iii) the creditor's name with respect to each such administrative expense. |
| if and when filed by any Parent, | (f)   any other filings made by any Parent with the SEC or any comparable Governmental Authority. |
| promptly, but in any event within 5 days after Borrower has knowledge of any event or condition that | (g)   notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto. |

ATL 22306858v2

| | |
|---|---|
| constitutes a Default or an Event of Default, | |
| promptly after the commencement thereof, but in any event within 5 days after the service of process with respect thereto on any Parent or any of its Subsidiaries, | (h)    notice of all actions, suits, or proceedings brought by or against any Parent or any of its Subsidiaries before any Governmental Authority which reasonably could be expected to result in a Material Adverse Effect. |
| upon the request of Agent, | (j)    any other information reasonably requested relating to the financial condition of any Parent or its Subsidiaries. |

Schedule 5.1 – 2

## Schedule 5.2

Provide Agent (and, if reasonably requested by any Lender, with copies to such Lender) with each of the documents set forth below at the following times in form satisfactory to Agent:

| Daily (no later than the 2:00 p.m. on each Business Day (with all information needed for Agent to generate the Borrowing Base Certificate to be delivered by 1:00 p.m. on each Business Day)), | (a) an executed Borrowing Base Certificate, <br><br> (b) a detailed aging, by total, of Borrowers' Accounts, together with a reconciliation and supporting documentation for any reconciling items noted (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting), <br><br> (c) a detailed calculation of those Accounts that are not eligible for the Borrowing Base, if Borrowers have not implemented electronic reporting, <br><br> (d) a detailed Inventory system/perpetual report together with a reconciliation to Borrowers' general ledger accounts (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting), <br><br> (e) a detailed calculation of Inventory categories that are not eligible for the Borrowing Base, if Borrowers have not implemented electronic reporting, <br><br> (f) a detailed report as to Inventory returns by customer, <br><br> (g) a summary aging, by vendor, of Parents' and their Subsidiaries' accounts payable and any book overdraft (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting) and an aging, by vendor, of any held checks, and <br><br> (h) an Account roll-forward, in a format acceptable to Agent in its discretion, tied to the beginning and ending account receivable balances of Borrowers' general ledger. |
|---|---|
| Monthly (no later than the 30th day of each month) | (i) a reconciliation of Accounts, trade accounts payable, and Inventory of Borrowers' general ledger accounts to its monthly financial statements including any book reserves related to each category. |
| Upon request by Agent | (j) a report regarding Borrowers' accrued, but unpaid, *ad valorem* taxes, <br><br> (k) a detailed list of Borrowers' customers, with address and contact information, <br><br> (l) copies of borrowing base and other collateral reports provided to any Floorplan Inventory Lender under any Floorplan Financing Facility, <br><br> (m) copies of purchase orders and invoices for Inventory and Equipment acquired by Borrowers, <br><br> (n) a detailed report as to debits and credits relating to Accounts of such Account Debtors as Agent may designate from time to time, and |

Schedule 5.2 – 1

| | (o)   such other reports as to the Collateral or the financial condition of Parents and their Subsidiaries, as Agent may reasonably request. |
| --- | --- |

Note: All certificates, agings, calculations and other reports with respect to Accounts, Inventory and other Collateral shall be provided in a format and in detail as Agent may reasonably require, including as to the separation of Collateral by type (for example, Eligible Insured Accounts vs. Eligible Non-Insured Accounts, Eligible Excess Inventory vs. other Eligible Inventory) and by entity (for example, US Borrowers vs. Canadian Borrower).

Schedule 5.2 – 2

## Schedule A-3

**Authorized Persons**

Geoffrey E. Lewis
Peter A. Richichi, Jr.
William L. Cave
Craig W. Jones

## Schedule D-1

### Canadian Designated Account

WD Navarre Canada ULC

| | |
|---|---|
| Bank: | Royal Bank of Canada |
| Description: | Correspondent Account – Disbursement Account |
| Routing Number: | 000301043 |
| Account Number: | 01043-1009919 |

| | |
|---|---|
| Bank: | Royal Bank of Canada |
| Description: | Correspondent Account – Controlled Disbursement Account - Checking |
| Routing Number: | 000301043 |
| Account Number: | 01043-1009968 |

| | |
|---|---|
| Bank: | Wells Fargo Bank, NA |
| Description: | Disbursement Account – Outbound Wires and ACH |
| SWIFT Number: | WFBIUS6S |
| Account Number: | 7775040467 |

## Schedule D-2

## U.S. Designated Accounts

Wynit Distribution LLC
_____

Bank:                Wells Fargo Bank, NA
Description:         Controlled Disbursement Account -
                     Checking
Routing Number:     121000248
Account Number:     000004084298223


Bank:                Wells Fargo Bank, NA
Description:         Master Operating Account
Routing Number:     121000248
Account Number:     000004610091993


Bank:                Wells Fargo Bank, NA
Description:         Master Funding Account
Routing Number:     121000248
Account Number:     000004084298215


WD Navarre Distribution LLC
_____

Bank:                Wells Fargo Bank, NA
Description:         Controlled Disbursement Account -
                     Checking
Routing Number:     121000248
Account Number:     000004084298231


Bank:                Wells Fargo Bank, NA
Description:         Master Operating Account
Routing Number:     121000248
Account Number:     000004612071654

## Schedule D-3

**Designated Account Debtors**

Wal-Mart
Costco
Apple
Best Buy
Staples
B&H Photo

**Schedule E-1**
**Locations of Eligible Inventory**

Inventory:

4670 Aircenter Circle
Reno, Nevada 89502-5949

4655 Shelby Drive
Memphis, Tennessee 38118-7429

4550 Quality Drive
Memphis, Tennessee 38118-7529

450 Export Blvd., Unit A,
Mississuaga, Ontario L5S 2A4

1011 N 28th Ave, Suite 100*
DFW Airport, Texas 75261

8825 Boston Place*
Rancho Cucamonga, California 91730

*bailee/warehouseman

## <u>Schedule P-1</u>

### Permitted Investments

None

**Schedule P-2**

**Permitted Liens**

None

**Schedule 4.1(b)**

**Capitalization of Parents**

| Parent | Authorized Equity Interests | Issued and Outstanding Equity Interests | Holder |
|---|---|---|---|
| US Parent | 10,000 Membership Units | 5,000 Membership Units | Wynit, Inc. |
| | | 5,000 Membership Units | Peter A. Richichi |
| Canadian Parent | 200 shares of common stock | 50 Shares | Geoffrey E. Lewis |
| | | 50 Shares | Peter A. Richichi |

**Repurchase Obligations**

1.      Under the terms of its operating agreement, US Parent is obligated to repurchase the membership interests held by a deceased member.

**Schedule 4.1(c)**

**Capitalization of Parents'
Subsidiaries**

| **Subsidiary** | **Authorized Equity Interests** | **Issued and Outstanding Equity Interests** | **Holder** |
|---|---|---|---|
| Navarre Holdings | n/a | 1 membership unit | US Parent |
| Encore Software | n/a | 1 membership unit | Navarre Holdings |
| Navarre Digital | n/a | 1 membership unit | Navarre Holdings |
| Navarre Distribution | n/a | 1 membership unit | Navarre Holdings |
| Canadian Borrower | Unlimited common shares | 10 shares | Canadian Parent |

### Schedule 4.1(d)

**Subscriptions, Options,
Warrants, Calls**

None

**Schedule 4.6(b)**

**Litigation**

None

**Schedule 4.10(b)**

**Canadian Pension Plans**

None

**Schedule 4.11**

**Environmental Matters**

None

## Schedule 4.14

## Permitted Indebtedness

**US Parent:**

Indebted to Wells Fargo Commercial Distribution Finance, LLC, formally GE Commercial Distribution Finance Corporation, pursuant to an Inventory Financing Agreement dated February 12, 2014, secured by a security interest in all assets thereof. Outstanding balance on November 28, 2016: $7,878,042.96

Indebted to DELL Financial Services, LLC under Master Lease Agreement and Addendum No. 1 each dated November 21, 2011 regarding computer hardware and software. Thirty-six (36) monthly payments of $12,748.

Indebted to Cisco Systems Capital Corporation under Master Lease Agreement and Addendums, dated July 19, 2012 through March 30, 2016, regarding computer hardware and software. Thirty-six (36) monthly payments of $27,113.

Indebted to Winthrop Resources Corporation under Lease Agreement dated April 10, 2013 and addendum dated September 29, 2016, Interim lease payments of $189,475 through December 2016, then Forty-Four (44) monthly payments of $189,475.

Indebted to De Lage Landen ("DLL") under Lease Agreement dated October 30, 2015 regarding multi-function copiers. Thirty-Six (36) monthly payments of $5,342.

Vehicle lease with BMW Financial Services for dated April 12, 2016. Thirty-Six (36) monthly payments of $1,541 have been prepaid.

Vehicle lease with GM Financial Leasing for dated July 14, 201. Thirty-Six (36) monthly payments of $594.

# MASERATI
## CAPITAL USA®

Statement Date  08/10/17
Account                                     0011332871
Vehicle Description
VIN                                         2017 MASERATI LEVANTE
License Plate Number                        ZN661YUL4HX226022
Dealer Name
Term:  36                    MASERATI LOTUS GREENVILLE
Maturity Date                               Months in Service:  06
                                                        02/28/2020

Due Date  08/28/17

|ılıljıljıljıljıljıljıljıljıljıljı|ljıljıl
00002395 CAL Z1 22317-100000000000  DC
WYNIT DISTRIBUTION
2 WEST WASHINGTON ST
GREENVILLE, SC 29601-2774


129

| Payment Detail | |
| --- | --- |
| Current Base Rent Due | $1,661.71 |
| Total Payment Due | $1,661.71 |

**Visit our Website:**
MaseratiCapitalUSA.com

Account Information: 1-844-868-2149
TTY:                1-800-524-9765

## OPPORTUNITIES FOR YOU

Manage your auto account online. You can schedule a one-time
or repeating payment from any checking or savings account.
You can also sign up for paperless statements and account alerts.
Take advantage of these great services by logging in at
MaseratiCapitalUSA.com

## ACCOUNT MESSAGES

• Please enter your License Plate Number on the back of this statement and check the box on the remittance coupon.
• See reverse of statement for important information pertaining to your account.
• * The tradename "Maserati Capital USA" as well as the Maserati Trident and Maserati Capital USA logos are owned by Maserati S.p.A. or its affiliates and are licensed to JPMorgan Chase Bank, N.A. ("Chase"). Lease accounts are owned by Chase. Maserati North America is solely responsible for its vehicle products and services and for promotional statements about them and is not affiliated with Chase or its affiliates.

| Transaction Date | Transaction Description | ACTIVITY SINCE LAST STATEMENT | Transaction Total |
| --- | --- | --- | --- |
| 07-25-17 | PAYMENT - BASE RENT   1661.71 | | $1,661.71 |

$1 49,851.30

130140

MAS 108   E
b 50 260      $48,189.59
            X EXEC   Outstanding
                    amount. Remaining
                    Lease Payments
            August 2017

max
direct
8 pymts
or 10k

## AUTO LEASE PAYMENT COUPON          (To ensure proper credit, return this portion with your payment)

# MASERATI

**Schedule 4.24**

**Locations of Inventory and Chief Executive Office**

Inventory:                                4670 Aircenter Circle
                                          Reno, Nevada 89502-5949

                                          4655 Shelby Drive
                                          Memphis, Tennessee 38118-7429

                                          4550 Quality Drive
                                          Memphis, Tennessee 38118-7529

                                          450 Export Blvd., Unit A,
                                          Mississuaga, Ontario L5S 2A4

                                          1011 N 28th Ave, Suite 100*
                                          DFW Airport, Texas 75261

                                          8825 Boston Place*
                                          Rancho Cucamonga, California 91730

Chief Executive Office:        700 W 76th Street Ste 116 Eden Prairie, MN 55344

*bailee/warehouseman

**Schedule 6.5**

**Nature of Business**

Consumer electronics distribution

## EXHIBIT A-1

### FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT

This **ASSIGNMENT AND ACCEPTANCE AGREEMENT** ("Assignment Agreement") is entered into as of _____ between _____ ("Assignor") and _____ ("Assignee").  Reference is made to the Agreement described in Annex I hereto (the "Credit Agreement").  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Credit Agreement.

I.        In accordance with the terms and conditions of Section 13 of the Credit Agreement, the Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, that interest in and to the Assignor's rights and obligations under the Loan Documents as of the date hereof with respect to the Obligations owing to the Assignor, and Assignor's portion of the Commitments, all to the extent specified on Annex I.

II.       The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim and (ii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby; (b) makes no representation or warranty and assumes no responsibility with respect to (i) any statements, representations or warranties made in or in connection with the Loan Documents, or (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any other instrument or document furnished pursuant thereto; (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower or any Guarantor or the performance or observance by any Borrower or any Guarantor of any of their respective obligations under the Loan Documents or any other instrument or document furnished pursuant thereto, and (d) represents and warrants that the amount set forth as the Purchase Price on Annex I represents the amount owed by Borrowers to Assignor with respect to Assignor's share of the Revolving Loans assigned hereunder, as reflected on Assignor's books and records.

III.      The Assignee (a) confirms that it has received copies of the Credit Agreement and the other Loan Documents, together with copies of the financial statements referred to therein and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (b) agrees that it will, independently and without reliance upon Agent, Assignor, or any other Lender, based upon such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Loan Documents; (c) [confirms that it is an Eligible Transferee;] (d) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (e) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender; [and (f) attaches the forms prescribed by the Internal Revenue Service of the United States certifying as to the Assignee's status for purposes of determining exemption from United States withholding taxes with respect to all payments to be made to the Assignee under the Credit Agreement or such other documents as are necessary to indicate that all such payments are subject to such rates at a rate reduced by an applicable tax treaty.]

IV.       Following the execution of this Assignment Agreement by the Assignor and Assignee, the Assignor will deliver this Assignment Agreement to the Agent for recording by the Agent.  The effective date of this Assignment (the "Settlement Date") shall be the latest to occur of (a) the date of the execution and delivery hereof by the Assignor and the Assignee, (b) the receipt by Agent for its sole and separate account a processing fee

in the amount of $3,500 (if required by the Credit Agreement), (c) the receipt of any required consent of the Agent, and (d) the date specified in Annex I.

V.    As of the Settlement Date (a) the Assignee shall be a party to the Credit Agreement and, to the extent of the interest assigned pursuant to this Assignment Agreement, have the rights and obligations of a Lender thereunder and under the other Loan Documents, and (b) the Assignor shall, to the extent of the interest assigned pursuant to this Assignment Agreement, relinquish its rights and be released from its obligations under the Credit Agreement and the other Loan Documents, provided, however, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Article 15 and Section 17.9(a) of the Credit Agreement.

VI.    Upon the Settlement Date, Assignee shall pay to Assignor the Purchase Price (as set forth in Annex I).  From and after the Settlement Date, Agent shall make all payments that are due and payable to the holder of the interest assigned hereunder (including payments of principal, interest, fees and other amounts) to Assignor for amounts which have accrued up to but excluding the Settlement Date and to Assignee for amounts which have accrued from and after the Settlement Date.  On the Settlement Date, Assignor shall pay to Assignee an amount equal to the portion of any interest, fee, or any other charge that was paid to Assignor prior to the Settlement Date on account of the interest assigned hereunder and that are due and payable to Assignee with respect thereto, to the extent that such interest, fee or other charge relates to the period of time from and after the Settlement Date.

VII.    This Assignment Agreement may be executed in counterparts and by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  This Assignment Agreement may be executed and delivered by telecopier or other facsimile transmission all with the same force and effect as if the same were a fully executed and delivered original manual counterpart.

VIII.    THIS ASSIGNMENT AGREEMENT SHALL BE SUBJECT TO THE PROVISIONS REGARDING CHOICE OF LAW AND VENUE, JURY TRIAL WAIVER, AND JUDICIAL REFERENCE SET FORTH IN SECTION 12 OF THE CREDIT AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement and Annex I hereto to be executed by their respective officers, as of the first date written above.

[NAME OF ASSIGNOR]

as Assignor

By    _____

Name:

Title:

[NAME OF ASSIGNEE]

as Assignee

By    _____

Name:

Title:

ACCEPTED THIS _____ DAY OF
_____

**WELLS FARGO BANK, NATIONAL ASSOCIATION,** a national banking association, as Agent

By    _____

Name:

Title:

ANNEX FOR ASSIGNMENT AND ACCEPTANCE

ANNEX I

1.     Administrative Borrower:  WYNIT DISTRIBUTION, LLC, a New York limited liability company

2.     Name and Date of Credit Agreement:

> Senior Secured, Super Priority Debtor in Possession Credit Agreement dated as of September [__], 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement") by and among WYNIT DISTRIBUTION, LLC, a New York limited liability company ("US Parent"), WYNIT HOLDINGS, INC., a New York corporation ("Canadian Parent"), the Subsidiaries of US Parent and Canadian Parent party thereto (together with US Parent and Canadian Parent, collectively, the "Loan Parties"), the lenders party thereto as "Lenders" (each of such Lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender"), WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association ("Wells Fargo"), in its capacity as administrative agent for each member of the Lender Group and the Bank Product Providers.

3.     Date of Assignment Agreement:                                      _____

4.     Amounts:

   a.     Assigned Amount of US Revolver Commitment          $_____

   b.     Assigned Amount of Canadian Revolver Commitment      $_____

   c.     Assigned Amount of US Revolving Loans              $_____

   d.     Assigned Amount of Canadian Revolving Loans          $_____

5.     Settlement Date:                                              _____

6.     Purchase Price                                              $_____

7.     Notice and Payment Instructions, etc.

   Assignee:                       Assignor:

ATL 22299052v2

**Exhibit B-1**

**Form of Borrowing Base Certificate**

[to be provided by Borrowers/Agent]

**Exhibit B-2**

**FORM OF BANK PRODUCT PROVIDER AGREEMENT**

**[Letterhead of Specified Bank Product Provider]**

**[Date]**

Wells Fargo Bank, N.A., as Agent
1100 Abernathy Road, Suite 1600
Atlanta, GA 30328
Attn: Portfolio Manager--Wynit

      Reference is hereby made to that certain Senior Secured, Super Priority Debtor in Possession Credit Agreement dated as of September [__], 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement") by and among WYNIT DISTRIBUTION, LLC, a New York limited liability company ("US Parent"), WYNIT HOLDINGS, INC., a New York corporation ("Canadian Parent"), the Subsidiaries of US Parent and Canadian Parent Party thereto (together with US Parent and Canadian Parent, collectively, the "Loan Parties"), the lenders party thereto as "Lenders" (each of such Lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender"), WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association ("Wells Fargo"), in its capacity as administrative agent for each member of the Lender Group and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, "Agent"), as a joint lead arranger and as joint book runner,  JPMORGAN CHASE BANK, N.A. and SUNTRUST ROBINSON HUMPHREY, INC., as joint lead arrangers and joint book runners, and JPMORGAN CHASE BANK, N.A. and SUNTRUST BANK, as syndication agents.  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

      Reference is also made to that certain [describe the Bank Product Agreement or Agreements] (the "Specified Bank Product Agreement [Agreements]") dated as of _____, by and between [Lender or Affiliate of Lender] (the "Specified Bank Product Provider") and [identify the Loan Party].

      1.    Appointment of Agent.   The Specified Bank Product Provider hereby designates and appoints Agent, and Agent by its signature below hereby accepts such appointment, as its agent under the Credit Agreement and the other Loan Documents. The Specified Bank Product Provider hereby acknowledges that it has reviewed Sections 15.1 through 15.15 and Sections 15.17, 15.18, and 17.5 (collectively such sections are referred to herein as the "Agency Provisions"), including, as applicable, the defined terms used therein.  Specified Bank Product Provider and Agent each agree that the Agency Provisions which govern the relationship, and certain representations, acknowledgements, appointments, rights, restrictions, and agreements, between the Agent, on the one hand, and the Lenders or the Lender Group, on the other hand, shall, from and after the date of this letter agreement also apply to and govern, *mutatis mutandis*, the relationship between the Agent, on the one hand, and the Specified Bank Product Provider with respect to the Bank Products provided pursuant to the Specified Bank Product Agreement[s], on the other hand.

      2.    Acknowledgement of Certain Provisions of Credit Agreement.   The Specified Bank Product Provider hereby acknowledges that it has reviewed the provisions of Sections 2.4(b)(iii), 14.1, 15, and 17.5 of the Credit Agreement, including, as applicable, the defined terms used therein, and agrees to

be bound by the provisions thereof.  Without limiting the generality of any of the foregoing referenced provisions, Specified Bank Product Provider understands and agrees that its rights and benefits under the Loan Documents consist solely of it being a beneficiary of the Liens and security interests granted to Agent and the right to share in proceeds of the Collateral to the extent set forth in the Credit Agreement.

3.    <u>Reporting Requirements</u>.    Agent shall have no obligation to calculate the amount due and payable with respect to any Bank Products.  On a monthly basis (not later than the 10th Business Day of each calendar month) or as more frequently as Agent shall request, the Specified Bank Product Provider agrees to provide Agent with a written report, in form and substance satisfactory to Agent, detailing Specified Bank Product Provider's reasonable determination of the liabilities and obligations (and mark- to-market exposure) of Borrowers and the other Loan Parties in respect of the Bank Products provided by Specified Bank Product Provider pursuant to the Specified Bank Product Agreement[s].  If Agent does not receive such written report within the time period provided above, Agent shall be entitled to assume that the amount due and payable to the Specified Bank Product Provider is the amount last certified to Agent by the Specified Bank Product Provider as being due and payable (less any distributions made to the Specified Bank Product Provider on account thereof).

