# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:<br><br>WYNIT DISTRIBUTION, LLC, *et al.*<br><br>Debtors. | Jointly Administered<br>Case No. 17-42726<br>Chapter 11 Cases<br>Hon. Kathleen H. Sanberg |

## LIMITED OBJECTION, RESERVATION OF RIGHTS, REQUEST FOR ADEQUATE PROTECTION, AND JOINDER, OF SAGE SOFTWARE, INC. AND SAGE SOFTWARE CANADA LTD. TO THE NOTICE OF HEARING AND MOTION FOR INTERIM AND FINAL ORDERS GRANTING (I) AN EXPEDITED HEARING, (II) AUTHORITY TO (A) OBTAIN POSTPETITION FACILITY, (B) USE CASH COLLATERAL, AND (C) PROVIDE CERTAIN PROTECTIONS TO PREPETITION SENIOR LENDERS, AND (III) RELATED RELIEF [DOCKET NO. 56]

Sage Software, Inc. ("Sage U.S.") and Sage Software Canada Ltd. ("Sage Canada" both collectively "Sage") submit this limited objection pursuant to Paragraph 38 of the Court's Interim Order (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection to Prepetition Senior Lenders and Certain other Prepetition Secured Creditors pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, and (IV) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001 [Docket No. 56] (the "Interim Order").

Sage requests adequate protection for Sage's own interests in certain goods and proceeds in any final order authorizing post-petition secured financing, use of cash collateral, and granting adequate protection to lenders and other secured creditors ("Final Order").

## **JOINDER**

Sage, a similarly situated party, joins in the Limited Objections previously filed by Vidbox, Inc. [Docket No. 46], Quicken, Inc. [Docket No. 49] and McAfee, Inc. [Docket No. 50] except as

inconsistent with this filing.

## OBJECTION AND REQUEST FOR ADEQUATE PROTECTION

Sage is the owner of goods consigned to Best Buy Canada Ltd. ("Best Buy") and Staples

Canada Inc. ("Staples") for sale to retail customers pursuant to agreements between and among

Sage, the Debtors Wynit Distribution, LLC and WD Navarre Canada ULC, Best Buy, and Staples.

Sage is also the owner of the proceeds of consigned goods that Best Buy and Staples have sold to

their respective retail customers and not remitted to Sage. Sage respectfully submits any Final

Order must provide adequate protection for Sage's rights in the goods and proceeds.

## RELEVANT BACKGROUND

1.      Sage is a supplier of accounting software. Sage has offices in many countries and

is headquartered in the United Kingdom.

2.      The Debtors distribute consumer electronics and accessories, photography and

video equipment, specialty printing products and emerging technology products. The Debtors

effectively serve a "middle man" function, providing for the distribution of consumer electronics

and software products, such as the products developed by Sage.

3.      On August 4, 2011, Sage Canada entered into a Distribution Agreement Computer

Software Terms with Navarre Distribution Services ULC (the "Distribution Agreement"), as

amended by the Canadian Consignment Rider to Software Distribution Agreement dated June 6,

2012 (the "Canadian Consignment Rider").

4.      The Distribution Agreement provided for the distribution of Sage computer

software products by Navarre Distribution Services ULC in Canada. Under the terms of the

Canadian Consignment Rider, Sage consigned product to Staples and Best Buy in Canada for these

retailers to sell to their retail customers, and Sage retained all right, title and interest in and to the

2

consigned product until Staples of Best Buy sold the product to a retail customer. *See* Affidavit of Richard Hardy ("Hardy Aff."), Ex. A (Distribution Agreement and Canadian Consignment Rider).

5.      The Distribution Agreement was subsequently amended by way of Amendment #1 (the "Amendment") on or about April 1, 2016. The Amendment provided for an amendment to the Distribution Agreement to substitute Wynit Distribution, LLC and WD Navarre Canada, ULC, both of which are Debtors, for Navarre Distribution Services ULC. Hardy Aff., Ex. B (Amendment).

6.      The Amendment attaches thereto a copy of the Staples Addendum (the "Addendum") to the Canadian Consignment Rider between WD Navarre Canada, ULC and Sage Canada. The Addendum provides that, "Supplier, by its signature below, agrees to have its Products distributed and sold to Staples through consignment by Navarre Canada and therefore agrees to the terms and conditions in the Staples Canada Addendum . . . ." The Addendum goes on to provide for certain particulars regarding the consignment program, including the sales reporting period and the return of consigned products.

7.      Currently, the products that are the subject of the Distribution Agreement include the Sage 50 software, which product was provided by the Chapter 11 Debtors, through consignment arrangements, to Staples and Best Buy.

8.      On September 6, 2017, Celeste Helms, Regional Legal Director with Sage delivered a letter (the "First Sage Letter") to Tom Chase, General Counsel for Wynit Distribution, LLC, advising that Wynit Distribution, LLC and WD Navarre Canada, ULC (collectively, "Wynit") were in material breach of the Distribution Agreement, as amended, as a result of the payment obligations provided for therein and advised that the past due balance as at September 6,

3

2017 was CAD $1,079,088.59 (the "Past Due Amounts"). In the First Sage Letter, Wynit was further requested to secure, destroy and dispose of any Sage products and inventory remaining in its possession, in lieu of returning same to Sage. Further, the First Sage Letter advised as follows:

> Wynit's failure to timely provide the requested assurance of performance shall be considered by Sage to be a repudiation of the Agreement and, in such instance, Sage reserves the right to exercise all of its rights and remedies under the Agreement and at law and/or in equity. Sage further advises Wynit that for the purpose of minimizing its potential losses, which threaten to be considerable, Sage is entering into a new consignment arrangement with a third-party distributor regarding the unsold inventory currently in the retailer's possession; Wynit is reminded that under the Agreement Sage remains fully vested in all right, title and interest in and to the unsold inventory.

Hardy Aff., Ex. C (First Sage Letter.)

9.      On September 6, 2017, Sage delivered a further letter (the "Second Sage Letter") to Pete Richichi, Chief Operating Officer of Wynit Distribution, LLC and Mr. Chase in respect of the program transfer of the Sage 50 inventory held by Staples and Best Buy (collectively, the "Retailers") in Canada.

10.     In the Second Sage Letter, the Debtors were advised as follows, with respect to the transfer of the Sage 50 inventory:

> In view of WYNIT's announced closure of its North American distribution business, please be advised that Sage Software Canada, Ltd. ("Sage") is transferring the current unsold inventory (the "Transferred Inventory") of Sage's boxed Sage 50 (2017) software product held by the Retailers that was originally ordered and shipped through WYNIT Distribution, L.L.C. ("WYNIT US") and WD Navarre Canada, ULC ("Navarre") (WYNIT and Navarre, collectively and interchangeably, "WYNIT") for in-store retail and website sales by the Retailers. The transfer is to Synnex Corporation's Canadian distribution business. The Transferred Inventory will remain in the Retailers' possession until sold by them

4

> or otherwise disposed of in accordance with Sage's and the
> Retailers' separate arrangements with Synnex.

Hardy Aff., Ex. D (Second Sage Letter.)

11.     In connection with the transfer of the distribution of the Sage products to a third

party distributor on account of the fact that the Debtors had ceased the distribution business, Roger

Jaipargas, a Partner at Borden Ladner Gervais LLP ("BLG"), the lawyers for Sage, delivered an

email to Mario Forte at Goldman Sloan Nash & Haber LLP, the lawyers for the WD Navarre

Canada, ULC and Wynit Distribution, LLC on September 17, 2017 (the "BLG Email") advising

of Sage's intent to take steps to immediately engage a new distributor with a view to minimizing

its losses on account of the disruption of services that resulted due to the Debtors' insolvency

proceedings. Hardy Aff., Ex. E (BLG email).

12.     On information and belief, representatives of the Debtors also advised Staples of

the consignment arrangements with Sage and confirmed to Staples that Wynit Distribution, LLC

did not own the consigned inventory that Staples obtained from Wynit.

13.     In a letter dated September 7, 2017 from Mark Shanahan of Staples to Ward

Thomas at Wynit Distribution, LLC, Mr. Shanahan stated:

> Further to our recent discussion, *I am writing to confirm that Wynit*
> *Distribution LLC ("Wynit") does not own the consignment*
> *inventory* that Staples Canada Inc. ("Staples") obtained from Wynit
> and currently has in its possession ("Consignment Inventory"), as
> set out in the attached list ("Product List"). This *Consignment*
> *Inventory is owned by the manufacturer of such product*, as also set
> out in the Product List.
>
> *Wynit therefore instructs Staples to work directly with the*
> *manufacturers of the Consignment Inventory to manage the current*
> *inventory and/or work with alternative distribution partners* to
> create a move forward strategy in partnership with the
> manufacturers. Wynit releases Staples from any liability to Wynit

> Distribution Inc., including its affiliates and their respective officers,
> directors, employees, successors and assigns, in connection with the
> Consignment Inventory on the Product List."

Hardy Aff., Ex. F (correspondence from Staples to Wynit Distribution, LLC); Ex. G ("Product List" referred to in the September 7, 2017 letter from Staples) (emphasis added).

14.     On September 14, 2017, Sage received a memo from Betty Leung at Staples regarding the "Wynit Closure" which provided in part as follows, "Please be informed that we have received a letter from Wynit on September 8, 2017 regarding the consignment goods we have in our stores. Wynit has relinquished its ownership of the goods. We have decided to work with you to make the transition happen to prevent further sales disruption." Hardy Aff. Ex. H (Email from Rachelle Tolentino at Staples and memo delivered by Staples to Sage).

15.     On September 8, 2017, Sage received an email from Amy Burrows at Best Buy attaching a "SKU Transfer Agreement" dated August 31, 2017 (the "Transfer Agreement"). The cover email from Ms. Burrows to Sage stated as follows, "Attached is the signed document we have signed by Wynit and Best Buy Canada. This states as of Aug 31 the inventory is no longer responsible to Wynit." Hardy Aff., Ex. I (September 8, 2017 Best Buy email).

16.     The Transfer Agreement provides that: "Wynit desires to cease all consignment related activation of Best Buy's current on-hand inventory of consignment products." The Transfer Agreement was executed on September 8, 2017 between Best Buy and WD Navarre Canada, ULC, which is a Debtor in these jointly administered cases and is also the subject of a Part IV ancillary proceeding in Ontario under the *Companies' Creditors Arrangement Act* ("CCAA"). Hardy Aff., Ex. I (September 8, 2017 Best Buy email and Transfer Agreement.)

17.     Sage is owed approximately CAD $1,079,088.59 on account of Sage consigned products that have been sold by Best Buy and Staples and in respect of which the Debtors have

6

received the proceeds but have not remitted same to Sage.

## OBJECTION

18.     Sage is entitled to adequate protection for its interests in the Sage inventory in the possession, custody or control of Best Buy, Staples or the Debtors (the "Sage Goods") and in the proceeds from previous sales of Sage inventory which have not been remitted to Sage (the "Sage Proceeds"). 11 U.S.C. §§ 361, 362 and 363. However, the Debtors' proposed DIP financing impairs Sage's rights in several respects, including:

> ➢ The Debtors propose to grant their lenders post-petition liens on substantially all the Debtors' property. Such property could be read to include the Sage Goods and the Sage Proceeds.

> ➢ The Debtors propose to grant super-priority administrative status to the lenders' claims. This could be read to impair Sage's right, title and interest in the Sage Goods and the Sage Proceeds.

> ➢ The Debtors propose to pay cash and other intangible property to their lenders. This could also be read as allowing the Debtors to pay the Sage Proceeds to the lenders in contravention of Sage's right, title, and interest.

> ➢ The Debtors propose that they be prohibited from returning goods to creditors. This could be read as prohibiting the Debtors from returning the Sage Goods to Sage or from allowing Sage to transfer the Sage Goods to a new distributor in Canada.

## REQUEST FOR ADEQUATE PROTECTION

19.     On the other hand, this Court can readily provide adequate protection for Sage's right, title and interest in the Sage Goods and the Sage Proceeds without impairing the interests of the Debtors or their lenders. For example:

➢ The Debtors' warehouse in Mississauga, Ontario warehouse (the "Mississauga Premises")
contains significant inventory, which may include Sage inventory. As Sage previously
advised in the First Sage Letter, Sage requests that the Final Order instruct the Debtors to
securely destroy and dispose of the Sage product inventory remaining in its possession at
the Mississauga Premises, rather than return same to Sage.