4.    <u>Bank Product Reserve Conditions</u>.  Specified Bank Product Provider further acknowledges and agrees that Agent shall have the right (to the extent permitted pursuant to the Credit Agreement), but shall have no obligation to establish, maintain, relax, or release reserves in respect of any of the Bank Product Obligations and that if reserves are established there is no obligation on the part of the Agent to determine or insure whether the amount of any such reserve is appropriate or not (including whether it is sufficient in amount).  If Agent chooses to implement a reserve, Specified Bank Product Provider acknowledges and agrees that Agent shall be entitled to rely on the information in the reports described above to establish the Bank Product Reserve Amount.

5.    <u>Bank Product Obligations</u>.  From and after the delivery to Agent of this agreement duly executed by Specified Bank Product Provider and the acknowledgement of this agreement by Agent and Borrower, the obligations and liabilities of Borrowers and the other Loan Parties to Specified Bank Product Provider in respect of Bank Products evidenced by the Specified Bank Product Agreement[s] shall constitute Bank Product Obligations (and which, in turn, shall constitute Obligations), and Specified Bank Product Provider shall constitute a Bank Product Provider until such time as Specified Bank Product Provider or its Affiliate is no longer a Lender. Specified Bank Product Provider acknowledges that other Bank Products (which may or may not be Specified Bank Products) may exist at any time.

6.    <u>Notices</u>.  All notices and other communications provided for hereunder shall be given in the form and manner provided in <u>Section 11</u> of the Credit Agreement, and, if to Agent, shall be mailed, sent, or delivered to Agent in accordance with <u>Section 11</u> in the Credit Agreement, if to Borrower, shall be mailed, sent, or delivered to Borrower in accordance with <u>Section 11</u> in the Credit Agreement, and, if to Specified Bank Product Provider, shall be mailed, sent, or delivered to the address set forth below, or, in each case as to any party, at such other address as shall be designated by such party in a written notice to the other party.

If to Specified Bank
Product Provider:

_____

_____

_____

Attn: _____

Fax No. _____

7.    <u>Miscellaneous</u>.  This agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto (including any successor agent pursuant to <u>Section 15.9</u> of the Credit Agreement); <u>provided</u>, that Borrower may not assign this agreement or any rights or duties hereunder without the other parties' prior written consent and any prohibited assignment shall be absolutely void *ab initio*.  Unless the context of this agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."   This agreement may be executed in any number of counterparts and by different parties on separate counterparts.  Each of such counterparts shall be deemed to be an original, and all of such counterparts, taken together, shall constitute but one and the same agreement.  Delivery of an executed counterpart of this letter by telefacsimile or other means of electronic transmission shall be equally effective as delivery of a manually executed counterpart.

8.    <u>Governing Law, Etc</u>.  THIS AGREEMENT SHALL BE SUBJECT TO THE PROVISIONS REGARDING CHOICE OF LAW AND VENUE AND JURY TRIAL WAIVER SET FORTH IN <u>SECTION 12</u> OF THE CREDIT AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

[signature pages to follow]

Sincerely,

**[SPECIFIED BANK PRODUCT PROVIDER]**


By:      _____
Name:    _____
Title:   _____

Acknowledged, accepted, and agreed
as of the date first written above:

**BORROWERS:**

WYNIT DISTRIBUTION, LLC


By:_____
Name:_____
Title:_____


WD NAVARRE DISTRIBUTION, LLC


By:_____
Name:_____
Title:_____


WD ENCORE SOFTWARE, LLC


By:_____
Name:_____
Title:_____


WD NAVARRE DIGITAL SERVICES, LLC


By:_____
Name:_____
Title:_____


WD NAVARRE HOLDINGS, LLC


By:_____
Name:_____
Title:_____


WD NAVARRE CANADA, ULC


By:_____
Name:_____
Title:_____


ATL 22299052v2

Acknowledged, accepted, and
agreed as of _____


**WELLS FARGO BANK, NATIONAL ASSOCIATION**,
a national banking association,
as Agent


By:      _____
Name:   _____
Title:    _____

**EXHIBIT C-1**

**FORM OF COMPLIANCE CERTIFICATE**

[on US Parent's letterhead]

To:   Wells Fargo Bank, National Association
      1100 Abernathy Road, Suite 1600
      Atlanta, GA 30328
      Attn:  Portfolio Manager – Wynit

Re:       Compliance Certificate dated _____, 20__

Ladies and Gentlemen:

Reference is hereby made to that certain Senior Secured, Super Priority Debtor in Possession Credit Agreement dated as of September [__], 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement") by and among WYNIT DISTRIBUTION, LLC, a New York limited liability company ("US Parent"), WYNIT HOLDINGS, INC., a New York corporation ("Canadian Parent"), the Subsidiaries of US Parent and Canadian Parent Party thereto (together with US Parent and Canadian Parent, collectively, the "Loan Parties"), the lenders party thereto as "Lenders" (each of such Lenders, together with its successors and permitted assigns, is referred to hereinafter as a "Lender"), WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association ("Wells Fargo"), in its capacity as administrative agent for each member of the Lender Group and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, "Agent"), as a joint lead arranger and as joint book runner,  JPMORGAN CHASE BANK, N.A. and SUNTRUST ROBINSON HUMPHREY, INC., as joint lead arrangers and joint book runners, and JPMORGAN CHASE BANK, N.A. and SUNTRUST BANK, as syndication agents.  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

Pursuant to Section 5.1 of the Credit Agreement, the undersigned officer of Administrative Borrower hereby certifies as of the date hereof that:

1.      The financial information of each Parent and its respective Subsidiaries furnished in Schedule 1 attached hereto, has been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for year-end audit adjustments and the lack of footnotes), and fairly presents in all material respects the financial condition of each Parent and its respective Subsidiaries as of the date set forth therein.

2.      Such officer has reviewed the terms of the Credit Agreement and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and financial condition of each Parent and its respective Subsidiaries during the accounting period covered by the financial statements delivered pursuant to Section 5.1 of the Credit Agreement.

3.      Such review has not disclosed the existence on and as of the date hereof, and the

Exhibit C-1 - 1

undersigned does not have knowledge of the existence as of the date hereof, of any event or condition that constitutes a Default or Event of Default, except for such conditions or events listed on <u>Schedule 2</u> attached hereto, in each case specifying the nature and period of existence thereof and what action each Parent and its respective Subsidiaries have taken, are taking, or propose to take with respect thereto.

4.    Except as set forth on <u>Schedule 3</u> attached hereto, the representations and warranties of each Parent and its respective Subsidiaries set forth in the Credit Agreement and the other Loan Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date hereof (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date..

Exhibit C-1 - 2

ATL 22299052v2

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned as of the date first above written.

WYNIT DISTRIBUTION, LLC,
a New York limited liability company, as Administrative Borrower

By:_____
Name: _____
Title: _____

Exhibit C-1 - 3

ATL 22299052v2

## **SCHEDULE 1**

**Financial Information**

Exhibit C-1 - 4

ATL 22299052v2

## **SCHEDULE 2**

**Default or Event of Default**

Exhibit C-1 - 5

ATL 22299052v2

## **SCHEDULE 3**

**Representations and Warranties**

Exhibit C-1 - 6

ATL 22299052v2

## EXHIBIT I-1

**[FORM OF INTERIM ORDER]**

**<u>Exhibit B</u>**

**Interim Order**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

In re:

WYNIT DISTRIBUTION, LLC, *et al.*1
Debtors.

Joint Administration Pending

Case No. 17-42726

Chapter 11 Cases

---

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. § 364, (II) AUTHORIZING THE DEBTORS' LIMITED USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (III) GRANTING

---

Upon the motion of the debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), dated September 8, 2017 (the "**Motion**"), (a) seeking the entry of this interim order (this "**Order**") and a final order (the "**Final Order**"): (i) authorizing Wynit Distribution, LLC, a New York limited liability company ("**US Parent**"), WD Navarre Distribution, LLC, a New York limited liability company ("**Navarre Distribution**"), WD Encore Software, LLC, a New York limited liability company ("**Encore Software**"), WD Navarre Digital Services, LLC, a New York limited liability company ("**Navarre Digital**"); WD Navarre Holdings, LLC, a New York limited liability company ("**Navarre Holdings**"); together with US Parent, Navarre Distribution, Encore Software, and Navarre Digital, individually, a "**US Borrower**", and collectively, "**US Borrowers**"), Wynit Holdings, Inc., a New York corporation ("**Canadian Parent**"), and WD Navarre Canada, ULC, a Nova Scotia unlimited liability company ("**Canadian Borrower**"; Canadian Borrower and US Borrowers, each individually, a "**Borrower**", and collectively, the "**Borrowers**") to obtain senior secured post-petition financing in an aggregate

---

1       The Debtors in these chapter 11 cases are the following:  Wynit Distribution, LLC (Case No. 17-2726), WD Navarre Distribution, LLC (Case No. 17-42728), WD Encore Software, LLC(Case No. 17-42729), WD Navarre Digital Services, LLC (Case No. 17-32865), WD Navarre Holdings, LLC (Case No. 17-32864), Wynit Holdings, Inc. (Case No. 17-32866), WD Navarre Canada, ULC (Case No. 17-32867).

principal amount not to exceed $15,000,000 (the "**Postpetition Facility**"), pursuant to section 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), from Wells Fargo Bank, National Association (in its individual capacity, "**Wells Fargo**"), as administrative agent (in such capacity, the "**Postpetition Agent**") for itself and for the lenders party to the Postpetition Credit Agreement (defined below) (collectively with Wells Fargo, the "**Postpetition Lenders**"), pursuant to the terms of this Order and that certain Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, by and among each Borrower, the Postpetition Agent, and the Postpetition Lenders, in substantially the form attached to the Motion as <u>Exhibit A</u> (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Postpetition Credit Agreement**");[2] (ii) authorizing the Debtors to execute, deliver and enter into the Postpetition Credit Agreement and other Postpetition Loan Documents (as defined in <u>paragraph 2</u> below) and to perform such other and further acts as may be required in connection with the Postpetition Loan Documents; (iii) granting security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the Postpetition Agent, for the benefit of itself and the Postpetition Lenders, to secure all obligations of the Debtors under and with respect to the Postpetition Facility; (iv) authorizing the Debtors' limited use of Cash Collateral (as defined in <u>paragraph E</u> below), solely on the terms and conditions set forth in this Order and in the Postpetition Loan Documents; (v) granting adequate protection to the Prepetition Senior Lenders (as defined in <u>paragraph D</u>[3] below), whose liens and security interests are being primed by the Postpetition Facility, as more fully set forth in this Order; and

---

[2]   Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Postpetition Credit Agreement.

[3]   References to paragraphs of this Order and to sections and paragraphs of any other document are for the convenience of the parties only and for compliance with any applicable Local Bankruptcy Rules of this Court, and are in no way any waiver of any other applicable provisions of this Order or such document. Such references are also deemed to include and incorporate all subparts of any referenced section or paragraph.

(vi) modifying the automatic stay imposed under section 362 of the Bankruptcy Code; (b) requesting, pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the applicable Local Bankruptcy Rules of this Court, that an emergency interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of this Order, which authorizes the Debtors to borrow under the Postpetition Loan Documents, on an interim basis, up to an aggregate principal amount not to exceed $3,500,000; and (c) requesting, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Bankruptcy Rules of this Court, that this Court (i) schedule a final hearing (the "**Final Hearing**") on the Motion as set forth in paragraph 36 below to consider entry of the Final Order authorizing the balance of the borrowings and letter of credit issuances under the Postpetition Loan Documents on a final basis, and (ii) approve notice procedures with respect thereto; and the Interim Hearing having been held before this Court on September 13, 2017; and this Court having considered the Motion and all pleadings related thereto, including the record made by the Debtors at the Interim Hearing; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**[4]

A.      <u>Commencement of Cases</u>.  On September 8, 2017 (the "**Petition Date**"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no creditors' committee (the "**Creditors' Committee**") has yet been appointed in the Chapter 11 Cases.

---

4  Pursuant to Bankruptcy Rule 7052, any findings of fact contained herein that may be construed as matters of law shall be treated as conclusions of law as if set forth below, and vice versa.

B.    <u>Jurisdiction; Venue</u>.  This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.   Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure.   Venue of the Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    <u>Adequate Notice</u>.  On September 8, 2017, the Debtors filed the Motion with this Court and pursuant to Bankruptcy Rules 2002, 4001 and 9014, and the Local Bankruptcy Rules of this Court, the Debtors have provided notice of the Motion and the Interim Hearing by electronic mail, facsimile, hand delivery or overnight delivery to the following parties and/or to their counsel as indicated: (i) the Office of the United States Trustee for this District (the "**U.S. Trustee**"); (ii) the each of the Debtors' twenty (20) largest unsecured creditors; (iii) counsel to the Postpetition Agent; (iv) counsel to the Prepetition Senior Agent (as defined in below); (v) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (vi) all financial institutions at which the Debtors maintain deposit accounts; (vii) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; (viii) the local office for the Internal Revenue Service and (ix) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof (collectively, the "**Notice Parties**").  Given the nature of the relief sought in the Motion, this Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law, and no further notice relating to this proceeding is necessary or required.

ATL 22308762v1

D.      Prepetition Loan Documents, Liens and Claims.

(a)     Without prejudice to the rights of any other party, but subject to the time limitations specified in paragraph 29 of this Order, the Debtors admit, stipulate and agree that, on and as of the Petition Date, the Debtors were indebted and bound as described below:

**Prepetition Senior Agent and Prepetition Senior Lenders**

1.      Pursuant to that certain Credit Agreement, dated as of November 29, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Senior Credit Agreement**"), among each Borrower (with Canadian Parent party thereto as a guarantor), Wells Fargo, as administrative agent for itself and the Prepetition Senior Lenders (as defined below) (in such capacity, the "**Prepetition Senior Agent**"), and the other lenders party thereto (collectively, together with each Bank Product Provider and each Issuing Bank (each as defined in the Prepetition Senior Credit Agreement), the "**Prepetition Senior Lenders**"), the Prepetition Senior Agent and Prepetition Senior Lenders agreed to extend loans to, issue letters of credit for, and provide services and other credit accommodations to, the Borrowers.  The Prepetition Senior Credit Agreement, along with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as defined therein, are collectively referred to herein as the "**Prepetition Senior Loan Documents**" (as the same may be amended, restated, supplemented or otherwise modified from time to time).

2.      All obligations of the Debtors arising under, or in connection with, the Prepetition Senior Credit Agreement (including, without limitation, the "Obligations" and "Bank Product Obligations", each as defined therein), any other Prepetition Senior Loan Document, and/or any Bank Product Agreement shall collectively be referred to herein as the "**Prepetition Senior Obligations**."

3.      Pursuant to the Guaranty and Security Agreements (as defined in the Prepetition Senior Credit Agreement) and all other Prepetition Senior Loan Document that purport to create a Lien (as defined in the Prepetition Senior Credit Agreement) in favor of Prepetition Senior Agent (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Senior Security Documents**"), each Debtor granted to the Prepetition Senior Agent, for the benefit of itself and the Prepetition Senior Lenders, to secure the Prepetition Senior Obligations, a first priority security interest in and continuing lien (the "**Prepetition Senior Liens**") on substantially all of such Debtor's assets and property, and all proceeds, products, accessions, rents and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  All collateral granted or pledged by the Debtors pursuant to any Prepetition Senior Security Document or any other Prepetition Senior Loan Document, including, without limitation, the "Collateral" as defined in the Prepetition Senior Credit Agreement, and all pre-petition and post-petition proceeds thereof shall collectively be referred to herein as the "**Prepetition Senior Collateral**".

-5-

4.      (i) All Prepetition Senior Loan Documents executed and delivered by the Debtors to the Prepetition Senior Agent or any Prepetition Senior Lender are valid and enforceable by the Prepetition Senior Agent and the Prepetition Senior Lenders against each of the Debtors; (ii) the Prepetition Senior Liens constitute valid, binding, enforceable and perfected first priority liens and security interests in and on the Prepetition Senior Collateral, subject only to the Prior Liens (as defined below) and are not subject to avoidance, reduction, disallowance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except insofar as such liens are subordinated to the Postpetition Liens and the Carve-Out (each term as hereinafter defined)) in accordance with the provisions of this Order); (iii) the Prepetition Senior Obligations constitute legal, valid and binding obligations of each of the Debtors, (iv) no offsets, defenses or counterclaims to the Prepetition Senior Obligations exist, (v) no portion of the Prepetition Senior Obligations, or any amounts previously paid to Prepetition Senior Agent or any Prepetition Senior Lender on account of or with respect the Prepetition Senior Obligations, are subject to avoidance, reduction, disgorgement, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (vi) each Guaranty and Security Agreement (as defined in the Prepetition Senior Credit Agreement) continues in full force and effect notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the Postpetition Agent or Postpetition Lenders to the Debtors pursuant to the terms of this Order or Postpetition Loan Documents.

5.      The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Senior Agent or any Prepetition Senior Lender with respect to the Prepetition Senior Credit Agreement or any other Prepetition Senior Loan Documents, whether arising at law or at equity, including, without limitation, any re-characterization, subordination, avoidance or other debtor claims arising under or pursuant to sections 105, 510 or 542 through 553, inclusive, of the Bankruptcy Code.

6.      As of the Petition Date, (i) the Debtors were truly and justly indebted to the Prepetition Senior Agent and Prepetition Senior Lenders pursuant to the Prepetition Senior Loan Documents, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $76,724,574.38 in respect of loans made and letters of credit issued by the Prepetition Senior Agent and Prepetition Senior Lenders, plus all accrued and hereafter accruing and unpaid interest thereon and any additional fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Senior Loan Documents) now or hereafter due under the Prepetition Senior Credit Agreement and the other Prepetition Senior Loan Documents, and (ii) the value of the Prepetition Senior Collateral exceeded the amount of Prepetition Senior Obligations.

(b)      The Debtors irrevocably waive any right to challenge or contest the

Prepetition Senior Liens and the validity of the Prepetition Senior Obligations; provided that,

subject to paragraph 28 of this Order and the time limitations specified in paragraph 29 of this

Order, none of the foregoing acknowledgments or agreements by the Debtors contained in this

-6-

paragraph D shall be binding on any other party and shall not affect the rights of any committee, Person or entity (other than the Debtors with respect to the acknowledgements and agreements set forth in paragraph D(a)) with respect to their rights to assert, pursue or otherwise allege any of the claims and actions described in paragraph 29 of this Order.

(c)     As used herein, the term "**Prior Liens**" means only valid, enforceable, and non-avoidable liens and security interests in the Prepetition Senior Collateral that were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which are senior in priority to the Prepetition Senior Liens under applicable law and after giving effect to any subordination or intercreditor agreements.  For the avoidance of doubt, the Prior Liens shall not include, or be deemed to include, any or all of the Prepetition Senior Liens, and/or the Adequate Protection Senior Liens (as defined in paragraph 17(a) below), all of which liens are being primed by the Postpetition Liens as set forth herein.

E.     Cash Collateral.  For purposes of this Order, the term "**Cash Collateral**" shall mean and include all "cash collateral" as defined by section 363(a) of the Bankruptcy Code and shall include and consist of, without limitation, all of the respective cash proceeds of the Postpetition Collateral (as defined below in paragraph 9 of this Order) and Prepetition Senior Collateral in which any of the Prepetition Senior Agent or Prepetition Senior Lenders has an interest (including, without limitation, any adequate protection lien or security interest), whether such interest existed as of the Petition Date or arises thereafter pursuant to this Order, any other order of this Court, applicable law or otherwise.

F.     Exigent Circumstances.  The Debtors have an immediate and critical need to obtain post-petition financing under the Postpetition Facility and to use Cash Collateral in order to, among other things, finance the ordinary costs of their operations, make payroll, and

-7-

satisfy other working capital and operational needs.  The Debtors' access to sufficient working capital and liquidity through the incurrence of post-petition financing under the Postpetition Facility and the use of Cash Collateral under the terms of this Order is vital to the preservation and maintenance of the value of the Debtors' estates.  Consequently, without access to the Postpetition Facility and the use of Cash Collateral, to the extent authorized pursuant to this Order, the Debtors and their estates would suffer immediate and irreparable harm.

G.    <u>No Alternative Sources of Funding</u>.  The use of Cash Collateral alone would be insufficient to meet the Debtors' post-petition liquidity needs.  Given the Debtors' current financial condition and capital structure, the Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code, from sources other than the Postpetition Agent and the Postpetition Lenders on terms more favorable than the terms of the Postpetition Facility.  The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the Postpetition Facility.  The Debtors require both additional financing under the Postpetition Facility and the use of Cash Collateral under the terms of this Order in order to satisfy their post-petition liquidity needs.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the Postpetition Agent and the Postpetition Lenders pursuant to the terms of this Order and the Postpetition Loan Documents represents the best financing presently available to the Debtors.

H.    <u>Willingness of Postpetition Lenders</u>.  The Postpetition Agent and the Postpetition Lenders have indicated a willingness to provide the Debtors with certain financing

-8-

commitments, but solely on the terms and conditions set forth in this Order and in the Postpetition Loan Documents.