➢ The Interim Order already contains adequate protection provisions for Quicken, Inc.,
McAfee, LLC, and VIDBOX, Inc., who are also consignors. (See paragraph 10(b) – (d) of
the Interim Order.) The Final Order should include the following protections for Sage,
which are modeled on the provisions in the Interim Order for the other consignors:

> Sage Software, Inc. ("Sage US"), Sage Software Canada Ltd. ("Sage
> Canada" and, collectively with Sage US, "Sage"), Wynit
> Distribution, LLC, and WD Navarre Canada, ULC are party to that
> certain Distribution Agreement Computer Software Terms dated as
> of August 4, 2011 (the "Sage Distribution Agreement") amended by
> a rider that sets forth the terms of a "consignment arrangement" (the
> "Sage Consignment Rider") dated June 6, 2012, and amended by
> Amendment #1 on or about April 1, 2016 (the "Amendment", and
> collectively with the Distribution Agreement and the Sage
> Consignment Rider, the "Sage Contract") as to certain products
> delivered by Sage in Canada (any products delivered pursuant to
> such Sage Contract, the "Sage Goods"). Nothing contained in this
> Order shall have any effect on (i) the determination of whether the
> consignment arrangement set forth in the Sage Contract is a true
> consignment agreement; (ii) who is the owner of the Sage Goods; or
> (iii) the extent, validity, and priority of Sage's rights and interests in
> or to, or ownership of, the Sage Goods, or any accounts receivable
> or other proceeds generated by such Sage Goods, or any proceeds of
> any of the foregoing or of any goods previously consigned to Wynit
> Distribution, LLC or WD Navarre Canada ULC, which proceeds
> have not been remitted to Sage (collectively, the "Sage Proceeds"),
> which rights are hereby specifically reserved by all parties. For the
> avoidance of doubt, nothing contained in this Order will grant the
> Postpetition Lenders, the Prepetition Senior Lenders, the

Postpetition Agent, the Prepetition Senior Agent, Fitbit, or WFCDF any liens or security interests (whether as priming liens, as junior liens, as adequate protection liens, or otherwise) in the Sage Goods or in the Sage Proceeds, or entitle the Postpetition Lenders, the Prepetition Senior Lenders, the Postpetition Agent, the Prepetition Senior Agent, Fitbit, or WFCDF to assert any priority or super-priority claims or rights to such Sage Goods or the Sage Proceeds, pending a judicial determination or consensual resolution of the competing claims of all parties, including, but not limited to, Sage, the Prepetition Senior Agent, Prepetition Senior Lenders, Postpetition Agent, Postpetition Lenders, Fitbit, WFCDF, and the Debtors, to such Sage Goods or Sage Proceeds.

## <u>RESERVATION OF RIGHTS</u>

Sage respectfully reserves all rights regarding the DIP Motion, including the right to further object regarding the relief requested and to present any additional evidence, whether prior to or during any hearing (whether "interim," "final," or otherwise) on the DIP Motion and notwithstanding any relief the Court may grant on an interim basis.

**WHEREFORE**, Sage respectfully requests that the Court sustain the Objection, incorporate the modifications proposed in the Objection, and grant such other and further relief as is just and equitable.

Respectfully submitted,

**WARNER LAW, LLC**

Dated:  September 21, 2017

*/e/ George E. Warner, Jr.*
George E. Warner, Jr. (#0222719 MN)
120 South Sixth Street, Suite 1515
Minneapolis, Minnesota 55402-1817
Telephone (952) 922-7700

and

**BRENNAN, RECUPERO, CASCIONE,
SCUNGIO & MCALLISTER, LLP**

*/e/ Thomas S. Hemmendinger*
Thomas S. Hemmendinger (#3122 RI)
362 Broadway
Providence, RI 02909
Telephone (401) 453-2300
*(Pro Hac Admission Pending)*

*Attorneys for Sage Software, Inc. and Sage
Software Canada Ltd.*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:<br><br>WYNIT DISTRIBUTION, LLC, *et al.*<br><br>Debtors. | Jointly Administered<br>Case No. 17-42726<br>Chapter 11 Cases<br>Hon. Kathleen H. Sanberg |

## VERIFICATION OF RICHARD HARDY

I, Richard Hardy, Director of Sales for Sage Software Canada, Ltd., verify that I have read the foregoing Limited Objection and do hereby certify and declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

I further certify and declare that the attached is a true and correct copy of my September 20, 2017 Affidavit submitted in the related Canadian insolvency proceedings. I reaffirm all matters contained therein and that the Exhibits attached thereto are all true and correct copies of the original Documents.

Dated: SEPT 20 2017

Richard Hardy

Court File No. CV-17-582329-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF CERTAIN PROCEEDINGS TAKEN IN THE
UNITED STATES BANKRUPTCY COURT WITH RESPECT TO WD
NAVARRE CANADA, ULC and (the "Local Debtor")

APPLICATION OF WYNIT DISTRIBUTION, LLC UNDER SECTION
46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*

**AFFIDAVIT OF RICHARD HARDY**
**(Sworn September 20, 2017)**

I, **RICHARD HARDY,** of the City of North Vancouver, in the Province of British

Columbia, **MAKE OATH AND SAY AS FOLLOWS:**

1.     I am a Director of Sales for Sage Software Canada Ltd. and as such have personal
knowledge of the matters to which I hereinafter depose, except where such knowledge is stated to
be based on information and belief, in which case I confirm the source of my information and in
all cases do verily believe it to be true.

2.     This affidavit is sworn in response to an application brought by Wynit Distribution, LLC
pursuant to Part IV of the *Companies' Creditors Arrangement Act* ("CCAA") for an Initial
Recognition Order and a Supplemental Recognition Order which seeks various relief, including
the recognition of the Chapter 11 Proceedings commenced on September 8, 2017 by Wynit
Distribution, LLC, Wynit Holdings, Inc., WD Navarre Canada, ULC, WD Navarre Distribution,
LLC, WD Navarre Digital Service, LLC, WD Navarre Holdings, LLC and WD Navarre Encore

Software, LLC (collectively, the **"Chapter 11 Debtors"**) in the United States Bankruptcy Court for the State of Minnesota (the **"US Court"**).

### Background

3.      Sage Software, Inc. and Sage Software Canada Ltd. (**"Sage Canada"** and collectively, **"Sage"**) are suppliers of accounting software.  Sage has offices in a number of countries and is headquartered in the United Kingdom.

4.      The Chapter 11 Debtors distribute consumer electronics and accessories, photography and video equipment, specialty printing products and emerging technology products.  The Chapter 11 Debtors effectively serve a "middle man" function, providing for the distribution of consumer electronics and software products, such as the products developed by Sage.

5.      On August 4, 2011, Sage Canada entered into a Distribution Agreement Computer Software Terms with Navarre Distribution Services ULC (the **"Distribution Agreement"**), as amended by the Canadian Consignment Rider to Software Distribution Agreement dated June 6, 2012 (the **"Canadian Consignment Rider"**).  The Distribution Agreement provided for the distribution of Sage computer software products by Navarre Distribution Services ULC in Canada. Under the terms of the Canadian Consignment Rider, Sage consigned product to Staples Canada Inc. (**"Staples"**) and Best Buy Canada Ltd. (**"Best Buy"**) for these retailers to sell to their retail customers, and Sage retained all right, title and interest in and to the consigned product until Staples of Best Buy sold the product to a retail customer.  Attached hereto and marked as Exhibit "**A**" is a true copy of the Distribution Agreement and the Canadian Consignment Rider.

6.     The Distribution Agreement was subsequently amended by way of Amendment #1 (the **"Amendment"**) on or about April 1, 2016. The Amendment provided for an amendment to the Distribution Agreement to substitute Wynit Distribution, LLC and WD Navarre Canada, ULC, both of which are Chapter 11 Debtors, for Navarre Distribution Services ULC. Attached hereto and marked as Exhibit **"B"** is a true copy of the Amendment.

7.     The Amendment attaches thereto a copy of the Staples Canada Addendum (the **"Addendum"**) to the Canadian Consignment Rider between WD Navarre Canada, ULC and Sage Canada. The Addendum provides that, "Supplier, by its signature below, agrees to have its Products distributed and sold to Staples through consignment by Navarre Canada and therefore agrees to the terms and conditions in the Staples Canada Addendum …". The Addendum further goes on to provide for certain particulars in connection with the consignment program, including the sales reporting period and the return of consigned products.

8.     Currently, the products that are the subject of the Distribution Agreement include the Sage 50 software, which product was provided by the Chapter 11 Debtors, through consignment arrangements, to Staples and Best Buy.

### Recent Developments with the Chapter 11 Debtors

9.     On September 6, 2017, Celeste Helms, Regional Legal Director with Sage delivered a letter (the **"First Sage Letter"**) to Tom Chase, General Counsel for Wynit Distribution, LLC, advising that Wynit Distribution, LLC and WD Navarre Canada, ULC (collectively, **"Wynit"**) were in material breach of the Distribution Agreement, as amended, as a result of the payment obligations provided for therein and advised that the past due balance as at September 6, 2017 was CAD

- 4 -

$1,079,088.59 (the "**Past Due Amounts**"). In the First Sage Letter, Wynit was further requested

to secure, destroy and dispose of any Sage products and inventory remaining in its possession, *in*

*lieu* of returning same to Sage. Further, the First Sage Letter advised as follows:

> "Wynit's failure to timely provide the requested assurance of performance shall be
> considered by Sage to be repudiation of the Agreement and, in such instance, Sage
> reserves the right to exercise all of its rights and remedies under the Agreement and
> at law and/or in equity. Sage further advises Wynit that for the purpose of
> minimizing its potential losses, which threaten to be considerable, Sage is entering
> into a new consignment arrangement with a third-party distributor regarding the
> unsold inventory currently in the retailer's possession; Wynit is reminded that under
> the Agreement Sage remains fully vested in all right, title and interest in and to the
> unsold inventory."

Attached hereto and marked as Exhibit "**C**" is a true copy of the First Sage Letter.

10.     On September 6, 2017, Sage delivered a further letter (the "**Second Sage Letter**") to Pete

Richichi, Chief Operating Officer of Wynit Distribution, LLC and Mr. Chase in respect of the

program transfer of the Sage 50 inventory held by Staples and Best Buy (collectively, the

"**Retailers**") in Canada.

11.     In the Second Sage Letter, the Chapter 11 Debtors were advised as follows, with respect to

the transfer of the Sage 50 inventory:

> "In view of WYNIT's announced closure of its North American distribution
> business, please be advised that Sage Software Canada, Ltd. ("Sage") is transferring
> the current unsold inventory (the "Transferred Inventory") of Sage's boxed Sage
> 50 (2017) software product held by the Retailers that was originally ordered and
> shipped through WYNIT Distribution, L.L.C. ("WYNIT US") and WD Navarre
> Canada, ULC ("Navarre") (WYNIT and Navarre, collectively and interchangeably,
> "WYNIT") for in-store retail and website sales by the Retailers. The transfer is to
> Synnex Corporation's Canadian distribution business. The Transferred Inventory
> will remain in the Retailers' possession until sold by them or otherwise disposed of
> in accordance with Sage's and the Retailers' separate arrangements with Synnex."

Attached hereto and marked as Exhibit "**D**" is a true copy of the Second Sage Letter.

- 5 -

12.    In connection with the transfer of the distribution of the Sage products to a third party

distributor on account of the fact that the Chapter 11 Debtors had ceased the distribution business,

Roger Jaipargas, a Partner at Borden Ladner Gervais LLP ("**BLG**"), the lawyers for Sage,

delivered an email to Mario Forte at Goldman Sloan Nash & Haber LLP, the lawyers for the WD

Navarre Canada, ULC and Wynit Distribution, LLC on September 17, 2017 (the "**BLG Email**")

advising of Sage's intent to take steps to immediately engage a new distributor with a view to

minimizing its losses on account of the disruption of services that resulted due to the Chapter 11

Debtors' insolvency proceedings.  Attached hereto and marked as Exhibit "E" is a true copy of the

BLG Email.

13.    I understand that representatives of the Chapter 11 Debtors also advised Staples of the

consignment arrangements with Sage and confirmed to Staples that Wynit Distribution, LLC did

not own the consigned inventory that Staples obtained from Wynit.

14.    In a letter dated September 7, 2017 from Mark Shanahan of Staples to Ward Thomas at

Wynit Distribution, LLC, Mr. Shanahan stated:

> "Further to our recent discussion, **I am writing to confirm that Wynit
> Distribution LLC ("Wynit") does not own the consignment inventory** that
> Staples Canada Inc. ("Staples") obtained from Wynit and currently has in its
> possession ("Consignment Inventory"), as set out in the attached list ("Product
> List").  This **Consignment Inventory is owned by the manufacturer of such
> product,** as also set out in the Product List.
>
> **Wynit therefore instructs Staples to work directly with the manufacturers of
> the Consignment Inventory to manage the current inventory and/or work with
> alternative distribution partners** to create a move forward strategy in partnership
> with the manufacturers.  Wynit releases Staples from any liability to Wynit
> Distribution Inc., including its affiliates and their respective officers, directors,
> employees, successors and assigns, in connection with the Consignment Inventory
> on the Product List." [**emphasis added**]

Attached hereto and marked as Exhibit "F" is a true copy of the September 7, 2017 correspondence from Staples to Wynit Distribution, LLC. Attached hereto and marked as Exhibit "G" is a true copy of the "Product List" that is referred to in the September 7, 2017 letter from Staples.

15.     On September 14, 2017, Sage received a memo from Betty Leung at Staples with regard to the "Wynit Closure" which provided in part as follows, "Please be informed that we have received a letter from Wynit on September 8, 2017 regarding the consignment goods we have in our stores. Wynit has relinquished its ownership of the goods. We have decided to work with you to make the transition happen to prevent further sales disruption." Attached hereto and marked as Exhibit "H" is a true copy of the email from Rachelle Tolentino at Staples, together with the memo delivered by Staples to Sage.

16.     On September 8, 2017, Sage received an email from Amy Burrows at Best Buy attaching a "Sku Transfer Agreement" dated August 31, 2017 (the "Transfer Agreement"). The cover email from Ms. Burrows to Sage stated as follows, "Attached is the signed document we have signed by Wynit and Best Buy Canada. This states as of Aug 31 the inventory is no longer responsible to Wynit."

17.     The Transfer Agreement provides that: "Wynit desires to cease all consignment related activation of Best Buy's current on-hand inventory of consignment products." The Transfer Agreement was executed on September 8, 2017 between Best Buy and WD Navarre Canada, ULC, which is both a Chapter 11 Debtors and the "Local Debtor", as contemplated in the proposed CCAA proceedings. Attached hereto and marked as Exhibit "I" is a true copy of the Best Buy email dated September 8, 2017, together with the Transfer Agreement.