        I.      <u>Limited Consent</u>.  The consent of the Prepetition Senior Agent and the Prepetition Senior Lenders to the priming of their liens by the Postpetition Liens is limited to the Postpetition Facility presently before this Court, with Wells Fargo as Postpetition Agent and a subset of the Prepetition Senior Lenders as Postpetition Lenders, and shall not, and shall not be deemed to, extend to any other post-petition financing or to any modified version of this Postpetition Facility with any party other than Wells Fargo as Postpetition Agent.  Furthermore, the consent of the Prepetition Senior Agent and the Prepetition Senior Lenders to the Debtors' use of Cash Collateral and the priming of their liens by the Postpetition Liens as provided in this Order does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Senior Agent and the Prepetition Senior Lenders that their interests in the Prepetition Senior Collateral are adequately protected pursuant to this Order or otherwise.  Nothing in this Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Prepetition Senior Agent or any Prepetition Senior Lender are or will be adequately protected with respect to any non-consensual use of Cash Collateral or non-consensual priming of the Prepetition Senior Liens.

        J.      <u>Section 364(d) Finding</u>.  The security interests and liens granted pursuant to this Order to the Postpetition Agent, for the benefit of itself and the Postpetition Lenders, are appropriate under section 364(d) of the Bankruptcy Code because, among other things: (i) such security interests and liens do not impair the interests of any holder of a valid, perfected, prepetition security interest or lien in any property of the Debtors' estates, and/or (ii) the holders of such security interests and liens have consented (or are deemed to have consented) to the security interests and priming liens granted pursuant to this Order to the Postpetition Agent for the benefit of itself and the Postpetition Lenders.

-9-

K.     <u>Good Cause Shown</u>.   Good cause has been shown for immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and such relief is in the best interest of the Debtors, their estates and creditors.   In particular, the authorizations granted herein for the Debtors to execute the Postpetition Loan Documents, to use the Cash Collateral, and to obtain interim financing, including on a priming lien basis, are necessary to avoid immediate and irreparable harm to the Debtors and their estates, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

L.     <u>Section 364(e); Good Faith</u>.   The Postpetition Facility, Postpetition Loan Documents, use of Cash Collateral and provision of adequate protection contained herein have been negotiated in good faith and at arm's-length among the Debtors, the Prepetition Senior Agent and Postpetition Agent.   Accordingly, any credit extended and loans made to, Cash Collateral used by, and adequate protection provided by the Debtors pursuant to this Order shall be, and hereby are, deemed to have been extended, issued, made, used or provided, as the case may be, in "good faith" as required by, and within the meaning of, section 364(e) of the Bankruptcy Code.

Based upon the foregoing findings, stipulations, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     <u>Motion Granted</u>.   The Motion is approved on an interim basis on the terms and conditions set forth in this Order.   This Order shall become effective immediately upon its entry.   To the extent any provisions in this Order conflict with any provisions of the Postpetition Loan Documents, the provisions of this Order shall control and govern to the extent of such conflict.   All objections to the entry of this Order have been withdrawn or overruled.

-10-

2.      <u>Postpetition Loan Documents</u>.      The terms and conditions of the Postpetition Credit Agreement are hereby approved.  The Debtors are hereby authorized to enter into and deliver the Postpetition Credit Agreement and such additional documents, instruments, notes and agreements as may be reasonably required by the Postpetition Agent to implement the terms or effectuate the purposes of this Order (as such additional documents, instruments, notes and agreements may be amended, restated, supplemented or otherwise modified from time to time, together with the Postpetition Credit Agreement, the "**<u>Postpetition Loan Documents</u>**"). Each Borrower is hereby authorized to borrow money and obtain letters of credit under the Postpetition Credit Agreement, in accordance with the terms of this Order and the Postpetition Loan Documents.  Upon execution and delivery thereof by any Borrower or any other applicable Debtor, the Postpetition Loan Documents shall be incorporated by reference as part of this Order and shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto (and its respective estate, successor and assigns) in accordance with the terms thereof.

3.      <u>Amendments</u>.  The Debtors are hereby authorized, without further notice, motion or application to, order of, or hearing before, this Court, to enter into agreements with the Postpetition Agent providing for any non-material modifications to the Approved Budget (as defined below), the Professional Fee Budget (as defined below), or the Postpetition Credit Agreement, or of any other modifications to the Postpetition Credit Agreement necessary to conform the Postpetition Credit Agreement to this Order; <u>provided</u>, <u>however</u>, that notice of any material modification or amendment to the Approved Budget, the Professional Fee Budget, or the Postpetition Credit Agreement shall be provided to counsel to the Creditors' Committee (if one is appointed) and counsel to the U.S. Trustee, each of whom shall have three (3) days from the date of such notice within which to object in writing to such material modification or amendment.  If the Creditors' Committee or the U.S. Trustee timely objects in writing served on counsel for the Agent and the Debtors to any material modification or amendment to the

-11-

Approved Budget or the Postpetition Credit Agreement, then such modification or amendment shall only be permitted pursuant to an order of this Court.

    4.    <u>Permitted Use</u>.

    a.    <u>Generally</u>.  Notwithstanding anything in this Order to the contrary, the Debtors may use the Cash Collateral and proceeds of the Postpetition Facility, obtain and maintain Letters of Credit and pay Postpetition Obligations solely in accordance with and pursuant to the financial covenants, availability formulae, and other terms and conditions set forth in the Postpetition Loan Documents and this Order, including, without limitation, pursuant to the Approved Budget (as defined in <u>paragraph 8</u> below), but in all events only until the earliest of (i) December 7, 2017, (ii) the closing of any refinancing of the Prepetition Senior Obligations and Postpetition Obligations, (iii) confirmation of any chapter 11 plan in the Chapter 11 Cases, (iv) the conversion or dismissal of any of the Chapter 11 Cases, (v) the appointment of a trustee or examiner in any of the Chapter 11 Cases, and (vi) at the option of the Postpetition Agent in its sole discretion, the occurrence of any Event of Default under this Order and/or the Postpetition Credit Agreement (the date of the earliest such occurrence, the "**Commitment Termination Date**").  Notwithstanding the foregoing, but subject to the Maximum Amount (as defined in <u>paragraph 7</u> below), if the Postpetition Agent or the Postpetition Lenders in their respective sole discretion advance funds or provide other extensions of credit to the Debtors in excess of any financial covenants, availability formulae, or other terms and conditions (or any other limitations in the Postpetition Loan Documents, including, without limitation, the Approved Budget), such advances (and any other indebtedness in excess of such amount) shall constitute Postpetition Obligations entitled to the rights, priorities, benefits and protections of the Postpetition Loan Documents and this Order.

    b.    <u>No Duty to Monitor Compliance</u>.  The Postpetition Agent, the Prepetition Senior Agent, the Postpetition Lenders and the Prepetition Senior Lenders may assume the Debtors will comply with this Order, the Approved Budget and the Postpetition Loan

-12-

Documents and shall not (i) have any obligation with respect to the Debtors' use of Cash Collateral or the use of proceeds of the Postpetition Facility; (ii) be obligated to ensure or monitor the Debtors' compliance with any financial covenants, formulae, or other terms and conditions of any Postpetition Loan Document or (iii) be obligated to pay (directly or indirectly from the Prepetition Senior Collateral or Postpetition Collateral) any expenses incurred or authorized to be incurred pursuant to the Postpetition Loan Documents.

5.     Postpetition Obligations.   For purposes of this Order, the term "**Postpetition Obligations**" shall mean all amounts owing under or in connection with the Postpetition Credit Agreement and other Postpetition Loan Documents (including, without limitation, all "Obligations" as defined in the Postpetition Credit Agreement) and shall include the principal of, interest on, fees, costs, expenses and other charges owing in respect of, such amounts (including, without limitation, any attorneys', accountants', financial advisors' and other fees, costs and expenses that are chargeable or reimbursable under the Postpetition Loan Documents), and any obligations in respect of letters of credit or indemnity claims, as well as any Bank Product Obligations (as defined in the Postpetition Credit Agreement), in each case whether contingent or otherwise.

6.     Interest, Fees, Costs and Expenses.   The Postpetition Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Order and the Postpetition Loan Documents, in each case without further notice, motion or application to, order of, or hearing before, this Court. The Debtors shall pay on demand all fees, costs, expenses and other charges payable under the terms of the Postpetition Loan Documents, including, without limitation, all fees, costs and expenses described in the Postpetition Credit Agreement, in each case whether or not the Postpetition Credit Agreement and transactions contemplated therein are consummated. None of such fees, costs and expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee

-13-

application with this Court; <u>provided</u>, that after the Closing Date (as defined in the Postpetition Credit Agreement) the Postpetition Agent shall submit summaries of its professional fee invoices to the Debtors, the U.S. Trustee and counsel for the Creditors' Committee (if one is appointed). Such summary invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summaries shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine. The U.S. Trustee and the Creditors' Committee may object to the reasonableness of the fees, costs and expenses included in any professional fee summary invoice submitted by the Postpetition Agent; provided that, (i) any portion of any such summary invoice that is not the subject of any objection shall be paid immediately, and (ii) any objection shall be forever waived and barred unless (A) it is filed with this Court and served on counsel to the Postpetition Agent no later than ten (10) days after the objecting party's receipt of the applicable professional fee summary invoice, and (B) it describes with particularity the items or categories of fees, costs and expenses that are the subject of the objection and provides the specific basis for the objection to each such item or category of fees, costs and expenses. Any hearing on an objection to payment of any fees, costs and expenses of the Postpetition Agent set forth in a professional fee summary invoice shall be limited to the reasonableness or necessity of the particular items of categories of the fees, costs and expenses which are the subject of such objection. The Debtors shall indemnify the Postpetition Agent and the Postpetition Lenders (and other applicable parties) to the extent set forth in the Postpetition Loan Documents. All such unpaid fees, costs, expenses, and charges that have not been disallowed by this Court on the basis of an objection filed by the U.S. Trustee or the Creditors' Committee in accordance with the terms hereof shall constitute Postpetition Obligations and shall be secured by the Postpetition Collateral as specified in this Order. Any and all fees, commissions, costs and expenses paid prior to the Petition Date by any Debtor to the Postpetition Agent or Postpetition Lenders in connection with or with respect to the

-14-

Postpetition Facility, Postpetition Credit Agreement or other Postpetition Loan Documents are hereby approved in full.

7.     Maximum Amount.  Subject to the terms and conditions set forth in this Order and in the Postpetition Loan Documents, the Debtors may use the proceeds of the Postpetition Facility and the Cash Collateral solely to: (i) pay outstanding Postpetition Obligations as provided in the Postpetition Loan Documents and this Order, (ii) make the adequate protection payments required under this Order, and (iii) fund general corporate and working capital requirements of the Debtors constituting administrative expenses in the Chapter 11 Cases, in each case in accordance with the Approved Budget and the terms of the Postpetition Loan Documents; provided, however, that no proceeds of the Postpetition Facility or the Cash Collateral may be used to fund any employee retention programs unless and until the Postpetition Agent has given its prior written consent for such use.   The aggregate principal amount of Revolving Loans available under the Postpetition Credit Agreement shall not at any time exceed $15,000,000 without further order of this Court (the "**Maximum Amount**"), provided, however, that from and after the entry of this Order and prior to the entry of the Final Order, the Maximum Amount shall be limited to $3,500,000.

8.     Approved Budget.

a.     Generally.  Attached hereto as Exhibit A is a 3-week budget (the "**Initial Approved Budget**") which reflects on a line-item basis the Debtors' anticipated cumulative cash receipts and expenditures on a weekly basis and all necessary and required cumulative expenses which the Debtors expect to incur during each week of the Initial Approved Budget.  The Initial Approved Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) prepared by Debtors and approved by the Postpetition Agent in writing (each such additional budget, a "**Supplemental Approved Budget**"), in each case without further notice, motion or application to, order of, or hearing before, this Court (except as required by paragraph

-15-

3 above).  Whichever of the Initial Approved Budget or any Supplemental Approved Budget that is in effect at any time shall constitute the "**Approved Budget**."

      b.    <u>Budget Covenants</u>.  On a weekly basis for the period from the Petition Date through the last day of the week of determination, actual Revolver Usage, outstanding Prepetition Senior Obligations, receipts of and disbursements by the Debtors shall comply with terms of the Postpetition Credit Agreement.  The Debtors shall provide to the Postpetition Agent, so as actually to be received within two (2) business days following the end of each week, weekly line-by-line certified variance reports for the preceding weekly period and on a cumulative basis from the Petition Date to the report date, comparing actual Canadian Revolver Usage, US Revolver Usage, Revolver Usage, outstanding Prepetition Senior Obligations, cash receipts and disbursements to amounts projected in the Approved Budget, in form and scope reasonably acceptable to the Postpetition Agent.  The Debtors shall, on the second (2nd) Business Day of each week from the Closing Date until the Commitment Termination Date, deliver to the Postpetition Agent an updated, "rolling" 13-week budget which sets forth by line item updated projected Revolver Usage, outstanding Prepetition Senior Obligations, receipts and disbursements for the Debtors during the period commencing from the end of the previous week through and including thirteen weeks thereafter; <u>provided</u> that the Debtors shall still be subject to and be governed by the terms of the Approved Budget then in effect and the Postpetition Agent, Prepetition Senior Agent, Postpetition Lenders and Prepetition Senior Lenders shall, as applicable, have no obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral with respect thereto.  The Debtors acknowledge and agree that (i) the incurrence or payment by the Debtors of expenses (x) other than the itemized amounts set forth in the Approved Budget or (y) in excess of the variances permitted by Section 7 of, and the definition of "Substantial Compliance" set forth in, the Postpetition Credit Agreement, or (ii) other violation of the terms and condition of this <u>sub-paragraph (b)</u> (each a "**Budget Default**"), shall constitute an Event of Default under this Order and the Postpetition Credit Agreement.

-16-

9.    <u>Postpetition Liens</u>.  As security for the full and timely payment of the Postpetition Obligations, the Postpetition Agent, for the benefit of the Postpetition Agent and the Postpetition Lenders, is hereby granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, valid, binding, enforceable, unavoidable and fully perfected security interests, liens and mortgages (collectively, the "**Postpetition Liens**") in and upon all pre-petition and post-petition real and personal, tangible and intangible property and assets of each of the Debtors of any kind or nature whatsoever, wherever located, whether now existing or hereafter acquired or arising, including, without limitation, all Prepetition Senior Collateral, cash (including all Cash Collateral wherever held), cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, goods, fixtures, real property interests, intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, one hundred percent (100%) of the capital stock of each Debtor's direct and indirect domestic and foreign subsidiaries, all inter-company notes held by the Debtors, copyrights, trademarks, trade names, licenses, rights to payment including tax refund claims, and causes of action (exclusive of actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (the "**Avoidance Actions**"), but, subject to entry of the Final Order, inclusive of the proceeds and recoveries from the Avoidance Actions (the "**Avoidance Action Proceeds**")), and the Prepetition Senior Collateral, and the proceeds, products, offspring, rents and profits of all of the foregoing, including insurance proceeds (all of the foregoing, the "**Postpetition Collateral**"). Such Postpetition Liens shall not be released except to the extent that the Postpetition Obligations and Prepetition Senior Obligations have been permanently and indefeasibly paid in full, in cash and the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent, and Prepetition Senior Lenders have received a releases from each of the Debtors and their estates in

-17-

form and substance acceptable to the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent, and Prepetition Senior Lenders.

10.     Other Priority Matters.  Subject to the Carve-Out, the Postpetition Liens: (a) shall, pursuant to section 364(c)(2) of the Bankruptcy Code, constitute first priority security interests in and liens on all Postpetition Collateral that is not otherwise subject to any Prior Lien; (b) shall, pursuant to section 364(d)(1) of the Bankruptcy Code, be senior to and prime (i) the Prepetition Senior Liens, and (ii) the Adequate Protection Senior Liens (the liens described in clauses (i) and (ii) above, collectively, the "**Primed Liens**"); and (c) shall, pursuant to section 364(c)(3) of the Bankruptcy Code, be immediately junior in priority to any and all Prior Liens (other than the Primed Liens) on or in the Postpetition Collateral.  Other than the Carve-Out and Prior Liens, the Postpetition Liens shall at all times be senior to the following (collectively, the "**Subordinate Liens and Related Rights**"):  (i) the rights of any Debtor and any successor trustee or estate representative in the Chapter 11 Cases or any other subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 proceeding if any of the Chapter 11 Cases are converted to a case under Chapter 7 of the Bankruptcy Code (collectively, the "**Successor Case**"); (ii) any inter-company claim of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, and (iii) any security interest or lien which is either (x) avoided or otherwise preserved for the benefit of any Debtor's estate under section 551 or any other provision of the Bankruptcy Code, or (y) junior or otherwise subordinate to the Prepetition Senior Liens.  The Postpetition Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination, impairment or avoidance, for all purposes in the Chapter 11 Cases and any Successor Case.  Other than the Carve-Out and Prior Liens, no other liens or security interests, whether for adequate protection or otherwise, shall be senior or equal to or pari passu with the Postpetition Liens in these Chapter 11 Cases or any Successor Case without the express written consent of the Postpetition Agent given in accordance with the Postpetition Credit Agreement (which consent may be withheld in its sole discretion).

-18-

Notwithstanding anything herein to the contrary, all parties retain and reserve all their rights to dispute the validity, priority, enforceability and perfection of the Prior Liens.

11.    **Super-Priority Claim**.    In addition to the Postpetition Liens, the Postpetition Agent and Postpetition Lenders are hereby granted, for all Postpetition Obligations, an allowed super-priority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code (the "**Super-Priority Claim**") against each Debtor and its respective estate. Except for the Carve-Out, the Super-Priority Claim shall have priority over all other costs and expenses of administration of any kind (and no cost or expense of administration shall be senior to, equal to, or pari passu with, the Super-Priority Claim), including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise.

12.    No Reduction or Impairment.   No obligation or liability owed, or payment, transfer or grant of security, to Postpetition Agent or any Postpetition Lender under this Order or any other Postpetition Loan Document shall be stayed, restrained, voidable, impaired, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or be subject to any defense, reduction, setoff, recoupment or counterclaim, whether in the Chapter 11 Cases or any Successor Case.  Subject to paragraph 29 below, the release of claims by the Debtors against the Postpetition Agent and the Postpetition Lenders (and other applicable parties) set forth in the Postpetition Credit Agreement is hereby approved.  The Postpetition Obligations, once paid by any Debtor, shall be non-refundable.

13.    Carve-Out.

a.    Generally.  Notwithstanding anything to the contrary contained in this Order, the liens and claims granted to any of the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent, or Prepetition Senior Lenders in this Order, the Postpetition Loan

-19-

Documents, and/or the Prepetition Senior Loan Documents shall be subject to the payment, without duplication, of the following fees and claims (collectively, the "**Carve-Out**"), but only to the extent that there are not sufficient, unencumbered funds in the Debtors' estates to pay such amounts at the time payment is required to be made:

(i)     with respect to claims incurred prior to the Carve-Out Trigger Date, the claims of (x) professionals of the Debtors whose retention is approved by this Court during the Chapter 11 Cases pursuant to Sections 327 and 328 of the Bankruptcy Code (the "**Debtors' Professionals**") for unpaid fees and expenses which were incurred on and after the Petition Date and prior to the Carve-Out Trigger Date; and (y) professionals of any statutory committees appointed in the Chapter 11 Cases whose retention is approved by this Court during the Chapter 11 Cases pursuant to Section 1103 of the Bankruptcy Code (the "**Committee's Professionals**" and together with the Debtors' Professionals, the "**Retained Professionals**") for unpaid fees and expenses which were incurred on and after the Petition Date and prior to the Carve-Out Trigger Date; provided that, in each case, such fees and expenses of the Retained Professionals (A) are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code, (B) comply with the professional fee budget approved in writing by the Postpetition Agent and attached hereto as Exhibit B (such budget, the "**Professional Fee Budget**"), (C) are not excluded from the Carve-Out under paragraph 28 of this Order, and (D) do not exceed $800,000 in the aggregate for all of the Retained Professionals (such fees and expenses, the "**Pre-Carve-Out Trigger Date Expenses**" and the permitted amount thereof, the "**Pre-Carve-Out Trigger Date Amount**");

(ii)     with respect to claims incurred on or after the Carve-Out Trigger Date, the claims of Retained Professionals for unpaid fees and expenses which were incurred on and after the Carve-Out Trigger Date; provided that, in each case, such fees and expenses of the Retained Professionals (A) are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code, (B) are not excluded from the Carve-Out under paragraph 28 of this Order, and (C) do not exceed $50,000 in the aggregate for all of the Retained Professionals (such fees and expenses, the "**Post-Carve-Out Trigger Date Expenses**" and the permitted amount thereof, the "**Post-Carve-Out Trigger Date Amount**" and, together with the Pre-Carve-Out Trigger Date Amount, the "**Carve-Out Amount**"); and

(iii)     unpaid fees payable to the United States Trustee and Clerk of the Bankruptcy Court pursuant to Section 1930 of Title 28 of the United States Code.

b.     Carve-Out Trigger Date.  As used herein, the term "**Carve-Out Trigger Date**" means the date on which the Postpetition Agent provides written notice to the Debtors that the Carve-Out is invoked, which notice shall be delivered only on or after (i) the occurrence and continuation of an Event of Default under the Postpetition Credit Agreement or

-20-

the Commitment Termination Date, and (ii) the termination of the Postpetition Agent's or Postpetition Lenders' obligations to make loans or provide other extensions of credit under the Postpetition Credit Agreement.

        c.    <u>Carve-Out Trigger Date Amounts</u>.  Subject to the terms and conditions of this Order and the Postpetition Loan Documents, the Debtors shall be permitted, during the time period prior to the Carve-Out Trigger Date, to pay compensation and reimbursement of reasonable fees and expenses of the Retained Professionals allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, as the same may be due and payable, that constitute Pre-Carve-Out Trigger Date Expenses and such payments shall not reduce or be deemed to reduce the Pre-Carve-Out Trigger Date Amount or the Post-Carve-Out Trigger Date Amount.  On and after the Carve-Out Trigger Date, the dollar amounts available to be paid under the Carve-Out Amount shall be reduced, dollar-for-dollar, by the aggregate amount of payments made to the Retained Professionals on account of their Pre-Carve-Out Trigger Date Expenses or Post-Carve-Out Trigger Date Expenses (whether from Cash Collateral, any proceeds of the Postpetition Facility, or otherwise).

        d.    <u>Reservation of Rights</u>.  Payment of any fees and expenses of the Retained Professionals pursuant to the Carve-Out shall not, and shall not be deemed to, (i) reduce any Debtor's obligations owed to any of the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent, and/or Prepetition Senior Lenders or (ii) subordinate, modify, alter or otherwise affect any of the liens and security interests of such parties in the Postpetition Collateral or Prepetition Senior Collateral (or their respective claims against the Debtors).  The Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent, and Prepetition Senior Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Retained Professionals (or of any other Person) incurred in connection with the Chapter 11 Cases or any Successor Case, and nothing in this Order or otherwise shall be construed to obligate such parties in any way to pay compensation to or to reimburse expenses of

-21-

any Retained Professional or any other Person, or to ensure that any Debtor has sufficient funds to pay such compensation or reimbursement. Nothing herein shall impair, or be construed to impair, the ability of any party to object to any of the fees, expenses, reimbursement or compensation of the Retained Professionals.