**The Sage Concerns**

18.     I understand that the Mississauga, Ontario warehouse (the **"Mississauga Premises"**) of the

Chapter 11 Debtors contains significant inventory, which may include Sage inventory.  As Sage

previously advised in the First Sage Letter, Sage is content that the Chapter 11 Debtors securely

destroy and dispose of the Sage product inventory remaining in its possession at the Mississauga

Premises, rather than return same to Sage.

19.     However, Sage has certain concerns that will need to be addressed.  In particular, Sage is

owed approximately CAD $1,079,088.59 on account of Sage consigned products that have been

sold by the Retailers and in respect of which the Chapter 11 Debtors have received the proceeds

therefrom, without remitting same to Sage.  In addition, Sage is concerned that it does not have

sufficient information and details with respect to the nature and extent of the Sage consigned

inventory that may still be at the Staples and Best Buy stores throughout Canada.  Further, Sage

has not been provided with a formal accounting in respect of any recent sales made by the Retailers

of the Sage products.

20.     It is anticipated that Sage may need to seek the assistance of the Court in the determination

of these issues.  At this time, Sage is seeking to raise these issues with the Court, KSV Kofman

Inc. in its capacity as Proposed Information Officer of WD Navarre Canada, ULC and the various

other stakeholders in the proposed Part IV CCAA proceedings.

21.     Sage believes that any Orders that may be made by the Ontario Superior Court of Justice

(Commercial List) should be made on a without prejudice basis to all of Sage's rights in connection

- 8 -

with its consigned inventory and the proceeds thereof, which are issues that will need to be

determined at a future date.


SWORN BEFORE ME at the City )
of Richmond, British Columbia )
this 20th day of September, 2017. )
                                                    )
_____  )    _____
A commissioner for taking affidavits )    **RICHARD HARDY**


TRENT BLANCHETTE
*Articling Student*
BORDEN LADNER GERVAIS LLP
1200 Waterfront Centre, 200 Burrard Street
P.O. Box 48600, Vancouver, Canada V7X 1T2
604-640-4063

This is Exhibit "......A........" referred to in the

affidavit of ...RICHARD HARDY......

Sworn before me on SEPTEMBER 20, 20 17

................................................
A Commissioner for taking Affidavits
for British Columbia

## DISTRIBUTION AGREEMENT COMPUTER SOFTWARE (TERMS) BETWEEN

## NAVARRE DISTRIBUTION SERVICES ULC

## AND SAGE SOFTWARE CANADA, LTD.

THIS DISTRIBUTION AGREEMENT COMPUTER SOFTWARE (TERMS) (the "Agreement") is entered into as of the 2<sup>1st</sup> day of August 2011, (the "Effective Date") by and between Navarre Distribution Services ULC, a British Columbia unlimited liability company with principal offices located at 7400 49th Avenue North, New Hope, Minnesota, 55428 ("Navarre Canada") and Sage Software Canada, Ltd., an Ontario corporation with principal offices located at 60 Burnhamthorpe Road W., Suite 700, Mississauga, Ontario L6B 3C2, Canada ("Sage Canada").

### RECITALS

(i) Sage Canada and Navarre Canada wish to enter into a Distribution Agreement for Navarre Canada's distribution of Sage Canada software products to Canadian Customers.

(ii) Sage Canada and Navarre Canada agree that except for the changes set out below, the terms of this Agreement should be the same as those contained in that certain Distribution Agreement Computer Software (TERMS) entered into on January 12, 2011 by and between Navarre Canada's parent, Navarre Distribution Services, Inc. and Sage Canada's affiliate, Sage Software, Inc. (the "US Agreement").

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

### AGREEMENT

1. **Terms and Conditions.** Except for the terms set out below, all terms and conditions of the U.S. Agreement are hereby incorporated by reference and shall apply to this Agreement between Navarre Canada and Sage Canada. All references in the U.S. Agreement to "Vendor" shall be read as applying to Sage Canada and all references to "Navarre" shall be read as applying to Navarre Canada. A copy of the U.S. Agreement is attached hereto as Exhibit 1. Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the U.S. Agreement.

2. **Sage Canada Products ("Product(s)").** For the purpose of the Agreement between Navarre Canada and Sage Canada, the term "Product(s)" shall mean the line of computer software products under the Sage Simply Accounting brand that are manufactured or marketed by Sage Canada during the term of this Agreement and provided to Navarre Canada for Distribution. Sage Canada can add, remove or modify these Products upon sixty (60) days prior written notice to Navarre. Sage Canada shall comply in all respects with, and shall ensure that the Products are in compliance with, the Canada Consumer Product Safety Act of 2011.

3. **Territory.** For the purpose of the Agreement between Navarre Canada and Sage Canada, the term "Territory" shall mean Canada only.

4. **Payments.** All payments under this Agreement shall be made in Canadian Dollars.

5. **Governing Law.** This Agreement and the rights and obligations of the parties hereunder will be governed by the laws of British Columbia, Canada, without giving effect to such province's conflict of laws principles; Navarre Canada and Sage Canada each consent to service of process against it in any action or proceeding related to this Agreement by the delivery of a copy of such process to the respective address set forth above.

*[signature page follows]*

A500390v1v2                          5.                          891.35V&130507/00

The parties, by their authorized representatives, have caused this Agreement to be duly executed as of the Effective Date indicated above.

Navarre Distribution Services ULC

By:    Joyce Fleck    Brad Kmwin

Title:    President    vp Sales

Sage Software Canada, Ltd.

By: JOHN SCHOLTSEN

Title: VICE PRESIDENT

## DISTRIBUTION AGREEMENT
## COMPUTER SOFTWARE (TERMS)

This Distribution Agreement (the "Agreement") is made and entered into as of the 12th day of January, 2011 by and between Navarre Distribution Services, Inc., a Minnesota corporation having principal offices at 7400 49th Avenue North, New Hope, Minnesota, 55428 ("Navarre"), and Sage Software, Inc., a Virginia corporation having principal offices at 6561 Irvine Center Drive, Irvine, California 92618 ("Vendor").

*Vendor's predecessor in interest, Peachtree Software, Inc., and Navarre's predecessor in interest, Navarre Corporation, entered in that certain original Computer Software Distribution Agreement between the parties dated May 30, 1997 (the "Peachtree Original Agreement"). This Agreement restates and supersedes the Peachtree Original Agreement in its entirety.*

*Vendor's predecessor in interest, Interact Commerce Corporation, and Navarre's predecessor in interest, Navarre Corporation, entered in that certain original Computer Software Distribution Agreement between the parties dated February 26, 2001 (the "ACT! Original Agreement"). This Agreement restates and supersedes the ACT! Original Agreement in its entirety.*

*The purpose of this Agreement is to set forth the agreement of the parties with respect to the terms and conditions under which Navarre may continue to distribute certain software products manufactured or marketed by Vendor.*

1.  **DEFINITIONS.** The terms defined below are used in this Agreement with the ascribed meanings, unless the context in which the term is used expressly provides otherwise.

    1.1  "Customer(s)" means wholesale and retail outlets, one stops, rack jobbers, military and wholesale clubs, sub-distributors, internet retailers and any other third parties, including all present and future customers of Navarre, to which Navarre markets and sells Products typically for further distribution or sale by such customer.

    1.2  "EDI" means Electronic Data Interchange which is the electronic and automated exchange of business documents, including purchase orders, invoices and ship notices, between the parties in an EDI standard format (e.g. X.12, UCS and VICS) mutually acceptable to the parties.

    1.3  "End Users" means the ultimate consumers of the Products.

    1.4  "Product(s)" means the line of computer software products under the Sage Peachtree and Sage ACT! brands that are manufactured or marketed by Vendor during the term of this Agreement and provided to Navarre for distribution. Vendor can add, remove or modify these Products upon sixty (60) days prior written notice to Navarre.

    1.5  "Territory" means distribution to Customers located in the United States (including territories and possessions) and Canada and distribution through the United States military exchange world-wide retail system.

2.  **APPOINTMENT.**

    2.1  Vendor appoints Navarre as an authorized distributor of Vendor's Products. Subject to the terms and conditions of this Agreement, Vendor grants to Navarre and Navarre accepts from Vendor the non-exclusive right to acquire and to market and sell Products in the Territory.

    2.2  Navarre agrees not to alter Products or Product packaging or make copies of software media or documentation. Navarre will distribute Products to Customers in unopened packages.

    2.3  Navarre is not required by this Agreement to acquire and market any minimum quantity or amount of Products.

**3. TERM.**

3.1   The current term of this Agreement is extended to December 31, 2011. The current term and any renewal term, as provided for below, are individually and collectively referred to as the "Term."

3.2   After the then current Term, this Agreement shall be automatically renewed for successive one (1) year periods, unless either party gives the other written notice, at least ninety (90) days prior to the expiration of the then current Term, that it does not desire that the Agreement continue. If such notice is given, the Agreement shall terminate at the end of the then current Term, provided that, if Vendor's account is in a debit balance, Navarre, at its option, may extend the Agreement for a period equal to the duration of time until the debit balance is extinguished or paid by Vendor.

3.3   This Agreement is subject to early termination as provided in Section 9, below.

**4. ORDERS, SHIPMENT AND DELIVERY.**

4.1   Orders. Navarre will order Products from Vendor in writing (which includes facsimile or electronic mail transmission), or via EDI, signed or transmitted by an authorized representative of Navarre (the "Purchase Order" or "P.O."). All orders are subject to acceptance by Vendor, and Navarre may cancel all or part of any order prior to the date of shipment. The parties will use EDI if mutually agreed to.

4.2   Shipment. Vendor will specify the shipping schedule in its acknowledgment of the P.O. Vendor will use commercially reasonable efforts to meet the acknowledged delivery schedule but will not be liable for delays resulting from causes beyond its reasonable control. If a shortage of any Product in Vendor's inventory exists in spite of Vendor's good faith efforts, Vendor agrees to allocate its available inventory of such Product to Navarre in proportion to Navarre's percentage of all Vendor's customer orders for such Product during the previous sixty-day period. Navarre may accept or reject any partial shipments.

4.3   Delivery. All freight and shipping charges are paid by Navarre. Vendor bears the risk of loss or damage to Products in transit. Risk of loss and, except for consigned Products, title to Products will pass to Navarre only upon receipt by Navarre at its warehouse, or such other destination designated on the applicable P.O.

4.4   Packing List and Slip. A packing list showing Navarre's P.O. number, quantity ordered, quantity shipped and a detailed identification of the Products must accompany all shipments. Each load carton in a shipment will contain a packing slip which will include P.O. number, Product description, a Uniform Product Code ("UPC") and carton quantities.

4.5   UPC Codes. All Products will bear a UPC part code, and all shipping cartons will contain the identical UPC part code on the outside of the carton. The UPC numbers and codes must conform to the Uniform Code Council, GS1 US, and Retail Industry Standards. Each unit of Product received by Navarre with missing, defective or inaccurate UPC codes is subject to a fifty-cent ($.50) chargeback to Vendor to compensate Navarre for its increased handling costs of such Product.

4.6   Nonconforming Shipments. Vendor agrees that master carton quantities will match those originally provided by Vendor, unless notice of any change is given five (5) days before shipment. If timely notice is not received by Navarre, any Customer penalties incurred as a result of the change will be charged back to Vendor.

**5. PAYMENT AND PRICING.**

5.1   Payment Terms. Navarre will pay Vendor net forty-five (45) days from the receipt of the Products. On or after the date of shipment, Vendor will invoice Navarre for the purchase of Products on terms consistent with this Agreement. For the consignment program this section is superseded by the Consignment Rider attached hereto.

26188v3:10507/00

*4*

5.2    **Price Protection.** Vendor represents and warrants that the price with respect to any Product shall never be less favorable to Navarre than that made available by Vendor to any other similarly situated purchasers of such Product within the same class of trade. In the event that Vendor reduces the price of any of its Products, or offers the Products at a lower price to any other similarly situated party within the same class of trade, including raising any discount offered, Vendor will immediately adjust its pricing charged to Navarre for the difference between the invoice price charged to Navarre and the reduced price for each unit of Product: (i) held in inventory by Navarre or its Customers on the date that the reduced price is first offered; or (ii) in transit to Navarre or to its Customers and invoiced within five (5) working days before or after the price protection notification. The foregoing price protection for Product in the control of Navarre's Customers is conditioned upon Navarre obtaining inventory documentation from such Customers and providing the same to Vendor.

5.3    **Price Increases.** The price charged to Navarre by Vendor for any Product (current or future releases) may only be increased by sixty (60) days advance written notice given by Vendor to Navarre. In the event that Vendor raises the list price of a Product, all orders for such Product placed prior to the effective date of the price increase will be invoiced at the lower price.

5.4    **Resale Prices.** The selling prices, discounts, payment terms and return privileges offered by Navarre to its Customers will be determined by Navarre in its sole and exclusive discretion. Vendor will make no pricing commitments to any Customers or other third parties which would otherwise obligate Navarre.

5.5    **Credits.** Any credits due Navarre, including, but not limited to, price protection credits, return credits, and approved advertising or marketing funds, will be handled by the issuance of chargebacks by Navarre, and the issuance of a matching credit memo by Vendor. Vendor will provide a matching credit memo for such chargebacks within fifteen (15) days of receipt of documentation from Navarre. In case there is a balance due Navarre, then Navarre will be entitled, at its option, to withhold future payments due Vendor until such debit balance is extinguished or require Vendor to issue a check to Navarre within forty-five (45) days for the credit balance. In case of a disputed account balance, both parties will make a good faith effort to reconcile the account within twenty-one (21) days.