14.    Cash Collection Procedures.

a.    Generally. From and after the date of the entry of this Order, all collections and proceeds of any Postpetition Collateral or Prepetition Senior Collateral or services provided by any Debtor and all Cash Collateral which shall at any time come into the possession, custody or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same bank accounts into which the collections and proceeds of the Prepetition Senior Collateral were deposited under the Prepetition Senior Credit Agreement (or in such other accounts as are designated by Postpetition Agent from time to time), and such collections and proceeds upon such deposit shall be applied, subject to the Carve-Out and any Prior Liens, against the Postpetition Obligations and Prepetition Senior Obligations as provided in the Postpetition Loan Documents and this Order. The Debtors shall promptly enter into any additional agreements providing for the establishment of lock boxes, blocked accounts, or similar arrangements in favor of the Postpetition Agent for purposes of facilitating cash collections from the Debtors in accordance with the terms of the Postpetition Credit Agreement and this Order.

b.    Existing Accounts. The Prepetition Senior Agent and the Prepetition Senior Lenders shall immediately share dominion and control with the Postpetition Agent with respect to each depository account of the Debtors or other third party that was subject to a deposit account control agreement or similar agreement with or in favor of any of the Prepetition Senior Agent or the Prepetition Senior Lenders as of the Petition Date, and such agreements shall hereafter be additionally enforceable by the Postpetition Agent against, and binding upon, each depository institution party thereto until the Postpetition Obligations have

-22-

been paid in full in cash and the Postpetition Credit Agreement shall have been terminated, after which such agreements shall again be solely enforceable by the Prepetition Senior Agent and the Prepetition Senior Lenders, as applicable.

> c.     _Cash Collateral Account; Application of Cash Collateral_.     All funds received by Prepetition Senior Agent or Postpetition Senior Agent as Letter of Credit Collateralization with respect to any of the Letters of Credit issued under (and as defined in) the Prepetition Senior Credit Agreement or under (and as defined in) the Postpetition Credit Agreement (each such Letter of Credit, a "**Senior Letter of Credit**"; such funds, "**Senior LC Cash Collateral**"), shall be deposited into a bank account in the name of Postpetition Agent and maintained by Wells Fargo (the "**Senior LC Cash Collateral Account**").    Following the expiration or termination of any Senior Letter of Credit and the payment and satisfaction of all Prepetition Senior Obligations and Postpetition Obligations with respect to such Senior Letter of Credit and the expiration or termination of all outstanding Senior Letters of Credit, the portion (if any) of Senior LC Cash Collateral then held in the Senior LC Cash Collateral Account based on such expired or terminated Senior Letter of Credit (the amount of such portion to be determined in accordance with the definition of Letter of Credit Collateralization set forth in the Prepetition Senior Credit Agreement and Postpetition Credit Agreement (as applicable)) shall be applied by Postpetition Agent in accordance with the terms of the Postpetition Credit Agreement and this Order.

> 15.     _Non-Ordinary Course Dispositions_.

> a.     The Debtors shall comply in all respects with the liquidation process covenants and deadlines set forth the Postpetition Credit Agreement, for which time is of the essence, including, without limitation, the following:

> (i)     On or before 7 days after the Petition Date, the Debtors must file a motion to approve sale and bidding procedures with the Court together with (A) a committed asset purchase agreement, in form and substance acceptable to Agent, to purchase substantially all of the Inventory (as defined in the Postpetition Credit Agreement) of the

Borrowers from a purchaser satisfactory to the Postpetition Agent (such purchaser, the "**Inventory Stalking Horse Bidder**"; such committed asset purchase agreement, the "**Inventory Stalking Horse Bid**") for an amount acceptable to the Postpetition Agent (the "**Minimum Inventory Purchase Price**"), in cash at closing, signed by the Inventory Stalking Horse Bidder and the Debtors, with no material conditions to close (including any financing contingency), except for an order of the Court approving the sale, and (B) a committed asset purchase agreement, in form and substance acceptable to the Postpetition Agent, to purchase substantially all of the Equipment (as defined in the Postpetition Credit Agreement) and related assets of the Debtors not subject to a Prior Lien from a purchaser satisfactory to Postpetition Agent (such purchaser, the "**Equipment Stalking Horse Bidder**"; such committed asset purchase agreement, the "**Equipment Stalking Horse Bid**") for an amount acceptable to Postpetition Agent (the "**Minimum Equipment Purchase Price**"), in cash at closing, signed by the Inventory Stalking Horse Bidder and the Loan Parties, with no material conditions to close (including any financing contingency), except for an order of the Court approving the sale;

(ii)     The Debtors shall have obtained the Court's approval of (A) Inventory Stalking Horse Bid which must provide for payment of the Minimum Inventory Purchase Price, and (B) the Equipment Stalking Horse Bid, which Equipment Stalking Horse Bid must provide for payment of the Minimum Equipment Purchase Price, no later than 25 days after the Petition Date;

(iii)     The final auction of the assets covered by the Inventory Stalking Horse Bid and the Equipment Stalking Horse Bid shall be held no later than 42 days after the Petition Date;

(iv)     The Debtors shall have caused the Court to grant the Sale Motion no later than 45 days after the Petition Date; and

(v)     The closing and funding of (A) the sale described in the Inventory Stalking Horse Bid (including the receipt by Postpetition Agent and Prepetition Senior Agent of the Minimum Inventory Purchase Price) must occur no later than 55 days after the Petition Date, and (B) the sale described in the Equipment Stalking Horse Bid (including the receipt by Postpetition Agent and Prepetition Senior Agent of the Minimum Equipment Purchase Price) must occur no later than 65 days after the Petition Date.

b.     The respective rights of the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent and Prepetition Senior Lenders to credit bid all or any portion of the Postpetition Obligations and Prepetition Senior Obligations (as applicable) under section 363(k) of the Bankruptcy Code and other applicable law in connection with any proposed sale of Prepetition Senior Collateral or Postpetition Collateral (other than the sale of Inventory in the ordinary course of any Debtor's business), or to object to such proposed sale or other Asset

-24-

Disposition, shall be preserved through the closing of such sale or other Asset Disposition.  Any and all proceeds arising from or in connection with any sale or lease of Postpetition Collateral or Prepetition Senior Collateral, or other Asset Disposition, including proceeds arising from or in connection with any Asset Disposition described in the Postpetition Credit Agreement, shall, subject to the terms of the Postpetition Loan Documents, be immediately transferred to Postpetition Agent or Prepetition Senior Agent (as applicable) for application to, or cash collateralization of, the Postpetition Obligations or Prepetition Senior Obligations in accordance with the terms and conditions of the Postpetition Loan Documents and Prepetition Senior Loan Documents (in each case, as applicable).

16.    _Landlord Agreements_.    All landlord agreements to which either Prepetition Agent is a party shall be deemed amended to include the Postpetition Agent as a beneficiary thereunder, and such agreements shall thereafter be additionally enforceable by the Postpetition Agent against, and binding upon, each landlord party thereto in accordance with, and subject to, its respective terms and conditions until the Postpetition Obligations shall have been paid in full in cash and the Postpetition Credit Agreement shall have been terminated, after which such agreements shall again be solely enforceable by the applicable Prepetition Agent.

17.    _Adequate Protection Senior Obligations_.  Until the indefeasible repayment in full in cash of the Prepetition Senior Obligations and the expiration of the Complaint Filing Deadline (or resolution of any complaint or adversary proceeding described in _paragraph 29_ of this Order), as adequate protection for the Prepetition Senior Agent's interest in the Prepetition Senior Collateral, the Prepetition Senior Agent and Prepetition Senior Lenders are hereby granted the following:

a.    _Replacement Liens_.  Pursuant to sections 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the Prepetition Senior Agent, for its benefit and the benefit of the Prepetition Senior Lenders, is hereby granted by each Debtor continuing valid, binding,

-25-

enforceable and perfected, liens and security interests in and on all of the Postpetition Collateral (the "**Adequate Protection Senior Liens**").  The Adequate Protection Senior Liens shall (i) be subordinate only to: (A) the Carve-Out, (B) the Postpetition Liens, and (C) the Prior Liens; and (ii) be senior and superior to the Subordinate Liens and Related Rights.  The Adequate Protection Senior Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination, impairment or avoidance, for all purposes in the Chapter 11 Cases and any Successor Case.  Except as described in clause (i) above, no other liens or security interests, whether for adequate protection or otherwise, shall be senior or equal to or <u>pari</u> <u>passu</u> with the Adequate Protection Senior Liens in these Chapter 11 Cases or any Successor Case without the prior written consent of the Prepetition Senior Agent given in accordance with the Prepetition Senior Credit Agreement (which consent may be withheld in its sole discretion).

> b.   <u>Adequate Protection Senior Claim</u>.  Pursuant to section 507(b) of the Bankruptcy Code, the Prepetition Senior Agent and the Prepetition Senior Lenders shall have an allowed super-priority administrative expense claim (the "**Adequate Protection Senior Claim**") against each Debtor and its respective estate.  The Adequate Protection Senior Claim shall: (i) be subordinate only to: (A) the Carve-Out, and (B) the Super-Priority Claim; and (ii) be senior and superior to the Subordinate Claims and Related Rights.  Except as described in clause (i) above, no cost or expense of administration under any provision of the Bankruptcy Code (whether incurred in these Chapter 11 Cases or any Successor Case, whether for adequate protection, the lack of, or failure to provide, adequate protection, or otherwise), shall be senior to, equal to, or <u>pari</u> <u>passu</u> with, the Adequate Protection Senior Claim.

> c.   <u>Adequate Protection Payments</u>.  As further adequate protection, subject to the rights set forth in <u>paragraph 29</u> hereof, and without limiting any rights of the Prepetition Senior Agent and the Prepetition Senior Lenders under section 506(b) of the Bankruptcy Code which are hereby preserved, and in consideration, and as a requirement, for obtaining the consent of the Prepetition Senior Agent and Prepetition Senior Lenders to the entry

-26-

of this Order and the Debtors' consensual use of Cash Collateral as provided herein, (i) the proceeds of any Prepetition Senior Collateral and any Postpetition Collateral shall be paid to Prepetition Senior Agent and Prepetition Senior Lenders for application to the Prepetition Senior Obligations until such Prepetition Senior Obligations are paid in full and Letter of Credit Collateralization (as defined in the Prepetition Senior Credit Agreement) with respect to all outstanding Letters of Credit (as defined in the Prepetition Senior Credit Agreement) has occurred, (i) Debtors shall make all payments of interest as and when due under the Prepetition Senior Credit Agreement, and (ii) the Debtors shall, on the Closing Date and on a monthly basis thereafter, pay or reimburse the Prepetition Senior Agent and Prepetition Senior Lenders for any and all of its accruing, and accrued and past-due, fees, costs, expenses and charges payable under the Prepetition Senior Loan Documents, including without limitation, the reasonable attorneys' and other fees and expenses of the Prepetition Senior Agent and Prepetition Senior Lenders as provided in the Prepetition Senior Credit Agreement, whether accrued prepetition or postpetition, all without further notice, motion or application to, order of, or hearing before, this Court.

        d.        Adequate Protection Senior Obligations.  The Adequate Protection Senior Liens and Adequate Protection Senior Claim shall secure the payment of the Prepetition Senior Obligations in an amount equal to any diminution in the value of the Prepetition Senior Agent's interests in the Prepetition Senior Collateral from and after the Petition Date (the amount of such diminution, the "**Adequate Protection Senior Obligations**") including, without limitation, any such diminution resulting from (i) the use by the Debtors of the Prepetition Senior Collateral, including, without limitation, the Cash Collateral, (ii) the imposition of the Postpetition Liens, which will prime the Primed Liens, (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, (iv) the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Senior Collateral or otherwise, or (v) costs and fees incurred in connection with the Prepetition Senior Loan Documents.

-27-

e.      <u>Prepetition Senior Liens</u>.  None of the Prepetition Senior Liens shall be released unless and until (i) the Prepetition Senior Obligations have been indefeasibly paid in full in cash or Letter of Credit Collateralization (as defined in the Prepetition Senior Credit Agreement) has occurred (as applicable), (ii) the Prepetition Senior Agent and Prepetition Senior Lenders have received a release of any and all claims from each of the Debtors in form and substance acceptable to the Prepetition Senior Agent and Prepetition Senior Lenders, (iii) the Complaint Filing Deadline has occurred and all claims filed against any of the Prepetition Senior Agent and Prepetition Senior Lenders have been resolved, and (iv) the Prepetition Senior Agent and Prepetition Senior Lenders have been reimbursed in full for all liability, fees, costs, and expenses incurred in connection with any claims filed against any of them in connection with the Prepetition Senior Loan Documents.

18.     <u>Collections</u>.  Notwithstanding anything in this Order to the contrary, any and all claims and liens of the Prepetition Senior Agent and Prepetition Senior Lenders arising with respect to or in connection with this Order or the Prepetition Senior Loan Documents (the "**<u>Superior Senior Obligations</u>**"), including, without limitation, the Prepetition Senior Obligations, Prepetition Senior Liens, Adequate Protection Senior Obligations, and Adequate Protection Senior Claim, must and shall be indefeasibly paid and satisfied in full in cash and Letter of Credit Collateralization shall have occurred as to all outstanding Senior Letters of Credit issued under the Prepetition Senior Credit Agreement, before any payment or distribution, whether pursuant to a chapter 11 plan, setoff or otherwise, may or can be made to or retained by the Postpetition Agent or any of the Postpetition Lenders (in their respective capacities as such) arising with respect to or in connection with this Order and/or the Postpetition Loan Documents (collectively, the "**<u>Subordinate Senior Obligations</u>**").  Any payment or distribution, whether in cash, securities or other property, which would otherwise, but for the terms hereof, be payable or deliverable to Postpetition Agent or any Postpetition Lender in respect of or in connection with any Subordinate Senior Obligations shall be paid or delivered directly to the Prepetition Senior

Agent (to be held and/or applied by Prepetition Senior Agent in accordance with the terms of this Order and the Prepetition Senior Credit Agreement) until all Superior Senior Obligations are indefeasibly paid and satisfied in full in cash and Letter of Credit Collateralization has occurred with respect to all outstanding Senior Letters of Credit issued under the Prepetition Senior Credit Agreement.

19.    <u>Waiver of Section 506(c) Claims</u>.   No costs or expenses of administration or other charge, lien, assessment or claim incurred on or after the Petition Date of any Person or entity shall be imposed against the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent, or Prepetition Senior Lenders, their respective claims or the Prepetition Senior Collateral or Postpetition Collateral under section 506(c) of the Bankruptcy Code or otherwise, and the Debtors hereby irrevocably waive any and all such rights, remedies and benefits under section 506(c) of the Bankruptcy Code.

20.    <u>Other Waivers</u>.   Except for the Carve-Out and Prior Liens, no claim or lien having a priority superior to or <u>pari passu</u> with those granted pursuant to this Order to the Postpetition Agent, the Postpetition Lenders, the Prepetition Senior Agent and the Prepetition Senior Lenders, respectively, shall be granted or allowed while any portion of the Postpetition Facility (or any refinancing thereof), the Commitments (as defined in the Postpetition Credit Agreement) thereunder, the Postpetition Obligations, or the Adequate Protection Senior Obligations remain outstanding.  Except as expressly permitted by the Postpetition Credit Agreement, unless consented to in writing by the Postpetition Agent, no Debtor shall seek entry of any further orders in its Chapter 11 Case which authorize (a) under Bankruptcy Code section 363, the use of Cash Collateral; (b) the obtaining of credit or the incurring of indebtedness pursuant to Bankruptcy Code sections 364(c) or 364(d), (c) the return of goods pursuant to Bankruptcy Code section 546(h) to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's prepetition indebtedness based upon any such return pursuant to Bankruptcy Code section 553 or otherwise, or (d) the granting mortgages,

ATL 22308762v1

security interests, or liens in the Postpetition Collateral to any parties other than the Postpetition

Agent and Postpetition Lenders pursuant to section 364(d) of the Bankruptcy Code or otherwise.

21.    <u>Automatic Perfection</u>.

a.    The Postpetition Liens and the Adequate Protection Senior Liens

shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-

avoidable and effective by operation of law as of the Petition Date without any further notice, act

or action of or by any Person or entity, and without the necessity of execution by the Debtors, or

the filing or recordation, of any financing statements, security agreements, vehicle lien

applications, mortgages, filings with the U.S. Patent and Trademark Office, or other documents.

If the Postpetition Agent or either Prepetition Agent hereafter requests that the Debtors execute

and deliver to it any financing statements, security agreements, collateral assignments,

mortgages, or other instruments and documents considered by such party to be reasonably

necessary or desirable to further evidence the perfection of the liens and security interests

provided under this Order, then the Debtors are hereby authorized and directed, at their sole cost

and expense, to promptly execute and deliver such financing statements, security agreements,

mortgages, collateral assignments, instruments, and documents, and the Postpetition Agent and

Prepetition Senior Agent (as applicable) are hereby authorized to file or record such documents

in their respective discretion, in which event all such documents shall be deemed to have been

filed or recorded at the time and on the date of entry of this Order, but with the priorities as set

forth herein.  The Postpetition Agent and Prepetition Senior Agent may (in their respective sole

discretion), but shall not be required to, file a certified copy of this Order in any filing or

recording office in any state, county or other jurisdiction in which any Debtor has real or

personal property and such filing or recording shall be accepted and shall constitute sufficient

evidence of perfection of such applicable parties' interests in the Postpetition Collateral at the

time and on the date of entry of this Order, but with the priorities as set forth herein.

ATL 22308762v1

b.      To the extent that any applicable non-bankruptcy law would otherwise restrict the grant, scope, enforceability, attachment or perfection of the security interests and liens authorized or created under or in connection with this Order or the Postpetition Loan Documents, or otherwise would impose filing or registration requirements or fees and charges with respect thereto, such law is hereby pre-empted to the maximum extent permitted by the United States Constitution, the Bankruptcy Code, applicable federal law, and the judicial power of the United States Bankruptcy Court; provided that the Postpetition Agent and Prepetition Senior Agent may still take such steps as they wish to perfect their respective security interests and liens under otherwise applicable state law without waiving the benefits of this provision of this Order.

22.      Default Under Other Documents.  The Postpetition Agent, the Prepetition Senior Agent, the Postpetition Lenders and the Prepetition Senior Lenders shall have all rights and remedies with respect to the Debtors and any other rights, remedies, benefits and privileges as are set forth in this Order and the Postpetition Loan Documents (as applicable).  Except as otherwise expressly provided herein, no provision contained in any prepetition or postpetition agreement to which any Debtor is a party, or under which any Debtor is obligated or bound, that restricts, conditions, prohibits, limits or impairs in any way any Debtor from (a) granting the Postpetition Agent, the Prepetition Senior Agent, the Postpetition Lenders, and the Prepetition Senior Lenders the postpetition security interests or liens upon any of its assets, or (b) otherwise entering into and complying with all of the terms, conditions and provisions of this Order and Postpetition Loan Documents, shall be unenforceable against such Debtor.

23.      Successors and Assigns.  The provisions of this Order and the Postpetition Loan Documents shall, as applicable, be binding upon and inure to the benefit of the Postpetition Agent, the Prepetition Senior Agent, the Postpetition Lenders, the Prepetition Senior Lenders, and the Debtors and their respective estates, and their respective successors and assigns, including, without limitation, any trustee or other fiduciary hereafter appointed as a legal

-31-

representative of any of the Debtors or their estates, whether in these Chapter 11 Cases or any Successor Case.

24.     <u>Survival</u>.   The provisions of this Order and any actions taken pursuant thereto: (a) shall survive the entry of any order: (i) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (ii) substantively consolidating any of the Debtors or their respective estates; or (iii) dismissing or closing any of the Chapter 11 Cases; and (b) shall continue in full force and effect notwithstanding the entry of any such order.