6.    **RETURNS.**

6.1    **Defective Products.** Products which are returned after sale to End Users and are determined to be defective or are identified by Navarre or a Customer as defective prior to sale will be reported to Vendor. Vendor will advise Navarre regarding the disposition of such defective Products within ten (10) business days of receipt of a return authorization request from Navarre. Vendor will be responsible for all expenses regarding the return or other disposition of defective Products and will issue an immediate credit to Navarre for the purchase price plus all return freight charges.

6.2    **All Other Products.** Navarre and its Customers will have 100% return rights on all Products which are unsold to End Users for any reason, including obsolete, delisted or slow-moving goods, termination of this Agreement, or otherwise. Upon receipt of a return authorization request, Vendor will provide a return authorization number within seven (7) days. Such Products will be returned at Navarre's expense, and upon receipt of such Products, Vendor will credit Navarre's account with the amount originally charged for the Products, less any previous price protection credit.

6.3    **Delisted Products.** If Vendor notifies Navarre of delisted Products, i.e., Products that are discontinued by the Vendor or are subject to a version change, Navarre will have a period of at least one hundred and eighty (180) days from the date of receipt of such notification in which to return such delisted Products. Vendor is not obligated to credit returns of a delisted Product after such period.

5

6.4    Returns Handling Charges. Navarre and its Customers prefer destruction of Products in the field rather than handling physical returns to Vendor, with any such destruction validated by the applicable Customer in writing to Vendor. Navarre will not charge Vendor for processing approved destructions in field. Navarre will charge a handling fee for physical returns as follows: fifty cents ($.50) per unit for Products returned to Navarre by a Customer and shipped back to Vendor; and twenty-five cents ($.25) per unit for Products returned to Navarre by a Customer and approved by Vendor for destruction by Navarre. Customer handling charges for physical returns will also be charged back to Vendor, and Navarre will notify Vendor in advance of all such mandatory Customer charges.

6.5    Returns Upon Termination. Upon expiration or earlier termination of this Agreement, Vendor is not obligated to accept returns for a period longer than one-hundred eighty (180) days following the effective date of termination.

## 7.    ADVERTISING FUNDS AND RETAILER PROGRAMS.

7.1    Trademarks. Vendor acknowledges and agrees that Navarre and its Customers have the right to utilize Vendor's trade name and any trademarks, service marks and other artwork associated with the Products to identify the origin of the Products in advertising and promotional materials. With respect to Products made by a third party, Vendor will ensure that Navarre and its Customers have the right to use the third party's trademarks, service marks and other artwork associated with the Products in advertising and promotional materials.

7.2    Advertising and Marketing Funds. Vendor agrees that it will provide support by way of cooperative advertising funds ("Co-op") and market development funds ("MDF") to Navarre and its Customers for their advertising, marketing and promotional activities with respect to the Products. This support can be in the form of ad production assistance, catalog direct mail programs, shows, advertising in regional or national trade and/or consumer publications; and sales training days. All Co-op and MDF expenditures involving advertisements must be authorized by the Vendor prior to placement and comply with Vendor's requirements with respect to layout, size, artwork, trademark usage, minimum advertised price, street date, etc. Vendor will inform Navarre of such requirements. Vendor will issue a credit memo for Approved Co-op and MDF expenses within thirty (30) days after receipt of the applicable "proof of performance" documentation from Navarre. In the event that such Co-op and MDF expenditures would cause Navarre's account to move to a debit balance, Navarre reserves the right to require Vendor to pay for these expenditures in advance.

7.3    Special Retailer Programs. Special retailer marketing funds pass through programs, sales discounts and other programs, in which Vendor may choose to participate, are detailed in each Addendum to this Agreement, which when executed by Vendor will be incorporated into this Agreement. Vendor's Products may not be eligible for distribution to certain retailers without participation in such programs.

## 8.    TERMINATION.

8.1    Termination for Insolvency/Bankruptcy. This Agreement will terminate immediately without notice upon the occurrence of any of the following events, unless the party not subject of insolvency/bankruptcy promptly after discovery of the relevant facts notifies the affected party to the contrary in writing:

(i)    An insolvency, bankruptcy, or similar proceeding for reorganization or protection is instituted by or against either party pursuant to any present or future state or federal bankruptcy act or under any similar federal or state law (and with respect to any involuntary petition is not discharged within sixty (60) days;

(ii)    Either party makes or attempts to make an assignment for the benefit of its creditors;

(iii)   A receiver, trustee, liquidator, custodian or similar official is appointed for the business or property of either party and is not removed within sixty (60) days of the appointment; or

(iv)   Either party is unable to pay its debts generally as they become due.

8.2   **Termination for Cause.** In addition to any other rights or remedies which may be available at law or in equity, either party may terminate this Agreement for cause upon the material breach by the other party of the terms of this Agreement, and the failure of such other party to cure such breach within thirty (30) days of written notification of such material breach.

8.3   **Survival.** The obligations of the parties in Sections 5, 6 (subject to the time limitation in 6.5), 9, 10, 11, 12, and 13 of this Agreement shall survive the expiration or earlier termination of this Agreement.

## 9.   WARRANTIES and LIMITATIONS.

9.1   **Product Warranties.** Vendor represents and warrants that: (i) it has good and transferable title to the Products or a valid and enforceable license to distribute the Products; (ii) the Products are new, merchantable and fit for their intended purpose; (iii) the Products will perform in conformity with specifications and documentation supplied by Vendor, including, without limitation, any warranty statement provided for the benefit of End Users; (iv) the Products or their use do not infringe any patents, copyrights, trademarks, trade secrets or any other intellectual property rights of any third parties; and (v) the Products comply in all respects with all applicable laws and regulations pertaining to the design, manufacture, packaging, labeling and importation of the Products, including, without limitation, the certification, labeling and testing requirements of the Consumer Product Safety Improvement Act of 2008 ("CPSIA"). Vendor shall identify all Products that qualify as children's products subject to CPSIA on Schedule A (attached hereto and hereby incorporated herein and shall update Schedule A throughout the term if new children's products are added for distribution). Navarre will not extend any warranties to any Customers and End Users.

9.2   **Authority.** Vendor represents and warrants that (i) it has the full power and authority to execute and deliver this Agreement; (ii) this Agreement constitutes the legal, valid and binding obligation of Vendor enforceable in accordance with its terms; and (iii) no other consent, approval or authorization of any governmental authority or any third party is required in connection with the execution and delivery of this Agreement, or the carrying out, or performance of any of the transactions required or contemplated by this Agreement or, if required, such consent, approval, order or authorization has been obtained by Vendor prior to the date hereof.

9.3   **Rebate Programs.** If Vendor offers rebate programs to End Users, Vendor warrants that it will provide all such rebates within the time frame specified in the offer, or if no time is specified, within sixty (60) days of receiving a complete and proper request from an End User. In any rebate program offer, Vendor warrants that it will not expressly or by implication misrepresent any material term of the rebate program.

9.4   **Reliance.** Navarre shall have no obligation whatsoever to make any investigation of the facts relevant to any warranty or representation made by Vendor herein. Neither the furnishing by Vendor nor the receipt by Navarre of any document shall impair Navarre's absolute rights to rely, to have relied, and to continue to rely on any warranties or representations made by Vendor in this Agreement.

9.5   **Limitation of Liability.** Neither party, nor any of its directors, officers, or employees, shall be liable to the other for any special, indirect, consequential or incidental damages, including, but not limited to, lost profits, however caused. This limitation shall apply even if such party has been advised of the possibility of such damages or the damages were otherwise foreseeable. This limitation shall not apply to third party claims for which there is an indemnification obligation.

7

10.   **INDEMNIFICATION.**

10.1   Vendor's Indemnification.   Vendor shall be solely responsible for the design, development, supply, production and performance of the Products.   Vendor agrees to defend, indemnify and hold harmless Navarre and its Customers from and against any and all third party claims, suits, demands, subpoenas, actions and proceedings, liabilities, judgments, penalties, losses, damages, reasonable attorneys' fee if awarded in accordance with law and other costs and expenses ("Claim") that, may result, in whole or in part, from: (i) any infringement, or any claim of infringement, of any patent, trademark, copyright, trade secret or other proprietary right with respect to the Products; (ii) any warranty claim with respect to the Products or any breach by Vendor of this Agreement; (iii) any dispute between Vendor and any third party with respect to the Products; and (iv) any injury or damage, including but not limited to, any personal or bodily injury or property damage, arising out of or resulting in any way from any defective Products.

10.2   Navarre's Indemnification.   Navarre shall be solely responsible for its actions as an authorized distributor of the Products.   Navarre agrees to defend, indemnify and hold harmless Vendor from and against any and all Claims that may result, in whole or in part, from: (i) Navarre's actions in transporting the Products to Customers; (ii) any warranty claim with respect to the Products made by Navarre differently than those provided by Vendor; (iii) any dispute between Navarre and any third party with respect to the Products based on Navarre's actions or failures to act; and (iv) any injury or damage, including but not limited to, any personal or bodily injury or property damage, arising out of or resulting in any way from Navarre's actions pursuant to this Agreement.

10.3   Indemnification Procedure.   The party seeking indemnification will notify the other party of any Claim and will cooperate with and provide reasonable assistance to the other party (at the other party's expense) in the defense or settlement of such Claim, provided that the party seeking indemnification may, at its own expense, retain separate representation.   The indemnifying party has the right to control the defense or settlement of any Claim, provided, however, that the indemnifying party will not enter into any compromise or settlement which does not include a complete release of all claims against the other party and the Customers regarding the matter which is the subject of the Claim.

10.4   Insurance.   Vendor represents and warrants that it has, and will maintain during the Term of this Agreement, sufficient insurance coverage to enable it to meet its obligations under this Section.   Vendor's obligation to indemnify Navarre and its Customers shall not be limited by any limitation of the amount its insurance will cover or failure of Vendor to insure as required by this Section.

11.   **CONFIDENTIALITY.**   Vendor and Navarre recognize that the terms of this Agreement and the information provided to the other party pursuant to this Agreement is confidential and each party will take reasonable steps to protect such confidential information.

The parties acknowledge and agree that neither party hereto shall be liable for the reproduction, disclosure, or use of the information or data of the other party if the party receiving the information (the "Recipient") can document that the information (a) was in the public domain at the time the disclosing party (the "Discloser") communicated such information to the Recipient; (b) entered the public domain through no fault of the Recipient subsequent to the time of the Discloser's communication thereof to the Recipient; (c) was in the Recipient's possession free of any obligation of confidence at the time of the Discloser's communication thereof to the Recipient; (d) was rightfully communicated to the Recipient by a third party free of any obligation of confidence subsequent to the time of the Discloser's communication thereof to the Recipient; (e) was developed by employees or agents of the Recipient independently of and without any reference to any information that the Discloser has disclosed in confidence to any third party; or (f) was required to be disclosed pursuant to applicable law, provided that the Recipient uses commercially reasonable efforts to allow the Discloser an opportunity to resist such communication or seek a protective order;

8

12.    **LIMITATION OF LIABILITY.** EXCEPT WITH RESPECT TO THIRD PARTY CLAIMS FOR WHICH THERE IS AN INDEMNIFICATION OBLIGATION, IN NO EVENT SHALL, EITHER PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT EXCEED THE AMOUNT PAID OR PAYABLE BY NAVARRE TO VENDOR UNDER THIS AGREEMENT IN THE TWELVE MONTHS IMMEDIATELY PRECEDING THE DATE ON WHICH THE LIABILITY AROSE.

13.    **GENERAL.**

13.1    Governing Law. This Agreement and the rights and obligations of the parties hereunder will be governed by the laws of the State of Minnesota, without regard to its choice of law provisions. The parties agree that the state or federal courts located in Hennepin County, Minnesota have sole and exclusive jurisdiction and venue over any action relating to this Agreement and the parties hereby consent to the jurisdiction of such courts. For this purpose, Vendor appoints the Secretary of State of Minnesota as its agent for service of process in the event that Navarre is unable to serve process on Vendor at its last known business address or its registered agent.

13.2    Relationship of the Parties. Vendor and Navarre agree that their relationship is that of seller and buyer. Each are independent contractors acting for their own accounts and neither is authorized to make any commitment or representation, express or implied, on the other's behalf unless authorized in writing. In all matters relating to this Agreement, neither party nor such party's employees or agents are, or will act as, employees of the other party within the meaning or application of any federal or state law.

13.3    Assignment. This Agreement may not be assigned by either party, without prior mutual agreement. Notwithstanding the foregoing either party, by giving written notice to the other, may make any such assignment to a subsidiary, other affiliated company or any company purchasing substantially all of its assets. The provisions, rights and obligations of this Agreement are binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

13.4    Severability. If any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, the invalid or unenforceable part or provision will be deemed replaced with a provision which accomplishes to the extent possible and lawful the original purpose and intent of such provision, and the remainder of the Agreement continues unaffected and in full force and effect.

13.5    Waiver. No waiver of any provision or default under this Agreement will affect the right of either party to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar, at a later time. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which a party would otherwise have.

13.6    Headings. The headings and subheadings preceding the various Sections of this Agreement are for convenience only, have no legal significance and in no way change the construction or meaning of the terms hereof. Every word or phrase defined herein has, unless specified to the contrary, the same meaning throughout this Agreement. As used herein, whenever applicable, the singular includes the plural and the plural includes the singular, the masculine includes the feminine and the feminine includes the masculine.