25.     <u>Section 364(e); Effect of Modification or Appeal</u>.   Based on the findings set forth in this Order, in consideration for the financing provided under Postpetition Facility, the Postpetition Agent and the Postpetition Lenders are entitled to, and hereby are granted, the full rights, benefits, privileges and protections of, and provided by, section 364(e) of the Bankruptcy Code with respect to the Postpetition Obligations (and related liens, claims, rights, remedies and benefits) created or authorized by this Order in the event that this Order or any authorization or approval contained herein is subsequently stayed, vacated, reversed, amended or modified on appeal.  Any subsequent stay, modification, reversal, amendment or vacation of this Order shall not alter, modify or affect the validity, priority, perfection or enforceability of any claim, lien, or security interest of the Postpetition Agent, the Prepetition Senior Agent, the Postpetition Lenders, or the Prepetition Senior Lenders authorized, created or granted pursuant to this Order and outstanding immediately prior to the actual receipt of written notice by the Postpetition Agent and Prepetition Senior Agent of the effective date of such stay, modification, reversal, amendment or vacation.  Notwithstanding any such stay, modification, reversal, amendment or vacation, all obligations and other financial accommodations made pursuant to this Order, all Postpetition Obligations incurred and uses of Cash Collateral permitted by the Debtors pursuant hereto prior to the actual receipt of written notice by the Postpetition Agent and Prepetition Senior Agent of the effective date of such stay, modification, reversal, amendment or vacation, shall be governed in all respects by the original provisions of this Order and the Postpetition

-32-

Agent, the Prepetition Senior Agent, the Postpetition Lenders, and the Prepetition Senior Lenders shall be entitled to all of the rights, privileges, remedies, protections and benefits contained or granted in section 364(e) of the Bankruptcy Code, the Postpetition Loan Documents and this Order (as applicable), including, without limitation, the Postpetition Liens, Super-Priority Claims, Adequate Protection Senior Liens, and Adequate Protection Senior Claims.

26.    Modification of Automatic Stay; Other Remedies.

a.    Subject to sub-paragraph (c) below, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted and vacated as to the Postpetition Agent and Postpetition Lenders to the extent necessary to permit them to perform in accordance with, provide any notice under, and exercise, enjoy and enforce their respective rights, benefits, privileges and remedies pursuant to this Order and the other Postpetition Loan Documents, in each case without further notice, motion or application to, order of, or hearing before, this Court. Subject to sub-paragraph (c) below, regardless of any change in circumstances (whether or not foreseeable), neither section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the Postpetition Agent's or Postpetition Lenders' exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies as and to the extent provided in this Order.

b.    Subject to sub-paragraph (c) below, the Postpetition Agent and Postpetition Lenders are hereby authorized and granted leave from the automatic stay under section 362 of the Bankruptcy Code to do the following on and after the occurrence and continuation of an Event of Default under the Postpetition Credit Agreement (or otherwise on and after the Commitment Termination Date), in each case without further notice, motion or application to, order of, or hearing before, this Court:

(i)    terminate any obligation of Postpetition Agent or Postpetition Lenders to make loans or other extensions of credit under the Postpetition Loan Documents or this Order;

(ii) declare all Postpetition Obligations immediately due and payable in full in cash, and require that all letters of credit and other contingent obligations related thereto, if any, to be cash collateralized or terminated without liability to Postpetition Agent or Postpetition Lenders; and

(iii) revoke the Debtors' right, if any, under this Order and/or the other Postpetition Loan Documents to use Cash Collateral.

c. On and after the occurrence and continuation of an Event of Default under the Postpetition Credit Agreement (or otherwise on and after the Commitment Termination Date), and after obtaining Court approval upon notice and hearing, the Postpetition Agent, the Postpetition Lenders, the Prepetition Senior Agent, and Prepetition Senior Lenders shall be entitled to foreclose or otherwise enforce their respective liens on any or all of the Postpetition Collateral and/or to exercise any other default-related rights and remedies under the Postpetition Loan Documents, Prepetition Senior Loan Documents, this Order, and applicable law to the extent not already permitted pursuant to sub-paragraph (b) above.  The parties shall use their best efforts to schedule and attend an expedited Court hearing within three (3) business days of notice of the Event of Default or Commitment Termination Date being given to the Debtors.  The Debtors acknowledge and agree, and this Court hereby orders, that the only issue to be determined and decided at any Court hearing regarding such matters is whether an Event of Default has occurred and is continuing under the Postpetition Credit Agreement or whether the Commitment Termination Date has occurred and notice of such hearing need only be given to the Debtors, any statutory committee of unsecured creditors and the U.S. Trustee.

27. No Waiver of Rights.

a. Generally. Without limiting the terms and conditions of paragraphs 9 through 12  and 18 of this Order, none of the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent or Prepetition Senior Lenders waives, and each expressly reserves, any and all claims, causes of action, defenses, rights and remedies it has or may have

-34-

pursuant to any or all of the Prepetition Senior Loan Documents, the Postpetition Loan Documents, any inter-creditor or subordination agreement, the Bankruptcy Code and/or under applicable law against or with respect to any Debtor and any other Person or entity.

        b.    <u>Relative Priorities</u>.  Pursuant to section 510 of the Bankruptcy Code, any inter-creditor or subordination agreement between and/or among the Prepetition Senior Agent, any Prepetition Senior Lender, any Debtor and any other non-Debtor party thereto, and any other applicable inter-creditor or subordination provisions contained in any credit agreement, security agreement, indenture or related document, remain in full force and effect and are not amended, altered or modified by the terms of this Order or the Postpetition Loan Documents.

        c.    <u>Additional Rights Preserved</u>.  Without limiting the generality of this <u>paragraph 27</u>, the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent and Prepetition Senior Lenders may, as applicable, petition this Court for any such additional protection they may reasonably require with respect to the Prepetition Senior Obligations, the Postpetition Obligations, or otherwise, including, without limitation, their rights to request additional adequate protection of their interests in the Prepetition Senior Collateral.  Except as otherwise set forth herein, entry of this Order shall not in any way constitute agreement, consent, or acquiescence by the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent or Prepetition Senior Lenders to the terms of any plan of reorganization filed in the Chapter 11 Cases.

        28.    <u>Restriction on Use of Lenders' Funds</u>.  No portion of the Postpetition Facility, the Postpetition Collateral, the Prepetition Senior Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the Approved Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting any claims, actions or causes of action against or adverse to the interests of any of the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent, or Prepetition Senior

-35-

Lenders, including, without limitation, any action challenging or raising any defenses to the Postpetition Obligations, the Prepetition Senior Obligations, the Postpetition Liens, or the Prepetition Senior Liens; provided, that no more than $25,000 in the aggregate of the proceeds of the Postpetition Facility or the Postpetition Collateral (including Cash Collateral) may be used by the Creditors' Committee (if one is formed) to investigate the Prepetition Senior Obligations and the Prepetition Senior Liens.

29.    **Release of Claims Against Prepetition Senior Agent and Prepetition Senior Lenders.**  The stipulations and admissions contained in Paragraph D(a) of this Order, shall be binding on all parties in interest, including, without limitation, the Creditors' Committee, unless, and solely to the extent that, (a) the Creditors' Committee, or another party in interest, to the extent each has obtained Court approved standing and requisite authority, and has timely filed a complaint and commenced an adversary proceeding (subject to the limitations set forth in paragraph 28 of this Order) challenging the amount, extent, validity, or enforceability of the Prepetition Senior Obligations, or the perfection or priority of the Prepetition Senior Liens, or otherwise asserting any claims or causes of action on behalf of the Debtors' estates against the Prepetition Senior Agent or the Prepetition Senior Lenders relating to the Prepetition Senior Obligations, in each case no later than the earlier of (x) sixty (60) days after the date of appointment of the Creditors' Committee or (y) seventy-five (75) days after the Petition Date (such earlier date, the "**Complaint Filing Deadline**"), and (b) this Court rules in favor of the plaintiff in any such timely and properly commenced adversary proceeding.  If no such adversary proceeding is timely and properly commenced by the Complaint Filing Deadline, or to the extent such adversary proceeding does not result in a final and non-appealable order of this Court that is inconsistent with the acknowledgments of the Debtors contained in paragraph D(a) of this Order, then, without the requirement or need to file any proof of claim with respect thereto and without further notice, motion or application to, order of, or hearing before, this Court, but in all cases subject paragraph 27 of this Order, the acknowledgments of the Debtors contained in paragraph

-36-

D(a) of this Order with respect to the Prepetition Senior Agent, Prepetition Senior Lenders, Prepetition Senior Loan Documents, Prepetition Senior Liens, Prepetition Senior Obligations, and Prepetition Senior Collateral shall be binding, conclusive and final on the Creditors' Committee and any other Person, entity or party-in-interest in the Chapter 11 Cases and any Successor Case and (i) the claims, liens and security interests of the Prepetition Senior Agent and the Prepetition Senior Lenders shall be deemed to be finally allowed for all purposes in these Chapter 11 Cases and any Successor Case and shall not be subject to challenge by any party in interest as to validity, priority or otherwise, and (ii) the Debtors and their estates shall be deemed to have forever released any and all claims or causes of action against the Prepetition Senior Agent and the Prepetition Senior Lenders with respect to the Prepetition Senior Loan Documents, or any related transactions.  Notwithstanding anything to the contrary herein, if any such adversary proceeding is timely commenced, the stipulations contained in paragraph D(a) hereof shall nonetheless remain binding on all parties in interest and preclusive (as provided in the second sentence of this paragraph 29) except to the extent that such stipulations are expressly challenged in such adversary proceeding.

30.     No Marshaling.  The Postpetition Agent, the Prepetition Senior Agent, the Postpetition Lenders and the Prepetition Senior Lenders shall not be subject to the equitable doctrine of "marshaling", "election of remedies" or any other similar doctrine, or an "equities of the case" claim under section 552(b) of the Bankruptcy Code, in each case with respect to any of its respective interests in the Postpetition Collateral and Prepetition Senior Collateral.

31.     No Liability to Third Parties.  In making decisions to advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash Collateral, in approving any budget or in taking any actions permitted by this Order or the Postpetition Loan Documents, as applicable, the Postpetition Agent, the Prepetition Senior Agent, the Postpetition Lenders and the Prepetition Senior Lenders shall not (i) be deemed to be in control of the operations of any Debtor or to be acting as a "controlling person," "responsible person" or

-37-

"owner or operator" with respect to the operation or management of any Debtor, and/or (ii) owe any fiduciary duty to any Debtor, its respective creditors or its respective estate, and their relationship with each Debtor shall not constitute or be deemed to constitute a joint venture or partnership with such Debtor.

32.     <u>Insurance</u>.  To the extent that Wells Fargo, in its role as Prepetition Senior Agent, is listed as loss payee under the Debtors' insurance policies, Wells Fargo, in its role as Postpetition Agent, is also deemed to be the loss payee under the Debtors' insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies in accordance with the terms and conditions of this Order and the Postpetition Loan Documents.

33.     <u>Payments Held in Trust</u>.  Except as expressly permitted in this Order or the Postpetition Loan Documents, in the event that any person or entity receives any payment on account of a security interest in Collateral, receives any Collateral or any proceeds of Collateral or receives any other payment with respect thereto from any source prior to the indefeasible payment in full in cash of all Prepetition Senior Obligations and Postpetition Obligations, and termination of the Postpetition Facility in accordance with the Postpetition Loan Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in trust for the benefit of the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent, and Prepetition Senior Lenders and shall immediately turn over such proceeds to the Postpetition Agent for application to the Postpetition Obligations or the Prepetition Senior Agent for application to the Prepetition Senior Obligations, or as otherwise instructed by the Court, for application in accordance with the Postpetition Loan Documents and this Order.

34.     <u>Additional Defaults</u>.  In addition and without limitation of the Events of Default set forth in and defined in the Postpetition Loan Documents, this Order, or any Final Order, it shall be a default hereunder (and constitute an "**Event of Default**" under the

-38-

Postpetition Credit Agreement and this Order) if (a) an order is entered dismissing or converting any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or appointing a Chapter 11 trustee or an examiner with expanded powers, (b) a sale of substantially all assets is proposed by the Debtors without the written consent of the Postpetition Agent, Prepetition Senior Agent, Postpetition Lenders, and Prepetition Senior Lenders that would not indefeasibly pay the Prepetition Senior Obligations and Postpetition Obligations in full in cash, (c) any other motion is filed by the Debtors for any relief directly or indirectly affecting the Postpetition Collateral in a material manner unless all Prepetition Senior Obligations and Postpetition Obligations have been indefeasibly paid in final, in full, in cash, and completely satisfied upon consummation of the transaction contemplated thereby and such motion is otherwise approved of in writing by Postpetition Agent and Postpetition Lenders, (d) the Debtors fail to comply with any of the terms of, or its covenants under, this Order, the Approved Budget (subject to all applicable variances), or any stipulation or representation by the Debtors stated herein is false or misleading, or (e) at the option of the Postpetition Agent in its sole discretion, the occurrence of any Event of Default under the Postpetition Credit Agreement.   Any order for dismissal or conversion shall be automatically deemed to preserve the rights of the Postpetition Agent, Prepetition Senior Agent, Postpetition Lenders, and Prepetition Senior Lenders under this Order.  No order providing for the sale of substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code shall be entered by the Court unless, upon the closing of such transaction, all liens securing the Postpetition Obligations and Prepetition Senior Obligations (in their respective priority) are transferred to the proceeds of such sale and such proceeds or are applied to permanently and indefeasibly repay the Postpetition Obligations and Prepetition Senior Obligations, as applicable, in full, in cash.  If an order dismissing any of these Chapter 11 Cases under section 305 or 1112

-39-

of the Bankruptcy Code or otherwise is at any time entered, (i) the claims, security interests, liens and claims granted to or for the benefit of the Postpetition Agent, Postpetition Lenders, Prepetition Senior Agent, and Prepetition Senior Lenders pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order, as applicable, until all Postpetition Obligations and Prepetition Senior Obligations shall have been paid and satisfied in full (and that such claims and liens, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such claims and liens.

35.    <u>Proofs of Claim</u>.  None of the Prepetition Senior Agent, Prepetition Senior Lenders, Postpetition Agent, or Postpetition Lenders (or any affiliates thereof in connection with any Bank Product Obligations which constitute Postpetition Obligations hereunder) will be required to file proofs of claim or requests for approval of administrative expenses in any of the Chapter 11 Cases or any Successor Cases, and the provisions of this Order relating to the amount of the Prepetition Senior Obligations and the Postpetition Obligations shall constitute timely filed proofs of claim and/or administrative expense requests in each of the Chapter 11 Cases. Notwithstanding the foregoing, Prepetition Senior Agent shall be authorized (but not required) to file a master proof of claim against the Debtors (the "**<u>Master Proof of Claim</u>**") on behalf of itself and the Prepetition Senior Lenders on account of their prepetition claims arising under the Prepetition Senior Loan Documents, and the Prepetition Senior Agent shall not be required to file a verified statement pursuant to Bankruptcy Rule 2019.  If the Prepetition Senior Agent so files a Master Proof of Claim against the Debtors, the Prepetition Senior Agent (on its behalf and on behalf of each Prepetition Senior Lender), and each of its successors and assigns, shall be deemed to have filed a proof of claim in the aggregate amount set forth therein in each of the Chapter 11 Cases and any Successor Case, and the claims of the Prepetition Senior Agent and each Prepetition Senior Lender (and its successors and assigns) contained in the Master Proof of

-40-

Claim shall be allowed or disallowed as if each such entity had filed a separate proof of claim in each Chapter 11 Case in the aggregate amount set forth therein. The Prepetition Senior Agent shall further be authorized to amend its Master Proof of Claim from time to time to, among other things, reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from any transfer of such claims. The provisions set forth in this Paragraph and any Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors in interest, including, without limitation, the rights of the Prepetition Senior Agent and the Prepetition Senior Lenders as the holder of a claim against the Debtors under applicable law, and the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

36.     _Final Hearing; Procedure for Objections to and Entry of Final Order_.  The Motion is set for a Final Hearing before this Court at [___] [A.M./P.M.] Central time on September [__], 2017, at which time any party in interest may present any timely filed objections to the entry of the Final Order, which order shall be in form and substance acceptable to the Postpetition Agent in its sole discretion. The Debtors shall, in accordance with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules of this Court, promptly serve a notice of the Final Hearing and entry of this Order, together with a copy of this Order, by electronic mail, facsimile, hand delivery or overnight delivery to the Notice Parties and Creditors' Committee (once appointed) or its counsel. Such notice shall state that objections to the entry of the Final Order shall be in writing and shall be filed with the United States Bankruptcy Court for the District of Minnesota by no later than 4:00 P.M. (Prevailing Central time) on September [__], 2017 (the "**Objection Deadline**"), which objections shall be served so that the same are actually received by the Objection Deadline by: (i) Edwin H. Caldie, Esq., Stinson Leonard Street LLP, 50 South Sixth Street, Suite 2600, Minneapolis, MN 55402, fax 612-335-1657, ed.caldie@stinson.com (counsel to the Debtors), (ii) David B. Kurzweil, Esq. and John Dyer,

-41-

Esq., Greenberg Traurig, LLP, Terminus 200, 3333 Piedmont Road, N.E., Suite 2500, Atlanta, Georgia 30305, fax (678-553-2681 and 678-553-2236), Kurzweild@gtlaw.com and Dyerj@gtlaw.com (counsel to the Postpetition Agent & Prepetition Senior Agent); and (iii) [_____] (the office of the United States Trustee). Any objections by creditors or other parties-in-interest to any of the provisions of the Final Order shall be deemed forever waived and barred unless timely filed and served in accordance with this paragraph.

Dated: September ___, 2017.

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit C

**Approved Budget**

**Wynit Distribution**

Initial Approved Budget

*DIP Exhibit*

| Week | 1 | 2 | 3 | 3 Week |
|---|---|---|---|---|
| Week ending | 17-Sep | 24-Sep | 1-Oct | Total |
| TOTAL Collections | 2,205,424 | 2,205,424 | 2,205,424 | 6,616,271 |
| | | | | |
| Total Rent | - | - | 352,920 | 352,920 |
| Total Payroll and Benefits | 828,286 | - | 638,889 | 1,467,175 |
| Total Transportation | 5,000 | 5,000 | 5,000 | 15,000 |
| Total Professional Fees | - | - | - | - |
| Total Equipment Leases | - | - | - | - |
| Total IT Services | 136,823 | 33,603 | - | 170,426 |
| Total Warehouse Operating Costs | 144,000 | 26,000 | 23,500 | 193,500 |
| Total Interest and Bank Charges | 157,500 | 7,500 | 447,316 | 612,316 |
| Total Other Payments | 177,800 | 26,800 | 29,010 | 233,610 |
| TOTAL Disbursements | 1,449,408 | 98,903 | 1,496,635 | 3,044,947 |
| Net Cash Flow | 756,016 | 2,106,520 | 708,789 | 3,571,325 |
| | | | | |
| Beginning Debtor-in-Possession Loan | - | 1,449,408 | 1,548,311 | - |
| Less:  Collections after Paydown of Pre-Petition | - | - | - | |
| Add:  Disbursements | 1,449,408 | 98,903 | 1,496,635 | 3,044,947 |
| Ending Debtor-in-Possession Loan | 1,449,408 | 1,548,311 | 3,044,947 | 3,044,947 |

**Collateral Schedule**

| | 9/5/2017 | 9/10/2017 | 9/17/2017 | 9/24/2017 | 10/1/2017 |
|---|---|---|---|---|---|
| Cash | 582,080 | - | - | - | - |
| Accounts Receivable | 108,987,511 | 104,756,013 | 99,908,660 | 95,960,807 | 92,581,641 |
| Inventory | 64,889,078 | 66,513,853 | 68,970,846 | 70,591,306 | 71,632,886 |
| Other Receivables | 1,946,756 | 1,946,756 | 1,946,756 | 1,946,756 | 1,946,756 |
| Prepaid Assets | 4,366,560 | 4,308,980 | 4,251,399 | 4,193,818 | 4,136,238 |
| | | | | | |
| TOTAL Assets | 180,771,986 | 177,525,602 | 175,077,662 | 172,692,687 | 170,297,522 |
| | | | | | |
| Wells Fargo LOC | 76,885,076 | 76,625,227 | 75,869,211 | 73,762,690 | 73,053,902 |
| | | | | | |
| Wells Fargo Floor Finance | - | - | - | - | - |
| | - | | | | |
| Winthrop Resources | 3,983,484 | 3,983,484 | 3,983,484 | 3,983,484 | 3,983,484 |
| Dell Financial Services | 252,227 | 252,227 | 252,227 | 252,227 | 252,227 |
| Cisco Capital | 456,124 | 456,124 | 456,124 | 456,124 | 456,124 |
| | | | | | |
| Greenville Office Loan | 3,202,212 | 3,202,212 | 3,202,212 | 3,202,212 | 3,202,212 |
| | | | | | |
| Total Financial Obligations | 84,779,122 | 84,519,273 | 83,763,257 | 81,656,737 | 80,947,948 |
| | | | | | |
| Equity Cushion | 95,992,863 | 93,006,329 | 91,314,405 | 91,035,950 | 89,349,573 |

Wynit Distribution

**Professional Fee Exhibit**

| *Week* | *1* | *2* | *3* |
| --- | --- | --- | --- |
| Week ending | 17-Sep | 24-Sep | 1-Oct |

**ESTATE PROFESSIONALS**

Estate Professional Fees - Incurred

| | | | |
| --- | --- | --- | --- |
| Conway MacKenzie Retainer | - | - | - |
| Stinson Leonard Street - Retainer | - | - | - |
| Canadian Counsel - Retainer | - | - | - |
| Conway Mackenzie | 210,000 | 210,000 | 210,000 |
| Stinson Leonard Street | 150,000 | 150,000 | 150,000 |
| Canadian Counsel | 35,000 | 35,000 | 15,000 |
| UCC Counsel and FA | - | - | 7,000 |
| Total Estate Professional Fees - Incurred | 395,000 | 395,000 | 375,000 |

## Exhibit D

**Borrowing Base Certificate**

Summary Base Borrowing Base Certificate

| | |
|---|---|
| Date | 9/5/17 |
| Name | WYNIT DISTRIBUTION, LLC |

| | |
|---|---|
| A/R As of: | 9/4/17 |
| Inventory As of: | 9/4/17 |

The undersigned, **WYNIT Distribution, LLC** ("Administrative Borrower"), pursuant to that certain Credit Agreement dated as of **November 29, 2016** (as amended, restated, modified, supplemented, refinanced, renewed, or extended from time to time, the "Credit Agreement"), entered into among Administrative Borrower, the subsidiaries and affiliates of Administrative Borrower party thereto as "Borrowers" (such subsidiaries and affiliates, together with Administrative Borrower, each, a "Borrower" and, collectively, the "Borrowers"), the lenders signatory thereto from time to time and Wells Fargo Bank, N.A. as administrative agent for the lenders (in such capacity, together with its successors and assigns, if any, in such capacity, "Agent") hereby certifies to Agent that the following items, calculated in accordance with the terms and definitions set forth in the Credit Agreement for such items are true and correct, and that the Borrowers are in compliance with and, after giving effect to any currently requested Advances, will be in compliance with, the terms, conditions, and provisions of the Credit Agreement.