13.7    Entire Agreement. This Agreement and any Schedules, Riders, Exhibits or Addenda attached hereto and hereby or hereafter incorporated herein constitute the entire agreement and understanding between the parties concerning the subject matter hereof and supersede all prior and contemporaneous representations, agreements, understandings, proposals and communications between the parties, whether written or oral. Both parties agree that to the extent there are any terms contained in any invoices or purchase orders issued pursuant to the terms of this Agreement that vary and conflict with the terms of this Agreement, then the terms set forth in this Agreement will govern unless such purchase order or invoice containing the contrary terms is signed by a duly authorized corporate officer of the party against whom enforcement is sought.

9

13.8    **Modification and Amendment.** This Agreement may not be modified, amended, rescinded, waived or otherwise changed except pursuant to a written consent, amendment or other agreement signed by a duly authorized corporate officer of each party.

13.9    **Notice.** All written notices between the parties shall be deemed to have been given if personally delivered or sent by nationally recognized overnight mail (such as UPS, Fed Ex or DHL), to the address specified below:

Vendor:    Sage Software, Inc.
6561 Irvine Center Drive
Irvine, California 92618
Attn. General Counsel

Navarre:    Navarre Distribution Services, Inc.
7400 49th Avenue North
New Hope, Minnesota 55428
Attn. General Counsel

A notice shall be deemed complete when said notice is deposited by sender in accordance with the method of delivery as stated above, and the date of such mailing shall constitute the date of notice.

13.10    **Execution in Counterparts.** This Agreement may be executed in any number of counterparts which, when taken together, constitute one and the same instrument.

The parties, by the actions of their authorized representatives, have executed this Agreement as of the date indicated above.

SAGE SOFTWARE, INC.                    NAVARRE DISTRIBUTION SERVICES, INC.

By: _____          By: _____
Name: Brendan Quigley                  Name: Duke Fick
SVP, Division CFO                       President
Title                                   Title

26155v3:10697/00

10

## Schedule A
## to
## DISTRIBUTION AGREEMENT
## COMPUTER SOFTWARE (TERMS) Dated: January 12, 2011

### Between NAVARRE DISTRIBUTION SERVICES, INC. ("Navarre") and SAGE SOFTWARE, INC. ("Vendor")

### CPSIA COMPLIANCE

List all Products designated or otherwise intended for use primarily by children under 12 years of age:
[If none, so state]

NONE

Describe how Vendor will make available to Navarre and Customers the CPSIA Certificate of Compliance for the above Products:

N/A

/1

## CONSIGNMENT RIDER to

## DISTRIBUTION AGREEMENT
### COMPUTER SOFTWARE (TERMS) Dated: January 12, 2011

### Between NAVARRE DISTRIBUTION SERVICES, INC. ("Navarre") and SAGE SOFTWARE, INC. ("Vendor")

### GENERAL TERMS AND CONDITIONS FOR CONSIGNMENT PROGRAMS:

*Navarre has developed consignment programs with certain major retailers (the "Retailer(s)"). Vendor may elect to participate in the consignment programs with respect to all or a portion of the Products and with respect to any or all such Retailers by executing the applicable Retailer Addendum attached hereto. The purpose of this Rider is to set forth the general terms and conditions applicable to all consignment programs and the terms specific to each Retailer are contained in the applicable Retailer Addendum.*

1. **Modification of the Agreement.** This Rider supersedes the payment and other terms of the Agreement as necessary to effectuate the consignment programs. All other provisions and definitions in the Agreement remain applicable but should be read and interpreted to be consistent with the delivery of Products on a consignment basis rather than as a sale (the "Consigned Products"). In addition, this Rider and all executed Retailer Addendums supersede any previous consignment agreements between Navarre and Vendor.

2. **Title of Consigned Products.** Vendor remains vested with all right, title and interest in each item of Consigned Product until sale by Retailer to an End User. Upon sale by Retailer to an End User, title passes from Vendor to Navarre, then from Navarre to the Retailer. Until such time, Navarre will not in any way acquire any right, title or interest in any Consigned Product and will not represent itself to third parties as being the owner of any such item, claim any rights of ownership therein, nor encumber any such item. Each Retailer has agreed to the same with respect to Consigned Products in its possession. Vendor is responsible for availing itself of the protections afforded consignors under the applicable sections of the Uniform Commercial Code ("UCC") and for filing UCC financing statements on the Consigned Products in the possession of Navarre and the Retailer. Navarre and each Retailer agree to cooperate with Vendor where necessary for Vendor to make such filings.

3. **Risk of Loss.** Navarre has responsibility for the care and condition of the Consigned Products in its possession following delivery by Vendor, and Navarre assumes liability for any loss or damage to Consigned Products in its possession, including but not limited to breakage, theft, and damage by water, fire or extraordinary conditions of a similar nature. Navarre will maintain all-risk property insurance covering the Consigned Products in its possession in an amount at least equal to the aggregate replacement value. Each Retailer has agreed to the same with respect to Consigned Products in its possession.

4. **Identification.** Vendor must provide a unique UPC code for each title of Consigned Product. Such unique SKU's are required to keep consignment inventory separate from Vendor's non-consignment Products for proper payment and accounting.

5. **Invoicing and Payment.**

    a. **Tracking Invoice.** Upon shipment of Consigned Products, Vendor will issue an invoice, for tracking purposes and not to indicate a sale, including a description of the Consigned Products by SKU, quantities, delivery location, the Vendor's published price and a cost of either $.01 or $.00 (to be determined by Navarre) per item shipped. These tracking invoices are necessary in order for Vendor to maintain an accounting for Consigned Product and for reconciliation of shipping shortages and discrepancies.

261864v3:10607/00

12

b,  Sales Reports.  Navarre will obtain from each Retailer electronic reports of weekly point of sales data showing sales of Consigned Products to End Users by SKU net of any returns from End Users. Consigned Product sold but returned by an End User pursuant to the Retailer's return policy will not be counted as a sale. Navarre will also be able to account for inventory on hand on a weekly basis including inventory at Navarre's distribution center, inventory at Retailer's distribution and retail locations, and returns in route to Vendor.

c,  Payment.  At the end of each Retailer's reporting period (the "Sales Reporting Period") as specified in the Retailer Addendum, Navarre will report net sales to Vendor for the Retailer aggregating the Consigned Products sold to End Users during that reporting period. Navarre will pay Vendor for such sales at Vendor's published purchase prices on the payment date (the "Payment Date") indicated in the Retailer Addendum.  Navarre will not charge Vendor an administrative fee for administering the consignment program. Any other credits or chargebacks authorized by the Agreement, this Rider and each Retailer Addendum may be deducted prior to payment.

6.  Shrinkage Reconciliation.  Each Retailer will audit the shrink or loss of Consigned Products periodically and report such losses to Navarre.  Audit periods vary by Retailer as indicated in the Retailer Addendum. The Retailer will report and pay for shrink losses within sixty (60) days after the end of the audit period. Navarre will then promptly report to Vendor and pay for such losses.

7.  Returns.  Navarre and the Retailer(s) will have one hundred percent (100%) return rights on all Consigned Products which are unsold to End Users for any reason, including obsolete, delisted, defective or slow-moving goods, termination of this Agreement, or otherwise.  Returns will be handled pursuant to the provisions of the Agreement, except that Consigned Products which become delisted may be returned at any time while this Rider is in effect.  Procedures for handling returns that vary by Retailer are indicated in the Retailer Addendum.

8.  Destruction of Defectives.  To eliminate return freight expense, Navarre and the Retailers prefer to destroy defective and damaged items on site.  Navarre will request approval from Vendor in each case, and if received, will provide Vendor with proof of destruction in order to delete the destroyed items from the Consigned Product inventory.

9.  Property Tax Reports.  Navarre and the Retailers will report Consigned Products in their possession to the appropriate taxing authorities if required by the particular authority.  They will be reported as consigned property owned by the Vendor.  Navarre will provide Vendor with the inventory amounts and locations of the property so reported along with applicable supporting documentation.  Vendor will be responsible for any property tax payable on the Consigned Products, and Navarre will chargeback all such property tax amounts paid to a taxing authority.  The foregoing applies only to valid property tax assessments and does not apply to sales and income taxes which are the responsibility of Navarre and the Retailer(s).  In the event a Retailer determines not to report and pay property tax on Vendor's behalf, Vendor will be solely responsible for reporting and paying property tax on Consigned Products.

*[Signature page follows]*

13

10. **Termination.** This Rider will terminate upon expiration or earlier termination of the Agreement. Upon termination of this Rider in its entirety, Navarre's sole obligation is to return or destroy, as approved by Vendor, any inventory of Consigned Products in its possession. In addition, this Rider will terminate with respect to any Retailer if, and at the time that, such Retailer terminates its participation in the consignment program. In such event, Navarre will facilitate Vendor's negotiations with a terminating Retailer regarding the disposition of the Consigned Products held by such Retailer.

SAGE SOFTWARE, INC:                          NAVARRE DISTRIBUTION SERVICES, INC.

By: _____         By: _____

Name: _Brendan Quigley___            Name: _JOYCE FILLIE_____

_SVP, Division CFO_                  _PresiDenT_
Title                                Title

14

### STAPLES ADDENDUM
### to
### NAVARRE'S CONSIGNMENT PROGRAMS RIDER

Vendor, by its signature below, agrees to participate in the Staples Consignment Program and, in addition to the General Terms and Conditions for Consignment Programs, agrees to the Staples specific terms set forth below.

Sales Reporting Period. Navarre will report to Vendor net sales of Consigned Products by Staples to End Users for each fiscal month in the Navarre AP calendar (either four or five weeks based on a modified 4-5-4 calendar),

Payment Date. Navarre's Payment Date to Vendor is the forty-fifth (45th) day following the last day of the Sales Reporting Period.

Shrinkage Audit Reports. Staples will audit shrink and loss of Consigned Products on a quarterly basis and report and pay for shrink losses forty-five (45) days after the close of each fiscal quarter.

Returns. Staples has a no physical returns policy. All returns will be destroyed in the field with Staples providing proof of performance. Destroyed items will be deleted from the Consigned Products Inventory. If Vendor does not approve any request for destruction and demands return, Staples will comply and charge a returns handling fee of ten dollars ($10.00) per store per return and return freight charges from Staples' preferred carrier. The fee and freight charges will be charged back to Vendor.

Other Programs. Vendor agrees to participate in Staples' eleven and one-half percent (11.5%) MDF/stocking fee/detailing program accrual based on Staples' net cost of Consigned Products sold. Navarre will issue chargebacks for this accrual and provide Vendor with proof of performance and other back up documentation. Staples retains the right to request additional marketing funds from Vendor to aid in the promotion of the Consigned Products.

Change in Retailer Terms. Vendor acknowledges that the foregoing terms are based on Staple's current consignment program. If Staples modifies its consignment program, Navarre will notify Vendor of any changes in the above terms. Vendor may opt out of the Staples consignment program if it is not in agreement with the changes

Signatures to Staples Addendum

SAGE SOFTWARE, INC.                          NAVARRE DISTRIBUTION SERVICES, INC.

By:                                          By:

Name: Brendan Quigley                        Name:

Title: SVP, Division CFO                     Title: President

Date: 1/17/14

15

## CANADIAN CONSIGNMENT RIDER to
## SOFTWARE DISTRIBUTION AGREEMENT

This CANADIAN CONSIGNMENT RIDER TO DISTRIBUTION AGREEMENT (the "Rider") is made and entered into as of June 6th, 2012 (the "Effective Date") by and between Sage Software Canada, Ltd. ("Sage Canada") and Navarre Distribution Services ULC ("Navarre Canada") (the parties collectively referred to herein as the "Parties" and individually as a "Party").

WHEREAS, effective on January 12, 2011, Sage Software, Inc. and Navarre Distribution Services, Inc. entered into that certain Distribution Agreement Computer Software (Terms), as amended from time to time (the "Distribution Agreement") with respect to the distribution of certain computer software products (the "Products");

WHEREAS, effective August 4, 2011, Sage Canada and Navarre Canada became parties to the Distribution Agreement with respect to Navarre Canada's purchase of Products from Sage Canada for distribution within the Dominion of Canada;

WHEREAS, Navarre Canada has developed consignment programs with certain Canadian retailers (the "Retailer(s)") and Sage Canada may elect to participate in the consignment programs with respect to all or a portion of the Products and with respect to any or all such Retailers by executing the applicable Canadian Retailer Addendum attached hereto; and

WHEREAS, Sage Canada and Navarre Canada now desire to amend the Distribution Agreement by adding the general terms and conditions applicable to all Canadian consignment programs set forth below and the terms specific to each Retailer contained in each Canadian Retailer Addendum executed by the Parties and attached hereto and hereby or hereafter incorporated herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### TERMS AND CONDITIONS FOR CANADIAN CONSIGNMENT PROGRAMS-

1. **Modification of the Agreement.** This Canadian Consignment Rider supersedes the payment and other terms of the Distribution Agreement as necessary to effectuate the Canadian consignment program(s) between Sage Canada and Navarre Canada and the Retailer(s) as indicated in the applicable addendum (the "Canadian Retailer Addendum") attached hereto and, when executed by the parties, incorporated herein. All other provisions and definitions in the Distribution Agreement remain applicable but should be read and interpreted to be consistent with the delivery of those Products authorized by Sage Canada from time to time to be distributed by Navarre Canada in the Dominion of Canada on a consignment basis rather than as a sale (the "Consigned Products").

2. **Title of Consigned Products.** Sage Canada remains vested with all right, title and interest in each item of Consigned Product until sale by Retailer to an End User. Upon sale by Retailer to an End User, title to the Consigned Products transfers, in a simultaneous transaction, from Sage Canada to Navarre Canada, then from Navarre Canada to Retailer. Until such time, Navarre Canada will not in any way acquire any right, title or interest in any Consigned Product and will not represent itself to third parties as being the owner of any such item, claim any rights of ownership therein, nor encumber any such item. Each Retailer has agreed to the same with respect to Consigned Products in its possession. Sage Canada is responsible for availing itself of the any security interest protections afforded consignors under the applicable Canadian federal, provincial or common law. Navarre Canada agrees to cooperate with Sage Canada where necessary for protection under such law.