### Accounts Receivable

| | US (USD) | Canada (USD) | Consolidated |
|---|---|---|---|
| Accounts Receivable Balance per Aging Report Assigned To Wells Fargo Bank, N.A. | 70,690,094.59 | 10,400,656.98 | 81,090,751.57 |
| Less Ineligibles (detailed on page 2) | 22,270,541.53 | 5,504,673.20 | 27,775,214.73 |
| Eligible Accounts Receivable | 48,419,553.06 | 4,895,983.78 | 53,315,536.84 |
| Accounts Receivable Availability before Sublimit(s) | **42,812,598.04** | **4,388,616.69** | **47,201,214.73** |
| **Net Available Accounts Receivable after Sublimit(s)** | 42,812,598.04 | 4,388,616.69 | 47,201,214.73 |

### Inventory

| | US (USD) | Canada (USD) | Consolidated |
|---|---|---|---|
| Inventory Balance Assigned To Wells Fargo Bank, N.A. | 244,402,097.17 | 85,369,384.75 | 329,771,481.92 |
| Less Ineligibles (detailed on page 3) | 197,922,666.29 | 79,368,004.98 | 277,290,671.27 |
| Eligible Inventory | 46,479,430.88 | 6,001,379.77 | 52,480,810.65 |
| Inventory Availability before Sublimit(s) | **27,426,615.46** | **3,805,474.91** | **31,232,090.37** |
| **Available Inventory after Sublimit(s)** | 27,426,615.46 | 3,805,474.91 | 31,232,090.37 |

### Summary & Other Assets

| | | US (USD) | Canada (USD) | Consolidated |
|---|---|---|---|---|
| **Total Collateral Availability** | | 70,239,213.50 | 8,194,091.60 | 78,433,305.10 |
| **Credit Line** | | 250,000,000.00 | 40,000,000.00 | 250,000,000.00 |
| | *Suppressed Availability* | - | - | - |
| **Availability before Reserves** | | 70,239,213.50 | 8,194,091.60 | 78,433,305.10 |
| **Reserves** | | | | |
| WEPPA | | | 36,000.00 | 36,000.00 |
| Rent Reserve | | 194,000.00 | 173,000.00 | 367,000.00 |
| | | | | - |
| **Total Reserves Calculated after the Credit Line** | | 194,000.00 | 209,000.00 | 403,000.00 |
| **Total Availability after Reserves before Loan Balance and LCs** | | 70,045,213.50 | 7,985,091.60 | 78,030,305.10 |
| Letters of Credit Balance | As of: 9/5/17 | | | - |
| Loan Balance | As of: 9/5/17 | 78,751,526.95 | (871,361.57) | 77,880,165.38 |
| **Net Availability** | | **(8,706,313.45)** | **8,856,453.17** | **150,139.72** |

Additionally, the undersigned hereby certifies and represents and warrants to the Lender Group on behalf of the Borrowers and each other Loan Party that (i) as of the date hereof, each representation or warranty contained in or pursuant to any Loan Document, any agreement, instrument, certificate, document or other writing furnished at any time under or in connection with any Loan Document, and as of the effective date of any advance, continuation or conversion requested above is true and correct in all material respects (except to the extent any representation or warranty expressly related to an earlier date), (ii) each of the covenants and agreements contained in any Loan Document have been performed (to the extent required to be performed on or before the date hereof or each such effective date), (iii) no Default or Event of Default has occurred and is continuing on the date hereof, nor will any thereof occur after giving effect to the request above, and (iv) all of the foregoing is true and correct as of the effective date of the calculations set forth above and that such calculations have been made in accordance with the requirements of the Credit Agreement.

_____
Authorized Signer

**Accounts Receivable Availability Detail**

Name: WYNIT DISTRIBUTION, LLC     CAD to USD Exchange Rate: 0.8081

Report based on Aging dated: 9/4/17

| | | Loan ID #: WTLA0 | WTLA1 | - | - | | WTLB0 | WTLB1 |
|---|---|---|---|---|---|---|---|---|
| | | Division Name: US Insured | US Uninsured | Canada Insured (USD) | Canda Uninsured (USD) | **Total** | Canada Insured (CAD) | Canada Uninsured (CAD) |
| **Aging Spreads:** | | | | | | | | |
| | Post dated | - | - | - | - | - | | |
| | 0 - 30 DOI | 21,232,805.75 | 8,819,256.54 | 4,112,168.51 | 233,241.77 | 34,397,472.57 | 5,088,687.67 | 288,629.84 |
| | 31 - 60 DOI | 14,151,314.41 | 8,490,116.94 | 1,753,615.43 | 210,489.25 | 24,605,536.03 | 2,170,047.56 | 260,474.26 |
| | 61 - 90 DOI | 5,917,009.82 | 2,531,556.80 | 843,505.29 | 116,745.28 | 9,408,817.19 | 1,043,813.01 | 144,468.85 |
| | 91 - 120 DOI | 2,152,541.89 | 933,115.54 | 996,248.23 | 9,080.11 | 4,090,985.77 | 1,232,827.90 | 11,236.37 |
| | 121+ DOI | 6,079,442.91 | 382,933.99 | 2,096,097.86 | 29,465.25 | 8,587,940.01 | 2,593,859.50 | 36,462.38 |
| | | | | | | | | |
| **A/R Aging Balance:** | | **49,533,120.83** | **21,156,973.76** | **9,801,636.94** | **599,020.04** | **81,090,751.57** | **12,129,237.64** | **741,269.69** |
| Ineligibles: | | | | | | | | |
| ERS | Pre-Past Due | - | - | - | - | - | | |
| ERS | Past Due1- | - | - | - | - | - | | |
| ERS | Past Due2-121+DOI; 91+DPD | 6,121,388.11 | 382,751.23 | 2,096,098.81 | 29,464.30 | 8,629,702.45 | 2,593,860.67 | 36,461.21 |
| ERS | Past Due Credits | - | - | - | - | - | | |
| ERS | CrossAge | 983,301.53 | - | 509,378.49 | - | 1,492,680.02 | 630,340.91 | |
| ERS | Intercompany | - | - | - | - | - | | |
| ERS | Foreign | 256,150.68 | - | 15,353.02 | - | 271,503.70 | 18,998.91 | |
| ERS | Government | - | - | - | - | - | | |
| ERS | COD | 17,909.80 | - | - | - | 17,909.80 | | |
| ERS | Debit Memo | - | - | - | - | - | | |
| ERS | Employee Sales | - | - | - | - | - | | |
| ERS | Progress Billing | - | - | - | - | - | | |
| ERS | Extended Terms | - | - | - | - | - | | |
| ERS | Finance Charges | - | - | - | - | - | | |
| ERS | Guaranteed | - | - | - | - | - | | |
| ERS | Samples | - | - | - | - | - | | |
| ERS | Consignment Sales | - | - | - | - | - | | |
| ERS | Bill & Hold | - | - | - | - | - | | |
| ERS | Bankrupt/Doubtful | - | - | - | - | - | | |
| ERS | Shortpay | - | - | - | - | - | | |
| ERS | Other1-PostDated | - | - | - | - | - | | |
| ERS | Other2-Miscellaneous | - | - | - | - | - | | |
| ERS | Other3-Unapplied cash (suspense) | - | - | - | - | - | | |
| ERS | Other4-Customers without a name | - | - | - | - | - | | |
| ERS | Other5 | - | - | - | - | - | | |
| ERS | Contra | 1,739,327.62 | 40,781.50 | 2,913.50 | - | 1,783,022.62 | 3,605.37 | |
| ERS | Other6 | - | - | - | - | - | | |
| ERS | Other7-61-90 DPD > $1MM | 7,069.43 | 16,501.39 | 3,733.89 | 243.44 | 27,548.15 | 4,620.58 | 301.25 |
| ERS | Other8-Government $5MM | - | - | - | - | - | | |
| Manual | Pre-Billing | | 4,034.30 | | - | 4,034.30 | | |
| Manual | 10% of credits | 1,843,979.93 | 787,615.12 | 441,789.32 | 26,999.64 | 3,100,384.01 | 546,701.30 | 33,411.26 |
| Manual | Unapplied Cash | 123,069.13 | 123,069.13 | | | 246,138.26 | | |
| Manual | Reconciliation (AR>GL) | 38,962.58 | | | | 38,962.58 | | |
| Manual | Bill & Hold | | - | | | - | | |
| Manual | Reclass amounts in excess of policy limit* | - | - | - | - | - | | |
| Manual | Concentration Cap | | 1,893,938.07 | | | 1,893,938.07 | | |
| Manual | Reserve grossed up as Ineligible | | | | | - | - | |
| Manual | Reserve grossed up as Ineligible | | | | | - | - | |
| Manual | Reserve grossed up as Ineligible | | | | | - | - | |
| Manual | Dilution Ineligible (grossed up) | 5,282,403.22 | 2,608,288.75 | 2,191,760.43 | 186,938.36 | 10,269,390.76 | 2,712,239.11 | 231,330.73 |
| | | | | | | | | |
| **Total Ineligible A/R:** | | **16,413,562.03** | **5,856,979.50** | **5,261,027.46** | **243,645.74** | **27,775,214.73** | **6,510,366.85** | **301,504.45** |
| | | | | | | | | |
| Eligible A/R | | 33,119,558.80 | 15,299,994.26 | 4,540,609.48 | 355,374.30 | 53,315,536.84 | 5,618,870.79 | 439,765.24 |
| Advance Rate | | 90% | 85% | 90% | 85% | | 90% | 85% |
| **A/R Availability before Sublimit(s)** | | **29,807,602.92** | **13,004,995.12** | **4,086,548.54** | **302,068.15** | **47,201,214.73** | **5,056,983.71** | **373,800.45** |
| | | | | | | | | |
| **Line Limit or Sublimit(s)** | | | | | | | | |
| | | | | | | | | |
| **Net A/R Availability** | | **29,807,602.92** | **13,004,995.12** | **4,086,548.54** | **302,068.15** | **47,201,214.73** | **5,056,983.71** | **373,800.45** |
| | | | | | | | | |
| **Overall policy limit** | | 80,000,000.00 | | | | | | |

Page 2 - AR Detail

**AR CONCENTRATIONS**
**WYNIT DISTRIBUTION, LLC**          As of:     9/4/2017

Consolidated

| # | Customer Name Calc | % or $ Allowed of Eligible AR | % of Eligible | % of AR | Total | Post dated | 0 - 30 DOI | 31 - 60 DOI | 61 - 90 DOI | 91 - 120 DOI | 121+ DOI | Ineligibles Total | Eligible A/R | Conc Cap | Conc IE | % of Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BEST BUY | 20% | 23% | 19% | 15,463,036.32 | - | 6,130,774.25 | 4,302,838.58 | 3,850,440.72 | 897,429.37 | 281,553.40 | 473,325.11 | 14,989,711.21 | 13,095,773.14 | 1,893,938.07 | 12% |
| 2 | APPLE INC | 20% | 16% | 13% | 10,164,184.51 | - | 9,185,047.59 | 843,864.48 | 133,666.33 | - | 1,606.11 | 1,606.11 | 10,162,578.40 | 13,095,773.14 | - | 0% |
| 3 | AMAZON.COM | 15% | 2% | 4% | 3,358,753.49 | - | 1,426,866.99 | 1,666,301.00 | 33,542.76 | 3,622.29 | 228,420.45 | 2,005,864.48 | 1,352,889.01 | 9,821,829.85 | - | 0% |
| 4 | COSTCO WHOLESALE | 20% | 1% | 4% | 3,207,983.41 | - | 412,372.79 | 383,119.26 | 295,449.86 | 617,960.53 | 1,499,080.97 | 2,465,663.71 | 742,319.70 | 13,095,773.14 | - | 0% |
| 5 | B&H PHOTO | 15% | 5% | 4% | 3,180,178.33 | - | 937,584.79 | 2,154,031.56 | 30,544.38 | 393.18 | 57,624.42 | 58,165.68 | 3,122,012.65 | 9,821,829.85 | - | 0% |
| 6 | WALMART/SAMS CLUB | 35% | 3% | 3% | 2,598,907.13 | - | 1,563,979.18 | 203,934.26 | 25,748.71 | 86,951.28 | 718,293.70 | 835,436.54 | 1,763,470.59 | 22,917,602.99 | - | 0% |
| 7 | STAPLES | 15% | 3% | 3% | 2,227,527.20 | - | 1,491,745.76 | 420,897.09 | 173,857.26 | 52,828.54 | 88,198.55 | 95,571.06 | 2,131,956.14 | 9,821,829.85 | - | 0% |
| 8 | MAGNELL NEWEGG | 15% | 3% | 2% | 1,820,136.44 | - | 338,464.23 | 492,156.36 | 622,833.04 | 259,708.20 | 106,974.61 | 106,974.61 | 1,713,161.83 | 9,821,829.85 | - | 0% |
| 9 | MEIJER | 15% | 2% | 2% | 1,650,302.63 | - | 215,396.98 | 518,882.16 | 323,620.82 | 475,538.84 | 116,863.83 | 131,971.96 | 1,518,330.67 | 9,821,829.85 | - | 0% |
| 10 | BBY DAYMEN CORE | 15% | 2% | 2% | 1,609,496.35 | - | 539,401.37 | 651,526.43 | 401,594.48 | 16,974.07 | - | - | 1,609,496.35 | 9,821,829.85 | - | 0% |
|  | Total Analyzed |  | 60% | 56% | 45,280,505.81 | - | 22,241,633.93 | 11,637,551.18 | 5,891,298.36 | 2,411,406.30 | 3,098,616.04 | 6,174,579.26 | 39,105,926.55 |  | 1,893,938.07 |  |

| CONSOLIDATED TOTAL AR | 100% | 81,090,751.57 | - | 34,397,472.57 | 24,605,536.03 | 9,408,817.19 | 4,090,985.77 | 8,587,940.01 |
|---|---|---|---|---|---|---|---|---|

| Remaining AR | 44% | 35,810,245.76 | - | 12,155,838.64 | 12,967,984.85 | 3,517,518.83 | 1,679,579.47 | 5,489,323.97 |
|---|---|---|---|---|---|---|---|---|

| Ineligible AR Prior to Concentration Ineligible | 15,611,885.89 |
|---|---|

| Net Eligible AR Prior to Concentration Ineligible | 65,478,865.68 |
|---|---|

Concentration Caps or Limits per LSA:

| Names (Customer_Name_Calc) | % or Dollar Cap |
|---|---|
| WALMART/SAMS CLUB | 35% |
| APPLE INC | 20% |
| BEST BUY | 20% |
| COSTCO WHOLESALE | 20% |
| TARGET CORPORATION | 20% |
| All Others | 15% |

**AR Breakdown**

WYNIT DISTRIBUTION, LLC

| (USD) | Aging | | | | | WF | 10% of credits |
|---|---|---|---|---|---|---|---|
| division_calc | balance_calc | debits | unapplied cash | credits | net balance | | |
| US | 98,778,089.47 | 54,532,528.97 | (128,583.56) | -26,315,950.53 | 70,690,094.59 | | 2,631,595.05 |
| Canada | 10,076,172.80 | 4,363,405.40 | | -4,687,889.58 | 10,400,656.98 | | 468,788.96 |
| **Totals** | 108,854,262.27 | 58,895,934.37 | | -31,003,840.11 | 81,090,751.57 | | 3,100,384.01 |

| (USD) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| sub_type_calc | Count | Percent of Count | Percent of Field | Balance | Future | 0-30 Days | 31-60 Days | 61-90 Days | 91-120 Days | 121+ Days |
| CREDITS | 42,464 | 40.36% | -111.16% | -31,003,840.11 | 0 | -7,314,366.70 | -3,760,387.25 | -2,267,012.58 | -2,062,323.46 | -15,599,750.12 |
| DEBITS | 62,746 | 59.64% | 211.16% | 58,895,934.37 | 0 | 8,614,022.54 | 7,765,559.79 | 4,673,993.66 | 2,473,133.92 | 35,369,224.46 |
| **Totals** | 105,210 | 100% | 100% | 27,892,094.26 | 0 | 1,299,655.84 | 4,005,172.54 | 2,406,981.08 | 410,810.46 | 19,769,474.34 |

## AR DILUTION

**Per Field Exam**

|  | US Insured | US Uninsured | Canada Insured (USD) | Canda Uninsured (USD) |
|---|---|---|---|---|
| *Dilution Calculation Detail:* | | | | |
| *Allowed Dilution* | *5.0%* | *5.0%* | *5.0%* | *5.0%* |
| *Current Dilution (per Field Exam-Divisional Method)* | *17.38%* | *17.38%* | *34.30%* | *34.30%* |
| *Dilution Reserve %* | *12.4%* | *12.4%* | *29.3%* | *29.3%* |
| *Eligible Receivables* | *38,401,962.02* | *17,908,283.01* | *6,732,369.91* | *542,312.66* |
| *Dilution Ineligible* | *4,754,162.90* | *2,217,045.44* | *1,972,584.38* | *158,897.61* |
| *Dilution Ineligible (grossed up)* | *5,282,403.22* | *2,608,288.75* | *2,191,760.43* | *186,938.36* |
| Lookback period per Credit Agreement | 12 | 12 | 12 | 12 |
| Field exam cutoff date | 10/31/16 | 10/31/16 | 10/31/16 | 10/31/16 |

**Inventory Availability Detail**

Name: **WYNIT DISTRIBUTION, LLC**

Based on the Inventory Perpetual dated: 9/4/17

| | Loan ID #: WTLA6 | WTLA7 | WTLA8 | WTLA9 | DO NOT POST - | WTLB6 | WTLB7 | |
|---|---|---|---|---|---|---|---|---|
| Inventory Category: | Wynit - FGs | Wynit - Excess | Navarre - FGs | Navarre - Excess | Navarre Canada - FGs (USD) | Navarre Canada - Excess (USD) | Navarre Canada - FGs (CAD) | Navarre Canada - Excess (CAD) | Total (USD) |
| ERS Inventory Total: | 2,375,408.68 | | 242,026,688.49 | | 85,369,384.75 | | 105,642,104.63 | | 329,771,481.92 |
| Manual Inventory Total: | | | (9,384,962.18) | 9,384,962.18 | | | | | |
| **Total Gross Inventory:** | **2,375,408.68** | **-** | **232,641,726.31** | **9,384,962.18** | **85,369,384.75** | **-** | **105,642,104.63** | **-** | **329,771,481.92** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ERS Consigned Out | 83,364.71 | | 1,175,983.27 | | - | | - | | 1,259,347.98 |
| ERS Consigned In | - | | 179,523,278.76 | | 78,030,625.43 | | 96,560,605.66 | | 257,553,904.19 |
| ERS Returns | 2,292,043.07 | | 7,983,329.78 | | 1,335,923.95 | | 1,653,166.63 | | 11,611,296.80 |
| ERS RM Packaging/Supplies | - | | 321,848.85 | | - | | - | | 321,848.85 |
| ERS EPSON/Hewlett Packard | - | | 6,334,913.56 | | - | | - | | 6,334,913.56 |
| ERS Small locations | - | | | | | | | | |
| ERS Delisted Titles | - | | 116,820.47 | | 1,455.60 | | 1,801.26 | | 118,276.07 |
| ERS Cost Test | - | | | | | | | | |
| ERS Samples | - | | | | - | | - | | - |
| ERS Ineligible9 | - | | - | | - | | - | | - |
| ERS Ineligible10 | - | | - | | - | | - | | - |
| ERS Ineligible11 | - | | - | | - | | - | | - |
| ERS Ineligible12 | - | | - | | - | | - | | - |
| ERS Ineligible13 | - | | - | | - | | - | | - |
| ERS Ineligible14 | - | | - | | - | | - | | - |
| ERS Ineligible15 | - | | - | | - | | - | | - |
| Manual Opportunity Buy-in GL# 220192 | | | 91,083.82 | | | | | | 91,083.82 |
| Manual Returns Adjustment | | | | | | | | | - |
| Manual Manual3 | | | | | | | | | - |
| Manual Manual4 | | | | | | | | | - |
| Manual Manual5 | | | | | | | | | - |
| Manual Manual6 | | | | | | | | | - |
| Manual Manual7 | | | | | | | | | - |
| Manual Manual8 | | | | | | | | | - |
| Manual Manual9 | | | | | | | | | - |
| Manual Manual10 | | | | | | | | | - |
| Manual Manual11 | | | | | | | | | - |
| Manual Manual12 | | | | | | | | | - |
| Manual Reserve grossed up as Ineligible | | | | | | | | | - |
| Manual Reserve grossed up as Ineligible | | | | | | | | | - |
| Manual Reserve grossed up as Ineligible | | | | | | | | | - |
| Manual Appraisal Reserve (grossed up) | | | | | | | | | - |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Total Ineligible Inventory:** | 2,375,407.78 | - | 195,547,258.51 | - | 79,368,004.98 | - | 98,215,573.55 | - | 277,290,671.27 |
| Eligible Inventory | 0.90 | - | 37,094,467.80 | 9,384,962.18 | 6,001,379.77 | - | 7,426,531.08 | - | 52,480,810.65 |
| Advance Rate | 62.14% | 52.36% | 64.69% | 36.55% | 63.41% | 0.00% | 63.41% | 0.00% | 59.51% |
| **Availability before Sublimit** | 0.56 | - | 23,996,411.22 | 3,430,203.68 | 3,805,474.91 | - | 4,709,163.36 | - | 31,232,090.37 |
| Sublimits | | | | 6,000,000.00 | | | | | |
| **Net Inventory Availability** | **0.56** | **-** | **23,996,411.22** | **3,430,203.68** | **3,805,474.91** | **-** | **4,709,163.36** | **-** | **31,232,090.37** |