I

30312v2:10587/00

16

3. **Freight.** Navarre Canada is responsible for payment of all freight charges and transportation expenses, including freight insurance and import duties and fees, for inbound shipments of Consigned Products to Navarre Canada and for shipments to Retailers from Navarre Canada.

4. **Risk of Loss.** Navarre Canada has responsibility for the care and condition of the Consigned Products in its possession following delivery by Sage Canada, and Navarro Canada assumes liability for any loss or damage to Consigned Products in its possession, including but not limited to breakage, theft, and damage by water, fire or extraordinary conditions of a similar nature. Navarre Canada will maintain all-risk property insurance covering the Consigned Products in its possession in an amount at least equal to the aggregate cost value.

5. **Identification.** Sage Canada must provide a unique UPC code for each title of Consigned Product. Such unique SKU's are required to keep consignment inventory separate from Sage Canada's non-consignment Products for proper payment and accounting.

6. **Invoicing and Payment.**

   a. **Tracking Invoice.** Upon shipment of Consigned Products, Sage Canada will issue an invoice, for tracking purposes and not to indicate a sale, including a description of the Consigned Products by SKU, quantities, delivery location and a cost of $0.00 per item shipped. These tracking invoices are necessary in order for Sage Canada to maintain an accounting for Consigned Product and for reconciliation of shipping shortages and discrepancies.

   b. **Sales Reports.** Navarre Canada will obtain from each Retailer electronic reports of weekly point of sales data showing sales of Consigned Products to End Users by SKU net of any returns from End Users. Consigned Product sold but returned by an End User pursuant to the Retailer's return policy will not be counted as a sale. Navarre Canada will also be able to account for inventory on hand on a weekly basis including inventory at Navarre Canada's distribution center, inventory at each Retailer's distribution and retail locations, and returns in route to Sage Canada.

   c. **Purchase Price.** Navarre Canada agrees to pay for the Consigned Products sold by Retailer(s) to End Users in Canadian dollars according to Sage Canada's Distributor Price List applicable to the Dominion of Canada. Sage Canada reserves the right to unilaterally increase or decrease the prices listed in the Canadian Distributor Price list from time to time upon thirty (30) days prior written notice to Navarre Canada.

   d. **Payment.** The "Sales Reporting Period" is each fiscal month in the Navarre AP calendar (either four or five weeks based on a modified 4-5-4 calendar). At the end of the Sales Reporting Period, Navarre Canada will report net sales to Sage Canada for each Retailer aggregating the Consigned Products sold to End Users during that reporting period. Navarre will pay Sage Canada in Canadian dollars for such sales by the forty-fifth (45th) day following the last day of the Sales Reporting Period.

7. **Shrinkage Reconciliation.** Each Retailer will audit the shrink or loss of Consigned Products periodically and report such losses to Navarre Canada. Audit periods vary by Retailer as indicated in the Canadian Retailer Addendum. All reports provided by a Retailer to Navarro Canada will be promptly furnished to Sage Canada. Upon receiving payment from a Retailer for identified shrinkage, Navarre will promptly pay Sage Canada for the missing units.

8. **Returns.** Return rights for Consigned Products will be the same as set forth in the body of the Distribution Agreement. Procedures for handling returns that vary by Retailer are indicated in the Canadian Retailer Addendum.

2                                          30312v2:10567/00

17.

9. Destruction of Defectives. To eliminate return freight expense, Navarre Canada and the Canadian Retailers prefer to destroy defective and damaged items on site. Navarre Canada will request approval from Sage Canada in each case, and if received, will provide Sage Canada with proof of destruction in order to delete the destroyed items from the Consigned Product inventory.

10. Compliance with Canadian Law. Sage Canada represents that (i) all Consigned Products will be packaged and labeled in compliance with all applicable Canadian federal, provincial and local laws and regulations, including by way of example all laws and regulations relating to safety, environment, labeling, language, recycling, country of origin designation and Customs requirements; and (ii) no Consigned Products will contain "old-growth wood or fibre." If the Consigned Products do not comply with such laws and regulations, Sage Canada agrees to indemnify Navarre Canada and Retailer(s) for any claims arising therefrom and Navarre Canada may pass through any chargebacks by Retailer(s) of any regulatory fines or penalties actually incurred as a result.

11. Term & Termination. The term of this Rider shall begin on the Effective Date and continue for a period of one (1) year. Thereafter the Rider will automatically renew for one (1) year terms unless terminated by Sage Canada at least ninety (90) days prior to a renewal date. This Consignment Rider will terminate upon expiration or earlier termination of the Distribution Agreement. Upon termination of this Canadian Consignment Rider in its entirety, Navarre Canada's sole obligation is to return or destroy, as approved by Sage Canada, any inventory of Consigned Products in its possession. In addition, this Consignment Rider will terminate with respect to any Retailer if, and at the time that, such Retailer terminates its participation in the consignment program. In such event, Navarre will facilitate Sage Canada's negotiations with a terminating Retailer regarding the disposition of the Consigned Products held by such Retailer.

IN WITNESS WHEREOF, the Parties hereto have caused this Rider to the Agreement to be executed on the date(s) set forth below.

SAGE SOFTWARE CANADA, LTD.                    NAVARRE DISTRIBUTION SERVICES ULC

Signature: _____            Signature: _____
Print Name: JOHN SCHOUTSEN                    Print Name: Joyce Fleck
Title: VP                                     Title: President

Date: 6-18-12

30312v2:10587/00

18

**CANADIAN RETAILER ADDENDUM**

**BEST BUY CANADA / FUTURE SHOP CONSIGNMENT PROGRAM**

Navarre Canada has established a consignment program, in the territory of Canada with Best Buy Canada Ltd., a Canadian corporation ("Best Buy Canada / Future Shop"). Sage Canada, by its signature below, agrees to participate in the Best Buy Canada / Future Shop Consignment Program and, agrees to the specific terms set forth below.

1. Shrinkage Audit Reports. Best Buy Canada / Future Shop will audit shrink and loss of Consigned Products on an annual basis and pay for shrink losses upon reconciliation of the annual report with Navarre Canada.

2. Sales Reports. Sage Canada acknowledges that Best Buy Canada / Future Shop's weekly sales reports (on EDI form 852) are approximate only and will not exactly equal the aggregated monthly sales report, based on point of sales data and customer returns, which monthly report is controlling for purposes of Navarre Canada's payment obligation to Sage Canada.

3. Pass Through Consignment Fee/MDF Allotment. If required by Best Buy Canada / Future Shop, Sage Canada agrees to pay the monthly administrative fee required by Best Buy Canada / Future Shop in connection with its consignment program which is equal to two percent (2%) of Best Buy Canada / Future Shop's sale price of Consigned Products sold by Best Buy Canada / Future Shop to End Users during the month. Sage Canada also agrees to pay Best Buy Canada / Future Shop an eleven percent (11%) MDF/ Stocking Fee/ Flyer placement/Detailing program accrual based on Best Buy Canada / Future Shop's net cost of Consigned Products sold. Navarre will issue chargebacks quarterly for this accrual and provide Sage Canada with proof of performance or other back up documentation. Best Buy Canada / Future Shop retains the right to request additional marketing funds from Sage Canada to aid in the promotion of the Consigned Products.

4. Change in Best Buy Canada / Future Shop Terms. Sage Canada acknowledges that the foregoing terms are based on Best Buy Canada / Future Shop's current consignment program. If Best Buy Canada / Future Shop modifies its consignment program, Navarre Canada will notify Sage Canada of any changes in the above terms. Sage Canada may opt out of the Best Buy Canada / Future Shop consignment program if it is not in agreement with the changes.

SAGE SOFTWARE CANADA, LTD.                    NAVARRE DISTRIBUTION SERVICES ULC

By: _____               By: _____

Name: ___JOHN SCHONISE___                   Name: ___Joyce Fleck___

Title ___VICE PRESIDENT___                  Title ___President___

Date: ___6-18-12___

30312v2:10587/00

19

This is Exhibit "....*B*....." referred to in the
affidavit of ...*RICHARD  HARDY*.....

Sworn before me on ...*SEPTEMBER 20,* 20 *17*

................................................
A Commissioner for taking Affidavits
for British Columbia

## AMENDMENT #1
### TO THE
### DISTRIBUTION AGREEMENT COMPUTER SOFTWARE (TERMS)
### AMONG
### WYNIT DISTRIBUTION, LLC,
### WD NAVARRE CANADA, ULC
### AND
### SAGE SOFTWARE CANADA, LTD. ("SUPPLIER")

This Amendment #1 to the Distribution Agreement Computer Software (Terms) ("**Amendment #1**") is made as of the 1st day of April , 2016 ("**Effective Date**") by and among **WYNIT Distribution, LLC**, a New State limited liability company with a principal place of business located at 2 West Washington Street, Suite 500, Greenville, South Carolina 29601 USA  and **WD Navarre Canada, ULC** a Nova Scotia Canada unlimited liability company with  a principal place of business located at  450 Export Boulevard, Unit A, Mississauga, Ontario,  L5S 2A4 CANADA along with its subsidiaries and affiliates (collectively " **WYNIT**") and **Sage Software Canada, Ltd.**, an Ontario corporation with its principal offices located at 13888 Wireless Way, Suite 120, Richmond, B.C., V6V 0A3,, Canada ("**Supplier**") also referred to as "**Sage Canada**" and "**Vendor**" in the Agreement (defined below).

**WHEREAS**, Navarre Distribution Services, ULC and Supplier entered into that certain Distribution Agreement Computer Software (Terms) dated August 4, 2011 along with the Canadian Consignment Rider to Software Distribution Agreement between Navarre Distribution Services, ULC and Supplier dated June 6, 2012 (collectively the "**Agreement**"); and

**WHEREAS**, WYNIT Distribution, LLC has acquired the majority of the assets of Navarre Distribution Services ULC on July 9, 2014, and chooses to continue its operations of distributor under this Agreement as WYNIT and its subsidiaries and affiliates as further defined in this Amendment #1; and

**WHEREAS**, WYNIT and Supplier now agree to amend certain terms and conditions of the Agreement through this Amendment #1; and

**NOW, THEREFORE**, in consideration of the foregoing premises and the covenants and conditions contained herein, the receipt and sufficiency of which is hereby acknowledged, Navarre Canada and Supplier do each hereby agree as follows:

1.  **Section 5. Governing Law** of the Agreement is being deleted and replaced in its entirety through this Amendment No.1 as follows:

    This Agreement and the rights and obligations of the parties hereunder will be governed by the laws of the Ontario, Canada, without regard to its choice of law provisions. The parties agree that the Ontario, Canada have sole and exclusive jurisdiction and venue over any action relating to this Agreement and the parties hereby consent to the jurisdiction of such courts. Navarre Canada and Supplier each consent to service of process against any action or proceeding related to this Agreement by the delivery of a copy of such process to the respective address set forth in the Notice section being added into this Agreement through this Amendment #1.

2.  **Section 6 Notice** is being added into the Agreement through this Amendment #1 withcontact information as follows:

WYNIT:
WYNIT Distribution, LLC
WD Navarre Canada, ULC
2 West Washington Street
Suite 500
Greenville, South Carolina 29601 USA
Attention: Legal Affairs

Supplier:
Sage Software, Inc.
c/o Sage Software Canada, Ltd.
1715 N. Brown Rd.

Lawrenceville, GA 30043USA
Attention: Legal Department

20

3.  **Section 7 Subsidiaries and/or Affiliates** is being added into the Agreement through this Amendment #1 as follows:

> Either party and any of its Subsidiaries and/or its Affiliates are incorporated hereto by reference. Any Subsidiary and/or Affiliate is defined as a legal entity directly or indirectly owned by a party, but any such legal entity shall only be considered a Subsidiary and/or an Affiliate of a party as long as such direct or indirect ownership exists. Either party may identify its Subsidiaries and/or Affiliates in any Exhibits, Addendums and Riders attached hereto and incorporated by reference to this Agreement.

4.  A **Staples Canada Addendum** is attached hereto through this Amendment #1 and is incorporated into the Agreement by reference.

The parties hereto hereby acknowledge and agree that except as expressly stated hereby through this Amendment #1, the Distribution Agreement Computer Software (Terms) along with the other Exhibits, Addendums and the Canadian Consignment Rider among the parties, reflect the entire agreement of the parties hereto. All parties agree that to the extent there are any terms contained in this Amendment #1 that vary and conflict with the terms of the Agreement then the terms set forth in this Amendment #1 shall govern. Capitalized terms not otherwise defined in this Amendment #1 shall have the meanings set forth in the Agreement.

**IN WITNESS WHEREOF**, WYNIT and Supplier have executed and delivered this Amendment #1 as of the Effective Date written above. This Amendment #1 may be executed in counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.