**Appraisal Review**

As of: 5/31/17

| | Wynit - FGs | Wynit - Excess | Navarre - FGs | Navarre - Excess | Navarre Canada - FGs (USD) | Navarre Canada - Excess (USD) | Navarre Canada - FGs (CAD) | Navarre Canada - Excess (CAD) | Totals |
|---|---|---|---|---|---|---|---|---|---|
| **Eligible Inventory per Appraisal** | 0.90 | - | 37,094,467.80 | 9,384,962.18 | 6,001,379.77 | - | 7,426,531.08 | - | |
| **Appraised NOLV %** | 73.10% | 61.60% | 76.10% | 43.00% | 74.60% | 0.00% | 74.60% | 0.00% | |
| **% times the NOLV** | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | |
| **% of NOLV** | 62.14% | 52.36% | 64.69% | 36.55% | 63.41% | 0.00% | 63.41% | 0.00% | |
| **Appraised Value** | 0.56 | - | 23,996,411.22 | 3,430,203.68 | 3,805,474.91 | - | 4,709,163.36 | - | 31,232,090.37 |
| **Appraisal Reserve** | | | | | | | | | |
| **Appraisal Ineligible (grossed up)** | - | - | - | - | - | - | - | - | |

**Accounts Receivable Comparison**

Name: WYNIT DISTRIBUTION, LLC

| Report based on Aging dated: | | 9/4/17 | 8/31/2017 | Change | % Change | Comments |
|---|---|---|---|---|---|---|
| **Aging Spreads:** | | | | | | |
| | Post dated | - | - | | 0.0% | |
| | 0 - 30 DOI | 34,397,472.57 | 38,116,718.86 | (3,719,246.29) | -9.8% | |
| | 31 - 60 DOI | 24,605,536.03 | 20,800,400.63 | 3,805,135.40 | 18.3% | |
| | 61 - 90 DOI | 9,408,817.19 | 8,869,422.66 | 539,394.53 | 6.1% | |
| | 91 - 120 DOI | 4,090,985.77 | 3,696,190.36 | 394,795.41 | 10.7% | |
| | 121+ DOI | 8,587,940.01 | 8,239,388.02 | 348,551.99 | 4.2% | |
| | | | | | | |
| **A/R Aging Balance:** | | 81,090,751.57 | 79,722,120.53 | 1,368,631.04 | 1.7% | |
| Ineligibles: | | | | | | |
| ERS | Pre-Past Due | - | - | | 0.0% | |
| ERS | Past Due1- | - | - | | 0.0% | |
| ERS | Past Due2-121+DOI; 91+DPD | 8,629,702.45 | 8,280,796.98 | 348,905.47 | 4.2% | |
| ERS | Past Due Credits | - | - | | 0.0% | |
| ERS | CrossAge | 1,492,680.02 | 1,593,337.95 | (100,657.93) | -6.3% | |
| ERS | Intercompany | - | - | | 0.0% | |
| ERS | Foreign | 271,503.70 | 275,870.97 | (4,367.27) | -1.6% | |
| ERS | Government | - | - | | 0.0% | |
| ERS | COD | 17,909.80 | 17,909.80 | - | 0.0% | |
| ERS | Debit Memo | - | - | - | 0.0% | |
| ERS | Employee Sales | - | - | - | 0.0% | |
| ERS | Progress Billing | - | - | - | 0.0% | |
| ERS | Extended Terms | - | - | - | 0.0% | |
| ERS | Finance Charges | - | - | - | 0.0% | |
| ERS | Guaranteed | - | - | - | 0.0% | |
| ERS | Samples | - | - | - | 0.0% | |
| ERS | Consignment Sales | - | - | - | 0.0% | |
| ERS | Bill & Hold | - | - | - | 0.0% | |
| ERS | Bankrupt/Doubtful | - | - | - | 0.0% | |
| ERS | Shortpay | - | - | - | 0.0% | |
| ERS | Other1-PostDated | - | - | - | 0.0% | |
| ERS | Other2-Miscellaneous | - | - | - | 0.0% | |
| ERS | Other3-Unapplied cash (suspense) | - | - | - | 0.0% | |
| ERS | Other4-Customers without a name | - | - | - | 0.0% | |
| ERS | Other5 | - | - | - | 0.0% | |
| ERS | Contra | 1,783,022.62 | 1,783,022.62 | - | 0.0% | |
| ERS | Other6 | - | - | - | 0.0% | |
| ERS | Other7-61-90 DPD > $1MM | 27,548.15 | - | 27,548.15 | N/A | |
| ERS | Other8-Government $5MM | - | - | - | 0.0% | |
| Manual | Pre-Billing | 4,034.30 | 622,496.21 | (618,461.90) | -99.4% | |
| Manual | 10% of credits | 3,100,384.01 | 3,090,567.82 | 9,816.19 | 0.3% | |
| Manual | Unapplied Cash | 246,138.26 | 263,107.78 | (16,969.52) | -6.4% | |
| Manual | Reconciliation (AR>GL) | 38,962.58 | 38,962.58 | - | 0.0% | |
| Manual | Bill & Hold | - | - | | 0.0% | |
| Manual | Manual6 | - | - | | 0.0% | |
| Manual | Reclass amounts in excess of policy limit* | - | - | | 0.0% | |
| Manual | Concentration Cap | 1,893,938.07 | 2,337,521.55 | (443,583.48) | -19.0% | Continues with BEST BUY. |
| Manual | Reserve grossed up as Ineligible | - | - | | 0.0% | |
| Manual | Reserve grossed up as Ineligible | - | - | | 0.0% | |
| Manual | Reserve grossed up as Ineligible | - | - | | 0.0% | |
| Manual | Dilution Ineligible (grossed up) | 10,269,390.76 | 9,794,955.64 | 474,435.12 | 4.8% | |
| | | | | | | |
| **Total Ineligible A/R:** | | 27,775,214.73 | 28,098,549.90 | (323,335.17) | -1.2% | |
| | | | | | | |
| Eligible A/R | | 53,315,536.84 | 51,623,570.63 | 1,691,966.21 | 3.3% | |
| | | | | | | |
| **A/R Availability before Sublimit(s)** | | 47,201,214.73 | 46,461,213.57 | 740,001.16 | 1.6% | |
| | | | | | | |
| **Line Limit or Sublimit(s)** | | - | - | | | |
| | | | | | | |
| Net A/R Availability | | 47,201,214.73 | 46,461,213.57 | 740,001.16 | 1.6% | |

## Inventory Comparison

Name: **WYNIT DISTRIBUTION, LLC**

| Based on the Inventory Perpetual dated: | 9/4/17 | 8/31/2017 | Change | % Change | Comments |
|---|---|---|---|---|---|
| ERS Inventory Total: | 329,771,481.92 | 334,734,639.15 | (4,963,157.23) | -1.5% | |
| Manual Inventory Total: | - | - | - | 0.0% | |
| Total Gross Inventory: | 329,771,481.92 | 334,734,639.15 | (4,963,157.23) | -1.5% | |
| ERS Consigned Out | 1,259,347.98 | 1,259,347.98 | - | 0.0% | |
| ERS Consigned In | 257,553,904.19 | 256,818,404.92 | 735,499.27 | 0.3% | |
| ERS Returns | 11,611,296.80 | 11,596,216.86 | 15,079.94 | 0.1% | |
| ERS RM Packaging/Supplies | 321,848.85 | 321,848.85 | - | 0.0% | |
| ERS EPSON/Hewlett Packard | 6,334,913.56 | 10,536,740.64 | (4,201,827.08) | -39.9% | |
| ERS Small locations | - | - | - | 0.0% | |
| ERS Delisted Titles | 118,276.07 | 118,258.20 | 17.87 | 0.0% | |
| ERS Cost Test | - | - | - | 0.0% | |
| ERS Samples | - | - | - | 0.0% | |
| ERS Ineligible9 | - | - | - | 0.0% | |
| ERS Ineligible10 | - | - | - | 0.0% | |
| ERS Ineligible11 | - | - | - | 0.0% | |
| ERS Ineligible12 | - | - | - | 0.0% | |
| ERS Ineligible13 | - | - | - | 0.0% | |
| ERS Ineligible14 | - | - | - | 0.0% | |
| ERS Ineligible15 | - | - | - | 0.0% | |
| Manual Opportunity Buy-in GL# 220192 | 91,083.82 | 91,083.82 | - | 0.0% | |
| Manual Returns Adjustment | - | - | - | 0.0% | |
| Manual Manual3 | - | - | - | 0.0% | |
| Manual Manual4 | - | - | - | 0.0% | |
| Manual Manual5 | - | - | - | 0.0% | |
| Manual Manual6 | - | - | - | 0.0% | |
| Manual Manual7 | - | - | - | 0.0% | |
| Manual Manual8 | - | - | - | 0.0% | |
| Manual Manual9 | - | - | - | 0.0% | |
| Manual Manual10 | - | - | - | 0.0% | |
| Manual Manual11 | - | - | - | 0.0% | |
| Manual Manual12 | - | - | - | 0.0% | |
| Manual Reserve grossed up as Ineligible | - | - | - | 0.0% | |
| Manual Reserve grossed up as Ineligible | - | - | - | 0.0% | |
| Manual Reserve grossed up as Ineligible | - | - | - | 0.0% | |
| Manual Appraisal Reserve (grossed up) | - | - | - | 0.0% | |
| **Total Ineligible Inventory:** | 277,290,671.27 | 280,741,901.27 | (3,451,230.00) | -1.2% | |
| Eligible Inventory | 52,480,810.65 | 53,992,737.88 | (1,511,927.23) | -2.8% | |
| **Availability before Sublimit** | 31,232,090.37 | 34,324,030.78 | (3,091,940.41) | -9.0% | |
| **Sublimits** | - | - | | | |
| **Net Inventory Availability** | 31,232,090.37 | 34,324,030.78 | (3,091,940.41) | -9.0% | |

**Consolidated AR Past Due Analysis (per Credit Agreement)**

**WYNIT DISTRIBUTION, LLC**

As of: 9/4/17

Currency: USD

| # | Customer Name Calc | % of Total PD | Total Balance | Post dated | 0 - 30 DOI | 31 - 60 DOI | 61 - 90 DOI | 91-120 DOI | 121+ DOI | Total Past Due | Total ERS Ineligible |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | COSTCO WHOLESALE | 17% | 3,207,983.41 | - | 412,372.79 | 383,119.26 | 295,449.86 | 617,960.53 | 1,499,080.97 | 1,499,080.97 | 2,465,663.71 |
| 2 | WALMART/SAMS CLUB | 9% | 2,598,907.13 | - | 1,563,979.18 | 203,934.26 | 25,748.71 | 86,951.28 | 718,293.70 | 752,039.49 | 835,436.54 |
| 3 | BJS WHOLESALE CLUB | 6% | 825,766.11 | - | 53,270.48 | 32,577.19 | 191,845.89 | 53,560.23 | 494,512.32 | 494,512.32 | 825,766.11 |
| 4 | NORDSTROM INC | 5% | 745,658.93 | - | 20,420.09 | 243,410.71 | 33,452.57 | 1,088.70 | 447,286.86 | 447,286.86 | 745,658.93 |
| 5 | TARGET CORPORATION | 4% | 1,422,752.24 | - | 511,414.56 | 415,709.06 | 138,006.71 | 4,483.61 | 353,138.30 | 353,138.30 | 358,985.03 |
| 6 | BEST BUY | 3% | 15,463,036.32 | - | 6,130,774.25 | 4,302,838.58 | 3,850,440.72 | 897,429.37 | 281,553.40 | 281,553.40 | 473,325.11 |
| 7 | IT SUPPLIER INC | 3% | 229,329.00 | - | - | - | - | - | 229,329.00 | 229,329.00 | 229,329.00 |
| 8 | AMAZON.COM | 3% | 3,358,753.49 | - | 1,426,866.99 | 1,666,301.00 | 33,542.76 | 3,622.29 | 228,420.45 | 228,420.45 | 2,005,864.48 |
| 9 | FRYS ELECTRONICS | 2% | 1,425,820.57 | - | 499,556.97 | 551,962.66 | 180,390.61 | 7,329.33 | 186,581.00 | 186,581.00 | 190,650.88 |
| 10 | ABC DEALS INC | 2% | 178,300.00 | - | - | - | - | - | 178,300.00 | 178,300.00 | 178,300.00 |
| | Total Analyzed | 36% | 29,456,307.20 | - | 10,618,655.31 | 7,799,852.72 | 4,748,877.83 | 1,672,425.34 | 4,616,496.00 | 4,650,241.79 | 8,308,979.79 |
| | Remaining AR | 64% | 51,634,444.37 | - | 23,778,817.26 | 16,805,683.31 | 4,659,939.36 | 2,418,560.43 | 3,971,444.01 | 3,979,460.66 | 3,913,386.95 |
| | Total AR | 100% | 81,090,751.57 | - | 34,397,472.57 | 24,605,536.03 | 9,408,817.19 | 4,090,985.77 | 8,587,940.01 | 8,629,702.45 | 12,222,366.74 |

**Consolidated AP Analysis**

WYNIT DISTRIBUTION, LLC

Currency: __USD__

## AP Concentrations

| # | Vendor Name Calc | % of Total AP | Total as of 09/04/17 | Unvouchered | <31 DPD | 31-60 DPD | 61-90 DPD | 91-120 DPD | 121+ DPD | Total 61+DPD |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | FITBIT INC | 22% | 31,704,552.06 | 9,633,025.91 | 7,446,757.19 | 1,743,564.63 | 12,588,352.35 | 754,425.67 | (461,573.69) | 12,881,204.33 |
| 2 | DJI EUROPE BV | 7% | 10,467,072.38 | 11,735,544.77 | (1,797,546.99) | (1,758,882.56) | 2,001,777.10 | 12,362,631.56 | (12,076,451.50) | 2,287,957.16 |
| 3 | SYMANTEC | 6% | 9,523,679.53 | 1,451,810.40 | 741,339.10 | 1,167,032.47 | 1,160,298.15 | 1,592,161.81 | 3,411,037.60 | 6,163,497.56 |
| 4 | YUNEEC USA INC | 5% | 7,862,235.45 | 251.96 | 3,015,869.19 | 1,433,735.92 | 1,079,533.90 | 1,679,749.37 | 653,095.11 | 3,412,378.38 |
| 5 | DAYMEN | 5% | 7,763,460.82 | 21,964,840.10 | (1,132,477.86) | (821,430.17) | (1,069,642.19) | (661,758.09) | (10,516,070.97) | (12,247,471.25) |
| 6 | CANON USA INC | 4% | 6,435,419.34 | 2,086,324.55 | 5,231,877.31 | (869,723.83) | (469.25) | (6,750.30) | (5,839.14) | (13,058.69) |
| 7 | MCAFEE INC | 2% | 3,119,749.75 | 148,640.43 | 692,352.52 | 988,783.39 | 296,857.38 | 225,390.47 | 767,725.56 | 1,289,973.41 |
| 8 | NUANCE COMMUNICATIONS INC | 2% | 3,088,787.84 | 4,995.93 | 1,313,403.25 | 407,587.81 | 143,825.07 | 303,969.76 | 915,006.02 | 1,362,800.85 |
| 9 | HID GLOBAL CORPORATION | 2% | 3,042,388.86 | 237,952.69 | 1,438,209.97 | 877,144.87 | 497,375.76 | (42.53) | (8,251.90) | 489,081.33 |
| 10 | ASIAN EXPRESS HOLDINGS LTD | 2% | 2,909,541.60 | 3.41 | (444,428.52) | (16,875.00) | 3,388,870.40 | - | (18,028.69) | 3,370,841.71 |
| | **Total Analyzed** | **59%** | 85,916,887.63 | 47,263,390.15 | 16,505,355.16 | 3,150,937.53 | 20,086,778.67 | 16,249,777.72 | (17,339,351.60) | 18,997,204.79 |
| | | | 100% | 55% | 19% | 4% | 23% | 19% | -20% | 22% |
| | **Total AP** | **100%** | 146,759,078.83 | 78,901,081.71 | 33,982,085.94 | 9,447,553.22 | 24,115,713.37 | 21,476,581.00 | (21,163,936.41) | 24,428,357.96 |
| | | | 100% | 54% | 23% | 6% | 16% | 15% | -14% | 17% |
| | **Remaining AP** | **41%** | 60,842,191.20 | 31,637,691.56 | 17,476,730.78 | 6,296,615.69 | 4,028,934.70 | 5,226,803.28 | (3,824,584.81) | 5,431,153.17 |
| | | | 100% | 52% | 29% | 10% | 7% | 9% | -6% | 9% |

## AP Analysis over 60 days from due date

| # | Vendor Name Calc | % of Total Past Due | Total Balance | Unvouchered | <31 DPD | 31-60 DPD | 61-90 DPD | 91-120 DPD | 121+ DPD | Total -61+DPD |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | FITBIT INC | 53% | 31,704,552.06 | 9,633,025.91 | 7,446,757.19 | 1,743,564.63 | 12,588,352.35 | 754,425.67 | (461,573.69) | 12,881,204.33 |
| 2 | SYMANTEC | 25% | 9,523,679.53 | 1,451,810.40 | 741,339.10 | 1,167,032.47 | 1,160,298.15 | 1,592,161.81 | 3,411,037.60 | 6,163,497.56 |
| 3 | YUNEEC USA INC | 14% | 7,862,235.45 | 251.96 | 3,015,869.19 | 1,433,735.92 | 1,079,533.90 | 1,679,749.37 | 653,095.11 | 3,412,378.38 |
| 4 | ASIAN EXPRESS HOLDINGS LTD | 14% | 2,909,541.60 | 3.41 | (444,428.52) | (16,875.00) | 3,388,870.40 | - | (18,028.69) | 3,370,841.71 |
| 5 | DJI EUROPE BV | 9% | 10,467,072.38 | 11,735,544.77 | (1,797,546.99) | (1,758,882.56) | 2,001,777.10 | 12,362,631.56 | (12,076,451.50) | 2,287,957.16 |
| 6 | AMAZON.COM | 6% | 1,728,637.60 | 14,026.92 | 70,277.83 | 249,074.99 | 720,330.15 | 430,917.79 | 244,009.92 | 1,395,257.86 |
| 7 | NUANCE COMMUNICATIONS INC | 6% | 3,088,787.84 | 4,995.93 | 1,313,403.25 | 407,587.81 | 143,825.07 | 303,969.76 | 915,006.02 | 1,362,800.85 |
| 8 | KASPERSKY LAB INC | 6% | 2,007,834.37 | 8,853.00 | 141,875.45 | 501,122.56 | 990,930.36 | 383,398.60 | (18,345.60) | 1,355,983.36 |
| 9 | MCAFEE INC | 5% | 3,119,749.75 | 148,640.43 | 692,352.52 | 988,783.39 | 296,857.38 | 225,390.47 | 767,725.56 | 1,289,973.41 |
| 10 | COREL CORPORATION | 4% | 996,141.97 | 12,615.74 | (85,019.22) | 162,814.18 | 439,439.67 | 229,060.79 | 237,230.81 | 905,731.27 |
| | **Total Analyzed** | **141%** | 73,408,232.55 | 23,009,768.47 | 11,094,879.80 | 4,877,958.39 | 22,810,214.53 | 17,961,705.82 | (6,346,294.46) | 34,425,625.89 |

## AP Unvouchered Aged

| Report | Count | Percent of Count | Percent of Field | balance_calc | 0-30 Days | 31-60 Days | 61-90 Days | 91-120 Days | 121+ Days |
|---|---|---|---|---|---|---|---|---|---|
| NAVARRE | 9,895 | 65.55% | 75.92% | 59,898,637.86 | 11,642,865.50 | 16,316,528.34 | 7,207,572.33 | 4,266,170.02 | 20,465,501.67 |
| WYNIT | 5,200 | 34.45% | 24.08% | 19,002,443.85 | 799,711.14 | 7,527,278.25 | 4,225,721.31 | 2,614,680.90 | 3,835,052.25 |
| **Totals** | 15,095 | 100% | 100% | 78,901,081.71 | 12,442,576.64 | 23,843,806.59 | 11,433,293.64 | 6,880,850.92 | 24,300,553.92 |

-

**Inventory by Location (Top 20)**
**WYNIT DISTRIBUTION, LLC**

| | Period | Activity date | Location_calc | Extended_value_calc |
|---|---|---|---|---|
| 1 | 201709 | 20170904 | Navarre - Consigned In USA | 197,517,845.41 |
| 2 | 201709 | 20170904 | Navarre - Consigned In Canada | 60,036,058.78 |
| 3 | 201709 | 20170904 | 4655 E. Shelby Drive - Memphis, TN 38118 | 36,114,133.93 |
| 4 | 201709 | 20170904 | 4550 Quality Drive - Memphis, TN 38118 | 25,493,397.69 |
| 5 | 201709 | 20170904 | 450 Export Blvd - Missisauga, Ontario, L5S 2A4 | 7,351,453.28 |
| 6 | 201709 | 20170904 | Navarre - Encore - Consigned Out | 1,888,243.73 |
| 7 | 201709 | 20170904 | 4670 Aircenter Circle - Reno, NV 89502 | 1,286,984.39 |
| 8 | 201709 | 20170904 | Wynit Consigned Out | 83,364.71 |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| | | | Subtotal top 20 | **329,771,481.92** |
| | | | All others | - |
| | | | Grand total inventory | **329,771,481.92** |

Top Inventory Locations

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| In re: | Joint Administration Pending |
| WYNIT DISTRIBUTION, LLC, *et al.*[1] <br>                         Debtors. | Case No. 17-17-42726 <br><br> Chapter 11 Cases |

---

**MEMORANDUM IN SUPPORT OF MOTION**
**FOR INTERIM AND FINAL ORDERS GRANTING (I) AN EXPEDITED HEARING, (II)**
**AUTHORITY TO (A) OBTAIN POSTPETITION FACILITY,  (B) USE CASH**
**COLLATERAL, AND (C) PROVIDE CERTAIN PROTECTIONS  TO PREPETITION**
**SENIOR LENDERS, AND**
**(III) RELATED RELIEF**

---

The above-captioned debtors (the "Debtors") submit this memorandum of law in support of the motion submitted herewith (the "Motion"), in accordance with Local Rule 9013-2(a).