SAGE SOFTWARE CANADA, LTD. ("SUPPLIER")      WYNIT DISTRIBUTION, LLC (" WYNIT")
                                             WD NAVARRE CANADA, ULC

By:_____      By:_____

Name:_____      Name:___ Bill Cave _____

Title:_____      Title:___ Chief Financial Officer ____

Date:_____      Date:_____

21

**STAPLES CANADA ADDENDUM**
**TO THE**
**CANADIAN CONSIGNMENT RIDER**
**BETWEEN**
**WD NAVARRE CANADA, ULC**
**AND**
**SAGE SOFTWARE CANADA, LTD.**

WD Navarre Canada, ULC's ("Navarre Canada") agreement with Staples Canada Inc. (**"Staples"**) requires Navarre Canada to obtain from our Suppliers specific representations with respect to the Products sold to Navarre Canada for resale to Staples on consignment. Supplier, by its signature below, agrees to have its Products distributed and sold to Staples through consignment by Navarre Canada and therefore agrees to the terms and conditions in this Staples Canada Addendum (**"Staples Canada Addendum"**) as follows:

Pass through funds under this Staples Canada Addendum are in addition to any other discounts and credits provided in the Distribution Agreement and Consignment Rider between Navarre Canada and Supplier. Pass through funds are amounts that Staples will charge to Navarre Canada as a price adjustment or charge back and Navarre Canada will in turn charge the same amount to Supplier.

1. **Sales Reporting Period.** Navarre Canada will report to Supplier net sales of Consigned Products by Staples to End Users for each fiscal month in the Navarre Canada AP calendar either four or five weeks based on a modified 4-5-4 calendar.

2. **Payment Date.** Navarre Canada's Payment Date to Supplier is the forty-fifth (45th) day following the last day of the Sales Reporting Period.

3. **Shrinkage.** If applicable, Supplier agrees to an inventory shrink allowance through Staples of one percent (1%) to cover for inventory that may no longer exist due to damage, miscounting, incorrect units of measure or any other similar issues.

4. **Returns.** Staples has a no physical returns policy. All returns will be destroyed in the field. Destroyed items will be deleted from the Consigned Products inventory. If Supplier does not approve any request for destruction and demands return, Staples will comply and charge a return handling fee of ten dollars ($10.00) per store per return and freight charges from Staples's preferred carrier. The fee and freight charges will be charged back to Supplier.

5. **Advertising Programs.** If applicable, Supplier agrees to participate in and pay the required fees for the Staples MDF/stocking fee/detailing program accrual in an amount equal to twenty-four percent (24%) of Staple's net cost of Consigned Products sold. Staples will charge Supplier directly for these fees. In addition, Staples retains the right to request additional marketing funds from Supplier to aid in the promotion of the Consigned Products which may be charged directly to Supplier.

6. **Compliance with Laws.** Supplier warrants that all Consigned Products will be packaged and labeled in compliance with all applicable Canadian federal, provincial and local laws and regulations, including by way of example all laws and regulations relating to safety, environment, labeling, language, recycling, country of origin designation and Customs requirements. Further no Products will contain "old-growth wood or fibre." If the Consigned Products do not comply with such laws and regulations, Supplier agrees to indemnify Navarre Canada and Staples for any claims arising therefrom and Navarre Canada may pass through any chargebacks by Staples of any regulatory fines or penalties actually incurred as a result.

7. **Change in Staples Terms.** Supplier acknowledges that the foregoing terms are based on Staple's current consignment program. If Staples modifies its consignment program, Navarre Canada will notify



Supplier of any changes in the above terms.  Supplier may opt out of the Staples consignment program if it is not in agreement with the changes.

8.   **Entire Agreement.** This Staples Canada Addendum, Canadian Consignment Rider and Distribution Agreement between the parties constitute the entire agreement and understanding between the parties concerning the subject matter hereof and supersede all prior and contemporaneous representations, agreements, understandings, proposals and communications between the parties, whether written or oral.

9.   **Conflict.** Both parties agree that to the extent there are any terms contained in this Staples Canada Addendum related to the subject matter hereto that vary and conflict with the terms of the Canadian Consignment and/or Distribution Agreement then the terms set forth in this Staples Canada Addendum will govern.

10. **Termination.** Either party may terminate this Staples Canada Addendum upon sixty (60) days advance written notice to the other party.

The parties, by the actions of their authorized representatives, have executed this Staples Canada Addendum as of the last day below.

**SAGE SOFTWARE CANADA, LTD. ("SUPPLIER")**          **WD NAVARRE CANADA, ULC ("NAVARRE CANADA")**

By:_____          By:_____

Name:_____          Name: Bill Cave

Title:_____          Title: Chief Financial Officer

Date:_____          Date:_____



23



Sage Software Canada, Ltd.
120 Bremner Blvd, Suite 1500
Toronto, Ontario
M5J 0A1

September 6, 2017

Via email at tchase@wynit.com and Federal Express

Attn: Tom Chase
General Counsel
WYNIT Distribution, LLC
2 W Washington ST
Greenville, SC 29601

Attn: General Counsel
WD Navarre Canada, ULC
450 Export BLVD Unit A
Mississauga, ON L5S 2A4

This is Exhibit "......C......" referred to in the

affidavit of ....RICHARD HARDY..........

Sworn before me on..SEPTEMBER 20, 20 17

..............................................................
A Commissioner for taking Affidavits
for British Columbia

RE:   Notification of Breach under Distribution Agreement Computer Software between
      Sage Software Canada, Ltd. ("Sage"), WYNIT Distribution, LLC ("WYNIT US"),
      and WD Navarre Canada, ULC ("Navarre") (WYNIT and Navarre, collectively and
      interchangeably, "WYNIT"), that was effective August 4, 2011 (the "Canadian
      Agreement")

Dear Mr. Chase,

The purpose of this letter is to formally notify WYNIT that it is in material breach of the
above-referenced Agreement including its payment obligations under Section 5 of the
January 12, 2011 "US Agreement", the terms and conditions of which were incorporated by
reference into the Canadian Agreement, Section 5 of the "Consignment Rider" to the US
Agreement, and Section 5 of the "Canadian Consignment Rider" to the Canadian Agreement.

As of the date of this letter, WYNIT's past due balance, which includes payments that are in
excess of 60 days overdue, totals CAD$667,770.85 (the "Past Due Balance") with an
additional CAD$411,317.74 due between September 8, 2017 and October 20, 2017 (the
"Remaining Balance"). The Past Due Balance together with the Remaining Balance totals
CAD$1,079,088.59 (the "Total Balance") exclusive of interest.

To-date, despite repeated requests, WYNIT has provided Sage with no meaningful
assurances that it will be able to fulfill its payment obligations under the Agreement.

Accordingly, the entire amount of the Past Due Balance is and is hereby declared to be
immediately due and payable. Further to the foregoing, Sage hereby demands the following
adequate assurance of performance: written confirmation that WYNIT can and will within

24

Tom Chase
General Counsel
WYNIT Distribution, LLC
September 6, 2017
Page 2

ten calendar days of the date of this letter pay the Total Balance via wire transfer to Sage.
**Sage requires this assurance of performance to be provided on or before September 8, 2017.**

WYNIT is further requested to securely destroy and dispose of the Sage product inventory remaining in its possession in lieu of returning it to Sage.

WYNIT's failure to timely provide the requested assurance of performance shall be considered by Sage to a repudiation of the Agreement and, in such instance, Sages reserves the right to exercise all of its rights available under the Agreement and at law and/or in equity. Sage further advises WYNIT that for the purpose of minimizing its potential losses, which threaten to be considerable, Sage is entering into a new consignment arrangement with a third-party distributor regarding the unsold inventory currently in the retailers' possession; WYNIT is reminded that under the Agreement Sage remains fully vested in all right, title, and interests in and to the unsold inventory. Sage expects WYNIT to meet its contractual obligation under the Agreement to work cooperatively with Sage for the purpose of facilitating that transition. A standard memorialization of the arrangement is enclosed for WYNIT's Chief Operating Officer's signature; further to the foregoing, please ensure that the memorialization is promptly executed and returned with the assurance of performance.

If you have any questions regarding this letter, please direct them to me at the address below.

Sincerely,

Celeste Helms
Regional Legal Director, North America
Sage
271 17th Street NW, Atlanta, GA 30363
Celeste.Helms@sage.com

Enclosure

25



Sage Software Canada, Ltd.
120 Bremner Blvd, Suite 1500
Toronto, Ontario
M5J 0A1

September 6, 2017

Via email at prichichi@wynit.com and Federal Express

Mr. Pete Richichi
Chief Operating Officer
WYNIT Distribution, LLC
2 W Washington ST
Greenville, SC 29601

Copy to

Attn: Tom Chase
General Counsel
WYNIT Distribution, LLC
2 W Washington ST
Greenville, SC 29601

And

Attn: General Counsel
WD Navarre Canada, ULC
450 Export BLVD Unit A
Mississauga, ON L5S 2A4

RE:   Programmatic transfer of Sage 50 inventory held by Staples and Best Buy (the "Retailers") in Canada

Dear Mr. Richichi,

In view of WYNIT's announced closure of its North American distribution business, please be advised that Sage Software Canada, Ltd. ("Sage") is transferring the current unsold inventory (the "Transferred Inventory") of Sage's boxed Sage 50 (2017) software product held by the Retailers that was originally ordered and shipped through WYNIT Distribution, LLC ("WYNIT US") and WD Navarre Canada, ULC ("Navarre") (WYNIT and Navarre, collectively and interchangeably, "WYNIT") for in-store retail and website sales by the Retailers. The transfer is to Synnex Corporation's Canadian distribution business. The Transferred Inventory will remain in the Retailers' possession until sold by them or otherwise disposed of in accordance with Sage's and the Retailers' separate arrangements with Synnex.

This is Exhibit "....D....." referred to in the
affidavit of ....RICHARD HARDY....
Sworn before me on ....SEPTEMBER 20.... 20.17...
.................................................
A Commissioner for taking Affidavits
for British Columbia

26

Mr. Pete Richichi
Chief Operating Officer
WYNIT Distribution, LLC
September 6, 2017
Page 2

This memorialization, upon your signature and return to Sage as requested in the letter to which it is attached, serves as written confirmation for the parties' records that Sage and WYNIT have fully released one another from contractual responsibilities (including Sage's payment of fees to WYNIT) and claims only with regard to the Transferred Inventory.

Sincerely,

Celeste Helms
Regional Legal Director, North America
Sage
271 17th Street NW, Atlanta, GA 30363
Celeste.Helms@sage.com


Acknowledged and agreed:


_____
Mr. Pete Richichi
WYNIT Distribution, LLC
WD Navarre Canada, ULC


_____
Date

27

## Jaipargas, Roger

| | | |
|---|---|---|
| From: | Jaipargas, Roger | This is Exhibit "..........E..........." referred to in the |
| Sent: | September-17-17 3:31 PM | affidavit of ....RICHARD  HARDY......... |
| To: | forte@gsnh.com | Sworn before me on SEPTEMBER 20, 20 17 |
| Subject: | Wynit Distribution, LLC et al. | |

A Commissioner for taking Affidavits
for British Columbia

Dear Mario,

Further to our discussion of last Friday, we are the lawyers for Sage Software Canada, Ltd. and Sage Software, Inc. (collectively, "Sage").

Reference is made to a Distribution Agreement Computer Software (terms) between Navarre Distribution Services ULC and Sage, as amended from time to time (the **"Distribution Agreement"**).

Wynit Distribution LLC, and various affiliates (the **"Debtors"**) filed for Chapter 11 Bankruptcy protection on September 8, 2017 (the **"Chapter 11 Proceedings"**).  On September 8, 2017, Wynit Distribution, LLC in its capacity as proposed foreign representative obtained an interim stay order from the Ontario Superior Court of Justice (Commercial List) providing for a stay of proceedings as against W. Navarre Canada, ULC and Wynit Holdings, Inc. collectively, (the **"Canadian Debtors"**).

We understand that it is contemplated that an application will be brought in the coming days for an initial recognition order and a supplemental recognition order pursuant to Part IV of the Companies Creditors Arrangement Act (**"CCAA"**).  We further understand that the Debtors distribution business has been shut down and that the Debtors are pursuing a liquidation through the Chapter 11 proceedings and the proposed ancillary proceedings in Canada.  In connection therewith, the insolvency proceedings commenced by the Debtors means that they can no longer provide for a distribution channel for the Sage products.  As there is no exclusive right of distribution in connection with the Sage products, Sage intends to take steps immediately to engage a new distributor with a view to minimizing its losses on account of the disruption that has occurred due to the Debtors insolvency proceedings.

Regards,

Roger



**Roger Jaipargas**
T 416.367.6266 | F 416.367.6749 | RJaipargas@blg.com
Bay Adelaide Centre, East Tower, 22 Adelaide St W, Toronto, ON, Canada M5H 4E3

**Borden Ladner Gervais LLP | it begins with service**
Calgary | Montréal | Ottawa | Toronto | Vancouver
blg.com | To manage your communication preferences or unsubscribe, please click on blg.com/mypreferences/

Please consider the environment before printing this email.

This message is intended only for the named recipients. This message may contain information that is privileged, confidential or exempt from disclosure under applicable law. Any dissemination or copying of this message by anyone other than a named recipient is strictly prohibited. If you are not a named recipient or an employee or agent responsible for delivering this message to a named recipient, please notify us immediately, and permanently destroy this message and any copies you may have. Warning: Email may not be secure unless properly encrypted.

28

**STAPLES**
IT'S PRO TIME™

**BUREAU**
**EN GROS**
TOUJOURS PRO™

*Delivered via Email*

September 7, 2017

Mr. Ward Thomas
Executive Vice President
Wynit Distribution, LLC
2 W Washington Street
Greenville SC 29601

This is Exhibit "......F......" referred to in the
affidavit of ....RICHARD...HARDY......
Sworn before me on SEPTEMBER 20 2017
...........................................................
A Commissioner for taking Affidavits
for British Columbia

Dear Ward,

Further to our recent discussion, I am writing to confirm that Wynit Distribution LLC ("Wynit") does not own the consignment inventory that Staples Canada Inc. ("Staples") obtained from Wynit and currently has in its possession ("Consignment Inventory"), as set out in the attached list ("Product List"). This Consignment Inventory is owned by the manufacturer of such product, as also set out in the Product List.