## BACKGROUND

The supporting facts are set forth in the Declaration of Pete Richichi in Support of Chapter 11 Petitions and Initial Motions (the "**First Day Declaration**"). All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion or, if not defined therein, the Interim Order.

## LEGAL ANALYSIS

### I.      THE DEBTORS' REQUEST FOR EXPEDITED RELIEF SHOULD BE GRANTED

The Debtors request expedited relief on the Motion. Bankruptcy Rule 9006(c) and Local Rule 9006-1(e) provide that the Court may reduce the notice period for a Motion "for cause

---

[1] The Debtors in these chapter 11 cases are the following:  Wynit Distribution, LLC (Case No. 17-2726), WD Navarre Distribution, LLC (Case No. 17-42728), WD Encore Software, LLC(Case No. 17-42729), WD Navarre Digital Services, LLC (Case No. 17-32865), WD Navarre Holdings, LLC (Case No. 17-32864), Wynit Holdings, Inc. (Case No. 17-32866), WD Navarre Canada, ULC (Case No. 17-32867).

shown." Cause exists here to grant the Motion on an expedited basis. As described in the Motion, the liquidity to be provided under the Postpetition Facility is essential to the Debtors' continued operations and the success of the Debtors' efforts to maximize the value of the estates, and is needed on the most urgent basis possible. Without the proceeds of the Postpetition Facility, the Debtors will be unable to effectuate an orderly sale process to the prejudice to their creditors, their employees, and other stakeholders. Accordingly, expedited relief requested is necessary to avoid immediate and irreparable harm.

## II.    THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN THE POSTPETITION FACILITY UNDER SECTION 364 OF THE BANKRUPTCY CODE

The Debtors meet the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain Postpetition Facility and, in return, to grant superpriority administrative status and liens on its property. Specifically, section 364(c) of the Bankruptcy Code provides as follows:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien . . . .

11 U.S.C. § 364(c).

Further, section 364(d) of the Bankruptcy Code provides:

> (1)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

2

(A)     the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2)     In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit. *See, e.g.*, *In re Barbara K Enters., Inc.,* No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); *In re Farmland Indus., Inc.,* 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of post-petition financing requires, among other things, an exercise of "sound and reasonable business judgment").

Further, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the Postpetition Loan Documents, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.

For example, in *In re ION Media Networks, Inc.,* the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

Here, given all the facts and circumstances present in these cases, the Debtors have satisfied the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the Postpetition Facility. The Debtors exercised proper business judgment in securing the Postpetition Facility on terms that are fair and reasonable and the best available to them in the current market. Given the circumstances, the Debtors could not obtain credit on an unsecured or administrative expense basis, and the Debtors have provided the Prepetition Senior Lenders with adequate protection against any potential diminution in value of their interests. Moreover, the Prepetition Senior Agent and the Prepetition Senior Lenders have consented to both the terms of the Postpetition Facility and the adequate protection proposed in connection therewith. For all the reasons discussed further below, therefore, the Court should grant the Debtors' request to enter into the Postpetiton Financing pursuant to sections 364(c) and (d) of the Bankruptcy Code.

**(A)   The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the Postpetition Facility**

Based on the facts of these Cases, the Postpetition Facility represents a proper exercise of the Debtors' business judgment. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including decisions about whether and how to borrow money. *Grp. of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. R.R.,* 318 U.S. 523, 550 (1943); *In re Farmland Indus., Inc.,* 294 B.R. 855, 882 (Bankr. W.D. Mo. 2003) ("Business judgments should be left to the board room and not to this Court.") (quoting *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (Bankr. D. Colo. 1985)); *In re Lifeguard Indus., Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

In general, a bankruptcy court defers to a debtor's business judgment regarding the need for, and the proposed use of, funds, unless the debtor's decision improperly leverages the bankruptcy process or its purpose is not so much to benefit the estate as it is to benefit a party in interest. *See Ames Dep't Stores,* 115 B.R. at 40; *see also In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513-14 (footnote omitted).

To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.,* No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at

*272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs., Inc.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

Here, the Debtors have exercised sound business judgment in determining that the Postpetition Facility is appropriate. The Debtors are not able to operate solely on the use of cash collateral. The Debtors have analyzed whether they could finance their operations during the case using only cash collateral and have concluded that Postpetition Facility is necessary. The Debtors considered such factors as the uncertainty inherent in estimating the timing of receipts and disbursements and the need for continued periodic incremental liquidity. In consideration of these factors, the Debtors concluded that the risks associated with attempting to finance their operations with cash collateral outweighed the benefits and certainty provided by the use of Postpetiton Financing.  Given the need for financing, the Debtors' decision is therefore sound and reasonable under the circumstances.

Further, the Prepetition Senior Lenders have consented to the terms of the Postpetition Facility and their treatment thereunder on the terms set forth in the DIP Orders. Their consent to the financing and support for the process are important considerations when planning a successful chapter 11 case. Rather than engaging in a costly and distracting dispute with the Prepetition Senior Lenders regarding the use of cash collateral or a priming lien, the Debtors are free to concentrate on running a comprehensive sale process and maximizing the value of the estate.

The Postpetition Facility will send a strong signal to the Debtors' employees, vendors and other parties in interest regarding the viability of the Debtors' ability to continue to operate during the Sale Process. Accordingly, if approved, the Postpetition Facility will preserve and

enhance the value of the Debtors' estates and, as such, entry into the Postpetition Facility is a sound exercise of the Debtors' business judgment.

### (B)      The Debtors Meet the Conditions Necessary Under Section 364(c) to Obtain Postpetition Facility on a Senior Secured and Superpriority Basis

Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain Postpetition Facility on a secured or superpriority basis, or both, where the Court finds, after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] . . . ." 11 U.S.C. § 364(c).

Courts have articulated a three-part test to determine whether a debtor is entitled to obtain financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> (a)      the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative expense claim;
>
> (b)      the credit transaction is necessary to preserve the assets of the estate; and
>
> (c)      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *accord In re St. Mary Hosp.,* 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Grp., Inc., 71* **B.R. 544,** 549 (Bankr. E.D. Pa. 1987).

In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Says. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986); *accord In re Ames Dep't Stores, Inc.,* 115 B.R. at 37 (debtor must show that it has made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Grp., Inc., 71* B.R. at 549 (secured credit under section

364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.; see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.,* 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). This is true especially when time is of the essence. *In re Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). When few lenders are likely to be able and willing to extend the necessary credit, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Says. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores,* 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

Given the Debtors' urgent need for liquidity, the Debtors were unable to solicit any viable proposals that authorized financing on an unsecured or administrative expense basis. On the contrary, the Debtors' negotiations made clear that the Debtors' only viable option was to obtain financing from their existing senior secured lenders on the terms provided in the Postpetition Loan Documents. *See* First Day Declaration ¶¶ 35-37.

The Court should therefore authorize the Debtors to provide the Postpetition Agent, on behalf of the Postpetition Lenders, superpriority administrative expense status for any obligations arising under the Postpetition Credit Agreement as provided for in section 364(c)(1) of the Bankruptcy Code, subordinate only to the Carve-Out.

8

**(C)     The Debtors Should Be Authorized to Obtain Postpetition Facility Secured by Liens that are Senior to the Liens Securing the Prepetition Secured Debt**

In addition to authorizing financing under section 364(c) of the Bankruptcy Code, a court may also authorize a debtor to obtain postpetition credit secured by a lien that is senior in priority to existing liens on the encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected or consent is obtained. See 11 U.S.C. § 364(d)(1).

When determining whether to authorize a debtor to obtain credit secured by a lien that is senior or equal to a prepetition lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's businesses;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

See, e.g., *Ames Dep't Stores,* 115 B.R. at 37-39; *Bland v. Farmworker Creditors,* 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.,* 294 B.R. at 862-79; *Barbara K Enters.,* 2008 WL 2439649, at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed.).

The Postpetition Facility satisfies each of these factors. First, as described above, the Debtors were unable to obtain alternative Postpetition Facility. The ultimate agreement reflects

the most favorable terms on which the Debtors were able to obtain financing. The Debtors are not able to obtain financing on equal or better terms than the terms provided by the Postspetition Lenders, or any other source, without granting liens senior in priority to those securing the Prepetition Senior Obligations.

Second, the Debtors urgently need the funds to be provided under the Postpetition Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest. Absent the Postpetition Facility, the Debtors will be unable to operate and conduct a responsible sale process. Providing the Debtors with the liquidity necessary to preserve the value of their assets through the pendency of these Chapter 11 Cases is in the best interests of all stakeholders.

Third, the terms of the Postpetition Facility are reasonable and adequate to support the Debtors' necessary activities through the pendency of these Cases. The interest rates under the Postpetition Facility are fair and reflect current market terms for financings of the type proposed in the Postpetition Facility. Furthermore, the fees required under the Postpetition Credit Agreement are market rates in comparison to the fees in other recent retail cases.

Fourth, as described in greater detail above and in the First Day Declaration, the Debtors and the Postpetition Lenders negotiated the Postpetition Loan Documents in good faith and at arms'- length, and the Debtors' entry into the Postpetition Loan Documents is an exercise of their sound business judgment.

The Postpetition Facility is on the most favorable terms available to the Debtors under current market conditions and the Debtors' financial condition. In light of all these factors, the Debtors should be authorized to secure the Postpetition Facility with first priority senior priming liens.

### (D)        Interests of the Prepetition Senior Lenders Are Adequately Protected

The Postpetition Facility adequately protects the interests of the Prepetition Senior Lenders who are consenting to the Postpetition Facility on the terms set forth in the DIP Orders. First, the interests of the Prepetition Senior Lenders are protected because the Postpetition Facility provides that the Prepetition Senior Obligations will be paid first out of the proceeds of the Postpetition Collateral. Second, the DIP Orders provide for (i) the Adequate Protection Senior Liens (as defined in the DIP Orders) to secure the Prepetition Senior Obligations and Adequate Protection Senior Claims (as defined in the DIP Orders) with respect to the Prepetition Senior Obligations; and (ii) additional adequate protection in the form of payments of interest at the default rate, fees and expenses (including attorneys' fees and expenses), indemnities and other amounts with respect to the Prepetition Senior Obligations in accordance with the Prepetition Senior Loan Documents.

A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if' the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest or granting of replacement liens or administrative claims. *See, e.g.*, *In re Martin,* 761 F.2d 472, 474 (8th Cir. 1985) ("[S]uch matters 'are [to be] left to case-by-case interpretation and development.") (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 339, reprinted in 1978 U.S. Code Cong. & Ad. News 5963, 6295); *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.,* 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the

11

vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession. *See Martin,* 761 F.2d at 474; *In re Johnson,* 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (holding that secured creditor is not impaired and is not entitled to receive adequate protection payments where value of collateral does not decline); *495 Cent. Park,* 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light,* 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

Further, courts in this district and others have approved similar forms of adequate protection for prepetition secured creditors. *See, e.g., In re Duke and King Acquisition Corp.,* No. 10-38652 (GFK) (Bankr. D. Minn. Jan. 24, 2011) [ECF No. 138] (authorizing replacement liens to prepetition secured creditors for the use of cash collateral); *In re Otter Tail AG Enters., LLC,* 2009 Bankr. LEXIS 5352, at *10-11 (Bankr. D. Minn. Nov. 20, 2009) (granting, inter alia, adequate protection liens for the use of cash collateral); *In re Schwing Am., Inc.,* No. 0936760 (NCD) (Bankr. D. Minn. Oct. 2, 2009) [ECF No. 15] (granting replacement liens in connection with authorizing Postpetition Facility on an interim basis); *In re Polaroid Corp.,* No. 08-46617 (GFK) (Bankr. D. Minn. Jan. 27, 2009) [ECF No. 70] (authorizing replacement liens to prepetition secured creditors for the use of cash collateral); *In re Premium Protein Prods., LLC,* 2009 Bankr. LEXIS 5285, at *26-27 (Bankr. D. Neb. Nov. 18, 2009) (granting adequate protection liens and superpriority claims pursuant to 507(b) to prepetition lenders); *In re AMF*

*Bowling Worldwide, Inc.,* No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 12, 2012) (granting, inter alia, first and second lien adequate protection liens); *In re Patriot Coal Corp.,* No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012) [ECF No. 275] (granting, inter alia, DIP liens, adequate protection liens and superpriority claims to secure DIP obligations); *In re NewPage Corp.,* No. 11-12804 (KG) (Bankr. D. Del. Oct. 5, 2011).

Accordingly, the Court should find that the adequate protection provided to the Prepetition Senior Lenders is fair and reasonable, and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## III.   THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES IN CONNECTION WITH THE POSTPETITION FACILITY

As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the Postpetition Agent and the Postpetition Lenders in connection with the Postpetition Facility. Specifically, the Debtors will pay a 0.25% unused line fee and a 1.0% commitment fee. The fees the Debtors have agreed to pay to the Postpetition Agent and the Postpetition Lenders and other obligations under the Postpetition Credit Agreement represent the most favorable terms on which the Postpetition Lenders would agree to make the Postpetition Facility available. The fees are in line with market rates and other DIP credit facilities approved in recent retail cases. The Debtors considered the fees when determining in their sound business judgment that the Postpetition Loan Documents constituted the best terms on which the Debtors could obtain the Postpetition Facility necessary to continue their operations and prosecute these Chapter 11 Cases, and paying these fees in order to obtain the Postpetition Facility is in the best interests of the Debtors' estates and creditors and other parties in interest.

## IV.   THE SCOPE OF THE DIP CARVE-OUT IS APPROPRIATE

The Postpetition Facility subjects the security interests and administrative expense claims of the Postpetition Lenders to the Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their professionals in certain circumstances during an event of default under the terms of the debtor's Postpetition Facility. *See Ames,* 115 B.R. at 40. The Postpetition Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *Id.* at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these Cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and the Creditors' Committee notwithstanding the grant of superpriority claims and the Postpetition Liens and Adequate Protection Senior Liens.

Courts in this district and others routinely approve of carve-outs agreed to by the debtors and their Postpetition Facility lenders. *See, e.g.*, *In re Genmar Holdings, Inc.,* No. 09-43537 (Bankr. D. Minn. June 4, 2009) [ECF No. 23]; *In re US Fidelis, Inc.,* 2010 Bankr. LEXIS 5837, at *18 (Bankr. E.D. Mo. May 28, 2010); *In re Trilogy Dev. Co.,* 2009 Bankr. LEXIS 5178, at *18-19 (Bankr. W.D. Mo. July 14, 2009); *In re AMF Bowling Worldwide, Inc.,* No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re The Great Atl. & Pac. Tea Co.,* No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011).

**V.     THE POSTPETITION LENDERS AND PREPETITION SENIOR LENDERS SHOULD BE DEEMED TO HAVE ACTED IN GOOD FAITH UNDER SECTION 364(E)**

14

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

As explained in detail herein and in the First Day Declaration, the Postpetition Loan Documents and proposed DIP Orders are the result of the Debtors' reasonable and informed determination that the Postpetition Lenders offered the most favorable terms on which to obtain needed Postpetition Facility, and of arm's-length, good faith negotiations between the Debtors, the Postpetition Lenders, and the Prepetition Senior Lenders. The terms and conditions of the Postpetition Loan Documents are fair and reasonable, the adequate protection provided to the Prepetition Senior Lenders is fair and reasonable, and the proceeds of the Postpetition Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the Postpetition Loan Documents other than as described herein. Accordingly, the Court should find that the Postpetition Lenders and Prepetition Senior Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## VI.    MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED FOR THE POSTPETITION LENDERS AND POSTPETITION AGENT

The Postpetition Loan Documents contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the Postpetition Agent to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the Postpetition Credit Agreement, and to take various other actions without further order of or application to the Court, subject to the a notice period as to certain remedies as provided in the DIP Orders (such period, the "**Remedies Notice Period**"). The Remedies Notice Period provides the Debtors three business days to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred,

Stay modification provisions of this sort are ordinary features of Postpetition Facility and, in the Debtors' business judgment, are reasonable under the circumstances. *See, e.g., In re Premium Protein Prods., LLC,* 2009 Bankr. LEXIS 5285, at *31-32 (Bankr. D. Neb. Nov. 18, 2009); *In re Trilogy Dev. Co.,* 2009 Bankr. LEXIS 5178, at *19 (Bankr. W.D. Mo. July 14, 2009); *In re AMF Bowling Worldwide, Inc.,* No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re Patriot Coal Corp.,* No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012); *In re Eastman Kodak Co.,* No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012); *In re Roomstore, Inc.,* No. 11-37790 (KLP) (Bankr. E.D. Va. Jan. 5, 2012); *In re The Great Atl. & Pac. Tea Co.,* No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Canal Corp. f/k/a Chesapeake Corp.,* No. 0836642 (DOT) (Bankr. E.D. Va. Feb. 3, 2009); *In re Circuit City Stores, Inc.,* No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008).

## VII.    THE DEBTORS REQUIRE IMMEDIATE ACCESS TO THE POSTPETITION FACILITY

The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate

and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores,* 115 B.R. at 36.

The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $2,500,000 under the Postpetition Facility, is not granted promptly after the Petition Date. Further, the Debtors anticipate that the commencement of these Chapter 11 Cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these Chapter 11 Cases and addressing key constituents' concerns regarding the Debtors' ability to preserve the value of their assets in light of these Chapter 11 Cases. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their businesses to preserve the value of their assets, meet payroll, procure any necessary goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the value of the Debtors' assets for the benefit of all parties in interest.

The importance of a debtor's ability to secure Postpetition Facility to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district and others in similar circumstances. *See, e.g.*, *In re Genmar Holdings, Inc.,* No. 09-43537 (Bankr. D. Minn. June 4, 2009) [ECF No. 23] (approving DIP loan with granting of senior lien); *In re US Fidelis, Inc.,* 2010 Bankr. LEXIS 5837, at *10 (Bankr. E.D. Mo. May 28, 2010) (authorizing secured Postpetition Facility on a superpriority basis); *In re Premium Protein Prods., LLC,* 2009 Bankr. LEXIS 5285, at *6-9 (Bankr. D. Neb. Nov. 18, 2009) (authorizing debtor to incur postpetition

secured indebtedness on an interim basis); *In re Trilogy Dev. Co.,* 2009 Bankr. LEXIS 5178, at *7 (Bankr. W.D. Mo. July 14, 2009) (authorizing postpetition secured financing with superpriority DIP liens priming prepetition secured construction loan); *In re Va. United Methodist Homes of Williamsburg, Inc.,* No. 13-31098 (KRH) (Bankr. E.D. Va. Mar. 6, 2013) (approving Postpetition Facility on an interim basis); *In re AMF Bowling Worldwide, Inc.,* No. 12-36495 (KRH) (Bankr. E.D. Va. Nov. 14, 2012) (same); *In re Patriot Coal Corp.,* No. 12-12900 (ALG) (Bankr. S.D.N.Y. July 11, 2012); *In re Eastman Kodak Co.,* No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012) (same); *In re Roomstore, Inc.,* No. 11-37790 (KLP) (Bankr. E.D. Va. Dec. 14, 2011) (same); *In re Bear Island Paper Co., L.L.C.,* No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010) (same); *In re Lyondell Chem. Co.,* No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (same). Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## **CONCLUSION**

For the foregoing reasons, the Debtors respectfully request that the Court grant the relief requested in the Motion.

18

Dated:  September 8, 2017

*e/Robert T. Kugler*

Robert T. Kugler (#0194116)
Edwin H. Caldie (#0388930)
Phillip J. Ashfield (#0388990)
Andrew J. Glasnovich (#0398366)
**STINSON LEONARD STREET LLP**
150 South Fifth Street Suite 2300, Minneapolis,
MN 55402
Telephone:  612.335.1500
Facsimile:  612.335.1657

**PROPOSED COUNSEL FOR THE
DEBTORS**