Wynit therefore instructs Staples to work directly with the manufacturers of the Consignment Inventory to manage the current inventory and/or work with alternative distribution partners to create a move forward strategy in partnership with the manufacturers. Wynit releases Staples from any liability to Wynit Distribution Inc., including its affiliates and their respective officers, directors, employees, successors and assigns, in connection with the Consignment Inventory on the Product List.

Please confirm your agreement to the above by signing below, and return a signed copy to Staples by Friday, September 8, 2017. Thank you in advance for your cooperation.

Sincerely,

Mark Shanahan
Divisional Vice President of Merchandising
Staples Canada Inc.

THE ABOVE IS ACKNOWLEDGED AND ACCEPTED on this  8  day of September 2017, by
WYNIT DISTRIBUTION, LLC.

By: _____
        Ward Thomas
        Executive Vice President

6 Staples Ave.
Richmond Hill, ON L4B 4W3
Canada, Staples.ca

29

## Jaipargas, Roger

**From:** Tolentino, Rachelle <Rachelle.Tolentino@staples.ca>
**Sent:** September-15-17 2:39 PM
**To:** Villarosa, Michelle
**Subject:** RE: memo with regards to the Wynit closure.

| SKU | Item # | Class | Status | Description |
|---------|---------|-------|--------|-------------|
| 2417365 | 8135947 | 385 | A | bSAGE50 PRO 2017 POSA |
| 2417364 | 8135946 | 385 | A | bSAGE50 FIRST STEP 2017 POSA |
| 2417367 | 8135949 | 385 | A | bSAGE50 PREMIUM 2017 2U POSA |
| 2417366 | 8135948 | 385 | A | bSAGE50 PRO+PAYROLL 2017 POSA |
| 2417368 | 8135950 | 385 | A | bSAGE50 PREM+PAY 2017 2U POSA |
| 2431837 | 8136247 | 385 | A | DC bSAGE50 FIRST STEP 2017 |
| 2431839 | 8136249 | 385 | A | DC bSAGE50 PRO 2017 |
| 2431840 | 8136251 | 385 | A | DC bSAGE50 PRO+PAYROLL 2017 |
| 2431841 | 8136253 | 385 | A | DC bSAGE50 PREMIUM 2017 2U |

**From:** Villarosa, Michelle [mailto:Michelle.Villarosa@sage.com]
**Sent:** September-15-17 2:34 PM
**To:** Tolentino, Rachelle
**Subject:** RE: memo with regards to the Wynit closure.

Thanks Rachelle. Could you also send the attached "Product List" which is referenced? Thanks!

Dear Ward,

Further to our recent discussion, I am writing to confirm that Wynit Distribution LLC ("Wynit") does not own the consignment inventory that Staples Canada Inc. ("Staples") obtained from Wynit and currently has in its possession ("Consignment Inventory"), as set out in the attached list ("Product List"). This Consignment Inventory is owned by the manufacturer of such product, as also set out in the Product List.

"...

Michelle Villarosa
National Account Manager, Sage 50 Canada
Colleague Activity Team Lead & Sage Foundation Canada Ambassador
Direct +1 604-207-3647  Toll Free +1 800-863-6408 x 353647

*This is Exhibit "......G......" referred to in the affidavit of ....RICHARD  HARDY..........*
*Sworn before me on SEPtember 20, 2017*
*A Commissioner for taking Affidavits for British Columbia*

**From:** Tolentino, Rachelle [mailto:Rachelle.Tolentino@staples.ca]
**Sent:** Friday, September 15, 2017 10:28 AM
**To:** Villarosa, Michelle <Michelle.Villarosa@sage.com>
**Subject:** RE: memo with regards to the Wynit closure.

Please see attached.

**From:** Villarosa, Michelle [mailto:Michelle.Villarosa@sage.com]
**Sent:** September-14-17 6:05 PM
**To:** Tolentino, Rachelle; Leung, Betty
**Subject:** RE: memo with regards to the Wynit closure.

1

30

Hi Rachelle and Betty,

Thanks for sending the detailed memo. Would you be able to provide us with the SKU transfer agreement between Staples and Wynit?

Thank you,

Michelle Villarosa
National Account Manager, Sage 50 Canada
Colleague Activity Team Lead & Sage Foundation Canada Ambassador
Direct +1 604-207-3647  Toll Free +1 800-863-6408 x 353647

**From:** Tolentino, Rachelle [mailto:Rachelle.Tolentino@staples.ca]
**Sent:** Thursday, September 14, 2017 10:20 AM
**To:** Tolentino, Rachelle <Rachelle.Tolentino@staples.ca>
**Subject:** memo with regards to the Wynit closure.

Dear All,

Kindly read the attached memo with regards to the Wynit closure.

Thank you and best regards,

**Rachelle Tolentino**
Category Specialist
Staples Canada

 

T: 905.737.1147 ext 2271
Rachelle.Tolentino@Staples.ca   www.staples.ca
6 Staples Avenue, Richmond Hill, ON L4B 4W3

---

**Attention:**
This email has arrived from the Internet.
Please use caution when opening attachments. Please follow all appropriate security policies when opening any email from a non-trusted source. If you feel this message is suspect please contact your local security representative or Help Desk for review.
**See you at #SageSummit Tour 2017. Learn More**
Paris | Madrid | Melbourne | Berlin | Johannesburg | Singapore | London | Atlanta | Toronto

*Sage Summit goes local, Business Builders, Build On!*

The information contained in this email transmission may constitute confidential information. If you are not the intended recipient, please take notice that reuse of the information is prohibited.

---

**Attention:**
This email has arrived from the Internet.
Please use caution when opening attachments. Please follow all appropriate security policies when opening any email from a non-trusted source. If you feel this message is suspect please contact your local security representative or Help Desk for review.

---

**Attention:**
This email has arrived from the Internet
Please use caution when opening attachments. Please follow all appropriate security policies when opening any email from a non-trusted source. If you feel this message is suspect please contact your local security representative or Help Desk for review.

31

## Jaipargas, Roger

**Subject:** FW: memo with regards to the Wynit closure.
**Attachments:** Wynit closing communication to vendor Sept 14.docx

**From:** Tolentino, Rachelle [mailto:Rachelle.Tolentino@staples.ca]
**Sent:** Thursday, September 14, 2017 10:20 AM
**To:** Tolentino, Rachelle <Rachelle.Tolentino@staples.ca>
**Subject:** memo with regards to the Wynit closure.

Dear All,

Kindly read the attached memo with regards to the Wynit closure.

Thank you and best regards,

Rachelle Tolentino
Category Specialist
Staples Canada

 

This is Exhibit "....H....." referred to in the
affidavit of ....RICHARD HARDY......
Sworn before me on SEPTEMBER 20, 20 17
........................................................
A Commissioner for taking Affidavits
for British Columbia

T: 905.737.1147 ext 2271
Rachelle.Tolentino@Staples.ca   www.staples.ca
6 Staples Avenue, Richmond Hill, ON L4B 4W3

---

**Attention:**
This email has arrived from the Internet.
Please use caution when opening attachments. Please follow all appropriate security policies when opening any email from a non-trusted source. If you feel this message is suspect please contact your local security representative or Help Desk for review.
See you at #SageSummit Tour 2017. **Learn More**
**Paris | Madrid | Melbourne | Berlin | Johannesburg | Singapore | London | Atlanta | Toronto**

*Sage Summit goes local. Business Builders, Build On!*

The information contained in this email transmission may constitute confidential information. If you are not the intended recipient, please take notice that reuse of the information is prohibited.

Hi all –

Please be informed that we have received a letter from Wynit on September 8, 2017 regarding the consignment goods we have in our stores. Wynit has relinquished its ownership of the goods. We have decided to work with you to make the transition happen to prevent further sales disruption.

Here are the key dates:

1. September 30 / October 1 – This is the weekend that we will move over to the distributor of your choice to continue the consignment business. You need to work with the distributor to give us all the new costs and set up information by September 22 (Friday). All the returns pending in our buildings will be put through to the new distributor of records.
2. September 10 – 30 sales (net of sell through support, backend program and shrink) – We will pay you or the distributor of your choice week of October 23. You need to indicate the payee information by Sept 27 to our accounts payable department via the associated category managers / specialists.
3. September 9 and prior sales and sell through support, backend program – We are obliged to settle the sell through with Wynit.

In the meantime, we will provide you with weekly sales data. If you have further questions, please reach out to your associated Staples category managers.


Regards,


Betty Leung

Category Manager

betty.leung@staples.ca

905-737-1147 x 2385

93

**Jaipargas, Roger**

| | |
|---|---|
| **Subject:** | FW: Sku Transfer Agreement - Sage |
| **Attachments:** | Wynit transfer of consigned product from Best Buy.pdf |

**From:** Burrows, Amy (Best Buy Canada) [mailto:ammclaug@bestbuycanada.ca]
**Sent:** Friday, September 08, 2017 4:50 PM
**To:** Villarosa, Michelle <Michelle.Villarosa@sage.com>; Hardy, Richard <Richard.Hardy@sage.com>
**Subject:** Sku Transfer Agreement - Sage

Hi Michelle and Richard,

Attached is the signed document we have singed by Wynit and Best Buy Canada. This states as of Aug 31 the inventory is no longer responsible to Wynit.

We will need to wait until we have all setup with Ingram before we can transfer the inventory and get logs setup.

That said, we believe we will also need a letter from Sage stating that along with our attached document, you agree to have us transfer the inventory to your new distributor. I imagine this would be a similar document to the attached, maybe including detail about sales owed and logs to be made up for.

Let me know if you want to discuss.

Thanks,

**Amy Burrows|** Merchandise Manager – Software
Best Buy Canada Ltd. | 604-412-1098 | ammclaug@bestbuycanada.ca

This is Exhibit "........I........" referred to in the
affidavit of ....RICHARD  HARDY........
Sworn before me on SEPTEMBER  20, 2017
........................................
A Commissioner for taking Affidavits
for British Columbia

Best Buy Canada Ltd., 8800 Glenlyon Parkway, Burnaby, BC, Canada V5J 5K3
BestBuy.ca / Privacy Policy / Unsubscribe
BestBuy.ca / Politique sur la confidentialité / Se désabonner

---

**Attention:**
This email has arrived from the internet.
Please use caution when opening attachments. Please follow all appropriate security policies when opening any email from a non-trusted source. If you feel this message is suspect please contact your local security representative or Help Desk for review.
**See you at #SageSummit Tour 2017. Learn More**
Paris | Madrid | Melbourne | Berlin | Johannesburg | Singapore | London | Atlanta | Toronto

*Sage Summit goes local. Business Builders, Build On!*

The information contained in this email transmission may constitute confidential information. If you are not the intended recipient, please take notice that reuse of the information is prohibited.

Best Buy Canada Ltd., 8800 Glenlyon Parkway, Burnaby, BC, Canada V5J 5K3
BestBuy.ca / Privacy Policy / Unsubscribe
BestBuy.ca / Politique sur la confidentialité / Se désabonner

1

34

**SKU Transfer Agreement**

Effective Date: August 31, 2017

This SKU Transfer Agreement is entered into by Best Buy Canada Ltd., a Canadian corporation, having its principal office at 8800 Glenlyon Parkway, Burnaby, British Columbia, V5J 5K3 ("Best Buy") and WD Navarre Canada, ULC, an unlimited liability Nova Scotia company ("Wynit").

Whereas Wynit on its behalf and on behalf of all affiliated (parent and subsidiary) companies has made available products, identified on the attached Exhibit A which is incorporated hereing by reference, for sale through Best Buy sales channels (the "Consignment Products"); and

Whereas Wynit desires to cease all consignment related activation of Best Buy's current on-hand inventory of Consignment Products.

The Parties agree as follows:

1) Best Buy and Wynit will work in good faith to reconcile for Consignment Products sales occurring prior to the Effective Date.
2) Best Buy is no longer responsible to Wynit for any sums otherwise owed or related to sales of the Consignment Products occurring on or after the Effective Date.
3) All consignment activities following the Effective Date will be conducted between Best Buy and alternate providers.

**WD NAVARRE CANADA, ULC**

Sign: _____

Print: __UNRED TrommS__

Title: __VP__

Date: __9/8/17__

**BEST BUY CANADA LTD.**

Sign: _____

Print: __MARTIN VIH-IAN VELOW__

Title: __VP__

Date: __9/8/17__

35

Court File No.: CV-17-582329-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF CERTAIN PROCEEDINGS TAKEN IN THE UNITED STATES BANKRUPTCY COURT WITH RESPECT TO WD NAVARRE CANADA, ULC and (the "Local Debtor")

APPLICATION OF WYNIT DISTRIBUTION, LLC UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*

|  |  |
|---|---|
|  | ***ONTARIO*** <br> **SUPERIOR COURT OF JUSTICE** <br> **(COMMERCIAL LIST)** <br><br> Proceedings Commenced at Toronto |
|  | **AFFIDAVIT OF RICHARD HARDY** <br> **(Sworn September 20, 2017)** |
|  | **BORDEN LADNER GERVAIS LLP** <br> Bay Adelaide Centre, East Tower <br> 22 Adelaide Street West <br> Toronto, ON  M5H 4E3 <br><br> **Roger Jaipargas - LSUC No. 43275C** <br> Tel:  416-367-6266 <br> Email: rjaipargas@blg.com <br><br> Lawyers for Sage Software, Inc., <br> and Sage Software Canada Ltd. |

TOR01: 7049469: v2